UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

RED ROCK SOURCING LLC, a Nevada limited
liability company; and CORONADO
DISTRIBUTING LLC, a Colorado limited liability
company,

                              Plaintiffs,

              - against -

JGX, LLC, a New York limited liability company;
LIBERTY INTERNATIONAL DISTRIBUTORS,
LLC, a New York limited liability company;
TRIPLE FIVE WORLDWIDE, LLC, a Nevada
limited liability company; ISAAC IMPORT, INC.,
a New York corporation; JACK GRAZI, an
individual; ISAAC SABA, an individual; ELIEZER
BERKOWITZ, an individual; DAVID
GHERMEZIAN, an individual; and YONAH
GHERMEZIAN, an individual,

                              Defendants.

**FIRST AMENDED COMPLAINT**

1:21-cv-01054-JPC

**DEMAND FOR JURY TRIAL**

On Lu (admitted *pro hac vice*)
Andrew H. Winetroub
(admitted *pro hac vice*)
**NIXON PEABODY LLP**
One Embarcadero Center
San Francisco, California
94111-3600
Tel: (415) 984-8200
Fax: (415) 984-8300

Daniel A. Schnapp
**NIXON PEABODY LLP**
55 West 46th Street
New York, NY 10036-4120
Tel: (212) 940-3000
Fax: (212) 940-3111

Erin T. Huntington
**NIXON PEABODY LLP**
677 Broadway, 10th Fl.
Albany, NY 12207
Tel: (518) 427-2650
Fax: (518) 427-2666

*Attorneys for Plaintiffs Red Rock Sourcing LLC and Coronado Distributing LLC*

Plaintiff Red Rock Sourcing LLC (hereinafter referred to as "**Red Rock**") and Plaintiff Coronado Distributing LLC (hereinafter referred to as "**Coronado**", and, together with Red Rock, the "**Plaintiffs**"), by and through their undersigned attorneys bring this First Amended Complaint against Defendants JGX, LLC (hereinafter referred to as "**JGX**"), Liberty International Distributors, LLC (hereinafter referred to as "**Liberty**"), Triple Five Worldwide, LLC (hereinafter referred to as "**Triple Five Worldwide**"), Isaac Import, Inc. (hereinafter referred to as "**Isaac Import**"), Jack Grazi (hereinafter referred to as "**Grazi**"), Isaac Saba (hereinafter referred to as "**Saba**"), Eliezer Berkowitz (hereinafter referred to as "**Berkowitz**"), David Ghermezian, and Yonah Ghermezian (collectively, JGX, Liberty, Triple Five Worldwide, Isaac Import, Grazi, Saba, Berkowitz, David Ghermezian, and Yonah Ghermezian are referred to herein as the "**Defendants**") for violation of 18 U.S.C. § 1962 (Racketeer Influenced and Corrupt Organizations Act); trademark infringement, contributory trademark infringement, false designation of origin and unfair competition under the Lanham Act, and false advertising under the Lanham Act, 15 U.S.C. §§ 1051 *et seq*.; deceptive business practices under the New York General Business Law; trademark infringement, tortious interference with prospective economic relations, unfair competition, unjust enrichment, dilution, and negligence under New York common law; and dilution by tarnishment under the New York General Business Law.

## INTRODUCTION

1.      This case arises out of Defendants' shocking, illegal, and fraudulent scheme at the height of the COVID-19 pandemic to enrich themselves with callous indifference to the public safety and health of the American people.  Defendants blatantly disregarded Plaintiffs' valuable trademarks, and in the process, destroyed not only the goodwill associated with those marks, but also Plaintiffs' entire business.  Taken together, Defendants committed a wholesale theft of

Plaintiffs' business and established goodwill. Defendants are responsible for importing into the United States, hundreds of thousands of bottles of illicit and potentially dangerous hand sanitizer that may still be circulating in commerce.

2. URBĀNE was a premium brand of hand sanitizer created and developed by Plaintiffs that was "made in the USA," and sold to national retailers such as *Pilot Travel Centers, Dicks Sporting Goods, Love's,* and *Tractor Supply,* and Plaintiffs were in final negotiations with *Rite Aid* for a national roll-out. Taking advantage of URBĀNE's recognized brand, and hoping to insert itself into Plaintiffs' existing supply chain, Defendants worked in concert to manufacture counterfeit URBĀNE hand sanitizer produced in Mexico. Defendants' inexperience, lack of due diligence, and gross negligence was worsened by their selection of a manufacturer for the counterfeit production. That Mexican factory was ultimately exposed by the FDA for using potentially inferior alcohol that resulted in methanol contamination in some of its hand sanitizer batches. (Methanol, or wood alcohol, is a substance that can be toxic when absorbed through the skin and can be life-threatening when ingested.) The factory, along with the URBĀNE brand, was put on the FDA's DO NOT USE list, and the public was instructed to "stop using it immediately…. (and) throw it away in a hazardous waste container."

3. Defendants' illegal actions have irreparably decimated Plaintiffs' business, goodwill, and valuable trademarks, for which the Court should impose both corporate and individual liability as well as punitive damages on all of the Defendants.

## JURISDICTION AND VENUE

4. This Court has subject matter jurisdiction over Coronado and Red Rock's claims pursuant to 18 U.S.C. § 1964, 15 U.S.C. § 1121, 28 U.S.C. §§ 1331 and 1338(a) because the claims at issue arise, *inter alia*, under the Racketeer Influenced and Corrupt Organizations (RICO) Act,

4887-2467-6877.2

18 U.S.C. §§ 1961 *et seq*., and the Lanham Act, 15 U.S.C. §§ 1051 *et seq.* In addition, supplemental jurisdiction over the related state law claims is conferred upon this Court by 28 U.S.C. § 1367(a).

5.  This Court has personal jurisdiction over Defendants, including under N.Y.C.P.L.R. Sections 301 and 302, because, upon information and belief, Defendants JGX, Liberty, Isaac Import, Grazi, David Ghermezian, and Yonah Ghermezian are citizens of this State; Defendants consummated transactions by which they purposefully directed activities toward this State; all Defendants have regularly transacted, and continue to transact, business in this State; all Defendants contracted to supply goods and/or services in this State; all Defendants are responsible for the counterfeit goods and/or property at issue likely being located in this State; all Defendants are causing and have caused tortious injury by an act in this State; and all Defendants are causing tortious injury in this State by an act outside this State where they regularly do or solicit business, engages in other persistent courses of conduct, and/or derives substantial revenue from goods used or consumed, or services rendered, in this State.

6.  The exercise of personal jurisdiction over these Defendants comports with due process.

7.  Venue is proper in this judicial district and Court pursuant to 28 U.S.C. § 1391 because a substantial part of the acts complained of herein occurred in this judicial district, and Defendants are subject to personal jurisdiction in this judicial district as aforesaid.

## THE PARTIES

8.  Plaintiff Coronado Distributing LLC is a Colorado limited liability company with a principal place of business located at 22354 Uintah Road, Lone Tree, Colorado 80124.

9.     Plaintiff Red Rock Sourcing LLC is a Nevada limited liability company with a principal place of business located at 404 Lake Windemere Street, Las Vegas, Nevada 89138.

10.     Defendant JGX, LLC is a New York limited liability company with a principal place of business in Kings County, New York.

11.     Defendant Liberty International Distributors, LLC is a New York limited liability company with a principal place of business in Albany County, New York.

12.     Defendant Triple Five Worldwide, LLC is a Nevada limited liability company with, upon information and belief, a principal place of business in East Rutherford, New Jersey.

13.     Defendant Isaac Import, Inc. is a New York corporation with, upon information and belief, a principal place of business in Kings County, New York.

14.     Defendant Jack Grazi is an individual who, upon information and belief, resides in Brooklyn, New York.

15.     Defendant Isaac Saba is an individual who, upon information and belief, resides in Mexico City, Mexico.

16.     Defendant Eliezer Berkowitz is an individual who, upon information and belief, resides in the State of New Jersey.

17.     Defendant David Ghermezian is an individual who, upon information and belief, resides in the State of New York.

18.     Defendant Yonah Ghermezian is an individual who, upon information and belief, resides in the State of New York.

4887-2467-6877.2

## FACTUAL BACKGROUND

### *The Rights in and to the URBĀNE Marks and Brand*

19.     Red Rock and Coronado are engaged in the manufacture, marketing, sale, and distribution of hand sanitizer; fragranced body care products such as shower gels, bath gel, and body scrubs; and non-medical bath bombs and salts.  Red Rock and Coronado often work together in developing, promoting, and selling these products to consumers nationwide.

20.     Coronado is the registered owner of U.S. Trademark Registration No. 6,068,164, registered on June 2, 2020, for the mark URBĀNE BATH & BODY registered in connection with *Fragranced body care preparations, namely, shower gels, bath gel, body scrubs; Bath bombs; Bath salts, not for medical purposes; Bath and shower gels and salts not for medical purposes* in Class 3 with a date of first use of August 1, 2019 (the "**164 Registration**").  A copy of the registration certificate for the '164 Registration is attached hereto as **Exhibit A**.

21.     Since August 1, 2019, Coronado has exclusively and continuously used in U.S. commerce its distinctive URBĀNE BATH & BODY mark in connection with the sale of *Fragranced body care preparations, namely, shower gels, bath gel, body scrubs; Bath bombs; Bath salts, not for medical purposes; Bath and shower gels and salts not for medical purposes* in U.S. commerce.

22.     Coronado is also the registered owner of U.S. Trademark Registration No. 6,295,360, registered on March 16, 2021 with a date of first use at least as early as April 2020, for the URBANE BATH & BODY word mark in connection with *Hand-sanitizing preparations* in Class 5 (the "**360 Registration**").  A copy of the '360 Registration is attached hereto as **Exhibit B**.

