UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------------X

RED ROCK SOURCING LLC and CORONADO
DISTRIBUTING LLC,

                        Plaintiffs,

              -v-

JGX, LLC, *et al.*,

                      Defendants.

-----------------------------------------------------------------------X

21 Civ. 1054 (JPC)

OPINION AND
ORDER

JOHN P. CRONAN, United States District Judge:

      Plaintiffs Red Rock Sourcing LLC ("Red Rock") and Coronado Distributing LLC ("Coronado") have sued nine defendants alleging violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.*; trademark infringement, contributory trademark infringement, unfair competition and false designation of origin, and false advertising under the Lanham Act, 15 U.S.C. § 1051 *et seq.*; deceptive business practices and civil conspiracy to engage in deceptive business practices under New York General Business Law ("N.Y. G.B.L.") section 349; trademark infringement, tortious interference with prospective economic advantage, unfair competition, unjust enrichment, and negligence under New York common law; and dilution by tarnishment under N.Y. G.B.L. section 360-1, all concerning an alleged scheme to counterfeit Plaintiffs' hand sanitizer. Dkt. 122 ("First Am. Compl.") ¶¶ 162-238. Before the Court is Plaintiffs' motion to file their proposed Second Amended Complaint, which would add eight additional defendants and new claims for fraudulent conveyance under New York Debtor & Creditor Law sections 273, 275, and 276, and for "Alter Ego/Piercing the

Corporate Veil." *See generally* Dkt. 263 ("Proposed Second Am. Compl."). For the reasons discussed below, the motion is granted in part and denied in part.

## I. Background[1]

### A. Overview of the Alleged Counterfeiting Scheme

In early 2020, Plaintiffs began developing a hand sanitizer under the URBĀNE Brand, a registered trademark owned by Coronado. Proposed Second Am. Compl. ¶¶ 28-31, 38, 40. Plaintiffs allege that URBĀNE Brand hand sanitizer is unique because "(1) it utilize[s] a high quality formula that was equally effective without the associated foul-smell of typical sanitizer; (2) it was 'Made in America' which particularly appealed to U.S. consumers; and (3) it came in a credit card-sized sprayer that was prized by consumers and retailers alike." *Id.* ¶ 46. Because the URBĀNE Brand was already established, Plaintiffs were able to bring their hand sanitizer product quickly to market at the onset of the COVID-19 pandemic, *id.* ¶¶ 44, 47, resulting in very successful initial sales of URBĀNE Brand hand sanitizer, *id.* ¶¶ 54-55, 58-59.

Shortly thereafter, however, Defendants and Intervenor Rigz, LLC ("Rigz") created and began selling counterfeit URBĀNE Brand hand sanitizer (the "Counterfeit Product"). *Id.* ¶¶ 61-64. According to Plaintiffs, the Counterfeit Product came in near-identical packaging, *id.* ¶ 75, but unlike true URBĀNE Brand hand sanitizer, the Counterfeit Product was manufactured in Mexico and contained methanol—"a substance that can be toxic when absorbed through the skin

---

[1] The following facts are drawn from Plaintiffs' Proposed Second Amended Complaint, as revised on January 3, 2023, and are assumed as true only for the purposes of this Opinion and Order. *See Lucente v. IBM Corp.*, 310 F.3d 243, 258 (2d Cir. 2002) ("An amendment to a pleading is futile if the proposed claim could not withstand a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6)."); *Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 237 (2d Cir. 2007) ("In considering a motion to dismiss . . . the court is to accept as true all facts alleged in the complaint."). The Court previously granted Plaintiffs' request to maintain certain portions of the Second Amended Complaint under seal, with redactions filed on the public docket. Dkt. 261 at 2.

and can be life-threatening when ingested," *id.* ¶ 2.  Ultimately, "at a minimum, hundreds of thousands of bottles" of the Counterfeit Product were produced, *id.* ¶ 196, and sold to stores as true URBĀNE Brand hand sanitizer, *id.* ¶¶ 199-200, 203-04, 207, 210-11.

The scheme was exposed when the U.S. Food and Drug Administration ("FDA") seized a shipment of the Counterfeit Product being delivered to the United States from Mexico.  *Id.* ¶¶ 216-17.  The FDA then placed URBĀNE Brand hand sanitizer "on its list of 'hand sanitizers consumers should not use' and added the product to its 'import alert' to stop the product from entering the country [(the "FDA Order")]."  *Id.* ¶ 218; *see also id.* ¶¶ 221-23.  As a result, allege Plaintiffs, "the URBĀNE Brand is, and will continue to be, irreparably tarnished by its association with the FDA Order" and all demand for URBĀNE Brand hand sanitizer has "plummeted precipitously."  *Id.* ¶ 224.  In particular, the FDA Order halted Plaintiffs' negotiations with retailers such as Rite Aid, IHG Hotels, Amazon, Shopify, and Tractor Supply Company to sell the product nationally.  *Id.* ¶¶ 227, 229-30.

## B.    Cast of Characters

To provide context for the analysis that follows, the Court reviews the various persons and entities, including their affiliations, that are relevant to Plaintiffs' motion.  The Proposed Second Amended Complaint alleges conduct that implicates individuals or entities that fall into four groups: (1) Plaintiffs, (2) Intervenor Rigz, (3) the Counterfeiting Defendants, and (4) the Retail Defendants.

### 1.    Plaintiffs

Red Rock and Coronado are established businesses in the bath and bodyworks industry and have been frequent partners.  *Id.* ¶ 27.  Red Rock, a limited liability company based in Nevada, *id.* ¶ 9, agreed to handle product development, supply chain, and distribution with respect to the URBĀNE Brand hand sanitizer, *id.* ¶ 40.  Coronado, a limited liability company based in

Colorado, *id.* ¶ 8, is the registered owner of the various URBĀNE marks at issue in this litigation, *id.* ¶¶ 28, 30-31.

### 2.    Intervenor Rigz

Rigz, which is not a party in this action, is a limited liability company located in Arizona. *Id.* ¶ 52.  Prior to the events at issue in this litigation, Rigz was Red Rock's long time distribution partner, and the two companies, "regularly communicated regarding their respective distribution businesses and opportunities they observed in the market." *Id.* ¶ 53.  After Plaintiffs developed their URBĀNE Brand hand sanitizer, they began selling the product to Rigz. *Id.* ¶ 54.  Rigz, in turn, "successfully placed URBĀNE hand sanitizer into a number of national businesses, including those of the Retail Defendants with over 2,000 combined stores located across the country." *Id.* ¶ 55.  After initial sales of URBĀNE Brand hand sanitizer were successful, and unbeknownst to Plaintiffs, Rigz began working with the Counterfeiting Defendants to produce the Counterfeit Product to meet the growing demand. *Id.* ¶¶ 62-64.  Rigz ultimately ordered approximately one million bottles of the Counterfeit Product, receiving at least 216,000 bottles. *Id.* ¶¶ 196, 238.  When the Counterfeit Product was recalled, Rigz hid its involvement in the scheme from its customers. *Id.* ¶ 237.