4887-2467-6877.2

23.     In addition, Coronado is the registered owner of U.S. Trademark Registration No.

6,348,225, registered on May 11, 2021, for the [URBĀNE] mark in connection with *Hand-sanitizing*

*preparations* in Class 5 (claiming a date of first use of at least as early as April 2020), and with

*Fragranced body care preparations, namely, shower gels, bath gel, body scrubs; Bath bombs;*

*Bath salts, not for medical purposes; Bath and shower gels and salts not for medical purposes* in

Class 3 (claiming a date of first use of at least as early as August 2019) (the "'**225 Registration**",

and, collectively with the '164 Registration and the '360 Registration, the "**URBĀNE Marks**").

A copy of the '225 Registration is attached hereto as **Exhibit C**.

24.     Since at least as early as April 2020, Coronado has continuously used its distinctive

URBĀNE BATH & BODY mark in connection with the sale of *Hand-sanitizing preparations* in

U.S. commerce.

25.     Coronado is the owner of all intellectual property rights in and to its distinctive

URBĀNE Marks, including without limitation the '164 Registration, '360 Registration, and the

'225 Registration.

26.     Through Coronado's continuous use of the URBĀNE BATH & BODY mark, it has

also established common law rights in and to its mark for use with at least those goods set forth in

the URBĀNE Marks as referenced herein.  True and correct images showing use of the marks are

attached hereto as **Exhibit D**.  Such common law rights and the goodwill in and to the URBĀNE

BATH & BODY mark, together with the URBĀNE Marks, are collectively referred to herein as

the "**URBĀNE Brand**".

### *The Covid-19 Pandemic and Development of Hand Sanitizer Under the URBĀNE Brand*

27.     The Covid-19 pandemic has been a once-in-a-lifetime catastrophe that has wrought

illness and death around the world.  The pandemic reached the United States in early 2020.

6

28.     Americans were forced to rapidly prepare for the inevitable spread of the virus.  In the United States, demand for a wide range of protective equipment and essential personal goods surged.  This surge in demand coincided with disruption to global supply chains, retail businesses shutting their doors, and workers confining themselves to their homes.

29.     As a result, a significant number of communities and retail outlets experienced shortages of highly sought after goods such as toilet paper, various nonperishable foods, and hand sanitizer.  This period of time was also marked by significant uncertainty about Covid-19's impact economically and on individuals' health and safety.

30.     It was at this time that Red Rock and Coronado commenced work on creating an American-made hand sanitizer that consumers acutely needed, and retailers were eager to supply. Red Rock and Coronado are both run by entrepreneurs with decades' worth of collective experience in sourcing, producing, and distributing products for consumers.

31.     In its efforts to develop and produce hand sanitizer, Red Rock was building on its expertise in sourcing materials, operating and expanding distribution networks, and developing and growing relationships with customers.

32.     Accordingly, Plaintiffs determined that Red Rock would be the entity through which hand sanitizer under the URBĀNE Brand would be brought to the public.  Red Rock was best suited to manage development of the product, create the requisite supply chain, build out inventory, and handle sales and distribution to customers.  In fact, Red Rock successfully took each of those steps and would have continued to build on them but for Defendants' wrongful acts.

33.     As the owner of the URBĀNE Brand, Coronado invested heavily in developing the brand prior to the onset of Covid-19.

34. As a result of Coronado's development of and investment in the URBĀNE Brand, Plaintiffs were able to go to market with a "Made in the USA" hand sanitizer that bore an established mark that retailers and consumers could readily trust and identify.

35. Ultimately, Plaintiffs' efforts led to the development of a hand sanitizer that met the needs of consumers and the market. The hand sanitizer Plaintiffs' created was at least 70% alcohol, made in the United States, and ready for production and distribution.

36. In addition to Plaintiffs successfully developing an urgently needed hand sanitizer, Coronado had already established the URBĀNE Brand in connection with other personal care goods, particularly bath products. As a result, Plaintiffs were prepared to go to market more quickly than many potential competitors, and with a high quality hand sanitizer under an established brand in use by early April 2020.

37. In order to meet consumers' urgent needs and the market's overwhelming demand for high quality hand sanitizer, Red Rock imported large volumes of bottles and sprayers from its international sources and worked with two domestic bottling companies to fill those bottles with hand sanitizer bearing the URBĀNE Brand.

38. The URBĀNE Brand hand sanitizer was unique in at least three respects: (1) it utilized a high quality formula that was equally effective without the associated foul-smell of typical sanitizer; (2) it was "Made in America" which particularly appealed to U.S. consumers; and (3) it came in a credit card-sized sprayer that was prized by consumers and retailers alike.

39. As a result, Red Rock was well positioned to bring critically needed hand sanitizer to the consuming public at the outset of the Covid-19 pandemic. In fact, Red Rock successfully began selling hand sanitizer under the URBĀNE Brand in April 2020, just as the virus commenced its harrowing first peak in the United States.

4887-2467-6877.2

*__Defendants Misappropriate the URBĀNE Brand to Produce Counterfeit Hand Sanitizer__*

40.     As a result of Defendants' actions, as set forth herein, the URBĀNE Brand was irreparably tarnished and Plaintiffs' growth trajectory halted, and their substantial business goodwill diminished, almost overnight.

41.     Beginning in or about late April 2020, Defendants' collectively worked together to cause hundreds of thousands, and possibly millions, of bottles of hand sanitizer bearing counterfeit imitations of the URBĀNE Brand to be produced and imported into the United States from Mexico, many of which are not accounted for and are likely still circulating in interstate commerce. As a result, a specific and ongoing threat of repetition of the wrongful acts committed by these Defendants persists.

42.     The unauthorized and illegal hand sanitizer product(s) produced as a result of Defendants' actions and bearing a spurious mark identical to or substantially indistinguishable from the URBĀNE Brand are referred to herein as the "**Disputed Products**".  True and correct images showing examples of the fraudulent URBĀNE branding on the Disputed Products is attached hereto as **Exhibit E**.  In fact, Defendants' collective actions included the wholesale theft of Plaintiffs' business and intellectual property.

43.     Many of the Disputed Products were ultimately sold to merchants and consumers.

**i.      Rigz and Its Principals Convert Authorized Use of the URBĀNE Brand Into a Scheme to Obtain Counterfeit Hand Sanitizer**

44.     Prior to the outset of the Covid-19 pandemic, Red Rock had established a business relationship with Rigz, LLC ("**Rigz**"), an Arizona limited liability company.  Red Rock's primary point of contact at Rigz was Anthony Carelli ("**Carelli**"), a sales executive.

45.     Through that relationship, Red Rock and Rigz regularly communicated regarding their respective distribution businesses and opportunities they observed in the market. Shortly after Red Rock commenced its production of hand sanitizer under the URBĀNE Brand, based on this foundation of trust and overlapping interests, Red Rock began selling the hand sanitizer to Rigz.

46.     Red Rock's early sales of URBĀNE hand sanitizer to Rigz were robust. In fact, in the first three months of sales, commencing in early April 2020, Red Rock sold more than $2,000,000 worth of URBĀNE hand sanitizer to Rigz.

47.     In turn, Rigz successfully placed URBĀNE hand sanitizer into a number of national businesses, including Pilot Travel Centers and Love's Travel Stops & Country Stores with over 2,000 combined stores located across the country. In the short period of time following its launch, URBĀNE hand sanitizer was successfully growing its presence in the market as a Made in the USA product and generating significant revenues and profits.

48.     Beyond Red Rock's sales to Rigz, Red Rock also sold URBĀNE hand sanitizer to customers like Tractor Supply Company. Early in the pandemic, URBĀNE hand sanitizer was being sold in Tractor Supply Company's approximately 1,900 stores.

49.      At the earliest stages of the pandemic, Red Rock was already demonstrating its ability to provide URBĀNE hand sanitizer to the market, even as it was ramping up its long-term product and distribution capabilities.

50.     Red Rock was also developing plans to market and sell its increasingly successful URBĀNE hand sanitizer to, among others, customers with whom Red Rock had existing relationships, including a number of national retailers.

4887-2467-6877.2

51.     As a result of such early and rapid success with selling URBĀNE hand sanitizer, Red Rock, among other things, sourced and imported from China, 2,000,000 empty bottles to package the URBĀNE hand sanitizer that would be Made in the United States.

52.     Yet, such early success selling authentic URBĀNE hand sanitizer was not enough for Rigz and its principals (Jarrett Portz ("**Portz**") and Carelli), who were intent on maximizing their profits during the early days of the Covid-19 pandemic.

53.     Without Red Rock or Coronado's knowledge, Rigz began looking for other sources to supply hand sanitizer. Rigz sought hand sanitizer from other vendors with the intent to use the URBĀNE Brand on that hand sanitizer. Rigz did not request, seek, or care whether it had approval from Red Rock or Coronado to use the URBĀNE Brand.

54.     At no point did Red Rock or Coronado authorize, approve of, or acquiesce to Rigz soliciting or otherwise engaging in such business activities using the URBĀNE Brand.