### 3.    The Counterfeiting Defendants

The Counterfeiting Defendants can be further subdivided into three groups:  (1) the JGX Defendants, which consist of Defendants JGX, LLC ("JGX"), Isaac Import, Inc. ("Isaac Import"), and Jack Grazi, and proposed Defendants Dib Jaradeh and Nouri Jaradeh; (2) Defendant Liberty International Distributors, LLC ("Liberty"); and (3) the Worldwide Defendants, which consist of Defendants Triple Five Worldwide, LLC ("Triple Five Worldwide"), Isaac Saba, Eliezer Berkowitz, David Ghermezian, and Yonah Ghermezian, and proposed Defendants Community Federal Savings Bank ("CFSB"), Don Ghermezian, Syd Ghermezian, and Nader Ghermezian.

4

### i. The JGX Defendants

The JGX Defendants were primarily responsible for "create[ing] the counterfeit URBĀNE label." *Id.* ¶¶ 72-74, 268.  JGX is an apparel company located in New York "with expertise in and a history of obtaining trademarks."  *Id.* ¶¶ 10, 65.  Its principals include Grazi, Dib Jaradeh, and Nouri Jaradeh.  *Id.* ¶¶ 64, 67, 72.  In addition to being a principal of JGX, Dib Jaradeh is the sole shareholder and director of Isaac Import.  *Id.* ¶ 67.  Plaintiffs allege that Grazi, Dib Jaradeh, and Nouri Jaradeh failed to observe any corporate formalities with respect to JGX and Isaac Imports and therefore seek to pierce both corporate veils.  *Id.* ¶¶ 394-414.  With respect to the alleged counterfeiting scheme, Grazi was allegedly JGX's primary point of contact with both Rigz and the Worldwide Defendants.  *Id.* ¶¶ 64-67, 103-06.  Dib Jaradeh was responsible for creating the counterfeit label, *id.* ¶ 73, and Nouri Jaradeh conducted research on Coronado and ultimately created purchase orders for the Worldwide Defendants, *id.* ¶¶ 72, 105.

### ii. Liberty

After creating the counterfeit URBĀNE mark, the JGX Defendants first partnered with Liberty as a manufacturer.  Formed in April 2020, Liberty had no significant prior experience in the hand sanitizer industry.  *Id.* ¶ 81. However, "Liberty communicated with a manufacturer in Mexico . . . regarding the production and bottling of hand sanitizer to fill the purchase order Rigz issued to JGX" for the Counterfeit Product.  *Id.* ¶ 85.  In April or early May 2020, Liberty, along with JGX, imported the first shipment of the Counterfeit Product into the United States.  *Id.* ¶ 86. The JGX Defendants eventually sidelined Liberty, and began partnering with the Worldwide Defendants as their new manufacturer.  *Id.* ¶ 87.

5

###### iii.      The Worldwide Defendants

The Worldwide Defendants consist of members of the Ghermezian family, their colleagues, and two of their businesses.  While the Proposed Second Amended Complaint is at times vague as to how each of the Ghermezians are related, Don, Syd, and David Ghermezian are "senior members" of the family, *id.* ¶ 109, while Yonah Ghermezian is Don Ghermezian's cousin, *id.* ¶ 240.[2]  Saba is Don Ghermezian's son-in-law by virtue of his marriage to Don Ghermezian's daughter, non-party Orly Ghermezian Saba.  *Id.* ¶ 91 n.1.  And Eliezer Berkowitz is Don Ghermezian's "acquaintance" and a business associate of the family.  *Id.* ¶ 90.

The Ghermezians are investors in retail shopping malls including the Mall of America, American Dream, and the West Edmonton Mall.  *Id.* ¶ 92.  When their businesses began to suffer at the onset of the COVID-19 pandemic, Don Ghermezian held a meeting in his home on May 4, 2020, attended by David Ghermezian, Yonah Ghermezian, and Saba, at which they made the decision to enter the hand sanitizer market.  *Id.* ¶¶ 89-91, 96-100.  Two days later, the Ghermezians connected with the JGX Defendants "and agreed to collaborate in obtaining and selling hand sanitizer."  *Id.* ¶ 103.  This collaboration entailed the Ghermezians coordinating the manufacturing of the Counterfeit Product for the JGX Defendants.  *Id.* ¶¶ 104-07, 269.

The Ghermezians selected Triple Five Worldwide as the entity through which to "facilitate US sales" of the Counterfeit Product.  *Id.* ¶ 110.  While Triple Five Worldwide was originally founded in June 2000, it had "no activity or assets" as of to May 2020.  *Id.* ¶¶ 110-11.  Its original managers were Don, Nader, and Syd Ghermezian, but those individuals were replaced as managers with Berkowitz, Saba, and Orly Ghermezian Saba on May 7, 2020.  *Id.* ¶¶ 111-12.  Despite being

---

[2]  The Proposed Second Amended Complaint does not allege Nader Ghermezian's relationship to the other Ghermezians.

formally replaced as managers, however, Don, Nader, and Syd Ghermezian remained *de facto* in charge of Triple Five Worldwide. *Id.* ¶ 122. Indeed, Plaintiffs allege that Saba and Orly Ghermezian Saba were not even aware that they were instated as managers of Triple Five Worldwide. *Id.* ¶¶ 112-13.[3] Don Ghermezian remained "consistently and intimately involved" with Triple Five Worldwide's manufacturing of the Counterfeit Product, micromanaging all aspects of the business. *Id.* ¶¶ 123-36. As such, Plaintiffs claim that Don, Syd, and Nader Ghermezian misused the corporate form and failed to observe the requisite corporate formalities with respect to Triple Five Worldwide and therefore Plaintiffs seek to pierce Triple Five Worldwide's corporate veil as well. *Id.* ¶¶ 385-93.

After setting up Triple Five Worldwide as the primary business entity to manufacture and sell the Counterfeit Product, *id.* ¶ 147, the Ghermezians allegedly began using CFSB as Triple Five Worldwide's banking partner, *id.* ¶ 148. CFSB was founded in 2001 "as a vehicle to, *inter alia*, support the Ghermezian family businesses." *Id.* ¶ 151. It is "wholly owned and controlled by members of the Ghermezian family," *id.* ¶ 153, most notably Syd Ghermezian, who is the bank's Chairman and CEO, *id.* ¶ 150. "CFSB allowed Triple Five Worldwide to open and/or operate an account without providing necessary corporate documentation," *id.* ¶ 164, and Triple Five Worldwide began using its CFSB account to make transactions in connection with the Counterfeit Product, including to the JGX Defendants, *id.* ¶¶ 173-74, 271. All the while, Syd Ghermezian maintained direct access to the Triple Five Worldwide account and would direct CFSB not to report transactions made on behalf of Triple Five Worldwide. *Id.* ¶¶ 166, 176-78.

---

[3] Plaintiffs' fraudulent conveyance claim seeks to unwind the transaction whereby Don, Nader, and Syd Ghermezian were replaced as managers. Proposed Second Am. Compl. ¶¶ 365-84.

**4.      The Retail Defendants**

The last relevant group of parties is the Retail Defendants, consisting of Pilot Travel Centers, LLC ("Pilot") and Love's Travel Stops & Country Stores, Inc. ("Love's").  Plaintiffs allege that both Pilot and Love's received shipments of the Counterfeit Product from Rigz.  Specifically, Pilot received approximately 85,882 units of the Counterfeit Product from Rigz and sold at least 50,324 units.  *Id.* ¶¶ 199-200.  Love's received approximately 115,295 units of the Counterfeit Product, of which it sold at least 92,769 units.  *Id.* ¶¶ 203-04.  Plaintiffs allege that the Counterfeit Product "was still available to consumers at nationwide chains including Pilot until as late as in or around September 2020."  *Id.* ¶ 236.