55.     In late April 2020, Carelli contacted Grazi, principal of JGX, in New York regarding Rigz's interest in and need for hand sanitizer. Shortly thereafter, on April 23, 2020, Carelli sent an email to Grazi to provide him with the URBĀNE label – which was identical or substantially indistinguishable from the authentic URBĀNE label – for use on hand sanitizer that JGX was to produce at Carelli and Rigz's request. A true and correct copy of Carelli's April 23, 2020 email to Grazi is attached hereto as **Exhibit F**.

ii.     **Rigz and JGX Work Together to Produce Counterfeit URBĀNE Hand Sanitizer for Consumption in the United States**

56.     JGX is a sophisticated apparel company with expertise in and a history of obtaining trademarks, including multiple trademark registrations relating to athletic apparel. Despite the

incongruence with its core business, and the large volume of hand sanitizer Rigz was requesting, Grazi and Carelli eagerly discussed JGX sourcing hand sanitizer for Rigz.

57. The discussions between Grazi and Carelli led to Rigz issuing an initial purchase order to JGX, on or about April 27, 2020, for 331,250 bottles of hand sanitizer under trademarks and/or designations identical to or substantially indistinguishable from the URBĀNE Brand.

58. Approximately fourteen minutes after Grazi received the purchase order issued by Rigz on April 27, 2020, Grazi forwarded the correspondence to Dib Jaradeh of Isaac Import. Grazi and Dib Jaradeh of Isaac Import subsequently exchanged communications, including but not limited to a telephone call with Carelli on April 30, 2020, to discuss and finalize critical details related to, among other things, the quantity of hand sanitizer under the counterfeit URBĀNE label to be produced as well as specifics regarding the pricing, manufacturing, and shipping of the bottles.

59. Rigz needed JGX to use the URBĀNE Brand, specifically, because its customers were expecting to purchase and receive hand sanitizer under the URBĀNE Brand and with its particular UPC.

60. Prior to agreeing to source hundreds of thousands of bottles of hand sanitizer for Rigz using the URBĀNE label, JGX never contacted Coronado, the owner of the URBĀNE Brand, to inquire as to whether Rigz had the authority to contract for the manufacture, distribution, and sale of URBĀNE hand sanitizer.

61. Coronado never approved of or consented to Rigz independently using the URBĀNE Brand. As such, Rigz could not have provided JGX with any evidence that it was, in fact, authorized to issue a purchase order for URBĀNE hand sanitizer.

4887-2467-6877.2

62.     In addition, Nouri Jaradeh, a principal of JGX, researched Coronado, the registered owner of the URBĀNE Marks, in May 2020 and corresponded with Grazi with respect to his findings. Despite that, JGX knowingly and willingly used the URBĀNE Brand on a massive scale in furtherance of the counterfeiting scheme.

63.     Dib Jaredeh of Isaac Import repurposed the URBĀNE label provided by Carelli to create a counterfeit version of the URBĀNE label for use on various unauthorized sanitizer bottles and products. A true and correct copy of Dib Jaradeh's email to Jack Grazi is attached hereto as **Exhibit G**.

64.     Upon information and belief, Isaac Import knew that Grazi and JGX intended to, and in fact did, use the counterfeit URBĀNE label in connection with marketing, producing, and selling hand sanitizer under the URBĀNE Brand without any lawful right to do so.

65.     In connection with a nationwide recall necessitated by the FDA placing URBĀNE hand sanitizer from Mexico on its list of products not to use or sell, one of the customers defrauded by Defendants' counterfeiting scheme, Pilot Travel Centers, produced the following side-by-side comparison of an authentic URBĀNE label with the counterfeit label created by Isaac Import and widely distributed and used by Defendants:



66.     Throughout the counterfeiting scheme, Grazi corresponded with Isaac Import through email communications with Dib Jaradeh. Upon information and belief, Grazi would often forward communications to Isaac Import that were directed to JGX on their face, thereby blurring the distinction between two purportedly separate companies.

67.     Grazi began circulating the URBĀNE label and representing that he was entitled to use it. A true and correct copy of an email sent on May 5, 2020 by Grazi, and copying Dib Jaradeh of Isaac Import, to solicit the manufacture of hand sanitizer under the counterfeit URBĀNE label created by Isaac Import is attached hereto as **Exhibit H.**

68.     A simple search on Google, let alone a trademark database search, as would be expected of an entity like JGX that owns multiple trademark registrations, would have revealed the illegality of its hand sanitizer business enterprise with Rigz.

69. In committing these acts, among other things, Grazi misused the corporate form for his personal benefit. Additionally, Grazi actively and individually participated in the wrongful and unlawful conduct, as set forth herein, committed by or for the benefit of JGX.

### iii. Amoyelle Joins the Counterfeiting Scheme Due to His Manufacturing Contacts in Mexico

70. Around the time JGX completed its first order with Rigz, JGX, upon information and belief, made use of email, telephone calls, and/or other wired transmissions to contact Amoyelle, principal of Liberty, an entity formed in or around April 2020 and lacking any significant previous experience or expertise in the production of hand sanitizer. JGX had never worked with Liberty before but made contact because of Liberty's manufacturing contacts in Mexico.

71. Upon information and belief, in order to secure Liberty's assistance in manufacturing the URBĀNE hand sanitizer sought by Rigz, JGX provided Liberty with assurances regarding the purchase order Rigz issued for hundreds of thousands of bottles.

72. For use in producing hand sanitizer under a counterfeit imitation of the URBĀNE Brand, on April 30, 2020, Grazi provided Liberty with the artwork necessary to depict and use the URBĀNE Brand, including the URBĀNE logo. A true and correct copy of Grazi's April 30, 2020 email to Amoyelle is attached hereto as **Exhibit I**.

73. Upon information and belief, Amoyelle questioned whether Grazi and JGX had authority to use the URBĀNE Brand, yet Amoyelle and Liberty willingly proceeded to associate with JGX in the production, distribution, and importation of counterfeit URBĀNE hand sanitizer.

74. Specifically, in late April or early May 2020, Liberty communicated with a manufacturer in Mexico, Tropicosméticos S.A. de C.V. ("**Trop**"), regarding the production and

bottling of hand sanitizer to fill the purchase order Rigz issued to JGX using trademarks and/or designations identical to or substantially indistinguishable from the URBĀNE Brand.

75.     Upon information and belief, in response to Liberty's order(s), Trop provided Liberty with an initial shipment of Disputed Products in or around late April or early May 2020. Subsequently, upon information and belief, Liberty and JGX successfully imported the counterfeit bottles into the United States.

76.     Liberty desired to produce additional quantities of counterfeit URBĀNE hand sanitizer, but, upon information and belief, Liberty was largely cut out of the counterfeiting scheme when the Ghermezian and Saba families, with their overwhelming financial resources and name recognition, became involved with JGX.

77.     Prior to consummating its arrangement with JGX, Liberty never contacted Coronado, the owner of the URBĀNE Brand, to inquire as to whether JGX or Rigz had the authority to contract for the manufacture, distribution, and sale of URBĀNE hand sanitizer. As with JGX, Liberty willfully disregarded its ability to discover Coronado's ownership of the URBĀNE Brand through readily available public sources.

### iv.     The Counterfeiting Scheme Expands to Others Seeking to Profit Off the Pandemic, Including Numerous Members of the Ghermezian Family

78.     Around the same time that Grazi and Carelli were cementing their plans to produce hand sanitizer under the URBĀNE Brand, multiple members of the Ghermezian family held a meeting at Don Ghermezian's house in New York to discuss launching a hand sanitizer business. The attendees at the meeting included, without limitation, Don Ghermezian, David Ghermezian, Yonah Ghermezian, Saba, and family acquaintance Berkowitz.

4887-2467-6877.2

79.    These Ghermezian family members believed that significant amounts of money could be made by selling hand sanitizer as a result of concerns about Covid-19, and they sought to build a business to take advantage of it.

80.    Upon information and belief, the Ghermezian family faced acute financial pressures at this time as their ownership of and investments in some of the largest in-person retail operations in the world, including without limitation the Mall of America, American Dream, and West Edmonton Mall, was at odds with the widespread lockdowns imposed by state and local governments during this phase of the Covid-19 pandemic.

81.    Following the kick-off meeting for the hand sanitizer business at Don Ghermezian's house, David Ghermezian, Berkowitz, and Yonah Ghermezian began their efforts to rapidly break into the hand sanitizer market.

82.    During this time, David Ghermezian and Berkowitz became aware of Grazi's interest in obtaining hand sanitizer through a mutual acquaintance, Eli Fox.  Sometime prior to May 6, 2020, Grazi, on the one hand, and Berkowitz and/or David Ghermezian, on the other hand, made contact and agreed to collaborate in obtaining and selling hand sanitizer.

83.    On May 6, 2020, Grazi sent Berkowitz the URBĀNE label for use on 2 ounce, 8 ounce, and 16 ounce bottles of hand sanitizer.  A true and correct copy of the May 6, 2020 email that Grazi sent to Berkowitz is attached hereto as **Exhibit J**.

84.    That same day, May 6, 2020, JGX issued at least five purchase orders for more than 660,000 bottles of hand sanitizer.  Those purchase orders were sent by Grazi to Berkowitz, Dib Jaradeh of Isaac Import, and Nouri Jaradeh, co-principal of JGX.  Of those purchase orders, three of them called for a total of 594,880 bottles of hand sanitizer to be shipped to JGX in Lake Havasu, Arizona, where Rigz's principal place of business is located.

85. Within hours of Berkowitz receiving the purchase orders from Grazi for hundreds of thousands of bottles of hand sanitizer, Berkowitz forwarded Grazi's email with the purchase orders to Saba. The very next day, Berkowitz then forwarded Grazi's email to David Ghermezian and Yonah Ghermezian. At this point, Berkowitz, David Ghermezian, and Saba were corresponding about when production of hand sanitizer under the URBĀNE label could commence.