\* \* \*

To summarize, as alleged, Plaintiffs began selling URBĀNE Brand hand sanitizer to Rigz for the purpose of reselling it to the Retail Defendants.  Rigz began coordinating with the JGX Defendants to produce the Counterfeit Product to meet the Retail Defendants' demand.  The JGX Defendants designed the Counterfeit Product and first worked with Liberty to manufacture it.  However, Liberty was shortly replaced by the Worldwide Defendants as JGX's manufacturing partner.  Ultimately, the Worldwide Defendants produced hundreds of thousands of bottles of the Counterfeit Product which they sold to JGX, which in turn sold it to Rigz, which in turn sold it to the Retail Defendants to sell to their customers.

**C.      Procedural History**

Prior to initiating this action, on August 3, 2020, Rigz and Plaintiffs entered into a settlement agreement regarding Rigz's involvement in the alleged counterfeiting scheme.  *See* Dkt. 286 ("Rigz Opposition") at 4-5; Dkt. 291 ("Pls. Sur-Reply") at 1; *see also* Dkt. 189 (the

"Settlement Agreement").[4]   Pursuant to that agreement, Plaintiffs "release[d] and discharge[d] Rigz et al. . . . and their past or present . . . customers . . . from any and all actions, claims, demands . . . and causes of action from the beginning of time to the date of this Settlement Agreement . . . arising under trademark infringement, counterfeiting, or theft of intellectual property."  Settlement Agreement ¶ 6.

Plaintiffs initiated this action on February 5, 2021 against JGX and Liberty.  Dkt. 1.  JGX answered the Complaint and asserted cross-claims against Liberty on March 24, 2021.  Dkt. 22.[5] The Court entered an initial Case Management Plan on April 27, 2021, pursuant to which "amended pleadings may not be filed and additional parties may not be joined except with leave of the Court."  Dkt. 28 ¶ 4.  The Court also ordered that "[a]ny motion for leave to amend or to join additional parties shall be filed by 5/7/21."  *Id.*

The parties then began discovery.  Rigz contends that Red Rock conducted what Rigz characterizes as an "informal deposition" of Rigz's employees and "insisted that Rigz produce documents . . . to help [Red Rock] identify and prosecute claims against other entities."  Rigz Opposition at 5-6.  Following this discovery, Rigz and Plaintiffs reached an amendment to the Settlement Agreement whereby Rigz agreed to pay Plaintiffs additional consideration to resolve its and its customers' conduct.  *See* Dkt. 190 (the "Amendment") at 1; *see also* Rigz Opposition at 6-8.

---

[4]  Although the Court previously granted Rigz's request to maintain the Settlement Agreement and its subsequent Amendment under seal, *see* Dkt. 191, the Court finds it necessary to discuss or quote from certain portions of the Settlement Agreement in aid of deciding the instant motion.  *See Zucaro v. Venable*, No. 21 Civ. 8775 (JPC), 2023 WL 2691557, at *2 n.3 (S.D.N.Y. Mar. 29, 2023).

[5]  To date, Liberty has failed to respond to the Complaint, the First Amended Complaint, or JGX's cross-claims, and has not opposed the instant motion to amend.

On December 23, 2021, Plaintiffs sought leave to amend the Complaint to add Triple Five Worldwide, Isaac Import, Grazi, Saba, Berkowitz, David Ghermezian, and Yonah Ghermezian as Defendants, as well as to bring a new negligence claim against all Defendants.  *See* Dkt. 102; 102-4.  Among other things, Plaintiffs argued that "the documents produced and testimony taken in discovery have revealed a more complete picture of the counterfeiting scheme set forth in the initial Complaint" which shows that "not only are JGX and Liberty liable for the claims Plaintiffs assert in this action, but that a number of further persons share liability such that Plaintiffs' claims are also rightfully asserted against them."  Dkt. 102-1 at 1.  At a conference held on January 27, 2022, the Court granted Plaintiffs leave to amend, Dkt. 118 ("Jan. 27, 2022 Tr.") at 21:11-12, finding that they demonstrated good cause based on additional information learned during discovery, *id* at 15-17.  The Court also found that the allegations concerning the newly added defendants and new claims demonstrated that Plaintiffs' proposed amendments were not futile.  *Id.* at 18:3-21:5.  In granting Plaintiffs' motion, however, the Court noted that the opposition raised "a number of potentially meritorious arguments regarding the allegations in the proposed amended complaint," *id.* at 21:14-16, and therefore gave Plaintiffs the opportunity to file a revised version of their proposed pleading, *id.* at 21:18-20.  Plaintiffs filed their First Amended Complaint on February 10, 2022.  Dkt. 122 ("First Am. Compl.").

Before and during the pendency of Plaintiffs' motion for leave to amend the Complaint, and after the First Amended Complaint was filed, the parties continuously engaged in significant discovery relevant to the new allegations in the Proposed Second Amended Complaint.  Among other things, Plaintiffs aver that Saba produced documents in advance of his deposition "reveal[ing] Don Ghermezian's personal involvement in the creation and execution of Triple Five Worldwide's hand sanitizer business," Dkt. 185 ("Motion") at 6; that Plaintiffs took a Rule

30(b)(6) deposition of JGX during which they learned of Grazi's close communications with Don Ghermezian and that "JGX lacked corporate minutes and failed to maintain the requisite corporate formalities," *id.* at 6-7; that Saba produced a video of the meeting at Don Ghermezian's house, *id.* at 7; that Plaintiffs took a Rule 30(b)(6) deposition of Isaac Import which revealed "comingling of Isaac Import's and JGX's business activities to such an extent that the three individuals behind these two companies . . . exercised complete dominion and control over JGX and Isaac Import," *id.*; that Plaintiffs deposed Saba and Orly Ghermezian Saba who revealed for the first time that neither was aware of "how they became managers of Triple Five Worldwide," *id.* at 8; that Plaintiffs deposed Don Ghermezian who admitted to "his involvement in the initial meeting regarding the development of a hand sanitizer business, the lack of corporate formalities and the misuse of the Triple Worldwide corporate form, and his high level of involvement in the sanitizer business," *id.* at 8-9; and that the Retail Defendants produced over 9,000 pages of documents "evidencing that they received and sold thousands of bottles of counterfeit sanitizer," Pls. Sur-Reply at 6.

On February 24, 2022, JGX, Grazi, and Isaac Import filed a letter describing their proposed motion to dismiss the First Amended Complaint. Dkt. 141. Triple Five Worldwide, Berkowitz, David Ghermezian, and Yonah Ghermezian did the same on March 2, 2022. Dkt. 147. On April 14, 2022, Plaintiffs notified the Court of their intent to seek leave to file a Second Amended Complaint and requested that the Court hold in abeyance Defendants' requests for a briefing schedule on their anticipated motions to dismiss pending the outcome of Plaintiffs' request to amend. Dkt. 166. The Court granted Plaintiffs' request to hold the motion to dismiss briefing schedule in abeyance. Dkt. 170. The parties filed pre-motion letters concerning Plaintiffs' anticipated motion to file the Second Amended Complaint. Dkts. 174, 176-77. In addition, Rigz

appeared and filed an opposition to Plaintiffs' anticipated motion to amend, raising the Settlement Agreement and arguing a lack of good cause for Plaintiffs' delay in adding claims against the Retail Defendants.  Dkt. 178.  In setting a briefing schedule on Plaintiffs' motion, the Court specifically directed Plaintiffs to "address the futility arguments raised by Defendants and non-party Rigz in their letters, including with respect to the settlement agreement supposedly entered into between Plaintiffs and Rigz . . . and whether Plaintiffs can establish 'good cause' for seeking leave to file a Second Amended Complaint." Dkt. 179.  Plaintiffs filed the instant motion to amend on May 20, 2022, Dkts. 184-86; Defendants filed opposition briefs on June 3, 2022, Dkts. 198 ("Worldwide Opposition"), 201 ("JGX Opposition"); and Plaintiffs replied on June 10, 2022, Dkt. 203 ("Reply").