**v. The Ghermezians Use Triple Five Worldwide, LLC as their Vehicle to Trade in Counterfeit Hand Sanitizer**

86. Only after Berkowitz, Saba, David Ghermezian, and Yonah Ghermezian had begun soliciting and taking orders for hundreds of thousands of bottles of hand sanitizer, most if not all of which included the URBĀNE label, did they start to run their operation through Triple Five Worldwide.

87. Triple Five Worldwide was formed as a Nevada limited liability company in June 2000. At least as late as May 6, 2020, the managing members of Triple Five Worldwide were Don Ghermezian, Nader Ghermezian, and Syd Ghermezian. A true and correct copy of the State of Nevada's business portal record for Triple Five Worldwide, with information dated as of May 7, 2020, is attached hereto as **Exhibit K**.

88. Upon information and belief, an entirely new slate of managing members for Triple Five Worldwide were put in place – substituting out the preceding managing members – on or about May 7, 2020. At that point, Berkowitz, Saba, and Orly Ghermezian Saba were listed as the managing members. A true and correct copy of the State of Nevada's business portal record for Triple Five Worldwide, with information dated as of June 29, 2021, is attached hereto as **Exhibit L**.

4887-2467-6877.2

89. Once Berkowitz, Saba, and Orly Ghermezian Saba were in place as managers, on or around May 8, 2020, Triple Five Worldwide began making and receiving payments, as well as placing and receiving orders for hand sanitizer.

90. Berkowitz, Saba, David Ghermezian, and Yonah Ghermezian misused the corporate form for their personal benefit.

91. Among other things, Triple Five Worldwide also lacked corporate formalities; possesses no tax records; Berkowitz, David Ghermezian, and Yonah Ghermezian conducted business on behalf of the company using email accounts provided by other entities; and the telephone number and address for Triple Five Worldwide, as evidenced by the invoices it issued, are connected to a different company.

92. Upon information and belief, replacing the preceding managing members of Triple Five Worldwide with Berkowitz, Saba, and Orly Ghermezian Saba, did not reduce the role and/or responsibility of the company's prior managers.

93. Indeed, on or about May 7, 2020, Saba sent a message to David Ghermezian in which he stated there was a Nevada company that already had the requisite DUNS [Data Universal Numbering System] Number that could be used if his father-in-law (Don Ghermezian) wanted to use that entity to operate the new business.

94. The existing Nevada company that Saba referenced in his May 7, 2020 message to David Ghermezian was Triple Five Worldwide.

95. In fact, a discussion among senior members of the Ghermezian family (including Don Ghermezian and David Ghermezian, along with Eli Berkowitz), as well as employees of two of the largest malls in North America (West Edmonton Mall and American Dream), determined that Triple Five Worldwide would be a key part of a business that would source and sell hand

sanitizer globally. Attached hereto as **Exhibit M** is a true and correct copy of an email, dated May 7, 2020, in which the structure and purpose of Triple Five Worldwide was set forth in detail.

96. Triple Five Worldwide sent invoices to JGX, LLC and Benzion (Benjamin) Tyberg (hereinafter referred to as "**Tyberg**") for hand sanitizer under the URBĀNE label. These invoices were created and sent by Yonah Ghermezian. Attached hereto as **Exhibit N** is a true and correct copy of one of the invoices Triple Five Worldwide issued to Grazi and JGX.

97. Grazi would apprise Isaac Import of the invoices Triple Five Worldwide issued to JGX.

98. Triple Five Worldwide also made and received payments worth hundreds of thousands of dollars in connection with counterfeit URBĀNE hand sanitizer. In particular, Triple Five Worldwide both made wire payments to and received wire payments from a number of entities and individuals who participated in the production and distribution of counterfeit hand sanitizer, including JGX, SoFlo Urban Team LLC, Click Concierge Services, Jacob Abramsky, and Teresa Ibarra Menendez.

99. Yet, Berkowitz, Saba, David Ghermezian, and Yonah Ghermezian continued to conduct business using their personal WhatsApp accounts, their personal telephones, and generally without any reference to an affiliation with a distinct business entity, Triple Five Worldwide.

100. Further, Berkowitz, Saba, David Ghermezian, and Yonah Ghermezian actively participated in the wrongful and unlawful conduct, as set forth herein, committed by or for the benefit of Triple Five Worldwide.

### vi. Production of Counterfeit Hand Sanitizer Quickly Ramps Up in Mexican Factories

101.     On or around May 6, 2020, Berkowitz, Saba, and David Ghermezian began corresponding frequently and in detail about their hand sanitizer endeavors, including pricing, managing customer relationships and expectations, manufacturing and importing issues, labeling, and receiving/making payments.

102.     Berkowitz, Saba, David Ghermezian, and Yonah Ghermezian also corresponded regularly with Grazi during this time period, with particular frequency during May and June 2020. Grazi told David Ghermezian that he had the authority to use and sell hand sanitizer using the URBĀNE label, and Triple Five Worldwide and its principals proceeded as fast as they could to produce product using that label.

103.     By on or about May 8, 2020, hand sanitizer using the URBĀNE label was being mass produced in a factory in Mexico and placed into boxes for shipment to the United States. True and correct images captured in one of the factories in which the counterfeit URBĀNE hand sanitizer was produced are attached hereto as **Exhibit O**.

104.     Grazi was desperate to fill Rigz's orders for hundreds of thousands of bottles of URBĀNE hand sanitizer, and, when production issues arose, Grazi turned to Berkowitz, Saba, and David Ghermezian for answers since they had the direct relationship with the factories in Mexico charged with producing the illicit hand sanitizer.

105.     Saba was in direct communication with the factory manufacturing hand sanitizer under the counterfeit URBĀNE label, and acted as a key conduit for information by and between Grazi, JGX, Triple Five Worldwide, and its principals.

106.     During this time, Portz and Carelli were applying relentless pressure on Grazi regarding their need to acquire URBĀNE hand sanitizer, as Rigz was intent on meeting demand for URBĀNE hand sanitizer from its customers (*e.g.*, Pilot and Love's).  Portz and Carelli both sent numerous communications to Grazi, using, upon information and belief, their personal telephones, email addresses (at least in part), and WhatsApp accounts, to demand that he produce as much URBĀNE hand sanitizer as possible as fast as possible.  At one point, on or about May 10, 2020, Portz went so far as to tell Grazi that he would put a crew of people on his personal airplane so that URBĀNE hand sanitizer could be distributed more quickly.

107.     In an effort to address issues that were slowing down production and distribution, Grazi sent multiple video messages that, upon information and belief, leveraged his personal relationship with the powerful Ghermezian and Saba families with the intent to expedite manufacturing and importation of counterfeit URBĀNE hand sanitizer.

108.     In a video message sent by Grazi, he stated: "Hi, my name is Jack Grazi. I'm producing with Isaac Saba, David Ghermezian, and Eli Berkowitz the URBĀNE label.  Please, I need you guys to ship right now.  I need a tracking number right now or else we lose the whole order.  Please, guys, come on.  Let's get this done right now."

109.     Upon information and belief, Grazi, Saba, David Ghermezian, and Berkowitz often conducted business in this manner, in which their respective entities were disregarded and they held themselves out as conducting business under their personal names and in pursuit of their personal ends.

110.     Ultimately, Grazi, Portz, Carelli, Berkowitz, Saba, David Ghermeizian, and Yonah Ghermezian were disappointed with the speed at which hand sanitizer under the URBĀNE label

was being produced. Each of these individuals wanted, in effect, as much counterfeit URBĀNE hand sanitizer as could be produced, and on an expedited production schedule.

111. Regardless, at a minimum, hundreds of thousands of bottles were ultimately produced, at least 216,000 of which were received and accepted by Rigz.

112. Upon information and belief, at least hundreds of thousands of additional bottles of counterfeit URBĀNE hand sanitizer remain in Mexico, having been produced with the intent to sell in the United States, as a result of the actions of the Defendants.

### vii. Defendants' Sales of Disputed Products Went Beyond Rigz's Initial Order

113. JGX was ultimately able to deliver more than 200,000 bottles of counterfeit URBĀNE hand sanitizer to Rigz. Rigz's initial approach to JGX and Grazi to produce URBĀNE hand sanitizer therefore led to the successful production, importation, and sale of hundreds of thousands of bottles of hand sanitizer that Rigz knew from the start constituted an unlawful use of the URBĀNE Brand.

114. Yet, the scope of Defendants' unlawful conduct extended well beyond Rigz's knowingly illicit purchase orders.

115. Triple Five Worldwide and its principals sold at least 50,000 bottles of hand sanitizer bearing the URBĀNE label to third party Tyberg. A true and correct copy of the purchase order issued by Triple Five Worldwide to Tyberg is attached hereto as **Exhibit P**. Grazi had knowledge of Triple Five Worldwide's intent to sell hand sanitizer under the URBĀNE label, and he permitted it to proceed despite being fully aware that neither he nor Triple Five Worldwide had the right to use the URBĀNE label.

116. After receiving shipments of counterfeit URBĀNE hand sanitizer, Rigz knowingly sold the counterfeit products to third party merchants for sale on to the general public. Rigz sold

counterfeit URBĀNE hand sanitizer to at least Pilot Travel Centers and Love's Travel Stops & Country Stores, nationwide chains of truck stops.

117.    The authentic URBĀNE hand sanitizer that Rigz used to solicit orders from its customers was clearly labeled as Made in the USA, yet Rigz obtained, sold, and distributed counterfeit URBĀNE hand sanitizer that was made in Mexico.

118.    Triple Five Worldwide remains in possession of a substantial volume of counterfeit hand sanitizer, which it stores, at least in part, in the American Dream mall, one of the largest shopping centers in North America.  David Ghermezian and Triple Five Worldwide continue to try to distribute their remaining inventory of counterfeit hand sanitizer.