While briefing was in progress on the motion to amend, Rigz formally sought leave to move to intervene.  Dkt. 187.  After the Court set a briefing schedule on Rigz's motion, Dkt. 202 at 1, Rigz filed its motion on June 13, 2022, Dkt. 205-06, Plaintiffs filed their opposition to Rigz's motion on June 21, 2022, Dkt. 213, and Rigz replied on June 27, 2022, Dkt. 215.  In addition, the JGX and Worldwide Defendants each filed briefs in support of Rigz's intervention.  Dkts. 212, 214. On February 1, 2023, the Court granted Rigz's motion, allowing permissive intervention under Federal Rule of Civil Procedure 24(b).  *See Red Rock Sourcing LLC v. JGX, LLC*, No. 21 Civ. 1054 (JPC), 2023 WL 1468980, at *3-5 (S.D.N.Y. Feb. 2, 2023).  Rigz then filed an opposition to Plaintiffs' motion to amend on February 13, 2023, Dkts. 283-84, and Plaintiffs filed a sur-reply responding to Rigz on February 23, 2023, Dkt. 289-1.[6]

---

[6] Rigz has moved to seal certain exhibits filed in its opposition and to redact portions of its brief that relate to the Settlement Agreement. Dkt. 285. Similarly, Plaintiffs have moved to redact portions of their sur-reply that reference or quote from the Settlement Agreement. Dkt. 289. No party in this case has opposed either request.  Given the reduced presumption of public access that

Finally, on November 18, 2022, while Plaintiffs' and Rigz's motions were pending, Plaintiffs sought leave to file a revised version of the Proposed Second Amended Complaint in light of new documents produced by Syd Ghermezian, which Plaintiffs contend should have been produced previously by several of the Worldwide Defendants. Dkt. 245 at 1. In particular, assert Plaintiffs, the new documents shed further light on "Don Ghermezian's management of the hand sanitizer business, the disregard for the corporate form across Triple Five entities, [and] the involvement of CFSB in Triple Five Worldwide's operations." *Id.* Accordingly, the Court granted Plaintiffs' request, but permitted Defendants to file sur-replies in further opposition to Plaintiffs' motion to amend after reviewing the revised Proposed Second Amended Complaint. Dkt. 249 at 3. Plaintiffs filed their revised Proposed Second Amended Complaint on January 3, 2023, Dkt. 263, and the JGX Defendants and the Worldwide Defendants filed sur-replies on January 6, 2023, Dkts. 264-1, 266.

## II.  Standard of Review

Pursuant to Federal Rule of Civil Procedure 15(a)(1), a party may amend its pleading once without leave of court "within: (A) 21 days after serving it, or (B) if the pleading is one to which a responsive pleading is required, 21 days after service of a responsive pleading or 21 days after service of a motion under Rule 12(b), (e), or (f), whichever is earlier." Amending a pleading after that deadline requires either the opposing party's written consent or leave of court. *See* Fed. R. Civ. P. 15(a)(2). A district court must "freely give leave [to amend] when justice so requires." *Id.* Under this liberal standard, a motion to amend is generally denied only if the moving party has unduly delayed or acted in bad faith or with a dilatory motive, the opposing party will be unfairly

---

applies to these materials, and the confidential nature of the Settlement Agreement and related communications, the Court grants these motions. *See Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 119 (2d Cir. 2006).

prejudiced if leave is granted, the proposed amendment is futile, or if prior amendments have repeatedly failed to cure pleading deficiencies. *Burch v. Pioneer Credit Recovery, Inc.*, 551 F.3d 122, 126 (2d Cir. 2008). When a proposed amendment would add new defendants, Rule 21 governs. *Shulman v. Chaitman LLP*, 392 F. Supp. 3d 340, 358 (S.D.N.Y. 2019). Under that Rule, the Court may allow a party to be added or removed "at any time, on just terms." Fed. R. Civ. P. 21. "In deciding whether to permit joinder, courts apply the same standard of liberality afforded to motions to amend pleadings under Rule 15." *N.Y. Wheel Owner LLC v. Mammoet Holding B.V.*, 481 F. Supp. 3d 216, 249 (S.D.N.Y. 2020); *Amaya v. Roadhouse Brick Oven Pizza, Inc.*, 285 F.R.D. 251, 253 (E.D.N.Y. 2012) ("There is . . . little practical difference between Rule 15 and Rule 21 since they both leave the decision whether to permit or deny an amendment to the district court's discretion.").

Rule 16(b), however, requires a plaintiff to make "a heightened showing when leave to amend a complaint would require modification of a court's scheduling order." *Cepeda v. United States*, No. 21 Civ. 5967 (JPC), 2021 WL 465409, at *4 (S.D.N.Y. Feb. 9, 2021). Rule 16(b)(3)(A) requires the court's scheduling order to "limit the time to join other parties, amend the pleadings, complete discovery, and file motions." Fed. R. Civ. P. 16(b)(3)(A). Such a schedule "may be modified only for good cause and with the judge's consent." Fed. R. Civ. P. 16(b)(4). The Second Circuit has explained that Rule 16(b) was "designed to offer a measure of certainty in pretrial proceedings, ensuring that 'at some point both the parties and the pleadings will be fixed.'" *Parker v. Columbia Pictures Indus.*, 204 F.3d 326, 340 (2d Cir. 2000) (citation omitted).

Thus, "[t]he period of 'liberal' amendment ends if the district court issues a scheduling order setting a date after which no amendment will be permitted. It is still possible for the plaintiff to amend the complaint after such a deadline, but the plaintiff may do so only up[on] a showing of the

'good cause' that is required to modify a scheduling order under Rule 16(b)(4)." *Sacerdote v. New York Univ.*, 9 F.4th 95, 115 (2d Cir. 2021); *see also DeCastro v. City of New York*, No. 16 Civ. 3850 (RA), 2020 WL 4932778, at *6 (S.D.N.Y. Aug. 24, 2020) (explaining that when a plaintiff seeks to amend a complaint after expiration of a deadline to do so, "'the lenient standard under Rule 15(a) . . . must be balanced against the requirement under Rule 16(b) that the Court's scheduling order' may be modified only for 'good cause'" (quoting *Holmes v. Grubman*, 568 F.3d 329, 334-35 (2d Cir. 2009))).  The burden of demonstrating diligence in seeking extension of the deadlines set in the scheduling order falls on the moving party.  *See Fresh Del Monte Produce, Inc. v. Del Monte Foods, Inc.*, 304 F.R.D. 170, 175 (S.D.N.Y. 2014).   And "[t]he primary consideration," although "not . . . the only consideration," is "whether the moving party can demonstrate diligence." *Kassner*, 496 F.3d at 244.  "If the party moving to amend seeks to add claims based on facts it knew or should have known at the time of the amendment deadline, it likely failed to act with sufficient diligence to satisfy Rule 16(b)."  *Blake Marine Grp., LLC v. Frenkel & Co.*, 425 F. Supp. 3d 330, 335 (S.D.N.Y. 2019)).