119.    Upon information and belief, Rigz, JGX, and/or Liberty may continue to be in possession of some quantity of counterfeit URBĀNE hand sanitizer.  Where the entirety of such potentially harmful products are currently located remains unknown.

### *Counterfeit Hand Sanitizer Detained by the FDA*

120.    In early July 2020, a shipment of Disputed Products was shipped from Trop in Mexico to the United States.  The Disputed Products were stopped and, upon information and belief, refused entry by the FDA at the port of entry.

121.    The FDA flagged all products arriving from Trop because it had allegedly used methanol in hand sanitizer formulas for other brands.  The original hand sanitizer solution sold under the URBĀNE Brand did not and does not contain methanol.

122.    The FDA placed hand sanitizer under the URBĀNE Brand on its list of "hand sanitizers consumers should not use" and added the product to its "import alert" to stop the product from entering the country (collectively, the "**FDA Order**").  On its website, the FDA identifies

the product subject to the FDA Order as "Urbane Bath and Body Hand Sanitizer", with Trop listed as the "Manufacturer" and Liberty as the "Distributor".

123.    Upon information and belief, the Disputed Products that led to the FDA order bore the URBĀNE label artwork that Deb Jaradeh of Isaac Import created and first distributed, based on the label Carelli provided to Grazi, and that Grazi and Triple Five Worldwide, as well as its principals, widely circulated without any authority to do so.

124.    The FDA Order, and the FDA's targeting of hand sanitizer products containing or allegedly containing methanol more generally, was included in numerous news reports and widely disseminated to the public.

125.    The FDA Order stated that "[t]he agency continues to warn the public not to use specific products listed."  It also included a statement from the FDA Commissioner: "Consumers must also be vigilant about which hand sanitizers they use, and for their health and safety we urge consumers to immediately stop using all hand sanitizers on the FDA's list of dangerous hand sanitizer products . . . We remain extremely concerned about the potential serious risks of alcohol-based hand sanitizers containing methanol. Producing, importing and distributing toxic hand sanitizers poses a serious threat to the public and will not be tolerated."

126.    The "serious threat to the public" is described in the FDA Order as the "toxic effects of methanol poisoning. Substantial methanol exposure can result in nausea, vomiting, headache, blurred vision, permanent blindness, seizures, coma, permanent damage to the nervous system or death. Although all persons using these products on their hands are at risk for methanol poisoning, young children who accidently ingest these products and adolescents and adults who drink these products as an alcohol (ethanol) substitute, are most at risk."

127.     Later in July 2020, the FDA issued a further News Release addressing its "do-not-use list of dangerous hand sanitizer products."  In its News Release, the FDA stated: "Additionally, the FDA is strongly urging distributors and retailers to stop distributing and selling hand sanitizers manufactured by the firms on the list immediately, even if the particular product is not included in a recall, due to the risk of methanol poisoning.  When identifying hand sanitizers from the FDA's do-not-use list, consumers should look for *one or more identifiers* from the list *that match the product's labeling*, including: Manufacturer name[;] *Product name*[; or] National Drug Code (NDC) number[.]  If *any* of the identifiers (*name*, company, or NDC) match a product on the list, *the FDA urges consumers to immediately stop using the hand sanitizer*. Dispose of the hand sanitizer bottle in a hazardous waste container, if available, or dispose of as recommended by local waste management and recycling centers. Do not flush or pour these products down the drain or mix with other liquids."  (Emphasis added.)  In short, the United States federal government told distributors, retailers, and American consumers not to buy, sell, or use URBĀNE hand sanitizer due to Defendants' actions.

128.     As a result, the URBĀNE Brand is, and will continue to be, irreparably tarnished by its association with the FDA Order.  Sales and consumer demand for hand sanitizer under the URBĀNE Brand have plummeted precipitously since the FDA Order was issued.

### *The FDA Order Tarnishes the URBĀNE Brand and Plaintiffs' Businesses*

129.     Prior to the FDA Order, Red Rock engaged in discussions with Rite Aid, which has roughly 2,500 stores in the United States, regarding widespread distribution of hand sanitizer under the URBĀNE Brand.  Those discussions progressed significantly, and a final contract for the sale of URBĀNE hand sanitizer was imminent.  The contract negotiations were able to proceed

expeditiously in significant part because of the fact that the URBĀNE Brand was already in use and established in the market.

130. Prior to finalizing and executing the contract, Red Rock learned of the FDA Order and, as a responsible business partner, brought it to the attention of Rite Aid.

131. At that point, and as a direct result of the issuance of the FDA Order, Rite Aid called off negotiations with Red Rock. As Rite Aid's representative put it in an August 11, 2020 email to Tom Bruss of Red Rock, "Your product is on the FDA recall list, we will not be bringing this product in."

132. The loss of this business opportunity has prevented Red Rock from selling hand sanitizer under the URBĀNE Brand to thousands of stores and generating, at least, many millions of dollars in revenue.

133. The contemplated agreement with Rite Aid was just one of a number of potential business deals and sales channels that Red Rock was in the process of pursuing prior to the FDA Order, including but not limited to with IHG Hotels, Amazon, and Shopify.

134. The FDA Order also resulted in Tractor Supply Company cancelling all of its orders with Red Rock for hand sanitizer under the URBĀNE Brand. Prior to that point, Red Rock's business with Tractor Supply Company was strong and growing.

135. The resulting damage to Coronado's URBĀNE Brand, as well as to Red Rock's business, including its substantial goodwill, is both substantial and lasting. As just one example, due to Defendants' conduct and the resulting FDA Order, Red Rock is currently paying to store empty URBĀNE bottles worth $1,500,000, as well as $100,000 worth of unused URBĀNE labels. Such costs for Red Rock are ongoing and substantial, and would not have been necessary had it

27

been able to continue selling hand sanitizer under the URBĀNE Brand, as it had done prior to Defendants' unlawful actions leading to the FDA Order.

136.    The principals of both Coronado and Red Rock have also had their business reputations damaged as a proximate result of the Defendants' wrongful conduct.  In particular, the FDA Order has harmed Plaintiffs in their subsequent business dealings, not only by immediately shutting down demand for hand sanitizer under the URBĀNE Brand, but also by undermining the credibility of both companies' products in general.

137.    As a direct result of Defendants' theft and destruction of the URBĀNE Brand, Plaintiffs have also suffered substantial and ongoing harm to their business operations due to their inability to, among other things, purchase and ship inventory.

### *Defendants' Subsequent Conduct Lays Bare Their Collective Callousness*

138.    Following the FDA Order, Plaintiffs sought to investigate how their valuable brand came to be destroyed by the counterfeiting activities of Defendants.  During that investigation, Plaintiffs were informed that Rigz ordered the production of unauthorized URBĀNE hand sanitizer to capitalize on its brand recognition with Rigz's customers.

139.    For instance, Plaintiffs have since discovered that Portz sent e-mail communications to Rigz's customers (*e.g.*, Love's Travel Stops & Country Stores) to discuss the FDA Order, and specifically the fact that the URBĀNE Brand was subject to it.  Portz described the counterfeit URBĀNE hand sanitizer produced in Mexico as simply a shipment that Rigz received, thereby implicating the distributor that Rigz's customers understood was responsible for URBĀNE hand sanitizer: Red Rock.

4887-2467-6877.2

140.    Upon information and belief, the counterfeit URBĀNE hand sanitizer produced in Mexico was still available to consumers at nationwide chains such as Pilot Travel Centers until as late as in or around September 2020.

141.    Rigz and its principals repeatedly communicated with customers regarding its ensuing recall of URBĀNE hand sanitizer without ever disclosing their fundamental role in the scheme leading to the FDA Order or absolving Red Rock of its otherwise apparent responsibility. In fact, Portz and Carelli communicated with Rigz's customers in such a manner that suggested the Mexican-made (counterfeit) URBĀNE hand sanitizer was related to the American-made (authentic) URBĀNE hand sanitizer.   Since no authentic URBĀNE hand sanitizer was made anywhere other than the United States, and the Mexican-made product bore no legally cognizable relation to Plaintiffs' authentic product, Portz and Carelli's representations to the contrary further disparaged and harmed Plaintiffs' URBĀNE Brand.

142.    It was not until in or about November 2021 that Plaintiffs learned the full extent of Rigz's desire for counterfeit URBĀNE hand sanitizer.  At that time, and only after Plaintiffs had been forced to resort to the Court's subpoena power, Rigz revealed that it ordered approximately one million bottles from JGX.  Plaintiffs also discovered previously undisclosed facts regarding the lengths to which Rigz was willing to go to obtain counterfeit URBĀNE hand sanitizer, which included Portz offering his own plane as a means of expediting distribution of the bottles   Thus, had it not been for the manufacturing and distribution issues faced by JGX, Triple Five Worldwide, and Liberty, Rigz would have received roughly one million bottles of counterfeit URBĀNE hand sanitizer.

143.    Further, the counterfeit URBĀNE hand sanitizer produced as a result of Defendants' fraudulent scheme was funneled into and comingled with existing orders for authentic

URBĀNE hand sanitizer. In large part, these existing orders were for national truck stop chains that remained open as essential businesses at the height of the Covid-19 pandemic.

144. Meanwhile, in or about August 2020, Don Ghermezian, the father of Orly Ghermezian, father-in-law of Saba, cousin of David Ghermezian and Yonah Ghermezian, and colleague of Berkowitz, paid or approved the payment of $100,000 to Grazi as compensation for the harm done to JGX's business relationship with Ross Stores as a result of the FDA Order.