### III.  Discussion

The Case Management Plan in this case provides that all amended pleadings, except those as of right pursuant to Federal Rule of Civil Procedure 15(a)(1), "may not be filed and additional parties may not be joined except with leave of Court" and that "[a]ny motion for leave to amend or to join additional parties shall be filed by 5/7/21."  Dkt. 28 ¶ 4.  Plaintiffs filed the present motion to amend over one year past this deadline—on May 20, 2022.[7]   Accordingly, Rule

---

[7] Indeed, the parties appear to assume that Rule 16(b)(4)'s good cause standard applies to Plaintiffs' motion on the theory that granting the motion would require modification of the expired deadline set in the Case Management Plan.  *See, e.g.*, JGX Opposition at 6-7 (arguing that Rule 16(b)(4)'s good cause standard applies because "the deadline to move to amend the complaint or

16(b)(4)'s good cause standard applies to Plaintiffs' motion to amend. *See Hurtado v. Hudson Fulton Corp.*, No. 20 Civ. 9133 (RA) (SLC), 2023 WL 2945846, at *3 (S.D.N.Y. Apr. 14, 2023) (collecting cases).

Applying this standard and as discussed below, the motion to amend is granted in part and denied in part. The Court finds that good cause exists to add new claims and the proposed new defendants within the JGX Defendants and the Worldwide Defendants groups, and that such amendments would not be futile. However, the motion is denied for lack of good cause with respect to the proposed joinder of the Retail Defendants.

## A.    The Worldwide Defendants

Starting with the Worldwide Defendants group, Plaintiffs seek to join Don Ghermezian, Syd Ghermezian, and CFSB as defendants to each of their existing claims,[8] Proposed Second Am. Compl. at 48, 56, 58-60, 62-68, and to add two new claims, one for fraudulent conveyance against Triple Five Worldwide and Don, Syd, and Nader Ghermezian, *id.* at 69, and the other for "Alter Ego/Piercing the Corporate Veil" against Don, Syd, and Nader Ghermezian, *id.* at 72.

First, Plaintiffs have demonstrated good cause to join these four new defendants and to assert these new claims. The Worldwide Defendants are critical of Plaintiffs' diligence in bringing the instant motion, arguing that "virtually all the facts upon which the [Proposed Second Amended Complaint] is based," such as the change in Triple Five Worldwide's managers which forms the

---

add parties expired on May 7, 2021" pursuant to the Case Management Plan and "[d]espite the stipulations and orders extending the pretrial schedule in this action, the deadline for a motion to amend was never extended"); *see also* Motion at 11, 17-20 (applying Rule 16(b)(4)'s good cause standard); Reply at 1-2 (same); Rigz Opposition at 18-21 (same); Pls. Sur-Reply at 5-9 (same).

[8] The existing claims are each pleaded against the "Counterfeiting Defendants" in the Proposed Second Amended Complaint, yet Plaintiffs do not define the "Counterfeiting Defendants" as including Nader Ghermezian. *See* Proposed Second Am. Compl. at 2. To the extent this was unintentional, the Court grants Plaintiffs leave to define the "Counterfeiting Defendants" as including Nader Ghermezian in the Second Amended Complaint.

basis of the fraudulent conveyance claims and the allegations concerning the involvement of Syd Ghermezian and CFSB in the counterfeiting scheme, "were known to plaintiffs, or should have been known to them, no later than October 2021." Worldwide Opposition at 3; *accord id.* at 11, 23; *see also id.* at 8 (asserting without explanation that "[t]he absence of 'Good Cause' is an additional reason for denying plaintiffs' motion as to Nader"). But the record suggests otherwise. The information presented to the Court by Plaintiffs—and not meaningfully refuted by the Worldwide Defendants—reveals that Plaintiffs have diligently pursued discovery in this matter, starting immediately after JGX's answer, continuing upon the filing of the First Amended Complaint and up to Plaintiffs' filing of both versions of the Proposed Second Amended Complaint. *See* Motion at 5-10; Dkt. 245; Pls. Sur-Reply at 6-7.

Plaintiffs further point to specific pieces of information learned through discovery which post-date or nearly post-date the First Amended Complaint. For example, between January 20 and February 16, 2022, Saba produced documents revealing "Don Ghermezian's personal involvement in the creation and execution of Triple Five Worldwide's hand sanitizer business." Motion at 6. Additional particulars of Don Ghermezian's involvement were revealed during the Rule 30(b)(6) deposition of JGX, at which Grazi testified, on February 14, 2022. *Id.* at 6-7. Plaintiffs obtained a video of the initial meeting at Don Ghermezian's house[9] from Saba's production on February 16, 2022. *Id.* at 7. On March 1, 2022, during the depositions of Saba and Orly Ghermezian Saba, Plaintiffs learned, among other things, that Saba and Orly Ghermezian Saba "did not know how they became managers of Triple Five Worldwide." *Id.* at 8. Similarly, Plaintiffs came to learn

---

[9] As discussed earlier, Plaintiffs allege that, after the onset of the COVID-19 pandemic, Don Ghermezian convened a meeting at his home, attended by David Ghermezian, Yonah Ghermezian, and Saba, at which they decided to enter the hand sanitizer market. Proposed Second Am. Compl. ¶¶ 89-91, 96-100.

further information regarding the extent to which the Triple Five Worldwide corporate form was "misuse[d]" and the extent of Don Ghermezian's involvement in the sanitizer business at his deposition on March 9, 2022. *Id.* at 8-9. At that deposition, Don Ghermezian testified that "[i]t's possible" that he remained an actual owner of Triple Five Worldwide, Dkt. 186-5 at 3:19-23, and that he became involved in its hand sanitizer operations "at a higher level," *id.* at 4:7-9. *See* Motion at 1-2. This differed from the 2021 deposition testimony of David Ghermezian and Berkowitz that Don Ghermezian had little or no role in Triple Five Worldwide. Dkts. 186-3 at 3:15-17, 186-4 at 3:13-18. Finally, Plaintiffs acquired additional information to support their proposed amendments from a document production in fall 2022 in response to a third-party subpoena to Syd Ghermezian—documents which, according to Plaintiffs, "should have [already] been produced by Triple Five Worldwide, Don Ghermezian, David Ghermezian, and Berkowitz." Dkt. 245 at 1.

Accordingly, while it may be the case that Plaintiffs had access to some of the information underlying the new allegations in the Proposed Second Amended Complaint prior to the Court-imposed deadline for motions to amend of May 7, 2021, or even prior to filing the First Amended Complaint, additional information learned through subsequent discovery supported Plaintiffs' allegations in the amendments relating to the Worldwide Defendants that they now seek. Good cause, therefore, exists to add new claims and defendants concerning the Worldwide Defendants. *See Samad Bros., Inc. v. Bokara Rug Co., Inc.*, No. 09 Civ. 5843 (JFK) (KNF), 2010 WL 2835754, at *3 (S.D.N.Y. June 30, 2010) (finding that the plaintiff acted diligently in moving to amend its complaint after receiving during discovery additional relevant information from the defendants and third parties that it did not previously possess, which provided the grounds for seeking to amend).