145. Don Ghermezian and/or Triple Five Worldwide made the $100,000 payment to Grazi and/or JGX after the counterfeiting scheme had collapsed following the FDA Order. As stated by Grazi on or about August 7, 2020, Don Ghermezian was making the payment because "we got terribly hurt" by "this very unfortunate situation."

146. On the other hand, no Ghermezian family member contacted Plaintiffs with respect to the harm done to them as a result of the counterfeiting scheme that they were instrumental in orchestrating.

147. The Ghermezian family members and their business associates have already acknowledged the substantial damage their central role in the fraudulent hand sanitizer scheme caused to businesses, relationships, and brands, as evidenced by the payment made to Grazi and/or JGX in or around August 2020.

148. Despite the fact that they acknowledged the destructive consequences of their actions with respect to Grazi, they have wrongfully denied responsibility for the irreparable harm those same actions have caused Plaintiffs, and, as a result, they continue to cause significant and ongoing damages to Plaintiffs.

149. On or about March 31, 2021, David Ghermezian offered counterfeit URBĀNE hand sanitizer, which was subject to the FDA Order, to Tyberg. In making his offer, David

Ghermezian stated "I'm [sic] still have lots and lots of stock even though the [sic] said it was false accusations about the methanol. Lmk [Let me know] if you need I'm glad to give to you a cheap price."

150. As recently as June 2021, nearly one year after the FDA Order, David Ghermezian corresponded with Saba to confirm that he is aware of thousands of units of counterfeit hand sanitizer "[s]itting in American Dream storage" and that he is still "[t]rying to find something to do w[ith] it." In response, Saba asked David Ghermezian "how much is AD [American Dream] consuming?" To which David Ghermezian replied "AD [American Dream] is using very little," thereby indicating that the second largest mall in the United States may have been using some quantity of counterfeit URBĀNE hand sanitizer at least into the summer of 2021.

151. In June 2021, David Ghermezian also told Saba that he had spoken with Grazi regarding Plaintiffs' allegations. At that time, David Ghermezian represented that neither he nor Grazi were concerned about the allegations being made by Plaintiffs because "Urbane isn't rly [really] a legit company so there's not much they can do[.]"

152. Accordingly, despite the deaths of hundreds of thousands of Americans from Covid-19, and the dangers presented by use of unsafe hand sanitizer, Defendants have showed no remorse for the dangerous product they are responsible for bringing into the United States. In fact, they have continued their years long pattern of deception and callous disregard for the rights of others in favor of their own short-term interests.

### *Defendants' Actions Have Violated Plaintiffs' Rights and Causes Substantial, Lasting Harm*

153. Coronado has neither given permission nor licensed the right to Defendants to use the URBĀNE Brand in connection with the Disputed Products, and therefore, Defendants'

unauthorized use of such marks constitutes, among other things, infringement, false designation of origin, and unfair competition.

154. Coronado is the registered owner of the '164 Registration, the '360 Registration, and the '225 Registration for the marks URBĀNE BATH & BODY and [URBĀNE mark]. Coronado's URBĀNE BATH & BODY and [URBĀNE mark] marks and federal registrations provide constructive notice of Coronado's rights in and to the URBĀNE Marks.

155. As of the date of this Amended Complaint, and notwithstanding having been put on notice of Coronado's rights in and to the URBĀNE Brand, Defendants have failed to fully account for, among other things, (i) the full scope of Disputed Products that were produced, (ii) the location of all Disputed Products imported into the United States, (iii) whether they have sold and/or are selling Disputed Products to consumers, and (iv) their earnings as a result of their wrongful and illegal conduct with respect to the URBĀNE Brand.

156. Upon information and belief, Defendants offered for sale and/or sold in the same or similar channels of trade the Disputed Products using marks that are identical and/or confusingly similar to one or more of the URBĀNE Marks and the URBĀNE Brand on and for goods that are identical and/or similar to and directly compete with those offered by Coronado and Red Rock.

157. Coronado's dates of first use relative to the URBĀNE Brand, in connection with at least the goods set forth within the '164 Registration for the URBĀNE Marks, precede the earliest date Defendants can possibly claim as their date of first use of the infringing marks incorporated on or in connection with the Disputed Products.

158. In particular, the '164 Registration has a constructive date of first use of August 1, 2019, which precedes the earliest date Defendants can possibly claim as their date of first use of the infringing marks incorporated on or in connection with the Disputed Products.

32

159. Since Defendants have knowledge, or reasonably should have knowledge, of Coronado's rights in and to the URBĀNE Brand, upon information and belief, Defendants' ongoing and continued offering for sale and/or sale of the Disputed Products constitutes knowing, intentional, and willful infringement.

160. Upon information and belief, Defendants' control over the manufacture, production, distribution, offering for sale and/or sale of the Disputed Products or otherwise use of marks that infringe one or more of the URBĀNE Marks has caused, or is likely to cause, confusion, mistake and/or deception amongst actual and potential consumers as to the source of the goods and services within the meaning of § 2(d) of the Lanham Act, 15 U.S.C. § 1052(d), all to the severe detriment of Coronado.

161. In view of the foregoing, Coronado and Red Rock, respectively, have been damaged and will continue to be damaged by virtue of Defendants' manufacture, production, distribution, offering for sale, and/or sale of the Disputed Products and use of infringing marks.

## COUNT I

**Violation of 18 U.S.C. § 1962 (Racketeer Influenced Corrupt Organizations Act)**

**(Plaintiff Coronado and Plaintiff Red Rock Against All Defendants)**

**(18 U.S.C. § 1962)**

162. Coronado and Red Rock re-allege the allegations contained in Paragraphs 1 through 146, as though fully set forth herein.

163. As described more fully above, Defendants engaged in acts indictable for crimes enumerated under 18 U.S.C. § 1961(1)(B) which include, *inter alia*, acts of mail fraud, wire fraud, and trafficking in counterfeit goods.

164. As described more fully above, Defendants engaged in a pattern of racketeering activity by, *inter alia*, executing a scheme to manufacture multiple rounds of Disputed Products and, in turn, to import and distribute such products, bearing infringing copies of the URBĀNE Brand that the Defendants knew or reasonably should have known were unauthorized, for sale to customers and consumers who were defrauded by the scheme.

165. Defendants perpetrated their fraud by use of the mails and/or wires.

166. In connection with trafficking the Disputed Products, the Defendants used a spurious mark that is identical with, or substantially indistinguishable from, the URBĀNE Brand, including the '164 Registration, the '360 Registration, and the '225 Registration, and that is likely to, and did in fact, confuse and/or deceive consumers.

167. Defendants' fraudulent representations and misappropriation of the URBĀNE Brand, as described herein, were the legal and proximate cause of the damages suffered by the Coronado and Red Rock, respectively, as their successful and growing sales of hand sanitizer under the URBĀNE Brand would have continued but for the fraudulent acts of the Defendants.

168. As a result of the foregoing, Coronado and Red Rock are entitled to three times their actual damages in an amount to be proven at trial, plus costs and attorneys' fees, pursuant to 18 U.S.C. § 1964.

## COUNT II

### Trademark Infringement

### (Plaintiff Coronado Against All Defendants)

### (15 U.S.C. §1114(1))

169. Coronado re-alleges the allegations contained in Paragraphs 1 through 153, as though fully set forth herein.

170.     Without the authorization or consent of Coronado, the Defendants have used and, on information and belief, continue to use trademarks and/or designations that are identical, confusingly similar to, and/or a reproduction, copy or colorable imitation of one or more of the URBĀNE Marks.

171.     Further, Defendants, by and through, *inter alia*, their manufacture, production, distribution, importation, offering for sale, and/or sale of the Disputed Products in U.S. commerce are and have been directly competing with Coronado's sales, distribution, and advertisement of the very same or similar goods and under and through the URBĀNE Marks.

172.     Defendants' actions in, *inter alia*, manufacturing, producing, distributing, importing, offering for sale, and/or selling the Disputed Products in commerce has occurred in the face of and notwithstanding having been on, at a minimum, constructive notice of Coronado's rights in the URBĀNE Marks.

173.     Defendants' unauthorized use of trademarks and/or designations that are identical, confusingly similar to, a reproduction, copy or colorable imitation of one or more of the URBĀNE Marks and in connection with competing goods, is likely to cause consumer confusion, mistake, and/or deception in the relevant market(s) as to the origin of the goods and services, and/or as to whether Defendants are sponsored by/affiliated with, or are otherwise connected to Coronado, in violation of Section 32(1) of the Lanham Act, as amended, 15 U.S.C. § 1114(1).

174.     By using trademarks and/or designations that are identical, confusingly similar to, a reproduction, copy or colorable imitation of one or more of the URBĀNE Marks, and by manufacturing, producing, distributing, importing, offering for sale, and/or selling the Disputed Products to the public in connection with said marks and/or designations or confusingly similar variants thereof, for profit and without Coronado's authorization, Defendants are depriving

Coronado of its exclusive right to control, use and otherwise benefit from its registered trademarks (along with other marks Coronado has applied for and/or uses at common law). If permitted to continue, Defendants' actions will nullify Coronado's right to exclusive use of its registered trademarks, free from infringement, and will have a substantial and adverse effect, as they already have, on Coronado's existing and projected future interstate business for goods identified by the URBĀNE Marks.

175. As a result of Defendants' infringing conduct, Coronado has suffered substantial damages in an amount to be proven at trial, as well as the continuing loss of the goodwill and reputation established by Coronado under its federally registered and other marks. This continuing loss of goodwill cannot be properly calculated and thus constitutes irreparable harm and an injury for which Coronado has no adequate remedy at law. Coronado will continue to suffer irreparable harm unless this Court enjoins Defendants' conduct.