The Worldwide Defendants primarily object to the Proposed Second Amended Complaint on futility grounds under Rule 15.  *See* Worldwide Opposition at 5-28.  For example, the Worldwide Defendants argue that the RICO claim fails because there are no allegations that any of the Worldwide Defendants made specific misrepresentations, as needed to satisfy Federal Rule of Civil Procedure 9(b)'s particularity requirement, *id.* at 27, and because such allegations as that "Syd and CFSB managed wire transfers and payments, without any allegations of control over the alleged enterprise" insufficiently plead those defendants' participation in the conduct of a RICO enterprise's affairs, *id.* at 15-16.  They argue that Plaintiffs fail to allege an open-ended pattern of racketeering activity because the Worldwide Defendants stopped manufacturing the Counterfeit Product following the FDA Order, and that there is no close-ended pattern because the Counterfeiting Defendants are not alleged to have engaged engage in the scheme for over two years.  *Id.* at 16-17.  With respect to trademark infringement, the Worldwide Defendants assert that there are no allegations that Syd Ghermezian or CFSB intentionally induced anyone to sell or manufacture the Counterfeit Product, and that their sole involvement was to supervise wire transfers.  *Id.* at 20-21.  And they argue that Plaintiffs' fraudulent conveyance claim fails because the change in Triple Five Worldwide's managers is not a conveyance.  *Id.* at 9.  In essence, the Worldwide Defendants seek to test the legal sufficiency of each Plaintiffs' claims, and therefore ask the Court to engage in an analysis akin to considering a motion to dismiss.

In general, "[a]n amendment is considered futile if it could not defeat a motion to dismiss for failure to state a claim."  *Cepeda*, 2021 WL 465409, at *3 (internal quotation marks omitted). That said, a motion to amend a complaint "should not be denied on the basis of futility unless the proposed amendment is clearly frivolous or facially insufficient."  *Doe. v. Cnty. of Rockland*, No. 21 Civ. 6751 (KMK), 2022 WL 2533151, at *4 (S.D.N.Y. July 7, 2022) (internal quotation marks

omitted).  Thus, "when amendments raise colorable claims, especially where they are based upon disputed facts, they should be allowed, and a comprehensive legal analysis deferred to subsequent motions to dismiss or for summary judgment."  *Id.* at *5 (brackets and internal quotation marks omitted); *see also Ahmad v. Day*, No. 20 Civ. 4507 (JMF) (GWG), 2022 WL 17970160, at *5 (S.D.N.Y. Dec. 8, 2022) ("[T]he fact that futility may sometimes constitute a reason for denial of a motion to amend is not a general invitation to explore the merits of novel proposed claims or to raise defenses that require analysis of matters outside the pleadings.  The futility defense to a motion to amend is not, in short, a substitute for a motion to dismiss or a motion for summary judgment." (quoting *Livingston v. Trustco Bank*, No. 1:20 Civ. 1030 (GTS/DJS), 2021 WL 6199655, at *2 (N.D.N.Y. Apr. 23, 2021))).

In this case, the Court cannot say that the proposed joinder of Don, Syd, and Nader Ghermezian and of CFSB or the proposed addition of claims for fraudulent conveyance or alter ego/veil piercing would be so plainly futile such that leave to amend would be improper.  In reaching this conclusion, the Court "is mindful of judicial economy and preserving the parties' resources."  *Cnty. of Rockland*, 2022 WL 2533151, at *5; *see also In re "Agent Orange" Prod. Liab. Litig.*, 220 F.R.D. 22, 25 (E.D.N.Y. 2004) (analyzing "the impact of granting leave [to amend] on judicial economy").  Here, many, if not all, of the Worldwide Defendants' futility arguments apply equally to defendants who are already parties to the case, or to conduct and allegations underlying causes of action that are already alleged in the First Amended Complaint. Thus, even if the Court were to, for example, agree with the Worldwide Defendants that Plaintiffs fail to sufficiently allege a RICO pattern of activity with respect to Don, Syd, and Nader Ghermezian and CFSB, the Worldwide Defendants would still be required to brief a motion to

dismiss in order to apply the same arguments to Triple Five Worldwide, Saba, Berkowitz, David Ghermezian, and Yonah Ghermezian.

More importantly, at this stage, the Proposed Second Amended Complaint sufficiently alleges that Don, Syd, and Nader Ghermezian and CSFB were active participants in the counterfeiting scheme, and that Plaintiffs' additional fraudulent conveyance claims and veil piercing/alter ego claims arise from the same conduct. As discussed above, the Proposed Second Amended Complaint includes allegations showing that Don, Nader, and Syd Ghermezian were leaders of the Ghermezian family. *See, e.g.*, Proposed Second Am. Compl. ¶ 98 (alleging that Don, Nader, and Syd Ghermezian wanted to get their children involved in the hand sanitizer scheme, viewing it as an opportunity to expand their involvement in the family business generally). The allegations suggest that Don Ghermezian, in particular, is the patriarch of the family and a driving force behind the counterfeiting scheme. Don Ghermezian was the first to research possible hand sanitizer brands. *Id.* ¶ 93. He then held a meeting in his home, *id.* ¶ 96, where the Ghermezians made the decision to enter the hand sanitizer market, *id.* ¶¶ 91, 99-100. Further, Don Ghermezian "was consistently and intimately involved in the counterfeit sanitizer operation because he, *inter alia*, spoke regularly with [other Worldwide Defendants] to stay updated on branding, sourcing, importing, and sales efforts; provided guidance and assistance; [provided] direction regarding the movement of counterfeit goods; . . . authorized payments and refunds . . . [and] communicated directly with potential customers to solicit sales." *Id.* ¶ 123; *see also id.* ¶¶ 126-32 (describing how Don Ghermezian directed certain payments on behalf of Triple Five Worldwide relating to the counterfeiting scheme), 134 (alleging that Don Ghermezian hosted a dinner for Grazi to discuss the Counterfeit Product), 166 (alleging Don Ghermezian had access to Triple Five Worldwide's bank accounts at CFSB).

In addition, according to the Proposed Second Amended Complaint, Syd Ghermezian and CFSB were primarily responsible for overseeing wire transactions for payments in support of the counterfeiting scheme. CFSB is "wholly owned and controlled by members of the Ghermezian family," *id.* ¶ 153, most notably Syd Ghermezian, *id.*, who is the bank's Chairman and CEO, *id.* ¶ 150. "CFSB allowed Triple Five Worldwide to open and/or operate an account without providing necessary corporate documentation," *id.* ¶ 164, and Triple Five Worldwide began using its CFSB account to make transactions in connection with the Counterfeit Product, including to the JGX Defendants, *id.* ¶¶ 173-74, 271. All the while, Syd Ghermezian maintained direct access to the Triple Five Worldwide account, *id.* ¶ 166, and directed CFSB not to report transactions made on behalf of Triple Five Worldwide, *id.* ¶¶ 176-78; *see also id.* ¶ 175 (alleging that Syd Ghermezian was aware of all Triple Five Worldwide transactions regarding the counterfeiting scheme and made sure that CFSB honored each of them). Finally, the Proposed Second Amended Complaint also contains allegations showing that Nader Ghermezian was an integral part of the scheme. Like Don and Syd Ghermezian, Plaintiffs allege that Nader Ghermezian was one of the original managers of Triple Five Worldwide whose title was fraudulently transferred to Orly Ghermezian Saba, Berkowitz, and Saba in order to hide his involvement in the alleged counterfeiting scheme, but that he remained *de facto* in charge of Triple Five Worldwide. *Id.* ¶¶ 111, 122. In addition, Plaintiffs allege that Nader Ghermezian was to communicate directly with in-house counsel for one of the Ghermezian entities regarding the selection of Triple Five Worldwide as the entity to facilitate the counterfeiting operation. *Id.* ¶ 110 n.3.