176. By using, without Coronado's authorization, trademarks and designations that are identical, confusingly similar to, a reproduction, copy or colorable imitation of one or more of the URBĀNE Marks and by manufacturing, producing, distributing, importing, offering for sale, and/or selling the Disputed Products to the public in connection with the infringing marks, Defendants have intentionally and knowingly infringed Coronado's rights, thus making this an exceptional case under 15 U.S.C. § 1117(a).

**COUNT III**

**Contributory Trademark Infringement**

**(Plaintiff Coronado Against All Defendants)**

177. Coronado re-alleges the allegations contained in Paragraphs 1 through 161, as though fully set forth herein.

178.     Upon information and belief, Defendants had control over, among other things, the manufacture, importation, distribution, offering for sale, and sale of the Disputed Products and did so with the knowledge, or they had reason to have such knowledge, that they did not have the rights to the trademarks used or incorporated in and on the Disputed Products.

179.     By, *inter alia*, importing, distributing, offering for sale, and selling, despite knowing, or having reason to know, that they did not have the rights to the trademarks, Defendants have intentionally induced third-parties to infringe Coronado's rights in and to the URBĀNE Marks, and/or any and all marks associated therewith, by facilitating the further distribution and dissemination of the Disputed Products.

180.     Further, upon information and belief, Defendants knew, or had reason to know, that Rigz was engaged in infringing conduct when it ordered, planned to sell, and sold products bearing the URBĀNE Marks.

181.     These actions by Defendants constitute contributory trademark infringement.

182.     As a proximate result of Defendants' contributory infringement, Coronado has been damaged and will continue to suffer damage to its business, reputation, and goodwill.

183.     Defendants' unlawful actions entitle Coronado to compensatory and other applicable damages in an amount to be proven at trial.

<u>**COUNT IV**</u>

**Unfair Competition and False Designation of Origin**

**(Plaintiffs Coronado and Red Rock Against All Defendants)**

**(15 U.S.C. §1125(a))**

184.     Coronado and Red Rock re-allege the allegations contained in Paragraphs 1 through 168, as though fully set forth herein.

185.     Defendants' unauthorized use of trademarks and/or designations that are identical and/or confusingly similar to one or more of the URBĀNE Marks in connection with the Disputed Products, which are identical and/or highly related goods, is likely to cause confusion, mistake, and/or deception among the general public as to the origin of the goods, or as to whether Defendants are sponsored by, affiliated with, originated from or otherwise connected with Coronado and/or Red Rock, in violation of Section 43(a) of the Lanham Act, as amended, 15 U.S.C. §1125(a).

186.     As a result of Defendants' infringing conduct, Coronado and Red Rock have suffered substantial commercial and other damages in an amount to be proven at trial, as well as the continuing loss of the goodwill and reputation established by Coronado in its marks and Red Rock in its commercial use thereof.  This continuing loss of goodwill cannot be properly calculated and thus constitutes irreparable harm and an injury for which neither Coronado nor Red Rock has an adequate remedy at law.  Coronado and Red Rock will both continue to suffer irreparable harm unless this Court enjoins Defendants' conduct.

187.     By violating 15 U.S.C. §1125(a) through the use of trademarks and designations that are identical, confusingly similar to, a reproduction, copy or colorable imitation of one or more of the URBĀNE Marks in connection with the selling, offering for sale, distributing, and/or marketing of goods and services to the general public under and through the infringing marks, Defendants have intentionally and knowingly infringed Coronado's rights, thus making this an exceptional case under 15 U.S.C. § 1117(a).

4887-2467-6877.2

## COUNT V

### False Advertising

### (Plaintiffs Coronado and Red Rock Against All Defendants)

### (15 U.S.C. § 1125(a)(1)(B))

188.    Coronado and Red Rock re-allege the allegations contained in Paragraphs 1 through 172, as though fully set forth herein.

189.    Defendants have made false and misleading statements of fact with respect to their authorization to distribute and sell the Disputed Products.

190.    Such false and misleading statements have actually deceived and/or have a tendency to deceive Coronado and Red Rock's current and prospective licensees, distributors, retailers, resellers and/or the general public.

191.    Defendants' false and misleading statements are material.

192.    Defendants have made such false and misleading statements with respect to their authorization to distribute and sell the Disputed Products in interstate commerce to current and prospective licensees, distributors, retailers and/or resellers.

193.    Coronado and Red Rock have been damaged by Defendants' false and misleading statements and, unless this conduct is enjoined, both Coronado and Red Rock's goodwill and reputation will continue to suffer irreparable injury that cannot adequately be calculated or compensated by money damages.

194.    Defendants' unlawful actions constitute false advertisements, which entitles Coronado and Red Rock to damages under 15 U.S.C. § 1117 in an amount to be determined at trial, as well as exemplary damages and attorneys' fees and costs.

4887-2467-6877.2

## COUNT VI

**Deceptive Business Practices & Civil Conspiracy to Engage in Deceptive Business Practices**

**(Plaintiffs Coronado and Red Rock Against All Defendants)**

**(N.Y. G.B.L. § 349)**

195.    Red Rock re-alleges the allegations contained in Paragraphs 1 through 179, as though fully set forth herein.

196.    Defendants were engaged in a consumer-oriented act or practice by promoting, importing, selling, offering to sell, and/or distributing the Disputed Products, which were designed for consumer use as hand sanitizer in the midst of a global pandemic.

197.    Defendants are not, in fact, licensed or authorized in any way whatsoever to promote, import, sell, offer to sell, and/or distribute the Disputed Products, yet they held themselves out as such in a misleading and material way.

198.    In carrying out their consumer-oriented acts and practices, the Defendants entered into multiple agreements pursuant to which they took overt acts in furtherance those agreements, namely, producing, promoting, importing, selling, offering to sell, and/or distributing the Disputed Products.

199.    Each of the Defendants intentionally conspired to mislead consumers and other customers with respect to the counterfeit nature of the URBĀNE hand sanitizer they were responsible for producing, promoting, importing, selling, offering to sell, and/or distributing in furtherance of their plan to wrongly profit off the URBĀNE Brand.

200.    Red Rock and Coronado have suffered injury as a result of Defendants' representations as to their right to promote, import, sell, offer to sell, and/or distribute the Disputed Products, as such deceptive acts are directly responsible for, *inter alia*, the FDA Order that has

prevented, and will continue to prevent, Red Rock from selling additional hand sanitizer under the URBĀNE Brand, has permanently damaged the reputation and goodwill of Coronado's URBĀNE Brand, and has greatly harmed the reputation and goodwill of Red Rock among its customers and business partners.

201.     As a result of the foregoing, Red Rock and Coronado are entitled to damages in an amount to be proven at trial, plus civil penalties pursuant to New York General Business Law §§ 349-c and 350-d.

## COUNT VII

### Trademark Infringement Under New York Common Law

### (Plaintiff Coronado Against All Defendants)

202.     Coronado re-alleges the allegations contained in Paragraphs 1 through 186, as though fully set forth herein.

203.     As set forth herein, Coronado owns all common law rights in and to the URBĀNE Brand.

204.     Coronado's use of the URBĀNE Brand, including the common law rights therein, for various goods and services rendered in commerce, including but not limited to hand sanitizer, has been substantially exclusive and continuous since the inception of the marks.

205.     The URBĀNE Brand is distinctive and representative of the goodwill built up by Coronado.

206.     By imitating and using the URBĀNE Brand in commerce in connection with *inter alia*, the manufacturing, importing, offering for sale, and sale of the Disputed Products, Defendants have infringed Coronado's common law trademark rights.

41

207.     Defendants' unlawful and improper actions, as set forth herein, are likely to cause confusion, mistake, or deception as to the source, origin, affiliation, sponsorship, and association of Defendants' goods and services and to mislead actual and prospective consumers into falsely believing that Defendants' hand sanitizer originates from or is otherwise connected with or sanctioned by Coronado when, in fact, it is not.

208.     As a direct and proximate result of Defendants' infringement, Coronado has sustained and is likely to continue to sustain substantial monetary damages and irreparable injury to its business, reputation, and goodwill, for which Coronado has no adequate remedy at law.

209.     By reason of the foregoing acts, Defendants are liable to Coronado for common law trademark infringement and Coronado is entitled to preliminary and permanent injunctive relief and monetary damages in an amount to be proven at trial.

## COUNT VIII

**Tortious Interference with Prospective Economic Advantage Under**

**New York Common Law**

**(Plaintiff Red Rock Against All Defendants)**

210.     Red Rock re-alleges the allegations contained in Paragraphs 1 through 194, as though fully set forth herein.

211.     During June and July, 2020, Red Rock had business relations with, among others, Rite Aid regarding widespread distribution of hand sanitizer under the URBĀNE Brand.  Those discussions advanced significantly such that a contract for the sale of significant amounts of URBĀNE hand sanitizer was imminent.  Rite Aid operates approximately 2,500 stores across the United States.  It was anticipated that this arrangement would be profitable for all involved.

42

212.    After discovering the existence of the FDA Order, at which point Red Rock was already in advanced business discussions with Rite Aid, Tom Bruss of Red Rock immediately and responsibly informed Rite Aid of the FDA Order so that all sides were aware of the material facts related to the contemplated transaction.  The FDA Order was issued as a direct result of Defendants' infringing and otherwise illegal activities.

213.    Following Red Rock's disclosure of the FDA Order to Rite Aid, Rite Aid terminated the contract negotiations with Red Rock.  An employee of Rite Aid informed Mr. Bruss of Red Rock that the FDA Order was the reason why the contemplated contract could not be completed and executed.