Thus, the Proposed Second Amended Complaint contains allegations showing that the newly added defendants and claims are sufficiently tied to those which the Court previously determined were not futile when it granted Plaintiffs leave to file the First Amended Complaint.

*See* Jan. 27, 2022 Tr. at 18:3-21:5.  If the Worldwide Defendants wish to further challenge the legal sufficiency of those claims, they may do so on a motion to dismiss or for summary judgment pursuant to a briefing schedule for all Defendants who seek to so move.  But at this stage, Plaintiffs' motion to amend is granted with respect to the Worldwide Defendants.

**B.      The JGX Defendants**

The Court next turns to the motion to amend as to the JGX Defendants.  Plaintiffs seek to join Dib Jaradeh and Nouri Jaradeh as defendants to each of their existing claims, Proposed Second Am. Compl. at 48, 56, 58-60, 62-68, and to assert a new claim for "Alter Ego/Piercing the Corporate Veil" against Grazi, Dib Jaradeh, and Nouri Jaradeh for their roles with JGX, *id.* at 73-74, and a second "Alter Ego/Piercing the Corporate Veil" claim against Dib Jaradeh for his role with Issac Import, *id.* at 74-75.  The JGX Defendants object primarily on good cause and futility grounds.  JGX Opposition at 7-25.  The Court finds that Plaintiffs' amendments with respect to the JGX Defendants are proper for similar reasons that it permits the amendments as to the Worldwide Defendants.

As to good cause, Plaintiffs aver that they learned many facts underlying the new allegations in the Proposed Second Amended Complaint after the original deadline to amend, and even after filing the First Amended Complaint, and the JGX Defendants have not meaningfully contended otherwise.  For example, on January 17, 2022, shortly before Plaintiffs filed the First Amended Complaint, "JGX produced nearly 1,500 pages of documents" showing "the Defendants' collaboration in executing the counterfeiting scheme as well as their disregard for the separate legal existence of the various entities involved."  Motion at 5-6.  On February 11, 2022, the day after the First Amended Complaint was filed, JGX made a supplemental production of documents which showed "the changes to the URBĀNE label ordered by Defendant Jack Grazi," and

23

revealing that the label for the Counterfeit Product "did not make any changes to the 'Drug Facts' or 'Ingredients' that were displayed on the label" even though the Counterfeit Product contained methanol. *Id.* at 6. Plaintiffs also learned more details regarding the extent to which Grazi and others disregarded corporate formalities with respect to JGX, such as by failing to keep corporate minutes, during JGX's February 14, 2022 deposition. *Id.* at 6-7; *see also id.* at 7 (averring that testimony from Isaac Import's Rule 30(b)(6) deposition "revealed the comingling of Isaac Import's and JGX's business activities to such an extent that the three individuals behind these two companies . . . exercise complete dominion and control over JGX and Isaac Import"). Thus, as with the Worldwide Defendants, Plaintiffs have diligently pursued discovery from the JGX Defendants, and the claims and parties they seek to add are based, at least in part, on facts learned or facts which became more clear following recent discovery. This is sufficient to demonstrate Rule 16(b)(4) good cause.

Turning to futility, as with the Worldwide Defendants, the proposed joinder of Dib and Nouri Jaradeh and the proposed additional claims for alter ego/veil piercing against Grazi, Dib Jaradeh, and Nouri Jaradeh are not so plainly futile that leave to amend would be improper. For instance, Plaintiffs' new alter ego/veil piercing claims against Grazi, Dib Jaradeh, and Nouri Jaradeh arise logically from the same counterfeiting scheme underlying their existing claims. In essence, Plaintiffs allege that in participating in the counterfeiting scheme giving rise to their RICO and infringement claims, Grazi, Dib Jaradeh, and Nouri Jaradeh failed to observe corporate formalities and improperly exercised complete control over JGX and (with respect to Dib Jaradeh) over Isaac Import, such that the Court should pierce those entities' veils. Proposed Second Am. Compl. ¶¶ 394-414. Thus, while the JGX Defendants may argue that the allegations underlying Plaintiffs' new alter ego/veil piercing claims are too conclusory to withstand a motion to dismiss

24

and that discovery shows that "JGX and Isaac Import maintain separate bank accounts, tax returns, and product lines such that they function as separate businesses," JGX Opposition at 10-11, judicial economy would be better served by considering these arguments through a motion to dismiss or for summary judgment, where the Court can analyze the legal sufficiency of the alter ego/veil piercing claims in relation to Plaintiffs' other claims that the Court already held were not futile. *See* Jan. 27, 2022 Tr. at 18:3-21:5.

This same logic applies equally to the JGX Defendants' opposition to joining Dib and Nouri Jaradeh. They argue that the Proposed Second Amended Complaint fails to sufficiently plead any RICO predicate acts of mail or wire fraud to withstand Rule 9(b), *id.* at 15, that there are no allegations of an "'open-ended' pattern[] of predicate acts that satisfy RICO's requirements as to the JGX Defendants," *id.* at 16 (emphasis omitted), that there are no allegations of a "'closed-ended' pattern of continuous and related predicate acts that satisfy RICO's requirements," *id.* (emphasis omitted), and that no factual allegations establish "that the JGX Defendants conspired to violate RICO," *id.* (emphasis omitted). As to Plaintiffs' infringement claims, the JGX Defendants argue that the Lanham Act does not apply retroactively and that the earliest registration date for any of Plaintiffs' URBĀNE marks post-dates much of the alleged conduct. *Id.* at 17. The JGX Defendants also contend that there are no allegations that Dib or Nouri Jaradeh used the marks in commerce, *id.*, no allegations that they learned of Plaintiffs' identity prior to the alleged infringement as required for a claim for contributory infringement, *id.* at 18-19, and no allegations that they "commercially advertised or promoted the" Counterfeit Product, as opposed to merely selling it to Rigz who specifically commissioned it, as required to support a false advertising claim, *id.* at 20. *See also id.* at 21-25 (raising similarly general arguments with respect to Plaintiffs'

deceptive business practices, tortious interference, unfair competition, and unjust enrichment claims).

But these same arguments also largely apply to claims that are already in the case, and the Court has already held that those claims were not futile. Jan. 27, 2022 Tr. at 18:3-21:5. Moreover, the Proposed Second Amended Complaint alleges that Dib and Nouri Jaradeh, like Grazi and the JGX entities, were integral to the alleged scheme. For example, as alleged, at the beginning of JGX's involvement, Grazi forwarded initial purchase orders from Rigz to Dib Jaradeh, and Grazi and Dib Jaradeh worked together with Rigz to finalize details related to the production of the Counterfeit Product. Proposed Second Am. Compl. ¶¶ 67-68. Dib Jaradeh, furthermore, allegedly was responsible for creating the label for the Counterfeit Product. *Id.* ¶ 73. As alleged, Nouri Jaradeh conducted research and discovered that Coronado was the owner of the URBĀNE mark, yet even after he reported his findings to Grazi, the JGX Defendants failed to take any action to confirm they were authorized to use the URBĀNE mark. *Id.* ¶ 72. Nouri Jaradeh also allegedly created purchase orders for the Worldwide Defendants once they joined the scheme. *Id.* ¶ 105.