214.    Therefore, Defendants interfered with Red Rock's relationship with, at a minimum, Rite Aid by manufacturing, distributing, and attempting to import the unlicensed and unauthorized Disputed Products.  Defendants' actions in manufacturing, distributing, and attempting to import the Disputed Products were intentional.

215.    As set forth herein, Defendants used wrongful means to interfere with Red Rock's relationship with Rite Aid, including but not limited to, trademark infringement, false designation of origin, unfair competition, and deceptive business practices.

216.    As a result of the foregoing, Red Rock's business relationship with Rite Aid was greatly damaged, thereby entitling Red Rock to damages in an amount to be proven at trial.

## COUNT IX

### Unfair Competition Under New York Common Law

### (Plaintiff Coronado Against All Defendants)

217.    Coronado re-alleges the allegations contained in Paragraphs 1 through 201, as though fully set forth herein.

218.    As set forth herein, by using Coronado's URBĀNE Brand, including but not limited to Coronado's common law rights therein, in commerce in connection with the manufacturing, distributing, importing, offering for sale, and sale of the Disputed Products, Defendants' activities described herein improperly traded upon the goodwill and valuable rights in and to the URBĀNE Brand and constitute unfair competition under the common law of the State of New York.

219.    Defendants' unlawful and improper actions, as set forth herein, are likely to cause confusion, mistake, or deception as to the source, origin, affiliation, sponsorship, and association of Defendants' goods and services and to mislead actual and prospective consumers into falsely believing that Defendants' hand sanitizer originates from or is otherwise connected with or sanctioned by Coronado when, in fact, it is not.

220.    As a direct and proximate result of Defendants' unfair competition, Coronado has sustained and is likely to continue to sustain substantial monetary damages and irreparable injury to its business, reputation, and goodwill, for which Coronado has no adequate remedy at law.

221.    Coronado is entitled to preliminary and permanent injunctive relief and monetary damages in an amount to be proven at trial.

**COUNT X**

**Unjust Enrichment Under New York Common Law**

**(Plaintiff Coronado Against All Defendants)**

222.    Coronado re-alleges the allegations contained in Paragraphs 1 through 206, as though fully set forth herein.

223.    Upon information and belief, Defendants generated significant revenues as a result of their wrongful and illegal use of Coronado's URBĀNE Brand. However, Coronado received no

44

benefit for the monies Defendants earned through misappropriating and infringing Coronado's intellectual property.

224.    As a result, Defendants were enriched at Coronado's expense, and it would be against equity and good conscience to allow the Defendants to keep the funds earned through their wrongful and illegal use of Coronado's intellectual property.

225.    As a result of the foregoing, Coronado is entitled to damages in an amount to be proven at trial.

## COUNT XI

### Dilution by Tarnishment Under New York Law

### (Plaintiff Coronado Against All Defendants)

### (N.Y. G.B.L. § 360-l)

226.    Coronado re-alleges the allegations contained in Paragraphs 1 through 210, as though fully set forth herein.

227.    As set forth herein, Coronado owns all right, title, and interest in and to the URBĀNE Brand.

228.    The URBĀNE Brand has a distinctive quality that is capable of dilution under New York law.

229.    The URBĀNE Brand is linked to Defendants' inferior products as a direct result of Defendants' unlicensed and unauthorized use of Coronado's URBĀNE Brand.  The URBĀNE Brand is also linked to the substantial negative associations and legal consequences that resulted from the FDA Order for which Defendants are responsible.

230.    As a result of the foregoing, Coronado is entitled to damages in an amount to be proven at trial.

# COUNT XII

## Negligence, Including Gross Negligence, Under New York Common Law

### (Plaintiffs Coronado and Red Rock Against All Defendants)

231.    Coronado re-alleges the allegations contained in Paragraphs 1 through 215, as though fully set forth herein.

232.    As the owner of the URBĀNE Brand for use in connection with, *inter alia*, product(s) deemed to be over the counter drugs (*e.g.*, hand sanitizer), Plaintiffs were owed a duty of care by those who used the URBĀNE Brand.  Since the Defendants used the URBĀNE Brand (unlawfully, as set forth herein), they owed Plaintiffs a duty of care.

233.    Defendants' reckless conduct with respect to the URBĀNE Brand, including but not limited to failing to ensure to integrity of the manufacturing process, failing to attend to FDA requirements for hand sanitizer products, and prioritizing quantity of product over quality, breached Defendants' duty to Plaintiffs.

234.    Defendants' conduct with respect to the counterfeit URBĀNE hand sanitizer they are responsible for producing, importing, distributing, and selling showed a reckless indifference to the rights of others.  Defendants' conduct also constituted a failure to use even slight care and/or conduct that is so careless as to show a complete disregard for the safety of others.

235.    As a result, Defendants' conduct severely deviated from the standard of reasonable care and constitutes gross negligence.

236.    Defendants' negligent conduct led to the production and distribution of products that were so deficient that the FDA placed them on its list of "hand sanitizers consumers should not use," and, as a result, led to customer requests for returns.

46

237. As a direct and proximate result of Defendants' gross negligence, Plaintiffs have sustained and are likely to continue to sustain substantial monetary damages and irreparable injury to their business, reputation, and goodwill, for which Plaintiffs have no adequate remedy at law.

238. As a result of the foregoing, Plaintiffs are entitled to damages in an amount to be proven at trial.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs Coronado Distributing LLC and Red Rock Sourcing LLC respectfully request that this Court:

i. Immediately, preliminarily, and permanently enjoin Defendants, and all persons acting in concert with them, including without limitation their officers, directors, employees, contractors, and any and all affiliates and current or potential business partners, and all persons purporting to act on their behalf or in active concert or in participation with them, from using or preparing to use Coronado's trademarks, including but not limited to the URBĀNE Brand, as well as any confusingly similar designations or marks, in any manner that violates or infringes Coronado's rights, and require Defendants and all participating persons to immediately and permanently discontinue their current infringing practices.

ii. Immediately, preliminarily, and permanently enjoin Defendants, and all persons acting in concert with them, including without limitation their officers, directors, employees, contractors, and any and all affiliates and current or potential business partners, and all persons purporting to act on their behalf or in active concert or in participation with them, from any further development, distribution, marketing, manufacturing, shipping, or any other use or preparation for use in commerce of

any hand sanitizer product identical or substantially similar to the Disputed Products.

iii.   Immediately, preliminarily, and permanently enjoin Defendants, and all persons acting in concert with them, including without limitation their officers, directors, employees, contractors, and any and all affiliates and current or potential business partners, and all persons purporting to act on their behalf or in active concert or in participation with them, from making any representations, statements, or other communications, in any form, that suggest, whether expressly or by implication, that Defendants have any right to use, in any matter whatsoever, the URBĀNE Brand.

iv.   Order Defendants to immediately collect and destroy, at Defendants' sole and exclusive expense, any and all units of the Disputed Products, or any products substantially similar thereto, wherever in the world they are located, and, upon completion, to certify in writing that such collection and destruction has occurred in accordance with the Court's Order.

v.   Enter judgment in favor of Coronado and Red Rock, respectively, on each and every count they have asserted herein and award Coronado and Red Rock all monetary damages caused by the acts forming the basis of this Complaint, including, without limitation, Coronado and Red Rock's actual and other damages as alleged herein.

vi.   Order Defendants to immediately prepare and provide to Coronado, at Defendants' sole and exclusive expense, a report and accounting of all uses, distributions, and

revenue realized, or that Defendants expect to realize, related to or derived from the Disputed Products.

vii. Award of treble damages to Coronado and Red Rock, respectively, pursuant to 18 U.S.C. § 1864 due to Defendants' willful commission of a pattern of racketeering activity.

viii. Award of treble damages to Coronado pursuant to 15 U.S.C. § 1117(b) due to Defendants' willful, knowing, and intentional infringement of the URBĀNE Marks.s

ix. Award all damages suffered by Coronado and Red Rock pursuant to New York statutory and common law.

x. Award of punitive damages to Coronado and Red Rock due to Defendants' willful and malicious disregard of Plaintiffs' rights and interests.

xi. Order Defendants to pay Coronado and Red Rock the costs of this action and Coronado and Red Rock's reasonable attorneys' fees and expenses pursuant to 18 U.S.C. § 1864, 15 U.S.C. § 1117(a), and any other applicable statutes or authority.

xii. Award Coronado and Red Rock such further relief as the Court deems just, proper, and equitable.

## JURY DEMAND

Plaintiffs Coronado Distributing LLC and Red Rock Sourcing LLC, respectively, hereby demand a trial by jury on all issues so triable, pursuant to Federal Rule of Civil Procedure 38.

Dated: February 10, 2022                      Respectfully submitted,

**NIXON PEABODY LLP**

By: */s/ Daniel A. Schnapp*

Daniel A. Schnapp
dschnapp@nixonpeabody.com
55 West 46th Street
New York, NY 10036-4120
Tel: (212) 940-3000
Fax: (212) 940-3111

Erin T. Huntington
ehuntington@nixonpeabody.com
677 Broadway, 10th Fl.
Albany, New York 12207
Tel: (518) 427-2650
Fax: (518) 427-2666

On Lu (admitted *pro hac vice*)
onlu@nixonpeabody.com
Andrew H. Winetroub (admitted *pro hac vice*)
awinetroub@nixonpeabody.com
One Embarcadero Center
San Francisco, California 94111-3600
Tel: (415) 984-8200
Fax: (415) 984-8300

*Attorneys for Plaintiffs Red Rock Sourcing LLC and Coronado Distributing LLC*

4887-2467-6877.2