Thus, because the allegations in the Proposed Second Amended Complaint illustrate that Dib Jaradeh and Nouri Jaradeh were active members of the alleged counterfeiting scheme, and because all the JGX Defendants will have the opportunity to jointly move to dismiss the subsequent version of the Complaint, the Court finds that Plaintiffs' proposed amendments with respect to the JGX Defendants is proper.

## C.    The Retail Defendants

Finally, the Court turns to Plaintiffs' proposed amendments with respect to the Retail Defendants. Plaintiffs seek to add new claims against Pilot and Love's for trademark infringement under the Lanham Act and New York common law based on their alleged sales of the Counterfeit

Product.  *Id.* at 75-77.  Specifically, Plaintiffs allege that Pilot received approximately 85,882 units of the Counterfeit Product from Rigz and sold approximately 50,324 units, *id.* ¶¶ 199-200; that Love's received approximately 115,295 units of the Counterfeit Product, of which it sold approximately 92,769 units, *id.* ¶¶ 203-04; and that the Counterfeit Product "was still available to consumers at nationwide chains including Pilot until as late as in or around September 2020," *id.* ¶ 236.  Rigz intervened and now objects on behalf of the Retail Defendants, arguing, *inter alia*, an absence of good cause.  Rigz Opposition at 18-21.  The Court agrees that Plaintiffs have failed to demonstrate good cause to join the Retail Defendants at this stage.

As noted above, "[i]f the party moving to amend seeks to add claims based on facts it knew or should have known at the time of the amendment deadline, it likely failed to act with sufficient diligence to satisfy Rule 16(b)."  *Blake Marine Grp.*, 425 F. Supp. 3d at 335.  In this case, Plaintiffs have been on notice of potential claims against the Retail Defendants from at least as early as their initial settlement negotiations with Rigz.  First, Rigz explicitly sought to expand the Settlement Agreement's release provision to include claims not just against Rigz but also against Rigz's customers.  *See* Rigz Opposition at 4-5.  This should have revealed to Plaintiffs the possibility that the Retail Defendants could have liability as sellers.  In addition, Plaintiffs have known of the identities of the Retail Defendants since the onset of this case.  Indeed, Plaintiffs' first iteration of the Complaint alleges that "Rigz successfully placed URBĀNE hand sanitizer into a number of national businesses, including Pilot Travel Centers and . . . Love's Travel Stops," Dkt. 1 ¶ 38, and that "distribution by JGX and Liberty enabled Rigz to sell the [Counterfeit] Products to, at a minimum, Pilot Travel Centers," *id.* ¶ 59.

Plaintiffs take the position that the Settlement Agreement only applies to claims against the Retail Defendants from before August 2020, and that they were therefore unable to bring claims

against the Retail Defendants until discovery confirmed whether any sales occurred after August 2020 and if so, how many.  Pl. Sur-Reply at 3-4.  Plaintiffs aver that in fall 2021, Pilot produced over 9,000 pages of documents "evidencing that they received and sold thousands of bottles of counterfeit sanitizer," and Love's produced "over 100 pages of documents," *id.* at 6, but that reaching the conclusion that the Retail Defendants sold units of the Counterfeit Product both before and after August 2020 "took weeks of review," *id.* at 8.

Plaintiffs, however, also acknowledge that by the time they filed the First Amended Complaint, in February 2022, they were in a position to allege—and they in fact did allege—that the Counterfeit Product "was still available to consumers at nationwide chains such as Pilot Travel Centers until as late as in or around September 2020."  First Am. Compl. ¶ 140; *see also* Pls. Sur-Reply at 7-8.  Moreover, this was notwithstanding "the fact that the Retail Defendants' productions did not confirm the *amount* of sales."  Pls. Sur-Reply at 7.  Furthermore, the only new allegations added to the Proposed Second Amended Complaint concerning the Retail Defendants are to quantify the number of sales made, but without specifying when those sales were made.  Indeed, the allegation concerning the Counterfeit Product's availability "in or around September 2020" remains substantively unchanged between the First Amended Complaint and the Proposed Second Amended Complaint.  *Compare* First Am. Compl. ¶ 140, *with* Proposed Second Am. Compl. ¶ 236.  Thus, even crediting Plaintiffs' argument that it took them weeks to review discovery from the Retail Defendants, which is understandable in light of competing priorities in this case, *see* Pls. Sur-Reply at 8 n.2, Plaintiffs had all the information they needed to add the Retail Defendants at the time they filed First Amended Complaint.  Thus, unlike with respect to the other proposed new defendants, Plaintiffs have failed to identify to any additional discovery obtained since the First Amended Complaint that justifies the delay in seeking to add the Retail Defendants.

Permitting this amendment also might cause significant prejudice to Rigz.  *See Hurtado*, 2023 WL 2945846, at \*4 (noting that "[c]ourts may also consider 'whether allowing the amendment of the pleading at this stage of the litigation will prejudice defendants'" in analyzing good cause under Rule 16(b) (quoting *Kassner*, 496 F.3d at 244)).  Rigz avers, and Plaintiffs do not dispute, that Rigz is required to indemnify the Retail Defendants in connection with the claims at issue in the Proposed Second Amended Complaint.  Rigz Opposition at 2, 12.  If that is the case, the Retail Defendants might have little incentive to participate in this litigation since they may be able to just transfer any liability judgment entered against them onto Rigz.

To be sure, this case is still in its early stages, as the majority of defendants have not yet answered any version of the Complaint.  Moreover, as noted above, Plaintiffs have been relatively diligent with discovery.  Thus, were the Court analyzing this motion as to the proposed claims against the Retail Defendants under Rule 15's lenient standard, it would be a closer call.  Rule 16(b)(4), however, imposes a stricter standard.  *Sacerdote*, 9 F.4th at 115.  Plaintiffs may only amend their pleading upon the demonstration of good cause, and, unlike their other proposed amendments, Plaintiffs have failed to make such a showing with respect to the Retail Defendants.  Plaintiffs could have sought to add the Retail Defendants prior to the deadline to seek leave to amend, and more importantly, they could have sought to add them when they amended their Complaint for the first time.  But Plaintiffs did not, and they have offered no persuasive explanation as to why.  Accordingly, Plaintiffs' motion to bring claims against the Retail Defendants in their Second Amended Complaint is denied.

## IV.  Conclusion

For the reasons discussed, Plaintiffs' motion to amend is granted in part and denied in part. Plaintiffs shall file a final version of the Second Amended Complaint, consistent with the Court's

ruling herein, within fourteen days of this Opinion and Order.   Absent extraordinary circumstances, this will be Plaintiffs' final opportunity to amend their Complaint.   As such, the Court encourages Plaintiffs to consider and attempt to address in the Second Amended Complaint the futility arguments raised by the Counterfeiting Defendants in their oppositions to amendment.

Within fourteen days following service of all of the newly-added defendants, the parties shall meet and confer and file a status letter regarding a briefing schedule for any dispositive motions.   Plaintiffs shall file one omnibus opposition, not to exceed forty-pages, in response to all motions.

The Clerk of Court is respectfully directed to close Docket Numbers 184, 285, and 289.

SO ORDERED.

Dated: May 31, 2023
       New York, New York

_____
          JOHN P. CRONAN
       United States District Judge