UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| RED ROCK SOURCING LLC, a Nevada limited liability company; and CORONADO DISTRIBUTING LLC, a Colorado limited liability company,<br><br>        Plaintiffs,<br><br>    - against -<br><br>JGX, LLC, a New York limited liability company; LIBERTY INTERNATIONAL DISTRIBUTORS, LLC, a New York limited liability company; TRIPLE FIVE WORLDWIDE, LLC, a Nevada limited liability company; ISAAC IMPORT, INC., a New York corporation; JACK GRAZI, an individual; NOURI JARADEH, an individual; DIB JARADEH, an individual; ISAAC SABA, an individual; ELIEZER BERKOWITZ, an individual; DAVID GHERMEZIAN, an individual; YONAH GHERMEZIAN, an individual; DON GHERMEZIAN, an individual; SYD GHERMEZIAN, an individual; NADER GHERMEZIAN, an individual; and COMMUNITY FEDERAL SAVINGS BANK, a federal savings bank,<br><br>        Defendants. | **SECOND AMENDED COMPLAINT**<br><br>1:21-cv-01054-JPC<br><br>**DEMAND FOR JURY TRIAL** |

| | |
|---|---|
| Daniel J. Hurteau<br>Erin T. Huntington<br>**NIXON PEABODY LLP**<br>55 West 46th Street<br>New York, New York 10036<br>Tel: (212) 940-3000<br>Fax: (212) 940-3111 | On Lu (admitted *pro hac vice*)<br>Andrew H. Winetroub<br>(admitted *pro hac vice*)<br>**NIXON PEABODY LLP**<br>One Embarcadero Center<br>San Francisco, California<br>94111-3600<br>Tel: (415) 984-8200 |

*Attorneys for Plaintiffs Red Rock Sourcing LLC and Coronado Distributing LLC*

Red Rock Sourcing LLC (hereinafter referred to as "**Red Rock**") and Coronado Distributing LLC (hereinafter referred to as "**Coronado,**" and together with Red Rock, the "**Plaintiffs**"), by and through their undersigned attorneys, bring this Second Amended Complaint against Defendants JGX, LLC (hereinafter referred to as "**JGX**"), Liberty International Distributors, LLC (hereinafter referred to as "**Liberty**"), Triple Five Worldwide, LLC (hereinafter referred to as "**Triple Five Worldwide**"), Isaac Import, Inc. (hereinafter referred to as "**Isaac Import**"), Jack Grazi (hereinafter referred to as "**Grazi**"), Nouri Jaradeh (hereinafter referred to as "**Jaradeh**"), Dib Jaradeh (hereinafter referred to as "**DJ**"), Isaac Saba (hereinafter referred to as "**Saba**"), Eliezer Berkowitz (hereinafter referred to as "**Berkowitz**"), David Ghermezian, Yonah Ghermezian, Don Ghermezian, Syd Ghermezian, Nader Ghermezian, and Community Federal Savings Bank (hereinafter referred to as "**CFSB**") (all named Defendants with the exception of Nader Ghermezian are referred to herein as the "**Counterfeiting Defendants**") for violation of 18 U.S.C. § 1962 (Racketeer Influenced and Corrupt Organizations Act); trademark infringement, contributory trademark infringement, false designation of origin and unfair competition, and false advertising under the Lanham Act, 15 U.S.C. §§ 1051 *et seq*.; deceptive business practices under the New York General Business Law; trademark infringement, tortious interference with prospective economic relations, unfair competition, unjust enrichment, dilution, and negligence under New York common law; and dilution by tarnishment under the New York General Business Law.

Plaintiffs further bring claims against Defendants Jaradeh, DJ, Grazi, Don Ghermezian, Syd Ghermezian, and Nader Ghermezian for Alter Ego/Piercing the Corporate Veil (collectively referred to herein as the "**Corporate Veil Defendants**").

## INTRODUCTION

1.      This case arises out of the Counterfeiting Defendants' shocking, illegal, and fraudulent scheme at the height of the COVID-19 pandemic to enrich themselves with callous indifference to the public safety and health of the American people.

2.      The Counterfeiting Defendants blatantly disregarded Plaintiffs' valuable trademarks, and in the process, destroyed not only the goodwill associated with those marks, but also Plaintiffs' entire business.

3.      Taken together, the Counterfeiting Defendants committed a wholesale theft of Plaintiffs' business and established goodwill.

4.      The Counterfeiting Defendants are responsible for importing into the U.S. at least hundreds of thousands of bottles of illicit and potentially dangerous hand sanitizer that may still be circulating in commerce.

5.      URBĀNE was a premium brand of hand sanitizer created and developed by Plaintiffs that was "Made in the USA," and sold to national retailers such as *Pilot, Love's,* and *Tractor Supply,* and Plaintiffs were in final negotiations with *Rite Aid* for a national roll-out.

6.      Taking advantage of URBĀNE's recognized brand and hoping to insert itself into Plaintiffs' existing supply chain, the Counterfeiting Defendants worked in concert to manufacture counterfeit URBĀNE hand sanitizer produced in Mexico.

7.      The Counterfeiting Defendants' inexperience, lack of due diligence, and gross negligence was worsened by their selection of a dubious manufacturer for the counterfeit production.

8.      That Mexican factory was ultimately exposed by the FDA for using potentially inferior alcohol that resulted in methanol contamination in some of its hand sanitizer

batches. (Methanol, or wood alcohol, is a substance that can be toxic when absorbed through the skin, and life-threatening when ingested.)

9.      The factory, along with the URBĀNE brand, was put on the FDA's DO NOT USE list, and the public was instructed to "stop using it immediately…. (and) throw it away in a hazardous waste container."

10.      The Counterfeiting Defendants' illegal actions have irreparably decimated Plaintiffs' business, goodwill, and valuable trademarks, for which the Court must impose both corporate and individual liability as well as punitive damages on all of the Counterfeiting Defendants.

## JURISDICTION AND VENUE

11.      This Court has subject matter jurisdiction over Plaintiffs' claims pursuant to 18 U.S.C. § 1964, 15 U.S.C. § 1121, 28 U.S.C. §§ 1331 and 1338(a) because the claims at issue arise, *inter alia*, under the Racketeer Influenced and Corrupt Organizations (RICO) Act, 18 U.S.C. §§ 1961 *et seq*., and the Lanham Act, 15 U.S.C. §§ 1051 *et seq.*

12.      In addition, supplemental jurisdiction over the related state law claims is conferred upon this Court by 28 U.S.C. § 1367(a).

13.      This Court has personal jurisdiction over all Defendants, including under N.Y. C.P.L.R. Sections 301 and 302, because, upon information and belief, Defendants JGX, Liberty, Isaac Import, Grazi, David Ghermezian, Yonah Ghermezian, Don Ghermezian, and Syd Ghermezian are citizens of this State; all Defendants consummated transactions by which they purposefully directed activities toward this State; all Defendants have regularly transacted, and continue to transact, business in this State; all Defendants contracted to supply goods and/or services in this State; all Defendants are responsible for the counterfeit goods and/or property at

issue likely being located in this State; all Defendants are causing and have caused tortious injury by an act in this State; and all Defendants are causing tortious injury in this State by an act outside this State where they regularly do or solicit business, engage in other persistent courses of conduct, and/or derive substantial revenue from goods used or consumed, or services rendered, in this State.

14.     The exercise of personal jurisdiction over all Defendants comports with due process.

15.     Venue is proper in this judicial district and Court pursuant to 28 U.S.C. § 1391 because a substantial part of the acts complained of herein occurred in this judicial district and all Defendants are subject to personal jurisdiction in this judicial district as aforesaid.

## THE PARTIES

16.     Coronado Distributing LLC is a Colorado limited liability company with a principal place of business located at 22354 Uintah Road, Cedaredge, Colorado 81413.

17.     Red Rock Sourcing LLC is a Nevada limited liability company with a principal place of business located at 2629 E. Craig Road, Las Vegas, Nevada 89030.

18.     Defendant JGX, LLC is a New York limited liability company with a principal place of business in Kings County, New York.

19.     Defendant Liberty International Distributors, LLC is a New York limited liability company with a principal place of business in Albany County, New York.

20.     Defendant Triple Five Worldwide, LLC is a Nevada limited liability company with, upon information and belief, a principal place of business in East Rutherford, New Jersey.

21.     Defendant Isaac Import, Inc. is a New York corporation with, upon information and belief, a principal place of business in Kings County, New York.

22.    Defendant Jack Grazi is an individual who, upon information and belief, resides in Brooklyn, New York.

23.    Defendant Nouri Jaradeh is an individual who, upon information and belief, resides in Brooklyn, New York.

24.    Defendant Dib Jaradeh is an individual who, upon information and belief, resides in Brooklyn, New York.

25.    Defendant Isaac Saba is an individual who, upon information and belief, resides in Mexico City, Mexico.

26.    Defendant Eliezer Berkowitz is an individual who, upon information and belief, resides in the State of New Jersey.

27.    Defendant David Ghermezian is an individual who, upon information and belief, resides in the State of New York.

28.    Defendant Yonah Ghermezian is an individual who, upon information and belief, resides in the State of New York.

29.    Defendant Don Ghermezian is an individual who, upon information and belief, resides in the State of New York.

30.    Defendant Syd Ghermezian is an individual who, upon information and belief, resides in the State of New York.

31.    Defendant Nader Ghermezian is an individual who, upon information and belief, resides in the State of New York.

32.    Defendant Community Federal Savings Bank is a federally chartered bank with a place of business located at 5 Penn Plaza, 14th Floor, New York, New York 10001, duly authorized to transact business in the State of New York.

## FACTUAL BACKGROUND

### A. *The URBĀNE Marks and Brand*

33.     Red Rock and Coronado are engaged in the manufacture, marketing, sale, and distribution of hand sanitizer; fragranced body care products; and non-medical bath bombs and salts.

34.     Red Rock and Coronado often work together in developing, promoting, and selling these products to retailers and distributors nationwide.

35.     Coronado is the registered owner of U.S. Trademark Registration No. 6,068,164, registered on June 2, 2020, with a date of first use of August 1, 2019, for the URBĀNE BATH & BODY word mark registered in connection with *Fragranced body care preparations, namely, shower gels, bath gel, body scrubs; Bath bombs; Bath salts, not for medical purposes; Bath and shower gels and salts not for medical purposes* in Class 3 (the "**164 Registration**").  A copy of the registration certificate for the '164 Registration is attached hereto as **Exhibit A**.

36.     Since August 1, 2019, Coronado has exclusively used in U.S. commerce its distinctive URBĀNE BATH & BODY mark in connection with the sale of *Fragranced body care preparations, namely, shower gels, bath gel, body scrubs; Bath bombs; Bath salts, not for medical purposes*.

37.     Coronado is also the registered owner of U.S. Trademark Registration No. 6,295,360, registered on March 16, 2021, with a date of first use of at least as early as April 2020, for the URBANE BATH & BODY word mark registered in connection with *Hand-sanitizing preparations* in Class 5 (the "**360 Registration**").  A copy of the '360 Registration is attached hereto as **Exhibit B**.

38. In addition, Coronado is the registered owner of U.S. Trademark Registration No. 6,348,225, registered on May 11, 2021, with a date of first use of at least as early as August 2019, for the design mark registered in connection with *Hand-sanitizing preparations* in Class 5 (claiming a date of first use of at least as early as April 2020), and with *Fragranced body care preparations, namely, shower gels, bath gel, body scrubs; Bath bombs; Bath salts, not for medical purposes; Bath and shower gels and salts not for medical purposes* in Class 3 (the "**'225 Registration**", and, collectively with the '164 Registration and the '360 Registration, the "**URBĀNE Marks**"). A copy of the '225 Registration is attached hereto as **Exhibit C**.

39. Since at least as early as April 2020, Coronado has used its distinctive URBĀNE BATH & BODY mark in connection with the sale of *Hand-sanitizing preparations* in U.S. commerce.

40. Coronado is the owner of all intellectual property rights in and to its distinctive URBĀNE Marks, including without limitation the '164 Registration, '360 Registration, and the '225 Registration.

41. Through Coronado's use of the URBĀNE BATH & BODY mark, it has also established common law rights in and to its mark for use with at least those goods set forth in the URBĀNE Marks as referenced herein. True and correct images showing use of the marks are attached hereto as **Exhibit D**.

42. Such common law rights and the goodwill in and to the URBĀNE BATH & BODY mark, together with the URBĀNE Marks, are collectively referred to herein as the "**URBĀNE Brand**".

## B. The COVID-19 Pandemic and Development of the URBĀNE Brand Hand Sanitizer

43.    The COVID-19 pandemic has been a once-in-a-lifetime catastrophe that has wrought illness and death around the world.

44.    The pandemic reached the U.S. in early 2020.

45.    Americans were forced to rapidly prepare for the inevitable spread of the virus.

46.    In the U.S., demand for a wide range of protective equipment and essential personal goods surged.

47.    This surge in demand coincided with disruption to global supply chains, retail businesses shutting their doors, and workers confining themselves to their homes.

48.    As a result, a significant number of communities and retail outlets experienced shortages of highly sought after goods such as toilet paper, nonperishable foods, and hand sanitizer.

49.    This period was marked by significant uncertainty not only about COVID-19's economic impact, but also on Americans' health and safety.

50.    It was at this time that Red Rock and Coronado commenced work on creating an American-made hand sanitizer that consumers acutely needed, and retailers were eager to supply.

51.    Red Rock and Coronado are both run by entrepreneurs with decades' worth of collective experience in sourcing, producing, marketing, and distributing in-demand products for consumers.

52.    In its efforts to develop and produce hand sanitizer, Red Rock was utilizing its expertise in sourcing materials, operating, and expanding distribution networks, and developing and growing relationships with customers.

53.    Accordingly, Plaintiffs determined that Red Rock would be the entity through which hand sanitizer under the URBĀNE Brand would be brought to the market.

54.    Red Rock was best suited to manage development of the product, create the requisite supply chain, build-out inventory, and manage sales and distribution to customers.

55.    In fact, Red Rock successfully took each of those steps and would have continued to build on them but for Defendants' wrongful acts.

56.    As the owner of the URBĀNE Brand, Coronado invested heavily in developing and marketing the brand prior to the onset of COVID-19.

57.    As a result of Coronado's development of and investment in the URBĀNE Brand, Plaintiffs were able to go to market with a "Made in the USA" hand sanitizer that bore a trustworthy and identifiable mark.

58.    Ultimately, Plaintiffs' efforts led to the development of a hand sanitizer that met the needs of consumers and the market.

59.    The hand sanitizer Plaintiffs created was at least 70% alcohol, made in the U.S., and ready for production and distribution.

60.    In addition to Plaintiffs successfully developing an urgently needed hand sanitizer, Coronado had worked hard to create and develop the URBĀNE Brand, and it was starting to become recognized in the bath and body industry.

61.    As a result, Plaintiffs were prepared to go to market more quickly than many potential competitors, and with a high-quality hand sanitizer under an already in-use brand by early April 2020.

62.    To meet consumers' urgent needs and the market's overwhelming demand for high quality hand sanitizer, Red Rock imported large volumes of bottles and sprayers from its international sources, by means of air freighting container loads, and worked with multiple

domestic blending and bottling companies to fill those bottles with hand sanitizer bearing the URBĀNE Brand.

63.    The URBĀNE Brand hand sanitizer was unique in at least three respects: (1) it utilized a high-quality formula that was equally effective without the associated foul medicinal-smell of typical sanitizer; (2) it was "Made in America," which particularly appealed to U.S. consumers and retailers; and (3) a large portion of the product was packaged in a unique credit card-sized sprayer that was prized by consumers and retailers alike.

64.    As a result, Red Rock was well positioned to bring critically needed hand sanitizer to the consuming public at the outset of the COVID-19 pandemic.

65.    In fact, Red Rock successfully began selling hand sanitizer under the URBĀNE Brand in April 2020, just as the virus commenced its harrowing first peak in the U.S.

### *C. Defendants Misappropriate the URBĀNE Brand to Produce Counterfeit Hand Sanitizer*

66.    As a result of the Counterfeiting Defendants' actions, as set forth herein, the URBĀNE Brand was irreparably tarnished, and Plaintiffs' growth trajectory halted; and their substantial business goodwill diminished, almost overnight.

67.    Beginning in or about late April 2020, the Counterfeiting Defendants collectively worked together to cause hundreds of thousands, and possibly millions, of bottles of counterfeit hand sanitizer bearing the URBĀNE Brand to be produced and imported into the U.S. from Mexico, many of which are not accounted for and are likely still circulating in interstate commerce.

68.    As a result, a specific and ongoing threat of repetition of the wrongful acts committed by the Counterfeiting Defendants persists.

69.    The unauthorized and illegal hand sanitizer product(s) produced because of the Counterfeiting Defendants' actions and bearing a spurious mark identical to or substantially

indistinguishable from the URBĀNE Brand are referred to herein as the "Counterfeit Products." True and correct images showing examples of the fraudulent URBĀNE branding on the Counterfeit Products are attached hereto as **Exhibit E**.

70.    In fact, the Counterfeiting Defendants' collective actions included the wholesale theft of Plaintiffs' business and intellectual property.

71.    Many of the Counterfeit Products were ultimately sold to retailers and consumers.

> **i.    Rigz Converts Authorized Use of the URBĀNE Brand Into a Scheme to Manufacture Counterfeit Hand Sanitizer**

72.    Prior to the outset of the COVID-19 pandemic, Red Rock had established a business relationship with distributor Rigz, LLC ("**Rigz**"), an Arizona limited liability company.

73.    Red Rock's primary point of contact at Rigz was sales executive Anthony Carelli ("**Carelli**").

74.    Red Rock and Rigz regularly communicated regarding their respective distribution businesses and opportunities they observed in the market.

75.    Based on this foundation of trust and overlapping interests, Red Rock began selling the hand sanitizer to Rigz shortly after Red Rock commenced its production of hand sanitizer under the URBĀNE Brand.

76.    Red Rock's early sales of URBĀNE hand sanitizer to Rigz were robust.

77.    In fact, in the first three months of sales, commencing in early April 2020, Red Rock sold more than $2,000,000 worth of URBĀNE hand sanitizer to Rigz.

78.    In turn, Rigz successfully placed URBĀNE hand sanitizer in several national businesses, including *Pilot Travel Centers* ("***Pilot***") and *Love's Travel Stops & Country Stores*

("***Love's***"), which had over 2,000 combined stores located across the country and were among the small number of essential businesses that remained open at the time.

79.     In the short period of time following its launch, URBĀNE hand sanitizer was successfully growing its presence in the market as a "Made in the USA" product and generating significant revenues and profits.

80.     Beyond Red Rock's sales to Rigz, Red Rock also sold URBĀNE hand sanitizer to distributors and retailers like *Tractor Supply, DG Victory, Advance Auto Parts, Nature's Distribution, Sacatelle, Gulf Coa*st (distributor for *Kroger* supermarkets), *Omega Distributors, Blendpack, ChillHit* (distributor for *Circle K* convenience stores), *Business Development Center*, and *Williams Group*.  At the earliest stages of the pandemic, Red Rock was already demonstrating its ability to provide URBĀNE hand sanitizer to the market, even as it was ramping up its long-term product and distribution capabilities.

81.     By way of example, URBĀNE hand sanitizer was being sold in *Tractor Supply Company's* ("***Tractor Supply***") approximately 1,900 stores early in the pandemic.

82.     Red Rock was also developing plans to market and sell its increasingly successful URBĀNE hand sanitizer to existing customers with whom Red Rock had relationships, including several national retailers.

83.     As a result of such early and rapid success, Red Rock sourced and imported from China 2,000,000 empty bottles to package the URBĀNE hand sanitizer in the U.S.

84.     The imported bottles were air freighted into the U.S. because there was little to no inventory available, such that Plaintiffs were among the few operations in the country prepared to supply products to the market at this time.

85.     Yet, such early success selling authentic URBĀNE hand sanitizer was not enough for Rigz and its principals (Jarrett Portz ["**Portz**"] and Carelli), who became greedy and hatched plans to extract as much profit as possible during the early days of the COVID-19 pandemic.

86.     Rigz began looking for other sources to supply hand sanitizer.

87.     Rigz sought hand sanitizer from other vendors with the intent to use the URBĀNE Brand on that hand sanitizer.

88.     Rigz did not request, seek, or care whether it had approval from Red Rock or Coronado to use the URBĀNE Brand.

89.     At no point did Red Rock or Coronado authorize, approve of, or acquiesce to Rigz soliciting or otherwise engaging in such illicit business activities using the URBĀNE Brand.

90.     In late April 2020, Carelli contacted Grazi, principal of JGX, in New York regarding Rigz's interest in and need for hand sanitizer.

91.     Shortly thereafter, on April 23, 2020, Carelli sent an email to Grazi to provide him with the URBĀNE label – which was identical or substantially indistinguishable from the authentic URBĀNE label – for use on hand sanitizer that JGX was to produce at Carelli and Rigz's request. A true and correct copy of Carelli's April 23, 2020 email to Grazi is attached hereto as **Exhibit F**.

> ## ii.     Rigz, JGX, and Isaac Import Conspire to Produce Counterfeit URBĀNE Hand Sanitizer to Defraud Americans

92.     JGX is an apparel company with expertise in and a history of obtaining trademarks relating to athletic apparel.

93.     Despite JGX having little to no experience with hand sanitizers or any health-related products for that matter, Grazi and Carelli were eager for JGX to source hand sanitizer for Rigz.

94.    The discussions between Grazi and Carelli led to Rigz issuing an initial purchase order to JGX, on or about April 27, 2020, for 331,250 bottles of hand sanitizer under trademarks and/or designations identical to or substantially indistinguishable from the URBĀNE Brand.

95.    Approximately fourteen minutes after Grazi received the initial purchase order, Grazi forwarded the correspondence to DJ, a principal of JGX and sole shareholder and director of Isaac Import.

96.    Grazi and DJ exchanged communications, including but not limited to a telephone call with Carelli on April 30, 2020, to discuss and finalize details related to the quantity of counterfeit hand sanitizer bearing the URBĀNE label to be produced, as well as pricing, manufacturing, and shipping of the bottles.

97.    Rigz required JGX to use the URBĀNE Brand because Rigz's customers were expecting to purchase and receive hand sanitizer under the URBĀNE Brand and with its UPC Code.

98.    Prior to agreeing to source hundreds of thousands of bottles of hand sanitizer for Rigz using the URBĀNE label, JGX never contacted Coronado, the owner of the URBĀNE Brand, to inquire as to whether Rigz had the authority to contract for the manufacture, distribution, and sale of URBĀNE hand sanitizer.

99.    JGX knew or should have known that this was its responsibility, given JGX's experience with and history of registering trademarks in the sports apparel market.

100.    Coronado never approved of or consented to Rigz independently using the URBĀNE Brand.

101.    As such, Rigz could not have provided and did not provide JGX with any evidence that it was authorized to issue a purchase order for URBĀNE hand sanitizer.

102.     Upon information and belief, JGX had suspicions about Rigz's use of the URBĀNE Brand.

103.     Jaradeh, an employee of Isaac Import and part-owner and principal of JGX, conducted online research about Coronado, the registered owner of the URBĀNE Marks, in May 2020 and communicated his findings to Grazi.

104.     Despite now knowing that Coronado was the proper owner of the URBĀNE Marks and not Rigz, JGX knowingly and willingly used the URBĀNE Brand on a massive scale in furtherance of the counterfeiting scheme.

105.     DJ took the URBĀNE label provided by Carelli and created a counterfeit version of the URBĀNE label for use on various unauthorized sanitizer bottles and products. A true and correct copy of DJ's email to Jack Grazi is attached hereto as **Exhibit G**.

106.     Upon information and belief, Isaac Import, DJ, and Jaradeh knew that Grazi, JGX, and Rigz intended to, and in fact did, use the URBĀNE label in connection with marketing, producing, and selling counterfeit hand sanitizer under the URBĀNE Brand without any lawful right to do so.

107.     In connection with a nationwide recall necessitated by the FDA placing URBĀNE hand sanitizer from Mexico on its list of products not to use or sell -- *Pilot* produced the following side-by-side comparison of an authentic URBĀNE label with the counterfeit label created by Isaac Import, DJ, and Jaradeh, and widely distributed and used by the Counterfeiting Defendants:





108.    Throughout the counterfeiting scheme, Grazi corresponded regularly with Jaradeh, DJ, and Isaac Import.

109.    Upon information and belief, Grazi would often forward communications to them that were directed to JGX on their face, thereby disregarding the distinction between two purportedly separate companies.

110.    Grazi began circulating the URBĀNE label and representing that he was entitled to use it.  A true and correct copy of an email sent on May 5, 2020 by Grazi, and copying DJ, to solicit the manufacture of counterfeit hand sanitizer under the URBĀNE label created by DJ is attached hereto as **Exhibit H.**

111.    A simple Google search, let alone a trademark database search -- as would be minimally expected of an experienced reseller like JGX that owns multiple trademark registrations -- would have revealed the unlawfulness of its hand sanitizer business enterprise with Rigz.

112.    Upon information and belief, JGX, Isaac Import, Grazi, Jaradeh, and DJ knew that they were counterfeiting the URBĀNE brand and acted with the specific intent of deceiving everyone outside the Counterfeiting Defendants, including Plaintiffs and the public at large, about the illicit nature of their product.

113.    In committing these acts, among other things, Grazi, Jaradeh, and DJ misused the corporate form for their personal benefit.

114.    Additionally, Grazi, Jaradeh, and DJ actively and individually participated in wrongful and unlawful conduct, as set forth herein, committed by or for the benefit of JGX and Isaac Import.

### iii.    Liberty Joins the Counterfeiting Conspiracy to Leverage Its Manufacturing Contacts in Mexico

115.    Around the time JGX completed its first order with Rigz, JGX, upon information and belief, made use of email, telephone calls, and/or other wired transmissions to contact Amoyelle, principal of Liberty.

116.    Liberty is an entity formed in or around April 2020, and like JGX, had no experience or expertise in the production of hand sanitizer.

117.    JGX had never worked with Liberty before but made contact because of Liberty's manufacturing contacts in Mexico.

118.    Upon information and belief, to secure Liberty's assistance in manufacturing the URBĀNE hand sanitizer sought by Rigz, JGX shared Rigz's purchase orders for hundreds of thousands of bottles to assure Liberty of the money that Liberty would make.

119.    On April 30, 2020, Grazi provided Liberty with the artwork depicting the URBĀNE Brand, including the URBĀNE logo, for use in producing counterfeit hand sanitizer.   A true and correct copy of Grazi's April 30, 2020 email to Amoyelle is attached hereto as **Exhibit I**.

120.    Upon information and belief, Amoyelle asked whether Grazi and JGX were authorized to use the URBĀNE Brand.

121.    Without being shown any evidence of authorization, Amoyelle and Liberty willingly proceeded to associate with JGX in the production, distribution, and importation of counterfeit URBĀNE hand sanitizer.

122.    In late April or early May 2020, Liberty communicated with a manufacturer in Mexico, Tropicosméticos S.A. de C.V. ("**Trop**"), regarding the production and bottling of hand sanitizer to fill the purchase order Rigz issued to JGX using trademarks and/or designations identical to or substantially indistinguishable from the URBĀNE Brand.

123.    Upon information and belief, in response to Liberty's order(s), Trop provided Liberty with an initial shipment of Counterfeit Products in or around late April or early May 2020.

124.    Subsequently, upon information and belief, Liberty and JGX successfully imported the counterfeit bottles into the U.S.

125.    Liberty desired to produce additional quantities of counterfeit URBĀNE hand sanitizer, but, upon information and belief, Liberty was largely cut out of the counterfeiting scheme when the Ghermezian and Saba families, with their overwhelming financial resources and name recognition, became involved with JGX.

126.    Prior to consummating its arrangement with JGX, Liberty never contacted Coronado, the owner of the URBĀNE Brand, to inquire as to whether JGX or Rigz had the authority to contract for the manufacture, distribution, and sale of URBĀNE hand sanitizer.

127.    As with JGX, Liberty willfully disregarded its ability to discover Coronado's ownership of the URBĀNE Brand through readily available public sources.

### iv.    The Ghermezians Join the Counterfeiting Conspiracy to Defraud the American Public and Profit Off the Pandemic

128.    The Ghermezian family's involvement in the hand sanitizer scheme was spread across multiple generations.

129.    Upon information and belief, the Ghermezian family members involved in the scheme are related in the following ways: (i) Nader Ghermezian is an uncle of Don Ghermezian and Syd Ghermezian; (ii) Don Ghermezian and Syd Ghermezian are brothers; (iii) Orly Ghermezian Saba is Don Ghermezian's daughter, and Saba is Don Ghermezian's son-in-law by virtue of his marriage to Orly; and (iv) Yonah Ghermezian, David Ghermezian, and Don Ghermezian are all cousins.

130.    Around the same time that Grazi, DJ, Jaradeh, and Carelli were cementing their plans to produce hand sanitizer under the URBĀNE Brand, multiple members of the Ghermezian family held a meeting at Don Ghermezian's house in New York to discuss launching their own hand sanitizer business.

131.    The attendees at the May 4, 2020 kick-off meeting included, without limitation, Don Ghermezian, David Ghermezian, Yonah Ghermezian, Saba, Orly Ghermezian Saba, and family acquaintance Berkowitz.

132.    The Ghermezian family members and Berkowitz believed that significant amounts of money could be made by selling hand sanitizer and profiting off the COVID-19 pandemic, and they sought to build a business to take advantage of it.

133.    Upon information and belief, the Ghermezian family's greed and desperation for money was a result of acute financial pressures.

134.    The family's ownership of and investments in some of the largest shopping malls in the world, including without limitation the Mall of America, American Dream, and West Edmonton Mall (the first and second largest malls in the U.S., and largest mall in Canada, respectively), were decimated because of the widespread lockdowns imposed by state and local governments during this phase of the COVID-19 pandemic.

135.    Prior to the kick-off meeting, on or about May 1, 2020, Don Ghermezian contacted GHA Design Studios ("GHA") regarding hand sanitizer brands and designs.

136.    Upon information and belief, GHA had previously worked for Don Ghermezian and/or Triple Five Worldwide to provide design services for the American Dream mall.

137.    GHA provided Don Ghermezian and Berkowitz with a "brand deck" presentation, which included proposals for brand names and packaging designs.

138.    The deck included a credit card-style dispenser and a carabiner bottle – both bearing packaging substantially similar to URBĀNE hand sanitizer.

139.    The May 4, 2020 kick-off meeting was led by Don Ghermezian, who presented the GHA presentation to the other Ghermezians and outlined his vision for the family sanitizer business.

140.    A video of the May 4, 2020 kick-off meeting taken by Saba shows bottles of Britz hand sanitizer, Trop's "house brand," on Don Ghermezian's table.[1]

---

[1] The Britz sanitizer had been sent by David Amoyelle pursuant to Saba's request for a sample to "test." However, the only "testing" that Saba, or anyone at the meeting did, was to put it on their hands.

141.    Don Ghermezian, Nader Ghermezian, and Syd Ghermezian, wanted to get their children and other younger family members involved in the family business.

142.    These elders identified the whirlwind demand for hand sanitizer as the ideal vehicle to mentor and train the younger Ghermezians while expanding their involvement in the Ghermezian dynasty.

143.    Following the kick-off meeting, David Ghermezian, Berkowitz, Yonah Ghermezian, Saba and Don Ghermezian began their efforts to rapidly break into the hand sanitizer market.

144.    Upon information and belief, during this time, Don Ghermezian, David Ghermezian, Berkowitz, Saba, and/or Yonah Ghermezian researched competitors – such as an URBĀNE credit-card style dispenser – and/or directed others to do so on their behalf.

145.    For example, on or about May 4, 2020, Saba sent Don Ghermezian a sample design for a "Hand sanitizer package" in a credit-card style dispenser.

146.    That same day, on or about May 4, 2020, Don Ghermezian responded to Saba and Berkowitz, "This is awesome. I think we want to mirror this design."

147.    During this time, David Ghermezian and Berkowitz became aware of Grazi's interest in obtaining hand sanitizer through a mutual acquaintance, Eli Fox.

148.    Sometime prior to May 6, 2020, Grazi and Berkowitz and/or David Ghermezian made contact and agreed to collaborate in obtaining and selling hand sanitizer.

149.    On May 6, 2020, Grazi sent Berkowitz the URBĀNE labels for use on 2-ounce, 8-ounce, and 16-ounce bottles of hand sanitizer.  A true and correct copy of the May 6, 2020 email that Grazi sent to Berkowitz is attached hereto as **Exhibit J**.

150.    That same day, May 6, 2020, JGX issued at least five purchase orders for more than 660,000 bottles of hand sanitizer.

151.    Those purchase orders were created by Jaradeh and sent by Grazi to Berkowitz and DJ, copying Jaradeh.

152.    Of those purchase orders, three of them called for a total of 594,880 bottles of hand sanitizer to be shipped to JGX in Lake Havasu, Arizona, where Rigz's principal place of business is located.

153.    Within hours of Berkowitz receiving the purchase orders from Grazi for hundreds of thousands of bottles of hand sanitizer, Berkowitz forwarded Grazi's email with the purchase orders to Saba.

154.    The very next day, Berkowitz forwarded Grazi's email to David Ghermezian and Yonah Ghermezian.

155.    At this point, Berkowitz, David Ghermezian, and Saba were corresponding about when production of hand sanitizer under the URBĀNE label could commence.

> **v.    Don Ghermezian Misuses Ghermezian Family Resources to Lead the Counterfeit Hand Sanitizer Conspiracy**

156.    Within days of the meeting at Don Ghermezian's house, Berkowitz, Saba, David Ghermezian, and Yonah Ghermezian began soliciting and taking orders for hundreds of thousands of bottles of counterfeit URBĀNE hand sanitizer.

157.    The next step was to run their operation through Triple Five Worldwide and CFSB.

> **a.    Triple Five Worldwide is Selected as the Corporate Conduit for the Counterfeit Hand Sanitizer Operation**

158.    On or about May 7, 2020, pursuant to a request from, and a discussion among senior members of the Ghermezian family (including Don Ghermezian, Syd Ghermezian, and David Ghermezian, along with Berkowitz), Michael Oseen ("**Oseen**"), Senior Vice President and/or Chief Financial Officer of the West Edmonton Mall, and Alan Glazer ("**Glazer**"), In-House Counsel for American Dream, outlined a business that would source and sell hand sanitizer globally.  Attached hereto as **Exhibit K** is a true and correct copy of an email, dated May 7, 2020, in which the structure of the operation was set forth in detail.

159.    Most notably, Triple Five Worldwide was selected as the corporate entity to "facilitate US sales" because it had "no activity or assets" but had "a DUNS number available" (Data Universal Numbering System).

160.    Nader Ghermezian was identified at the time as the person most knowledgeable about Triple Five Worldwide's activity and assets.

161.    Glazer was directed to communicate with Nader Ghermezian as the plan to launch a hand sanitizer business was being solidified and put into action.

162.    Triple Five Worldwide had previously been formed as a Nevada limited liability company in June 2000.

163.    At least as late as May 6, 2020, the managers of Triple Five Worldwide were Don Ghermezian, Nader Ghermezian, and Syd Ghermezian.  A true and correct copy of the State of Nevada's business portal record for Triple Five Worldwide, with information dated as of May 7, 2020, is attached hereto as **Exhibit L**.

164.    Upon information and belief, an entirely new slate of managers for Triple Five Worldwide were put in place – substituting out the preceding managers – on or about May 7, 2020.

165.    The new slate consisted of Berkowitz, Saba, and Orly Ghermezian Saba, who were now listed as the managers.  A true and correct copy of the State of Nevada's business portal record for Triple Five Worldwide, with information dated as of June 29, 2021, is attached hereto as **Exhibit M**.

166.    Oddly, neither Saba nor Orly Ghermezian Saba knew, in May 2020 or at any time thereafter, that they were named as managers of Triple Five Worldwide.

167.    Saba and Orly Ghermezian Saba did not: (i) sign any document; (ii) have any conversations regarding becoming managers of Triple Five Worldwide; or (iii) learn whether they acquired any ownership interests.

168.    Despite becoming managers of Triple Five Worldwide, Saba and Orly Ghermezian Saba do not know, among other things: (i) whether they own shares or membership units in the company; (ii) what corporate formalities Triple Five Worldwide has observed since May 7, 2020, if any; (iii) whether Triple Five Worldwide has conducted any meetings; (iv) whether Triple Five Worldwide has an operating agreement; (v) whether it has issued any shares or membership units; (vi) whether the company has a business plan; (vii) whether it files tax returns; (viii) who to ask to determine whether Triple Five Worldwide files tax returns; (ix) whether any other entity has an ownership interest in Triple Five Worldwide; or (x) how it came to be that Don Ghermezian, Syd Ghermezian, and Nader Ghermezian were removed as managers of the company.

169.    While Berkowitz was aware that he was a manager of Triple Five Worldwide, he was unaware that it had existed prior to May 2020.

170.    Despite being a manager of Triple Five Worldwide, Berkowitz does not know, among other things: (i) whether the company has an operating agreement; (ii) whether the company has articles of organization; (iii) whether the company has any resolutions; (iv) whether

anyone ever signed documents pertaining to ownership of the company; (v) who owned the company prior to Berkowitz becoming a manager; (vi) who presently owns the company; and (vii) whether the company has ever filed a tax return.

171.    The change in managers of Triple Five Worldwide – from Don Ghermezian, Syd Ghermezian, and Nader Ghermezian to Saba, Orly Ghermezian Saba, and Berkowitz – was executed by Glazer at the direction of the senior members of the Ghermezian family.

172.    Berkowitz, Saba, David Ghermezian, Yonah Ghermezian, Don Ghermezian, and Syd Ghermezian misused the corporate form for their personal benefit.

173.    Among other deficiencies, Triple Five Worldwide lacks corporate formalities; possesses no tax records; Berkowitz, David Ghermezian, Yonah Ghermezian, Don Ghermezian, and Syd Ghermezian conducted business on behalf of the company using email accounts associated with other Ghermezian entities; and the telephone number and address for Triple Five Worldwide, as evidenced by the invoices it issued, are connected to a different company.

174.    Triple Five Worldwide possesses no records establishing who owns the company, the date on which such ownership interests were acquired, or what consideration was exchanged to acquire such ownership interests.

175.    Triple Five Worldwide has asserted that it did not have *any* owners during the twenty (20) year period in which it existed prior to early May 2020.

176.    Berkowitz, Saba, David Ghermezian, and Yonah Ghermezian continued to conduct business using their personal WhatsApp accounts, their personal telephones, and generally without any reference to an affiliation with a distinct business entity, Triple Five Worldwide.

177.    Upon information and belief, replacing the preceding managing members of Triple Five Worldwide with Berkowitz, Saba, and Orly Ghermezian Saba, did not reduce the role and/or responsibility of the company's prior managers.

178.    Upon information and belief, despite being replaced as managers, Don Ghermezian, Syd Ghermezian, and Nader Ghermezian remained the owners of Triple Five Worldwide and continued to direct its activities.

179.    Don Ghermezian stated that he was involved in Triple Five Worldwide's hand sanitizer operation at a high level.

180.    But, Don Ghermezian was consistently and intimately involved in all aspects of the counterfeit sanitizer operation.

181.    He spoke regularly with David Ghermezian and Berkowitz about branding, sourcing, importing, and sales efforts; provided guidance and assistance; directed the movement of counterfeit goods; consulted with Berkowitz, David Ghermezian, and Saba; authorized payments and refunds (as described below); upon information and belief, communicated directly with potential customers to solicit sales; and oversaw every step of the entire operation.

182.    Within hours of the May 7, 2020, meeting at his house, Don Ghermezian sent an email that praised the work of Oseen and directed Berkowitz to call him to further discuss the hand sanitizer business.

183.    On May 8, 2020, Don Ghermezian and David Ghermezian exchanged multiple emails regarding specific details for an invoice for 2 oz. bottles of hand sanitizer.

184.    In their communications on May 8, 2020, Don Ghermezian directed David Ghermezian to revise the invoice to identify American Dream as the recipient and payor rather than Triple Five Worldwide.

185.    After receiving the updated invoice from David Ghermeizan, on May 8, 2020, Don Ghermezian forwarded the modified invoice to the Chief Financial Officer of American Dream (Adi Adair) with a copy to Syd Ghermezian and the Chief Operating Officer & General Counsel for Triple Five Group (Joe Calascibetta).

186.    In that email, Don Ghermezian directed that a wire payment be sent for the hand sanitizer invoice and set a deadline of later that day for the wire payment to go out.

187.    A few days later, on May 11, 2020, Don Ghermezian was again directing wire payments for hand sanitizer.  This time, Don Ghermezian circulated a purchase order from Triple Five Worldwide for, *inter alia*, 150,000 units of 2 oz. hand sanitizer under the URBĀNE Brand.

188.    In his email, Don Ghermezian directed that a wire payment be made the first thing the next day in accordance with the purchase order.

189.    Don Ghermezian also shared that the hand sanitizer was being put into trucks and that he wanted the truck to be able to leave as soon as possible.

190.    Don Ghermezian sent the email setting forth these instructions to Adi Adair and Treasury Manager for the Triple Five Group (Regina Davis), with a copy to Syd Ghermezian, Natasha Manbodh (Branch Operational Manager at CFSB), and David Ghermezian.

191.    The next week, on May 18, 2020, Don Ghermezian again managed and directed wire payments for hand sanitizer orders.

192.    These communications were labeled as being for the invoices for the first three shipments of hand sanitizer.  As with the other payments Don Ghermezian directed, he told Adi Adair that he needed a wire payment to go out immediately.

193.    In fact, the urgency to make the payment was such that David Ghermezian urged Don Ghermezian to authorize an exception to the practice of calling to confirm banking information prior to making payment.

194.    Don Ghermezian consented without asking any questions.  Berkowitz, Yonah Ghermezian, Daniel Ghermezian, and Regina Davis were also copied on these emails.

195.    All of the wire payments that Don Ghermezian oversaw and directed on May 8, May 11, and May 18, 2020 were sent to the same company – SoFlo Urban Team, LLC.

196.    Upon information and belief, the payments for hand sanitizer made after May 7, 2020 were not authorized, managed, or directed by any of the managers of Triple Five Worldwide (Berkowitz, Saba, and Orly Ghermezian Saba).

197.    Rather, Don Ghermezian directed each of the payments; David Ghermezian acted as an intermediary with SoFlo Urban Team, LLC; and the Chief Financial Officer of American Dream (who uses an email address with the @triplefive.com domain) executed the wire payments.

198.    In May 2020, among other times, Triple Five Worldwide's corporate form was disregarded, and its affairs were directly run by employees of separate entities that had no legal authority to do so.

199.    In or around May 2020, Don Ghermezian hosted Grazi at his personal residence to discuss the Counterfeit Products.

200.    Upon information and belief, Don Ghermezian gave Grazi a bottle of wine as a gift in appreciation of their business dealings.

201.    Upon information and belief, Don Ghermezian's position as the true owner of Triple Five Worldwide – in addition to being a high-level operator, advisor, and business

quarterback – enabled the Counterfeiting Defendants to commit the offenses detailed herein by directing, coordinating, and furthering the same.

202.     Upon information and belief, all sanitizer-related business conducted by Triple Five Worldwide, Berkowitz, David Ghermezian, Yonah Ghermezian, and Saba was overseen, approved, and/or performed at the behest, guidance, and/or direction of Don Ghermezian.

203.     Indeed, on or about May 7, 2020, Saba sent a message to David Ghermezian stating there was an existing Nevada company in the Ghermezian portfolio of companies that already had the requisite DUNS [Data Universal Numbering System] Number that could be used to operate the new counterfeiting business, with his father-in-law's (Don Ghermezian) permission.  That company was Triple Five Worldwide.

204.     On or about May 12, 2020, Don Ghermezian, Saba, Berkowitz, David Ghermezian, Yonah Ghermezian, and others, attended a Zoom meeting with GHA in which they reviewed a new brand deck with a list of potential brand names and marketing slogans like "palm2palm," "clean sky gel," "cleanwatch," "soapscene," "the health scrub," and "sans sink."

205.     In response to a follow-up email from GHA regarding "next steps," on or about May 31, 2020, Don Ghermezian emailed GHA stating "[w]e will be meeting tomorrow and will get back to you afterwards."

206.     Upon information and belief, GHA did not receive any response and followed-up with Ty LaRoche, Creative Director for Triple Five Group, Ltd., the parent company of Triple Five Worldwide.

207.     Upon information and belief, Ty LaRoche told GHA that Don Ghermezian, among others, "pulled us in to oversee what has been done so far."

208.    Upon information and belief, on or about June 9, 2020, Don Ghermezian, Saba, Berkowitz, David Ghermezian, Yonah Ghermezian, and others, held another meeting with GHA to discuss branding and market research for the sanitizer business.

209.    On or about July 6, 2020, Berkowitz sent an email to GHA, copying Don Ghermezian, stating "[w]e are definitely looking to go further with our concepts. I was actually going to reach out to you today to get an update."

210.    Don Ghermezian, Berkowitz, Saba, David Ghermezian, and Yonah Ghermezian actively participated in the wrongful and unlawful conduct, as set forth herein, committed by or for the benefit of Triple Five Worldwide, and Don Ghermezian led those wrongful activities.

### b.  CFSB Provides the Banking and Financial Platform to Operate the Counterfeit Hand Sanitizer Conspiracy

211.    Once Berkowitz, Saba, and Orly Ghermezian Saba were in place as managers, on or around May 8, 2020, Triple Five Worldwide began making and receiving payments, as well as placing and receiving orders for hand sanitizer.

212.    During the May 7, 2020 discussion, Don Ghermezian, Syd Ghermezian, David Ghermezian, and Berkowitz contemplated using, and subsequently did use, bank account(s) at CFSB for Triple Five Worldwide's sanitizer business. *See* **Exhibit K**.

213.    Following the May 7, 2020 discussion, Syd Ghermezian advised Don Gheremzian, Berkowitz, Oseen, and Glazer, among others, that ███████████████████████████ ████████████████████████████

214.    Don Ghermezian and others heeded Syd Ghermezian's advice ███████████████ ██████████████

215.    CFSB is a commercial bank run by Syd Ghermezian, Chairman and Chief Executive Officer.

216.    Upon information and belief, CFSB was founded in 2001 as a vehicle to, *inter alia*, support the Ghermezian family businesses.

217.    Upon information and belief, while CFSB has a commercial location – a small storefront located at 8916 Jamaica Avenue in Woodhaven, New York obtained in or about 2003 through a loan from the State of New York – it includes among its clients, certain members of the Ghermezian family and the businesses they control.



218.    Upon information and belief, the CFSB retail location appears as shown in the adjacent photograph.

219.    Upon information and belief, CFSB is wholly owned and controlled by members of the Ghermezian family, including Syd Ghermezian.

220.    Upon information and belief, there is no tangible division between CFSB and the various Ghermezian family businesses, including Triple Five Worldwide.

221.    Upon information and belief, CFSB grants Syd Ghermezian and Don Ghermezian access to certain accounts even if they are not the account holders or managers of the accounts.

222.    In filings with the Federal Election Commission, with some as recent as August 2020, Syd Ghermezian alternately listed his employer as either CFSB or Triple Five Worldwide,

and "Bank CEO" as his occupation. A true and correct copy of the August 2020 Federal Election Commission filing is attached hereto as **Exhibit N**.

223.    Syd Ghermezian's public representation to the Federal Elections Commission in August 2020 that his employer was Triple Five Worldwide was made months after his position as manager of Triple Five Worldwide was allegedly conveyed to Berkowitz, Saba, and/or Orly Ghermezian Saba.

224.    Upon information and belief, CFSB's operation as a conduit for the Ghermezian family businesses, rather than as an independent bank, has resulted in it running afoul of various banking and financial regulations.

225.    On or about February 17, 2011, the Department of Treasury, Office of Thrift Supervision issued a cease-and-desist order to CFSB's parent company, Community FSB Holding, based upon its "unsafe or unsound practices."

226.    The practices had "resulted in inadequate capitalization, inadequate earnings to fund growth and augment capital, and an excessive level of adversely classified loans and nonperforming assets and the commission of violations of regulations at its wholly owned subsidiary [CFSB]."

227.    As a result, Community FSB Holding was ordered to submit a capital maintenance plan identifying specific sources of additional capital; withhold from issuing any dividends or making any golden parachute payments; not incur or rollover any debt; change its compensation for its senior officers or director; and prepare written compliance progress reports.

228.    On or about February 6, 2014, CFSB entered into an agreement with the US Comptroller of the Currency following a finding that CFSB had engaged in "unsafe and unsound banking practices relating to management and earnings."

229.    Pursuant to its agreement with the Comptroller of the Currency, CFSB was required to create a compliance committee; create a business plan detailing CFSB's "objectives for improving core earnings, and achieving profitability on a consistent basis; strategies for ensuring that [CFSB] has the financial and personal resources necessary;" create "an education program designed to ensure that [CFSB's officers and President, Syd Ghermezian have] the skills and abilities necessary to supervise effectively;" and implement "internal controls and processes" to timely identify and report suspicious transactions.

230.    Upon information and belief, Syd Ghermezian's control of CFSB enabled Triple Five Worldwide, Don Ghermezian, David Ghermezian, Yonah Ghermezian, Saba, and Berkowitz to conduct the counterfeit sanitizer business.

231.    Syd Ghermezian knew or had reason to know that Triple Five Worldwide would use its CFSB account in connection and in furtherance of the counterfeit sanitizer scheme.

232.    Upon information and belief, CFSB allowed Triple Five Worldwide to open and/or operate an account without providing necessary corporate documentation.

233.    Triple Five Worldwide's application to open an account at CFSB falsely stated that Triple Five Worldwide's business was established on May 7, 2020.

234.    CFSB's Chairman and CEO, Syd Ghermezian, knew that was not true because he was one of three managers of Triple Five Worldwide prior to May 7, 2020 (alongside Don Ghermezian and Nadar Ghermezian).

235.    Further, on June 12, 2020, allegedly more than one month after Syd Ghermezian and Don Ghermezian had ceased being managers of Triple Five Worldwide, ███████████

████████████████████████████████████████

████████████████████████████████

236. ████████████████████████████████████████████████████

████████████████████████████████████

237.    None of these communications were sent to or copied any of the then current managers of Triple Five Worldwide (Berkowitz, Saba, Orly Ghermezian Saba).

238.    Upon information and belief, CFSB gave Syd Ghermezian and Don Ghermezian access to the Triple Five Worldwide bank account despite their not being listed as owners or managers of the company.

239.    Despite having opened and operated an account for Triple Five Worldwide, CFSB did not know ████████████████████████████████████

240.    Syd Ghermezian had personal knowledge that CFSB was unable to determine ████

██████████████████

241.    When CFSB finally attempted to determine who owned Triple Five Worldwide █

████████████████████████████████████████████████████

████████████████████████

242. ████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

243.    When CFSB was unable to determine the ownership of several Ghermezian family-affiliated entities, including Triple Five Worldwide, for multiple months, ████████████████

████████████████████████████████████████████████████████

████████████

244. 

245.

246.    None of Triple Five Worldwide's managers were included on these communications.

247.    After American Dream's Assistant Controller

248.    Upon information and belief, Syd Ghermezian intentionally

249.    Upon information and belief, without Syd Ghermezian's control over CFSB and his authority to accommodate the needs of his family's business, neither Triple Five Worldwide, Don Ghermezian, David Ghermezian, Yonah Ghermezian, Saba, nor Berkowitz would have been able to open a bank account as rapidly as they needed to or facilitate any of the wire transfers necessary to conduct the counterfeit sanitizer business.

250.    Triple Five Worldwide made and received payments worth hundreds of thousands of dollars in connection with counterfeit URBĀNE hand sanitizer through its account(s) with CFSB.

251.    In particular, Triple Five Worldwide, through CFSB, made wire payments to and received wire payments from a number of entities and individuals who participated in the production and distribution of counterfeit hand sanitizer, including JGX, SoFlo Urban Team LLC, Click Concierge Services, Jacob Abramsky, and Teresa Ibarra.[2] Attached hereto as **Exhibit O** is a is a true and correct copy of the wire transfers made and received by Triple Five Worldwide in connection with its sale of counterfeit URBĀNE hand sanitizer.

252.    Upon information and belief, Syd Ghermezian was not only aware of these transactions and the fact that they were furthering a counterfeit sanitizer business, but he also ensured that CFSB honored them.

253.    Several of the transfers were more than $10,000.

254.    Pursuant to federal law, CFSB was required to report these transactions and complete Currency Transaction Reports and/or Suspicious Activity Reports.

255.    Upon information and belief, to the extent CFSB failed to report these transactions, it did so at the direction of Syd Ghermezian.

### vi.    Production of Counterfeit Hand Sanitizer Quickly Ramps Up in Mexican Factories

256.    On or around May 6, 2020, Berkowitz, Saba, and David Ghermezian began corresponding with frenzy and in detail about their counterfeit hand sanitizer conspiracy, including pricing, managing customer relationships and expectations, manufacturing and importing issues, labeling, and receiving/making payments.

---

[2] SoFlo Urban Team LLC and Click Concierge Services are corporate entities through which the Mexican factories received payment for the Disputed Products.

257.    Berkowitz, Saba, David Ghermezian, and Yonah Ghermezian also corresponded regularly with Grazi during this period, with particular frequency during May and June 2020 so that Triple Five Worldwide and its principals could proceed as fast as they could to produce counterfeit product bearing the URBĀNE label.

258.    Triple Five Worldwide issued invoices created by Yonah Ghermezian to JGX and Benzion (Benjamin) Tyberg (hereinafter referred to as "**Tyberg**") for counterfeit hand sanitizer bearing the URBĀNE label.  Attached hereto as **Exhibit P** is a true and correct copy of one set of invoices Triple Five Worldwide issued to JGX and Tyberg.

259.    Grazi regularly apprised Jaradeh, DJ, and Isaac Import of the invoices Triple Five Worldwide issued to JGX.

260.    By on or about May 8, 2020, counterfeit hand sanitizer bearing the URBĀNE label was being mass produced in a factory in Mexico and placed into boxes for shipment to the U.S. True and correct images captured in one of the factories in which the counterfeit URBĀNE hand sanitizer was produced are attached as **Exhibit Q**.

261.    The labels applied to the counterfeit URBĀNE hand sanitizer bottles were the very same ones created by JGX, Isaac Import, Grazi, Jaradeh, and DJ.

262.    Crucially, the URBĀNE labels on the counterfeit hand sanitizer listed "Drug Facts" and "Ingredients" identical to the URBĀNE labels on the genuine hand sanitizer.

263.    Upon information and belief, the counterfeit URBĀNE hand sanitizer manufactured in Mexico did not contain identical ingredients as the genuine URBĀNE hand sanitizer manufactured and produced in the U.S.

264.    Upon information and belief, the labels on the counterfeit URBĀNE hand sanitizer distributed by Triple Five Worldwide falsely represented that Liberty was the distributor when it was in fact Triple Five Worldwide.

265.    Grazi was desperate to fill Rigz's orders for hundreds of thousands of bottles of URBĀNE hand sanitizer.

266.    When production issues arose, Grazi turned to Berkowitz, Saba, and David Ghermezian for answers since they had the direct relationship with the factories in Mexico charged with producing the counterfeit hand sanitizer.

267.    Saba and David Ghermezian were in direct communication with the factory manufacturing counterfeit hand sanitizer under the URBĀNE label and acted as a key conduit for information by and between Grazi, JGX, Triple Five Worldwide, and their principals.

268.    Saba and David Ghermezian's intent was to manufacture, import, and sell as much counterfeit hand sanitizer as possible, without regard for the safety of the consuming public, impact on COVID-19, or the associated intellectual property rights.

269.    During this time, Portz and Carelli were applying relentless pressure on Grazi to acquire URBĀNE hand sanitizer, as Rigz was intent on meeting demand for URBĀNE hand sanitizer from its customers (e.g., *Pilot* and *Love's*).

270.    Portz and Carelli each sent numerous communications to Grazi, using, upon information and belief, their personal telephones, email addresses (at least in part), and WhatsApp accounts to demand that Grazi produce as much counterfeit URBĀNE hand sanitizer as fast as possible.

271.    At one point, on or about May 10, 2020, Portz went so far as to tell Grazi that he would put a crew of people on his personal airplane so that URBĀNE hand sanitizer could be distributed more quickly.

272.    To address issues that were slowing down production and distribution, Grazi recorded and sent multiple video messages that, upon information and belief, leveraged his personal relationship with the powerful Ghermezian and Saba families with the intent to expedite manufacturing and importation of counterfeit URBĀNE hand sanitizer.

273.    Grazi stated in one of his video messages: "Hi, my name is Jack Grazi. I'm producing with Isaac Saba, David Ghermezian, and Eli Berkowitz the URBĀNE label. Please, I need you guys to ship right now. I need a tracking number right now or else we lose the whole order. Please, guys, come on. Let's get this done right now."

274.    Upon information and belief, Grazi, Saba, Jaradeh, DJ, David Ghermezian, and Berkowitz often conducted business in this manner – their respective entities were disregarded, and they held themselves out as conducting business under their personal names and in pursuit of their personal ends.

275.    Grazi, Portz, Carelli, Berkowitz, Saba, David Ghermezian, and Yonah Ghermezian wanted as much counterfeit URBĀNE hand sanitizer as could be produced, and on an expedited production schedule.

276.    Ultimately, they were disappointed with the speed of production.

277.    At a minimum, hundreds of thousands of bottles were finally produced, at least 216,000 of which were received and accepted by Rigz.

278.    Upon information and belief, at least hundreds of thousands of additional bottles of counterfeit URBĀNE hand sanitizer remain in Mexico.

279.    Defendants had produced these with the intent to sell in the U.S.

> **vii.    Behind Rigz's Back, Defendants Produce and Sell More Counterfeit Hand Sanitizer Than Rigz Authorized**

280.    JGX ultimately had produced and delivered more than 200,000 bottles of counterfeit URBĀNE hand sanitizer to Rigz.

281.    Rigz's conspiracy with JGX and Grazi to produce URBĀNE hand sanitizer therefore led to the successful production, importation, and sale of hundreds of thousands of bottles of hand sanitizer that Rigz knew from the start constituted an unlawful use of the URBĀNE Brand.

282.    During the pandemic, *Pilot* and *Love's* were deemed "essential" businesses necessary for public health and safety and were permitted to operate their nationwide chains of truck stops while shelter-in-place orders were active.

283.    *Pilot* and *Love's,* respectively, received many hundreds of thousands of units of URBĀNE hand sanitizer.

284.    Since the counterfeit URBĀNE hand sanitizer was inserted and mixed directly into the supply of hand sanitizer provided to *Pilot* and *Love's*, consumers were unwittingly and deceptively exposed to the large volume of counterfeit URBĀNE sanitizer that the Defendants are responsible for manufacturing, importing, and using in commerce in the U.S.

285.    The scope of the Counterfeiting Defendants' unlawful conduct extended well beyond Rigz's knowingly illicit purchase orders and their illegal actions to fulfill them.

286.    Unbeknownst to Rigz, Triple Five Worldwide and its principals sold at least 50,000 bottles of hand sanitizer bearing the URBĀNE label to third party Tyberg.  A true and correct copy of the May 22, 2020 e-mail correspondence between Triple Five Worldwide and Tyberg

confirming the order of over 50,000 units of hand sanitizer bearing the URBĀNE label is attached hereto as **Exhibit R**.

287.     Indeed, on or about May 26, 2020, Triple Five Worldwide received a wire transfer from Tyberg for $115,900.

288.     Grazi had knowledge of Triple Five Worldwide's intent to sell counterfeit hand sanitizer under the URBĀNE label, and he permitted it to proceed despite being fully aware that neither he nor Triple Five Worldwide had the right to use the URBĀNE label.

289.     After receiving shipments of counterfeit URBĀNE hand sanitizer made in Mexico, Rigz knowingly sold the counterfeit products to third party merchants for sale to the general public.

290.     Rigz sold counterfeit URBĀNE hand sanitizer to at least *Pilot* and *Love's*, "essential" business retailers operating nationwide chains of truck stops, including in New York State during the pandemic.

291.     The authentic URBĀNE hand sanitizer that Rigz used to solicit orders from its customers was clearly labeled as "Made in the USA", yet Rigz obtained, sold, and distributed counterfeit URBĀNE hand sanitizer that was made in Mexico.

292.     On or about June 24, 2020, David Ghermezian and Saba were actively coordinating the import and introduction into U.S. commerce of an additional 219,960 units of counterfeit URBĀNE hand sanitizer for which a substantial deposit had already been paid.

293.     Triple Five Worldwide remains in possession of a substantial volume of counterfeit hand sanitizer, which it stores at least in part in the American Dream mall, one of the largest shopping centers in North America.

294.     Upon information and belief, Don Ghermezian, David Ghermezian, Yonah Ghermezian, Saba, Berkowitz, and Triple Five Worldwide made no effort to destroy the counterfeit hand sanitizer.

295.     Upon information and belief, they chose to keep the remaining inventory despite the heavy costs associated with warehousing because they continue to try to sell their counterfeit hand sanitizer.

296.     The Counterfeiting Defendants refuse to provide a full accounting of where exactly the remaining inventory of counterfeit hand sanitizer is located or what they have done with it following the FDA Order (as defined hereinafter).

297.     Upon information and belief, Rigz, JGX, and/or Liberty continue to be in possession of some quantity of counterfeit URBĀNE hand sanitizer.

298.     Where these potentially harmful products are currently located remains unknown.

### D.  FDA Detains Defendants' Counterfeit Hand Sanitizer

299.     In early July 2020, Trop attempted to ship Counterfeit Hand Sanitizer from Mexico to the U.S.

300.     This shipment was stopped at the port of entry and refused entry into the U.S. by the FDA.

301.     The FDA flagged all products arriving from Trop because Trop had allegedly used methanol in hand sanitizer formulas for other brands it manufactured.

302.     The original hand sanitizer solution sold by Plaintiffs under the URBĀNE Brand was "Made in the USA" and has never contained methanol.

303.    The FDA placed all hand sanitizer under the URBĀNE Brand on its list of "hand sanitizers consumers should not use" and added the product to its "import alert" to stop the product from entering the country (collectively, the "**FDA Order**").

304.    On its website, the FDA identifies the product subject to the FDA Order as "Urbane Bath and Body Hand Sanitizer," with Trop listed as the "Manufacturer" and Liberty as the "Distributor".

305.    Upon information and belief, the Counterfeit hand sanitizer that led to the FDA Order bore the URBĀNE label artwork that Deb Jaradeh of Isaac Import created and first distributed.

306.    This artwork was replicated from the label that Carelli provided to Grazi.

307.    Grazi and Triple Five Worldwide, as well as its principals, widely circulated the label without any authority from Red Rock to do so.

308.    The FDA Order, and the FDA's targeting of hand sanitizer products containing or allegedly containing methanol more generally, was included in numerous news reports and widely disseminated to the public.

309.    The FDA Order stated that "[t]he agency continues to warn the public not to use specific products listed."

310.    It also included the following statement from the FDA Commissioner: "Consumers must also be vigilant about which hand sanitizers they use, and for their health and safety we urge consumers to immediately stop using all hand sanitizers on the FDA's list of dangerous hand sanitizer products . . . We remain extremely concerned about the potential serious risks of alcohol-based hand sanitizers containing methanol. Producing, importing and distributing toxic hand sanitizers poses a serious threat to the public and will not be tolerated."

311.    The "serious threat to the public" is described in the FDA Order as the "toxic effects of methanol poisoning. Substantial methanol exposure can result in nausea, vomiting, headache, blurred vision, permanent blindness, seizures, coma, permanent damage to the nervous system or death. Although all persons using these products on their hands are at risk for methanol poisoning, young children who accidently ingest these products and adolescents and adults who drink these products as an alcohol (ethanol) substitute, are most at risk."

312.    Later in July 2020, the FDA issued a further News Release addressing its "do-not-use list of dangerous hand sanitizer products."

313.    In its News Release, the FDA stated: "Additionally, the FDA is strongly urging distributors and retailers to stop distributing and selling hand sanitizers manufactured by the firms on the list immediately, even if the particular product is not included in a recall, due to the risk of methanol poisoning.   When identifying hand sanitizers from the FDA's DO-NOT-USE list, consumers should look for *one or more identifiers* from the list *that match the product's labeling*, including: Manufacturer name[;] *Product name*[; or] National Drug Code (NDC) number[.]  If *any* of the identifiers (*name*, company, or NDC) match a product on the list, *the FDA urges consumers to immediately stop using the hand sanitizer*.  Dispose of the hand sanitizer bottle in a hazardous waste container, if available, or dispose of as recommended by local waste management and recycling centers. Do not flush or pour these products down the drain or mix with other liquids." (Emphasis added).

314.    In short, the U.S. federal government told distributors, retailers, and American consumers not to buy, sell, or use URBĀNE hand sanitizer due to Defendants' actions.

315.    As a result, the URBĀNE Brand is, and will continue to be, irreparably tarnished by its association with the FDA Order.

316.    Sales and consumer demand for hand sanitizer under the URBĀNE Brand plummeted precipitously following the FDA Order.

### E. FDA Order Tarnishes the URBĀNE Brand and Destroys Plaintiffs' Businesses

317.    Prior to the FDA Order, Red Rock was engaged in discussions to supply *Rite Aid*, which has roughly 2,500 stores in the U.S., URBĀNE sanitizer, including to be sold under *Rite Aid's* in-house brand.

318.    A final contract for the sale of URBĀNE hand sanitizer was imminent.

319.    The contract negotiations proceeded expeditiously in significant part because the URBĀNE Brand was already in use and recognized in the market.

320.    Prior to finalizing and executing the contract, Red Rock learned of the FDA Order.

321.    As a responsible company and business partner, Red Rock immediately brought the FDA Order to the attention of *Rite Aid*.

322.    As a direct result of the issuance of the FDA Order, *Rite Aid* called off the purchase from Red Rock.

323.    *Rite Aid's* buyer stated clearly in her August 11, 2020 email to Tom Bruss of Red Rock, "Your product is on the FDA recall list, we will not be bringing this product in."

324.    The loss of this business opportunity with *Rite Aid* has prevented Red Rock from selling URBĀNE hand sanitizer to thousands of stores and generating many millions of dollars in revenue.

325.    The contemplated agreement with *Rite Aid* was just one of several business deals and sales channels that Red Rock was pursuing prior to the FDA Order.

326.    Red Rock was concurrently pitching URBĀNE sanitizer to national retailers that were desperately searching for hand sanitizer, such as *Walgreens, Walmart, Target, Costco, Bed*

*Bath & Beyond, Publix Super Market, Auto Zone, Big 5 Sporting Goods, Dollar Tree, Dick's Sporting Goods, Academy Sports + Outdoors,* and *Ace Hardware.*

327.    The *Cleveland Indians* (since renamed *Guardians*) – a professional baseball team – had purchased 5,000 units of URBĀNE sanitizer.

328.    Other sports teams that Red Rock was pitching URBĀNE sanitizer to included the *Colorado Rockies, Chicago Cubs, New York Yankees, Florida Marlins, Atlanta Braves, Philadelphia Phillies,* and *Los Angeles Dodgers*.

329.    Other sports-related potential customers include the *PGA, MLB,* and *NBA.*

330.    Red Rock's sales efforts extended to casinos (*MGM, Wynn, IHG Hotels, Caesar's Palace, Red Rock Casinos, Statio Casinos*), cruise lines (*Disney, Carnival*), car manufacturers (*Lexus*), rideshare services (*Uber*), and school districts (*City of Chicago School District*).

331.    Defendants' tarnishment of the URBĀNE brand also affected Red Rock's distributors who were simultaneously marketing and selling URBĀNE hand sanitizer.

332.    By way of example, Iowa-based *Business Development Center ("BDC")* invested almost 1,000 hours and between $18,000–$22,000 into marketing and selling URBĀNE hand sanitizer.

333.    *BDC's* customer, *Williams Distribution LLC* ("**Williams**") is a minority-owned distributor of commodity chemical products, selling to school districts nationwide and companies such as *Fisher Scientific, LabTech,* and *Chrysler.*

334.    In July 2020, *Williams* placed an initial order for URBĀNE hand sanitizer.

335.    Satisfied with the product, Williams confirmed its intention to purchase from *BDC* and forecasted its need for approximately 3,327,444 units of URBĀNE hand sanitizer.

336.    Because of URBĀNE's appearance on the FDA DO NOT USE list, *Williams* terminated its purchase of URBĀNE hand sanitizer.

337.    Moreover, because *BDC* had offered a product that was counterfeited and appeared on the FDA Order, *Williams* lost confidence in *BDC* and ceased its relationship with *BDC* both for sanitizer and non-sanitizer product lines.

338.    As a result, *BDC* lost not only a business opportunity, but also a customer.

339.    *BDC's* net revenue from the Williams sale would have been approximately $742,000 to $1,660,000.

340.    Had it not been for the FDA recall, *BDC* would have likely sold $4,949,541 to $8,303,535 in URBĀNE hand sanitizer.

341.    The FDA Order also caused *Tractor Supply, DG Victory, Sacatelle, Natures Distribution, and Omega Distribution* to cancel their orders for URBĀNE hand sanitizer.

342.    Prior to that point, Red Rock's business with these customers was strong and growing.

343.    The damage to the URBĀNE Brand and Red Rock's business because of Defendants' conspiracy that led to the FDA Order is long-lasting.

344.    By way of example, Red Rock is currently paying about $457,054 in storage fees to keep empty and unusable URBĀNE bottles, labels, and hand sanitizer worth about $3,062,097.

345.    Such costs for Red Rock are ongoing and substantial, and would not have been necessary but for Defendants' unlawful actions leading to the FDA Order.

346.    The principals of both Coronado and Red Rock have also had their business reputations damaged as a proximate result of the Defendants' wrongful conduct.

347.    In particular, the FDA Order has harmed Plaintiffs in their subsequent business dealings, not only by immediately shutting down demand for URBĀNE hand sanitizer, but also by undermining the credibility of both companies' products in general.

348.    As a direct result of the Counterfeiting Defendants' theft and destruction of the URBĀNE Brand, Plaintiffs have also suffered substantial and ongoing harm to their business operations and personal finances.

349.    With no revenue from selling URBĀNE hand sanitizer and burdensome storage costs, Plaintiffs had no capital to redeploy to other products.

350.    By way of example, one of the principals of Red Rock was forced to sell his home to support Red Rock's business and pay employees.

### F. Defendants' Subsequent Conduct Exposes Their Collective Callousness

351.    Following the FDA Order, Plaintiffs investigated how their valuable brand came to be destroyed by the activities of the Counterfeit Defendants.

352.    During that investigation, Plaintiffs learned that Rigz ordered the production of counterfeit URBĀNE hand sanitizer to capitalize on its brand recognition with Rigz's customers.

353.    Plaintiffs discovered that Portz sent e-mail communications to Rigz's customers (e.g., *Pilot* and *Love's*) to discuss the FDA Order, and that URBĀNE hand sanitizer was subject to it.

354.    Portz described the counterfeit URBĀNE hand sanitizer produced in Mexico as simply a shipment that Rigz received, thereby implying that it was the distributor that that was responsible for the counterfeiting, namely Red Rock.

355. Upon information and belief, the counterfeit URBĀNE hand sanitizer produced in Mexico was still available to consumers at nationwide chains, including *Pilot*, until as late as or around September 2020.

356. Rigz and its principals repeatedly communicated with customers regarding its ensuing recall of URBĀNE hand sanitizer without ever disclosing their fundamental role in the scheme leading to the FDA Order or absolving Red Rock of its otherwise apparent responsibility.

357. In fact, Portz and Carelli communicated with Rigz's customers in a manner that suggested the Mexican-made (counterfeit) URBĀNE hand sanitizer was related to the American-made (authentic) URBĀNE hand sanitizer.

358. Since no authentic URBĀNE hand sanitizer was made anywhere other than the U.S., and the Mexican-made product bore no legally cognizable relation to Plaintiffs' authentic product, Portz and Carelli's representations to the contrary further disparaged and harmed Plaintiffs' URBĀNE Brand.

359. It was not until in or about November 2021 that Plaintiffs learned the full extent of Rigz's master plan for counterfeit URBĀNE hand sanitizer.

360. At that time, and only after Plaintiffs had been forced to resort to the Court's subpoena power, Rigz revealed that it ordered approximately one million bottles from JGX.

361. Plaintiffs also discovered previously undisclosed facts regarding the lengths to which Rigz was willing to go to obtain counterfeit URBĀNE hand sanitizer, which included Portz offering his private airplane as a means of expediting distribution of the bottles.

362. Thus, had it not been for the manufacturing and distribution issues faced by JGX, Triple Five Worldwide, and Liberty, Rigz would have received about one million bottles of counterfeit URBĀNE hand sanitizer.

363.    Further, the counterfeit URBĀNE hand sanitizer produced because of Defendants' fraudulent scheme was funneled into and comingled with existing orders for authentic URBĀNE hand sanitizer.

364.    In large part, these existing orders were for national truck stop chains – *Pilot* and *Love's* – that remained open as essential businesses at the height of the COVID-19 pandemic.

365.    Meanwhile, in or about August 2020, Don Ghermezian (the father of Orly Ghermezian, father-in-law of Saba, cousin of David Ghermezian and Yonah Ghermezian, and colleague of Berkowitz) paid or approved the payment of $100,000 to Grazi as compensation for the harm done to JGX's business relationship with *Ross Stores* as a result of the FDA Order.

366.    Don Ghermezian and/or Triple Five Worldwide made the $100,000 payment from bank accounts at CFSB to Grazi and/or JGX after a recall by *Ross Stores* following the FDA Order.

367.    As stated by Grazi on or about August 7, 2020, Don Ghermezian was making the payment because "we got terribly hurt" by "this very unfortunate situation."

368.    Upon information and belief, most of this payment was actually made by another entity in which Don Ghermezian had an ownership interest or served in a managing role.

369.    The payment was made via wire transfer and was handled by the "bookkeeper" for the Triple Five Group, Ltd., who requested and provided JGX's W-9 to CFSB, and provided the wire transfer confirmation number to Grazi.

370.    The Ghermezian family members and their business associates have already acknowledged the substantial damage their central role in the fraudulent hand sanitizer scheme caused to businesses, relationships, and brands, as evidenced by the payment made to Grazi and/or JGX in or around August 2020.

371. On the other hand, no Ghermezian family member has ever directly contacted Plaintiffs with respect to the harm done to Plaintiffs because of the counterfeiting conspiracy that they were instrumental in orchestrating.

372. Even though they acknowledged the destructive consequences of their actions with respect to Grazi, the Ghermezian family members have wrongfully denied responsibility for the irreparable harm those same actions have caused Plaintiffs, and, as a result, they continue to cause significant and ongoing damages to Plaintiffs.

373. On or about March 31, 2021, even after the FDA Order, David Ghermezian was making efforts to sell counterfeit URBĀNE hand sanitizer.

374. David Ghermezian offered to Tyberg, "I'm [sic] still have lots and lots of stock even though the [sic] said it was false accusations about the methanol. Lmk [Let me know] if you need I'm glad to give to you a cheap price."

375. As recently as June 2021, nearly one year after the FDA Order, David Ghermezian corresponded with Saba to confirm that he is aware of thousands of units of counterfeit hand sanitizer "[s]itting in American Dream storage" and that he is still "[t]rying to find something to do w[ith] it."

376. In response, Saba asked David Ghermezian, "how much is AD [American Dream] consuming?" To which David Ghermezian replied "AD [American Dream] is using very little," thereby indicating that the second largest mall in the U.S. may have been using some quantity of counterfeit URBĀNE hand sanitizer at least into the summer of 2021.

377. In June 2021, David Ghermezian also told Saba that he had spoken with Grazi regarding Plaintiffs' allegations.

378.    At that time, David Ghermezian represented that neither he nor Grazi were concerned about the allegations being made by Plaintiffs because "Urbane isn't rly [really] a legit company so there's not much they can do[.]"

379.    As of December 2022, Don Ghermezian, David Ghermezian, Berkowitz, Yonah Ghermezian, Saba, and Triple Five Worldwide, among others, have intentionally and unlawfully concealed pertinent information relating to their fraudulent hand sanitizer scheme from Plaintiffs and the Court.

380.    This collective effort to conceal the details of their fraudulent scheme has encompassed, *inter alia*, their deposition testimony, sworn declarations, document productions, and discovery misconduct.

381.    Despite the deaths of more than one million Americans from COVID-19, and the dangers presented by use of unsafe hand sanitizer, Defendants have showed no remorse for the dangerous product they are responsible for bringing into the U.S.  Nor have they made any efforts to rectify their illicit scheme.

382.    In fact, they have continued their years-long pattern of deception and callous disregard for the rights of others in favor of their own short-term financial interests.

### G. Defendants' Actions Violated Plaintiffs' Rights and Caused Substantial, Lasting Harm

383.    Coronado has neither given permission nor licensed the right to the Counterfeiting Defendants to use the URBĀNE Brand in connection with the Counterfeit Products, and therefore, the Counterfeiting Defendants' unauthorized use of such marks constitutes, among other things, infringement, false designation of origin, and unfair competition.

384.    Coronado is the registered owner of the '164 Registration, the '360 Registration, and the '225 Registration for the marks URBĀNE BATH & BODY and .  Coronado's

URBĀNE BATH & BODY and marks and federal registrations provide constructive notice of Coronado's rights in and to the URBĀNE Marks.

385.    As of the date of this Second Amended Complaint, and notwithstanding having been put on notice of Coronado's rights in and to the URBĀNE Brand, the Counterfeiting Defendants have failed to fully account for, among other things: (i) the full scope of Counterfeit Products that were produced; (ii) the location of all Counterfeit Products imported into the U.S.; (iii) whether they have sold and/or are selling Counterfeit Products to consumers; and (iv) their earnings as a result of their wrongful and illegal conduct with respect to the URBĀNE Brand.

386.    Upon information and belief, the Counterfeiting Defendants offered for sale and/or sold in the same or similar channels of trade the Counterfeit Products using marks that are identical and/or confusingly similar to one or more of the URBĀNE Marks and the URBĀNE Brand on and for goods that are identical and/or similar to and directly compete with those offered by Coronado and Red Rock.

387.    Coronado's dates of first use relative to the URBĀNE Brand, in connection with at least the goods set forth within the '164 Registration for the URBĀNE Marks, precede the earliest date Defendants can possibly claim as their date of first use of the infringing marks incorporated on or in connection with the Counterfeit Products.

388.    In particular, the '164 Registration has a constructive date of first use of August 1, 2019, which precedes the earliest date Defendants can possibly claim as their date of first use of the infringing marks incorporated on or in connection with the Counterfeit Products.

389.    Since Defendants have knowledge, or reasonably should have knowledge, of Coronado's rights in and to the URBĀNE Brand, upon information and belief, the Counterfeiting

Defendants' ongoing and continued offering for sale and/or sale of the Counterfeit Products constitutes knowing, intentional, and willful infringement.

390.    Upon information and belief, Defendants' control over the manufacture, production, distribution, offering for sale and/or sale of the Counterfeit Products or otherwise use of marks that infringe one or more of the URBĀNE Marks has caused, or is likely to cause, confusion, mistake and/or deception amongst actual and potential consumers as to the source of the goods and services within the meaning of § 2(d) of the Lanham Act, 15 U.S.C. § 1052(d), all to the severe detriment of Coronado.

391.    In view of the foregoing, Coronado and Red Rock, respectively, have been damaged and will continue to be damaged by virtue of the Counterfeiting Defendants' manufacture, production, distribution, offering for sale, and/or sale of the Counterfeit Products and use of infringing marks.

## COUNT I

**Violation of 18 U.S.C. § 1962 (Racketeer Influenced Corrupt Organizations Act)**

**(Plaintiff Coronado and Plaintiff Red Rock Against the Counterfeiting Defendants)**

**(18 U.S.C. § 1962)**

392.    Coronado and Red Rock re-allege the allegations contained in the foregoing paragraphs, as though fully set forth herein.

### A.  Culpable Person

393.    Defendants JGX, Grazi, DJ, Jaradeh, Isaac Import, Don Ghermezian, Syd Ghermezian, David Ghermezian, Yonah Ghermezian, Berkowitz, Saba, CFSB, Triple Five Worldwide are all "persons" within the meaning of 18 U.S.C. § 1961(3) and 18 U.S.C § 1962(c) in that they are individuals and entities capable of holding a legal or beneficial interest in property.

## B.  The Enterprise

394.    As described more fully above, the Counterfeiting Defendants formed an enterprise with the sole purpose of sourcing, importing, distributing, and selling counterfeit URBĀNE sanitizer.

395.    The enterprise began when JGX, Grazi, DJ, Jaradeh, and Isaac Import began functioning as a continuing unit to source, import, distribute, and sell counterfeit URBĀNE hand sanitizer.

396.    Subsequently, as described more fully above, Don Ghermezian, Syd Ghermezian, David Ghermezian, Yonah Ghermezian, Berkowitz, Saba, CFSB, Triple Five Worldwide joined the enterprise to provide financial resources, links to additional customers beyond Rigz, and source hundreds of thousands of additional bottles of counterfeit URBĀNE hand sanitizer.

397.    The Enterprise was managed by two sets of defendants: Grazi, DJ, and Jaradeh, who exercised control over JGX and Isaac Import on the one hand; and Don Ghermezian, Syd Ghermezian, David Ghermezian, Yonah Ghermezian, Berkowitz, and Saba, either in their capacity as owners, managers, officers, agents, and/or persons with control over Triple Five Worldwide and CFSB, or in their individual capacities on the other hand.

398.    Grazi, DJ, Jaradeh, JGX, Isaac Import, Don Ghermezian, Syd Ghermezian, David Ghermezian, Yonah Ghermezian, Berkowitz, Saba, Triple Five Worldwide and CFSB formed an enterprise with each person having a clear relationship to the others and the enterprise as a whole.

399.    The enterprise could not accomplish its purpose without coordinated activity among its members. JGX, Isaac Import, Grazi, DJ, and Jaradeh created the fake URBĀNE label by repurposing the genuine label, managed the relationship and sales to *Pilot* and *Love's* through

Rigz, and maintain the relationship with Trop to ensure production and import of the counterfeit URBĀNE hand sanitizer.

400.    David Ghermezian, Yonah Ghermezian, Berkowitz, Saba, and Triple Five Worldwide provided cash up-front to Trop to enable the manufacture of the sanitizer, coordinate with Trop regarding the import and distribution of the sanitizer, store excess inventory until it can be sold, and solicit additional sales beyond Rigz.

401.    Don Ghermezian provided direction, oversight, and guidance as to the enterprise's operations, by making decisions regarding branding, sourcing, importing, and sales efforts, as well as authorizing and directing payments and refunds.

402.    Indeed, when Grazi sought a refund based upon a recall by one of JGX's customers, he made the request to Don Ghermezian.

403.    The payment subsequently came from two CFSB bank accounts, only one of which belonged to Triple Five Worldwide.

404.    Syd Ghermezian and CFSB managed the wire transfers and payments between the various members, customers, and Trop.

405.    Syd Ghermezian consistently held himself out as a "Bank CEO" as well as an employee of Triple Five Worldwide, even being replaced as a manager of the LLC.

406.    CFSB's role was crucial in allowing Triple Five Worldwide utilize a bank account without providing necessary corporate documentation, permitting non-managers such as Don Ghermezian and Syd Ghermezian to access the Triple Five Worldwide bank account, and ensuring that its wire transfers were not only honored but not reported for suspicious activity.

### C. Pattern of Racketeering Activity

407.    As described more fully above, the Counterfeiting Defendants, individually and as part of the enterprise, have engaged and continue to engage, directly or indirectly, in acts indictable for crimes enumerated under 18 U.S.C. § 1961(1)(B) which include, *inter alia*, acts of mail fraud and/or wire fraud, in violation of 18 U.S.C. §§ 1341 and 1343.

408.    The Counterfeiting Defendants, acting individually and as part of the enterprise, have devised the scheme to source and sell counterfeit URBĀNE hand sanitizer to defraud and obtain money or property by means of false or fraudulent pretenses and representations.

409.    Each Counterfeiting Defendant's participation is crucial to the racketeering activity as they have each enabled, conducted, and maintained the counterfeit sanitizer operation by knowingly making materially false or misleading statements, or material omissions, to their customers through the mail or wires, to induce them to unwittingly purchase counterfeit URBĀNE hand sanitizer and to conceal the true nature of the sanitizer's origin and manufacture.

410.    Among the numerous fraudulent statements and omissions alleged herein:

a.    Grazi claimed ownership of the URBĀNE brand in a video message to the manufacturers of the counterfeit sanitizer in or about May 2020. He further circulated the URBĀNE label and representing that he was entitled to use it. He further exchanged written communications and telephone calls with Saba, among others, to facilitate the manufacture and distribution of counterfeit hand sanitizer.

b.    Jaradeh researched Coronado, the registered owner of the URBĀNE Marks, in May 2020 and corresponded with Grazi with respect to his findings in or about May 2020. He subsequently created purchase orders for counterfeit URBĀNE

sanitizer and sent them to Grazi, who in turn transmitted them to Berkowitz on or about May 6, 2020.

c.  DJ knowingly created the fake URBĀNE label which not only falsely represented that URBĀNE was "Made in Mexico" but had identical "Drug Facts" and "Ingredients" to the genuine URBĀNE label without actually containing identical ingredients.

d.  David Ghermezian, Berkowitz, and Saba sent numerous messages and emails soliciting the manufacture, import, distribution, and sale of counterfeit URBĀNE sanitizer.

e.  Yonah Ghermezian created and sent numerous purchase orders and invoices for counterfeit URBĀNE sanitizer to JGX, Tyberg, and SoFlo Urban Team LLC.

f.  Don Ghermezian authorized payments to JGX in connection with the counterfeit sanitizer operation, including in August 2020 because JGX "got terribly hurt" by "this very unfortunate situation" after the FDA Order.

g.  Syd Ghermezian and CFSB provided the ability for the wire transfers and payments necessary to enable and sustain the counterfeit sanitizer operation.

h.  Syd Ghermezian and CFSB also knowingly disregarded errors in Triple Five Worldwide's application to open an account with CFSB and the lack of evidence of ownership of Triple Five Worldwide, while also participating in communications concerning payments and orders for counterfeit hand sanitizer.

411.  Triple Five Worldwide and JGX exchanged wire transfers in connection with their counterfeit sanitizer scheme including on the following occasions:

a.  May 18, 2020; $109,000; JGX to Triple Five Worldwide;

  b. May 26, 2020; $100,000; JGX to Triple Five Worldwide;

  c. June 25, 2020; $120,250; JGX to Triple Five Worldwide;

  d. August 12, 2020; $28, 743.75; Triple Five Worldwide to JGX;

  e. August 14, 2020; $69,995; Company on behalf of Triple Five Worldwide to JGX.

412. On or about May 26, 2020, Triple Five Worldwide received a wire transfer from Tyberg of $115,900 because of its sale of counterfeit URBĀNE sanitizer.

413. JGX received multiple wire transfers from Rigz in furtherance of the counterfeit sanitizer scheme including:

  a. April 28, 2020; $220,281.25;

  b. April 30, 2020; $207,031.25;

  c. April 30, 2020; $238,200;

  d. April 30, 2020; $46,146.25.

414. JGX mailed Rigz check payments with the following details:

  a. May 22, 2020; $212,533.75;

  b. June 24, 2020; $141,734.29.

415. On or about May 18, 2020, JGX wired Liberty $129,650 as payment for counterfeit URBĀNE hand sanitizer.

416. Every Counterfeiting Defendant has specific knowledge that the mails and wires are being used to advance the overall purpose of executing the counterfeit sanitizer operation, or it was reasonably foreseeable that the mails and wires would be used because the counterfeit sanitizer business depends upon messaging or emailing one another, customers, representatives of the factories; transmitting various forms and contracts including purchase orders and invoices by

the mails and wires; and remitting payments in connection with the manufacture, importation, transportation, and sale of the counterfeit sanitizer.

417.    Each of the hundreds of uses of the mails and wires as part of the counterfeit sanitizer operation, constitutes a separate instance of mail or wire fraud under 18 U.S.C. §§ 1341 and 1343, and thus is a predicate act.

418.    These predicate acts constitute a "pattern of racketeering activity" under 18 U.S.C. §§ 1961 and 1962.

419.    Defendants' conduct has involved and continues to pose a threat of long-term illegality since it is believed to be actively ongoing.

420.    In October 2020, David Ghermezian and Syd Ghermezian exchanged correspondence with respect to a $35,000 payment from SoFlo Urban Team to Triple Five Worldwide, with the wire payment to be received by CFSB, concerning issues pertaining to the counterfeit hand sanitizer that Triple Five Worldwide had ordered and sought to manufacture.

421.    How Triple Five Worldwide has used and/or is using the proceeds from this payment, which arose from Triple Five Worldwide's conduct that destroyed Plaintiffs' business, brand, and reputation, is unknown and presents and ongoing threat of further illegality.

422.    On or about March 31, 2021, after the FDA Order, David Ghermezian was trying to sell counterfeit URBĀNE hand sanitizer.

423.    By way of example, he wrote Tyberg, "I'm [sic] still have lots and lots of stock even though the [sic] said it was false accusations about the methanol.  Lmk [Let me know] if you need I'm glad to give to you a cheap price."

424.    Almost a year after the FDA Order, David Ghermezian was still soliciting sales of URBĀNE hand sanitizer.

425.    On June 9, 2021, Saba told David Ghermezian that he understood from Berkowitz that there were "2 truckloads left" of counterfeit hand sanitizer.

426.    In response, David Ghermezian said: "More bro.  There's thousands.  Lol.  Sitting in American Dream storage."

427.    Also on June 9, 2021, Saba asked David Ghermezian "There's nothing you can do with [the unused sanitizer bottles]?  Like how much is AD [American Dream] consuming?"

428.    David Ghermezian responded by stating that "AD [American Dream] is using very little" and "Trying to find something to do with it."

429.    Upon information and belief, and as evidenced by the allegations set forth herein, a large volume of counterfeit URBĀNE hand sanitizer continues to be stored by the Counterfeiting Defendants at the American Dream mall in New Jersey, and it may still be in use in commerce at the mall itself.

430.    Similarly, in November 2020 and against in April 2021, Berkowitz corresponded with Grazi regarding the location of unused bottles of hand sanitizer to obtain compensation from persons in Mexico who had been involved in the production of counterfeit sanitizer.

431.    Despite the existence of those communications, the location of all remaining counterfeit bottles of hand sanitizer remains unknown to Plaintiffs.

432.    In May 2021, David Ghermezian sought to coordinate with Berkowitz on how to approach Plaintiffs' allegations in this Court.

433.    Also in May 2021, David Ghermezian sent a message to Grazi seeking to talk to him.

434.    Upon information and belief, these communications were in furtherance of the unlawful scheme perpetuated by the Counterfeiting Defendants as well as their ongoing efforts to hide the extent and nature of their collection activities.

435.    Subsequently, in June 2021, David Ghermezian and Berkowitz corresponded about the tens of thousands of bottles of hand sanitizer they still had in their possession.

436.    Information as to where the remaining inventory of counterfeit URBĀNE hand sanitizer is being stored, as well as when and to whom it is being and/or has been offered for sale, is solely in the Counterfeiting Defendants' possession, custody, or control.

437.    Moreover, even despite being on notice of the illicit nature of the counterfeit hand sanitizer bearing the URBĀNE label, as set forth in the various submissions to the Court in this proceeding, the Counterfeiting Defendants have refused to admit any wrongdoing or stipulate to the injunctive relief sought by Plaintiffs.

438.    As of June 2023, Don Ghermezian, David Ghermezian, Berkowitz, Yonah Ghermezian, Saba, and Triple Five Worldwide, among others, have intentionally and unlawfully concealed pertinent information relating to their fraudulent hand sanitizer scheme from Plaintiffs and the Court.

**D.  RICO Conspiracy**

439.    Alternatively, and as described more fully above, each of the Counterfeiting Defendants conspired to violate 18 U.S.C. §§ 1961 (a), (b), and/or (c) by, *inter alia*, agreeing to work with other Counterfeiting Defendants to source, import, distribute, and sell counterfeit URBĀNE hand sanitizer.

440.    As alleged herein, each Counterfeiting Defendant knew about and agreed to facilitate the manufacture and sale of counterfeit sanitizer using mail and wire fraud.

### E.  Interstate Commerce

441.    The enterprise is engaged in interstate commerce and use instrumentalities of interstate commerce in their daily business activities.

442.    Specifically, members of the enterprise maintain offices in New Jersey and New York and use personnel in those offices to source, import, distribute, and sell counterfeit URBĀNE hand sanitizer throughout the U.S. via extensive use of interstate emails, mail, and wire transfers.

443.    In the present case, all communications between the members of the enterprise were by interstate email and mail, wire transfers, and other interstate wire communications.

### F.  Injury and Causation

444.    Plaintiffs have and will continue to be injured in their business and property by reason of the Counterfeiting Defendants' violations of 18 U.S.C. §§ 1962© and/or 1962(d) in an amount to be determined at trial. The injuries to Plaintiffs directly, proximately, and reasonably foreseeably resulting from or caused by these violations include, but are not limited to the Counterfeiting Defendants using a spurious mark that is identical with, or substantially indistinguishable from, the URBĀNE Brand, including the '164 Registration, the '360 Registration, and the '225 Registration, and that is likely to, and did in fact, confuse and/or deceive consumers; and the Counterfeiting Defendants' fraudulent representations and misappropriation of the URBĀNE Brand, as described herein, which caused irreparable damages to the successful and growing sales of hand sanitizer under the URBĀNE Brand that would have continued but for the fraudulent acts of the Counterfeiting Defendants.

445.    The damage to Plaintiffs' business caused by the illegal scheme perpetrated by the Counterfeiting Defendants is substantial and persists to this day.

446.    Plaintiffs' damages that are directly attributable to the fraudulent scheme detailed herein include, without limitation, (i) more than $27 million in the lost business value of URBĀNE hand sanitizer due to business opportunities that Plaintiffs would have had but for the Counterfeiting Defendants' racketeering activities; (ii) more than $2.2 million in out-of-pocket inventory costs for URBĀNE hand sanitizer that Plaintiffs were unable to sell due to the consequences of the Counterfeiting Defendants' conduct, including the FDA Order; (iii) more than $1.7 million in damages to Red Rock's sales of other products due to the immediate and severe financial harm suffered by Plaintiffs, including but not limited to the reduction in available capital, as a result of the Counterfeiting Defendants' destruction of the market for URBĀNE hand sanitizer; and (iv) more than $5 million in lost value of the URBĀNE Brand due to the Counterfeiting Defendants' wholesale theft and destruction of the brand through their unlawful use in commerce and the irreversible harm caused by being involved in and associated with the FDA Order.

447.    Each one of the aforementioned injuries suffered by Plaintiffs continues to have a detrimental impact on Plaintiffs' businesses.

448.    As a result of the foregoing, Coronado and Red Rock are entitled to three times their actual damages in an amount to be proven at trial, plus costs and attorneys' fees, pursuant to 18 U.S.C. § 1964(c).

## COUNT II

**Trademark Infringement**

**(Plaintiff Coronado Against the Counterfeiting Defendants)**

**(15 U.S.C. §1114(1))**

449.    Coronado re-alleges the allegations contained in the foregoing paragraphs, as though fully set forth herein.

450.    Without the authorization or consent of Coronado, the Counterfeiting Defendants have used and, on information and belief, continue to use trademarks and/or designations that are identical, confusingly like, and/or a reproduction, copy or colorable imitation of one or more of the URBĀNE Marks.

451.    Further, the Counterfeiting Defendants, by and through, *inter alia*, their manufacture, production, distribution, importation, advertising, and offering for sale and/or sale of the Counterfeit Products in U.S. commerce are and have been directly competing with Coronado's sales, distribution, and advertisement of the very same or similar goods and under and through the URBĀNE Marks.

452.    The Counterfeiting Defendants' actions in, *inter alia*, manufacturing, producing, distributing, importing, offering for sale, and/or selling the Counterfeit Products in commerce has occurred in the face of and notwithstanding having been on, at a minimum, constructive notice of Coronado's rights in the URBĀNE Marks.

453.    The Counterfeiting Defendants' unauthorized use of trademarks and/or designations that are identical, confusingly similar to, a reproduction, copy or colorable imitation of one or more of the URBĀNE Marks and in connection with competing goods, is likely to cause and has actually caused consumer confusion consumer confusion, mistake, and/or deception in the

relevant market(s) as to the origin of the goods and services, and/or as to whether the Counterfeiting Defendants are sponsored by/affiliated with, or are otherwise connected to Coronado, in violation of Section 32(1) of the Lanham Act, as amended, 15 U.S.C. § 1114(1).

454.    For example, the Counterfeiting Defendants' unauthorized use of the URBĀNE Marks has caused actual confusion amongst the consuming public, including but not limited to *Pilot* and *Love's* resulting in the loss of, *inter alia*, the goodwill and reputation established by Coronado under its federally registered marks.

455.    Moreover, each and every one of Grazi, Jaradeh, DJ, Saba, Berkowitz, David Ghermezian, Yonah Ghermezian, Don Ghermezian, and Syd Ghermezian were moving, active, conscious forces behind JGX, Isaac Import, Triple Five Worldwide, CFSB, and their associated principals' infringement of the URBĀNE Marks.

456.    By using trademarks and/or designations that are identical, confusingly similar to, a reproduction, copy or colorable imitation of one or more of the URBĀNE Marks, and by manufacturing, producing, distributing, importing, offering for sale, and/or selling the Counterfeit Products to the public in connection with said marks and/or designations or confusingly similar variants thereof, for profit and without Coronado's authorization, the Counterfeiting Defendants are depriving Coronado of its exclusive right to control, use and otherwise benefit from its statutorily-protected trademarks.

457.    If permitted to continue, the Counterfeiting Defendants' actions will nullify Coronado's right to exclusive use of its registered trademarks, free from infringement, and will have a substantial and adverse effect, as they already have, on Coronado's existing and projected future interstate business for goods identified by the URBĀNE Marks.

458.   As a result of the Counterfeiting Defendants' infringing conduct, Coronado has suffered substantial damages in an amount to be proven at trial, as well as the continuing loss of the goodwill and reputation established by Coronado under its statutorily-protected marks.

459.   This continuing loss of goodwill cannot be properly calculated and thus constitutes irreparable harm and an injury for which Coronado has no adequate remedy at law.  Coronado will continue to suffer irreparable harm unless this Court enjoins the Counterfeiting Defendants' conduct.

460.   By using, without Coronado's authorization, trademarks and designations that are identical, confusingly similar to, a reproduction, copy or colorable imitation of one or more of the URBĀNE Marks and by manufacturing, producing, distributing, importing, offering for sale, and/or selling the Counterfeit Products to the public in connection with the infringing marks, the Counterfeiting Defendants have intentionally and knowingly infringed Coronado's rights, thus making this an exceptional case under 15 U.S.C. § 1117(a).

## COUNT III

### Contributory Trademark Infringement

### (Plaintiff Coronado Against the Counterfeiting Defendants)

461.   Coronado re-alleges the allegations contained in the foregoing paragraphs, as though fully set forth herein.

462.   Upon information and belief, the Counterfeiting Defendants had control over, among other things, the manufacture, importation, distribution, advertising, and offering for sale, and sale of the Counterfeit Products and did so with the knowledge, or they had reason to have such knowledge, that they did not have the rights to the trademarks used or incorporated in and on the Counterfeit Products.

463.    By, *inter alia*, importing, distributing, offering for sale, and selling, despite knowing, or having reason to know, that they did not have the rights to the trademarks, the Counterfeiting Defendants have intentionally induced third-parties to infringe Coronado's rights in and to the URBĀNE Marks, and/or any and all marks associated therewith, by facilitating the further production, distribution, dissemination, and sale of the Counterfeit Products.

464.    Further, upon information and belief, the Counterfeiting Defendants knew, or had reason to know, that Rigz was engaged in infringing conduct when it ordered, planned to sell, and sold products bearing the URBĀNE Marks.

465.    These actions by the Counterfeiting Defendants constitute contributory trademark infringement.

466.    As a proximate result of the Counterfeiting Defendants' contributory infringement, Coronado has been damaged and will continue to suffer damage to its business, reputation, and goodwill.

467.    The Counterfeiting Defendants' unlawful actions entitle Coronado to compensatory and other applicable damages in an amount to be proven at trial.

## COUNT IV

**Unfair Competition and False Designation of Origin**

**(Plaintiffs Coronado and Red Rock Against the Counterfeiting Defendants)**

**(15 U.S.C. §1125(a))**

468.    Coronado and Red Rock re-allege the allegations contained in the foregoing paragraphs, as though fully set forth herein.

469.    The Counterfeiting Defendants' unauthorized use of trademarks and/or designations that are identical and/or confusingly similar to one or more of the URBĀNE Marks

in connection with the Counterfeit Products, which are identical and/or highly related goods, is likely to cause and has actually caused confusion, mistake, and/or deception among the general public as to the origin of the goods, or as to whether the Counterfeiting Defendants are sponsored by, affiliated with, originated from or otherwise connected with Coronado and/or Red Rock, in violation of Section 43(a) of the Lanham Act, as amended, 15 U.S.C. §1125(a).

470.    As a result of the Counterfeiting Defendants' infringing conduct, Coronado and Red Rock have suffered substantial commercial and other damages in an amount to be proven at trial, as well as the continuing loss of the goodwill and reputation established by Coronado in its marks and Red Rock in its commercial use thereof.

471.    This continuing loss of goodwill cannot be properly calculated and thus constitutes irreparable harm and an injury for which neither Coronado nor Red Rock has an adequate remedy at law.  Coronado and Red Rock will both continue to suffer irreparable harm unless this Court enjoins the Counterfeiting Defendants' conduct.

472.    By violating 15 U.S.C. §1125(a) through the use of trademarks and designations that are identical, confusingly similar to, a reproduction, copy or colorable imitation of one or more of the URBĀNE Marks in connection with the selling, offering for sale, distributing, and/or marketing of goods and services to the general public under and through the infringing marks, the Counterfeiting Defendants have intentionally and knowingly infringed Coronado's rights, thus making this an exceptional case under 15 U.S.C. § 1117(a).

## COUNT V

### False Advertising

### (Plaintiffs Coronado and Red Rock Against the Counterfeiting Defendants)

### (15 U.S.C. § 1125(a)(1)(B))

473. Coronado and Red Rock re-allege the allegations contained in the foregoing paragraphs, as though fully set forth herein.

474. The Counterfeiting Defendants have made false and misleading statements of fact in commercial advertising and/or promotion that misrepresent their authorization to distribute and sell the Counterfeit Products.

475. The Counterfeiting Defendants have worked in concert in furtherance of the counterfeiting scheme and have (individually and/or through their respective entities) made false and misleading statements of fact in commercial advertising or promotion to the relevant consuming public about their authorization to distribute and sell the Disputed Products.

476. The Counterfeiting Defendants have made such false and misleading statements in interstate commerce and these statements have deceived and/or have a tendency to deceive Coronado and Red Rock's current and prospective licensees, distributors, retailers, resellers and/or the general public.

477. The Counterfeiting Defendants' false and misleading statements are material.

478. The Counterfeiting Defendants have made such false and misleading statements in commercial advertising or promotion with respect to their authorization to distribute and sell the Counterfeit Products in interstate commerce to current and prospective licensees, distributors, retailers and/or resellers.

479. Coronado and Red Rock have been damaged by the Counterfeiting Defendants' false and misleading statements in commercial advertising or promotion and, unless this conduct is enjoined, both Coronado and Red Rock's goodwill and reputation will continue to suffer irreparable injury that cannot adequately be calculated or compensated by money damages.

480.    The Counterfeiting Defendants' unlawful actions constitute false advertisements, which entitles Coronado and Red Rock to damages under 15 U.S.C. § 1117 in an amount to be determined at trial, as well as exemplary damages and attorneys' fees and costs.

### COUNT VI

**Deceptive Business Practices & Civil Conspiracy to Engage in Deceptive Business Practices**

**(Plaintiffs Coronado and Red Rock Against the Counterfeiting Defendants)**

**(N.Y. G.B.L. § 349)**

481.    Red Rock re-alleges the allegations contained in the foregoing paragraphs, as though fully set forth herein.

482.    The Counterfeiting Defendants were engaged in a consumer-oriented act or practice by promoting, importing, selling, offering to sell, and/or distributing the Counterfeit Products, which were designed and sold for consumer use as hand sanitizer in the midst of a global pandemic.

483.    The Counterfeiting Defendants are not, in fact, licensed or authorized in any way whatsoever to promote, import, sell, offer to sell, finance, and/or distribute the Counterfeit Products, yet they held themselves out as such in a misleading and material way.

484.    In carrying out their consumer-oriented acts and practices, the Counterfeiting Defendants entered into multiple agreements pursuant to which they took overt acts in furtherance those agreements, namely, producing, promoting, importing, selling, offering to sell, financing, and/or distributing the Counterfeit Products.

485.    Each of the Counterfeiting Defendants intentionally conspired to mislead consumers and other customers with respect to the counterfeit nature of the URBĀNE hand sanitizer they were responsible for producing, promoting, importing, selling, offering to sell,

financing, and/or distributing in furtherance of their plan to wrongly profit off the URBĀNE Brand.

486.     Red Rock and Coronado have suffered injury as a result of the Counterfeiting Defendants' representations as to their right to promote, import, sell, offer to sell, finance, and/or distribute the Counterfeit Products, as such deceptive acts are directly responsible for, *inter alia*, the FDA Order that has prevented, and will continue to prevent, Red Rock from selling additional hand sanitizer under the URBĀNE Brand, has permanently damaged the reputation and goodwill of Coronado's URBĀNE Brand, and has greatly harmed the reputation and goodwill of Red Rock among its customers and business partners.

487.     As a result of the foregoing, Red Rock and Coronado are entitled to damages in an amount to be proven at trial, plus civil penalties pursuant to New York General Business Law §§ 349-c and 350-d.

## COUNT VII

### Trademark Infringement Under New York Common Law

### (Plaintiff Coronado Against the Counterfeiting Defendants)

488.     Coronado re-alleges the allegations contained in the foregoing paragraphs, as though fully set forth herein.

489.     As set forth herein, Coronado owns all common law rights in and to the URBĀNE Brand.

490.     Coronado's use of the URBĀNE Brand, including the common law rights therein, for various goods and services rendered in commerce, including but not limited to hand sanitizer, has been substantially exclusive and continuous since the inception of the marks.

491.    The URBĀNE Brand is distinctive, and representative of the goodwill built up by Coronado.

492.    By imitating and using the URBĀNE Brand in commerce in connection with *inter alia*, the manufacturing, importing, offering for sale, and sale of the Counterfeit Products, the Counterfeiting Defendants have infringed Coronado's common law trademark rights.

493.    Defendants' unlawful and improper actions, as set forth herein, are likely to cause confusion, mistake, or deception as to the source, origin, affiliation, sponsorship, and association of the Counterfeiting Defendants' goods and services and to mislead actual and prospective consumers into falsely believing that the Counterfeiting Defendants' hand sanitizer originates from or is otherwise connected with or sanctioned by Coronado when, in fact, it is not.

494.    As a direct and proximate result of the Counterfeiting Defendants' infringement, Coronado has sustained and is likely to continue to sustain substantial monetary damages and irreparable injury to its business, reputation, and goodwill, for which Coronado has no adequate remedy at law.

495.    By reason of the foregoing acts, the Counterfeiting Defendants are liable to Coronado for common law trademark infringement and Coronado is entitled to preliminary and permanent injunctive relief and monetary damages in an amount to be proven at trial.

## COUNT VIII

### Tortious Interference with Prospective Economic Advantage Under

### New York Common Law

### (Plaintiff Red Rock Against the Counterfeiting Defendants)

496.    Red Rock re-alleges the allegations contained in the foregoing paragraphs, as though fully set forth herein.

497.    During June and July, 2020, Red Rock had business relations with, among others, *Rite Aid* regarding widespread distribution of hand sanitizer under the URBĀNE Brand.

498.    Those discussions significantly advanced such that a contract for the sale of significant amounts of URBĀNE hand sanitizer was imminent.

499.    Rite Aid operates approximately 2,500 stores across the U.S.

500.    It was anticipated that this arrangement would be profitable for all involved.

501.    After discovering the existence of the FDA Order, at which point Red Rock was already in advanced business discussions with *Rite Aid*, Tom Bruss of Red Rock immediately and responsibly informed Rite Aid of the FDA Order so that all sides were aware of the material facts related to the contemplated transaction.

502.    The FDA Order was issued as a direct result of Defendants' infringing and otherwise illegal activities.

503.    Following Red Rock's disclosure of the FDA Order to *Rite Aid, Rite Aid* terminated the contract negotiations with Red Rock.

504.    The buyer at *Rite Aid* informed Mr. Bruss that the FDA Order was the reason why the contemplated contract could not be completed and executed.

505.    From April until early July 2020, Red Rock had business relations with, *inter alia*, *Pilot* and *Love's*, in part through Rigz, pursuant to which Red Rock sold hundreds of thousands of bottles of authentic URBĀNE hand sanitizer.

506.    The Counterfeiting Defendants knew of Red Rock's business with *Pilot* and *Love's*, either directly or indirectly, and their conduct in manufacturing, distributing, and importing unlicensed and unauthorized Counterfeit Products interfered, and, in fact, destroyed, Red Rock's business of producing and selling hand sanitizer through to *Pilot* and *Love's*.

507.    URBĀNE hand sanitizer was being sold in *Tractor Supply's* approximately 1,900 stores early in the pandemic.  The FDA Order caused *Tractor Supply* to cancel all of its orders with Red Rock for URBĀNE hand sanitizer under the URBĀNE Brand.

508.    Red Rock would have sold approximately three million units of URBĀNE hand sanitizer through BDC.  This sale did not materialize because of URBĀNE's appearance on the FDA DO NOT USE list.

509.    Therefore, the Counterfeiting Defendants interfered with Red Rock's relationship with, at a minimum, *Rite Aid, Pilot, Love's, Tractor Supply, and BDC* by manufacturing, distributing, and attempting to import the unlicensed and unauthorized Counterfeit Products.

510.    The Counterfeiting Defendants' actions in manufacturing, distributing, and attempting to import the Counterfeit Products were intentional.

511.    As set forth herein, the Counterfeiting Defendants used wrongful means to interfere with Red Rock's relationships with *Rite Aid, Pilot, Love's, and Tractor Supply,* including but not limited to, trademark infringement, false designation of origin, unfair competition, and deceptive business practices.

512.    As a result of the foregoing, Red Rock's business relationships with *Rite Aid, Pilot,* and *Love's* was greatly damaged, thereby entitling Red Rock to damages in an amount to be proven at trial.

## <u>COUNT IX</u>

### Unfair Competition Under New York Common Law

### (Plaintiff Coronado Against the Counterfeiting Defendants)

513.    Coronado re-alleges the allegations contained in the foregoing paragraphs, as though fully set forth herein.

514.    As set forth herein, by using Coronado's URBĀNE Brand, including but not limited to Coronado's common law rights therein, in commerce in connection with the manufacturing, distributing, importing, offering for sale, and sale of the Counterfeit Products, the Counterfeiting Defendants' activities described herein improperly traded upon the goodwill and valuable rights in and to the URBĀNE Brand and constitute unfair competition under the common law of the State of New York.

515.    The Counterfeiting Defendants' unlawful and improper actions, as set forth herein, are likely to cause confusion, mistake, or deception as to the source, origin, affiliation, sponsorship, and association of Defendants' goods and services and to mislead actual and prospective consumers into falsely believing that Defendants' hand sanitizer originates from or is otherwise connected with or sanctioned by Coronado when, in fact, it is not.

516.    The Counterfeiting Defendants engaged in their unfair competitive practices in bad faith, as set forth herein, by, *inter alia*, misappropriating Coronado's labor and expenditures in creating, building, and enhancing the URBĀNE Brand.

517.    As a direct and proximate result of the Counterfeiting Defendants' unfair competition, Coronado has sustained and is likely to continue to sustain substantial monetary damages and irreparable injury to its business, reputation, and goodwill, for which Coronado has no adequate remedy at law.

518.    Coronado is entitled to preliminary and permanent injunctive relief and monetary damages in an amount to be proven at trial.

## COUNT X

### Unjust Enrichment Under New York Common Law

### (Plaintiff Coronado Against the Counterfeiting Defendants)

519.    Coronado re-alleges the allegations contained in the foregoing paragraphs, as though fully set forth herein.

520.    Upon information and belief, the Counterfeiting Defendants generated significant revenues as a result of their wrongful and illegal use of Coronado's URBĀNE Brand. However, Coronado received no benefit for the monies the Counterfeiting Defendants earned through misappropriating and infringing Coronado's intellectual property.

521.    The Counterfeiting Defendants were wrongfully enriched by and through, *inter alia*, usurping Plaintiffs' business relationships and inserting the counterfeit hand sanitizer they manufactured, distributed, imported, and sold into the supply of authentic URBĀNE sanitizer that Plaintiffs were ultimately selling to *Pilot* and *Love's*.

522.    As a result, the Counterfeiting Defendants were enriched at Coronado's expense, and it would be against equity and good conscience to allow the Counterfeiting Defendants to keep the funds earned through their wrongful and illegal use of Coronado's intellectual property.

523.    As a result of the foregoing, Coronado is entitled to damages in an amount to be proven at trial.

## COUNT XI

### Dilution by Tarnishment Under New York Law

### (Plaintiff Coronado Against the Counterfeiting Defendants)

### (N.Y. G.B.L. § 360-l)

524.    Coronado re-alleges the allegations contained in the foregoing paragraphs, as though fully set forth herein.

525.    As set forth herein, Coronado owns all right, title, and interest in and to the URBĀNE Brand.

526.    The URBĀNE Brand has a distinctive quality that is capable of dilution under New York law.

527.    The URBĀNE Brand is linked to the Counterfeiting Defendants' inferior products as a direct result of Defendants' unlicensed and unauthorized use of Coronado's URBĀNE Brand.

528.    The URBĀNE Brand is also linked to the substantial negative associations and legal consequences that resulted from the FDA Order for which the Counterfeiting Defendants are responsible.

529.    As a result of the foregoing, Coronado is entitled to damages in an amount to be proven at trial.

## COUNT XII

### Negligence, Including Gross Negligence, Under New York Common Law

### (Plaintiffs Coronado and Red Rock Against the Counterfeiting Defendants)

530.    Coronado re-alleges the allegations contained in the foregoing paragraphs, as though fully set forth herein.

531.    As the owner of the URBĀNE Brand for use in connection with, *inter alia*, product(s) deemed to be over the counter drugs (*e.g.*, hand sanitizer), Plaintiffs were owed a duty of care by those who used the URBĀNE Brand.

532.    Since the Counterfeiting Defendants used the URBĀNE Brand (unlawfully, as set forth herein), they owed Plaintiffs a duty of care.

533.    The Counterfeiting Defendants' reckless conduct with respect to the URBĀNE Brand, including but not limited to failing to ensure to integrity of the manufacturing process, failing to attend to FDA requirements for hand sanitizer products, and prioritizing quantity of product over quality, breached the Counterfeiting Defendants' duty to Plaintiffs.

534.    The Counterfeiting Defendants' conduct with respect to the counterfeit URBĀNE hand sanitizer they are responsible for producing, importing, distributing, and selling showed a reckless indifference to the rights of others.

535.    The Counterfeiting Defendants' conduct also constituted a failure to use even slight care and/or conduct that is so careless as to show a complete disregard for the safety of others.

536.    As a result, the Counterfeiting Defendants' conduct severely deviated from the standard of reasonable care and constitutes gross negligence.

537.    The Counterfeiting Defendants' negligent conduct led to the production and distribution of products that were so deficient that the FDA placed them on its list of "hand sanitizers consumers should not use," and, as a result, led to customer requests for returns.

538.    As a direct and proximate result of the Counterfeiting Defendants' gross negligence, Plaintiffs have sustained and are likely to continue to sustain substantial monetary damages and irreparable injury to their business, reputation, and goodwill, for which Plaintiffs have no adequate remedy at law.

539.    As a result of the foregoing, Plaintiffs are entitled to damages in an amount to be proven at trial.

## COUNT XIII

**Fraudulent Conveyance**

**(Plaintiffs Coronado and Red Rock Against Triple Five Worldwide, LLC, Don Ghermezian, Syd Ghermezian, and Nader Ghermezian)**

**(New York Debtor & Creditor Law §§ 273, 275, 276, *et seq.*)**

540.    Coronado and Red Rock re-allege the allegations contained in Paragraphs 1 through 238, as though fully set forth herein.

541.    From its inception in or about June 2000, Triple Five Worldwide has been a shell company, devoid of any actual assets and used only as one of numerous conduits through which the Ghermezian family, including Don Ghermezian, Syd Ghermezian, and Nader Ghermezian, ran various real estate operations.

542.    On or about May 7, 2020, Triple Five Worldwide's managers were allegedly changed from Don Ghermezian, Syd Ghermezian, and Nader Ghermezian to David Ghermezian, Orly Saba, and Isaac Saba.

543.    Due to the opacity of the Triple Five Worldwide's corporate form, it is unclear whether this change in managers and/or members also effected a change in ownership.

544.    To the extent that this change in managers and/or members also constituted a change in ownership, it should be set aside.

545.    At the time of alleged the change in the identity of the managers and/or members, Triple Five Worldwide was already engaged or was about to engage in the hand sanitizer business.

546.     This change in Triple Five Worldwide's managers and/or members was made at the direction, and/or with the knowledge and approval, of Don Ghermezian, Syd Ghermezian, and Nader Ghermezian.

547.     There was no actual change in ownership nor any bona fide business purpose for the change in the names of Triple Five Worldwide's managers and/or members.

548.     Indeed, Saba and Orly Ghermezian had no knowledge, at the time of the change or thereafter, that they were being named as managers and/or members of Triple Five Worldwide, LLC.

549.     Further, at all relevant times including the time of the change in managers and/or members, Triple Five was undercapitalized and incapable of satisfying any of its foreseeable obligations.

550.     At the time of the change in managers and/or members, Don Ghermezian, Syd Ghermezian, and Nader Ghermezian knew that Triple Five Worldwide would incur debts beyond its ability to pay them.

551.     At all relevant times, Don Ghermezian, Syd Ghermezian, and Nader Ghermezian knew or should have known that Triple Five Worldwide was undercapitalized, insolvent, and/or incapable of satisfying any of its foreseeable obligations or operating as a hand sanitizer business.

552.     Indeed, one of the reasons for the selection of Triple Five Worldwide was that it was a shell company with "no activity or assets." *See* **Exhibit K**.

553.     The "initial seed funds" for Triple Five Worldwide's operations were planned to be sourced from personal loans by members of the Ghermezian family including, upon information and belief, Don Ghermezian, Syd Ghermezian, and Nader Ghermezian. *See id.*

554.    The initial intent for Triple Five Worldwide's sanitizer business was for it to be made a subsidiary of a Mexican company (that ultimately never came into existence) to further insulate Don Ghermezian, Syd Ghermezian, and Nader Ghermezian from liability.

555.    Don Ghermezian, Syd Ghermezian, and Nader Ghermezian deliberately kept Triple Five Worldwide undercapitalized and/or insolvent thereby ensuring that any liability it incurred because of its operation of a hand sanitizer business would not consume their capital or the capital of other family businesses.

556.    For example, most of the $100,000 payment to Grazi and/or JGX after the counterfeiting scheme had collapsed following the FDA Order was actually made by another entity under Don Ghermezian's control because Triple Five Worldwide did not have capital to make that payment.

557.    Plaintiffs are creditors of Triple Five Worldwide, and of its owners, because they have claims against Triple Five Worldwide and its owners, as set forth herein.

558.    Upon information and belief, the change in managers of Triple Five Worldwide was made by Don Ghermezian, Syd Ghermezian, and Nader Ghermezian, with actual intent to hinder, delay or defraud future creditors of Triple Five Worldwide.

559.    As a result of the foregoing, Plaintiffs are entitled to a judgment determining that the change in managers and/or owners of Triple Five Worldwide be disregarded and set aside and to recover any and all damages attributable to Triple Five Worldwide from Don Ghermezian, Syd Ghermezian, and Nader Ghermezian.

## COUNT XIV

## Alter Ego/Piercing the Corporate Veil

## (Plaintiffs Coronado and Red Rock Against Don Ghermezian, Syd Ghermezian, and

## Nader Ghermezian)

560.    Coronado and Red Rock re-allege the allegations contained in the foregoing paragraphs, as though fully set forth herein.

561.    Upon information and belief**,** Don Ghermezian, Syd Ghermezian, and Nader Ghermezian are the sole owners of Defendant Triple Five Worldwide LLC.

562.    Upon information and belief, Triple Five Worldwide has failed to observe the required corporate formalities including, *inter alia,* failing to properly issue stock, hold meetings, and/or keep corporate records.

563.    Upon information and belief, Triple Five Worldwide lacks any accounting, financial review or audit policies, or other mechanisms for ensuring the accuracy and/or legitimacy of its financial records.

564.    Upon information and belief, Don Ghermezian, Syd Ghermezian, and Nader Ghermezian exercise complete dominion and control over Triple Five Worldwide and it exists solely as a sham vehicle which Don Ghermezian, Syd Ghermezian, and Nader Ghermezian are using in bad faith to shield themselves from liability.

565.    Triple Five Worldwide is the alter ego of Don Ghermezian, Syd Ghermezian, and Nader Ghermezian.

566.    Plaintiffs have been harmed by Don Ghermezian's, Syd Ghermezian's, and Nader Ghermezian's abuse of the corporate form, as set forth herein.

567.    Given the unlawful, deceitful, and damaging acts by Don Ghermzian, Syd Ghermezian, and Nader Ghermezian set forth herein, they have no immunity from liability to the extent they acted as agents, officers, directors, managers, members, or owners of Triple Five Worldwide.

568.    As a result of the foregoing, Triple Five Worldwide's corporate veil should be pierced and Don Ghermezian, Syd Ghermezian, and Nader Ghermezian held personally liable for the acts and obligations of Triple Five Worldwide.

## COUNT XV

### Alter Ego/Piercing the Corporate Veil

### (Plaintiffs Coronado and Red Rock Against Grazi, Jaradeh, and DJ)

569.    Coronado and Red Rock re-allege the allegations contained in the foregoing paragraphs, as though fully set forth herein.

570.    Grazi and Jaradeh, LLC are the sole owners of JGX.

571.    Grazi holds a one-third ownership interest in JGX.

572.    Jaradeh, LLC holds a two-thirds ownership interest in JGX.

573.    Jaradeh, LLC has three managing members – Jaradeh, DJ, and their father, Zaki Jaradeh.

574.    However, Zaki Jaradeh has no role in the business or operation of Jaradeh, LLC, which, in practice, is managed entirely by Jaradeh and DJ.

575.    JGX has failed to observe the required corporate formalities including, *inter alia*, failing to properly issue stock, hold meetings, and/or keep corporate records.

576.    JGX operates out of the Isaac Import office.

577.    Grazi, DJ, and Jaradeh exercise complete dominion and control over JGX and it exists solely as a sham vehicle which Grazi, DJ, and Jaradeh are using in bad faith to shield themselves from liability.

578.    JGX is the alter ego of Grazi, DJ, and Jaradeh.

579.    Plaintiffs have been harmed by Grazi's, DJ's, and Jaradeh's abuse of the corporate form, as set forth herein.

580.    Given the unlawful, deceitful, and damaging acts by Grazi, DJ, and Jaradeh as set forth herein, they have no immunity from liability to the extent they acted as agents, officers, directors, managers, or members of JGX.

581.    As a result of the foregoing, JGX's corporate veil should be pierced and and Grazi, DJ, and Jaradeh should be held personally liable for the acts and obligations of JGX.

<u>**COUNT XVI**</u>

**Alter Ego/Piercing the Corporate Veil**

**(Plaintiffs Coronado and Red Rock Against DJ)**

582.    Coronado and Red Rock re-allege the allegations contained in the foregoing paragraphs, as though fully set forth herein.

583.    DJ is the sole shareholder and sole director of Isaac Import.

584.    Isaac Import has failed to observe the required corporate formalities including, *inter alia,* failing to properly issue stock, hold meetings, and/or keep corporate records.

585.    DJ exercises complete dominion and control over Isaac Import and it exists solely as a sham vehicle which DJ uses in bad faith to shield himself from liability.

586.    Isaac Import is the alter ego of DJ.

587.    Plaintiffs have been harmed by DJ's abuse of the corporate form, as set forth herein.

588.    Given the unlawful, deceitful, and damaging acts by DJ as set forth herein, DJ has no immunity from liability to the extent he acted as an agent, officer, director, or shareholder of Isaac Import.

589.    As a result of the foregoing, Isaac Import's corporate veil should be pierced and DJ should be held personally liable for the acts and obligations of Isaac Import.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs Coronado Distributing LLC and Red Rock Sourcing LLC respectfully request that this Court:

i.    Immediately, preliminarily, and permanently enjoin all Defendants, and all persons acting in concert with them, including without limitation their officers, directors, employees, contractors, and any and all affiliates and current or potential business partners, and all persons purporting to act on their behalf or in active concert or in participation with them, from using or preparing to use Coronado's trademarks, including but not limited to the URBĀNE Brand, as well as any confusingly similar designations or marks, in any manner that violates or infringes Coronado's rights, and require all Defendants and all participating persons to immediately and permanently discontinue their current infringing practices.

ii.    Immediately, preliminarily, and permanently enjoin all Defendants, and all persons acting in concert with them, including without limitation their officers, directors, employees, contractors, and any and all affiliates and current or potential business partners, and all persons purporting to act on their behalf or in active concert or in participation with them, from any further development, distribution, marketing, manufacturing, shipping, or any other use or preparation for use in commerce of

any hand sanitizer product identical or substantially similar to the Counterfeit Products.

iii.     Immediately, preliminarily, and permanently enjoin all Defendants, and all persons acting in concert with them, including without limitation their officers, directors, employees, contractors, and any and all affiliates and current or potential business partners, and all persons purporting to act on their behalf or in active concert or in participation with them, from making any representations, statements, or other communications, in any form, that suggest, whether expressly or by implication, that Defendants have any right to use, in any matter whatsoever, the URBĀNE Brand.

iv.     Order all Defendants to immediately collect and destroy, at Defendants' sole and exclusive expense, any and all units of the Counterfeit Products, or any products substantially similar thereto, wherever in the world they are located, and, upon completion, to certify in writing that such collection and destruction has occurred in accordance with the Court's Order.

v.     Enter judgment in favor of Coronado and Red Rock, respectively, on each and every count they have asserted herein and award Coronado and Red Rock all monetary damages caused by the acts forming the basis of this Complaint, including, without limitation, Coronado and Red Rock's actual and other damages as alleged herein.

vi.     Order all Defendants to immediately prepare and provide to Coronado, at Defendants' sole and exclusive expense, a report and accounting of all uses,

distributions, and revenue realized, or that Defendants expect to realize, related to or derived from the Counterfeit Products.

vii.　Award of treble damages to Coronado and Red Rock, respectively, pursuant to 18 U.S.C. § 1864 due to the Counterfeiting Defendants' willful commission of a pattern of racketeering activity.

viii.　Award of treble damages to Coronado pursuant to 15 U.S.C. § 1117(b) due to the Counterfeiting Defendants' willful, knowing, and intentional infringement of the URBĀNE Marks.

ix.　Award all damages suffered by Coronado and Red Rock pursuant to New York statutory and common law.

x.　Award of punitive damages to Coronado and Red Rock due to the Counterfeiting Defendants' willful and malicious disregard of Plaintiffs' rights and interests.

xi.　Order the Counterfeiting Defendants to pay Coronado and Red Rock the costs of this action and Coronado and Red Rock's reasonable attorneys' fees and expenses pursuant to 18 U.S.C. § 1864, 15 U.S.C. § 1117(a), and any other applicable statutes or authority.

xii.　Award Coronado and Red Rock such further relief as the Court deems just, proper, and equitable.

## JURY DEMAND

Plaintiffs Coronado Distributing LLC and Red Rock Sourcing LLC, respectively, hereby demand a trial by jury on all issues so triable, pursuant to Federal Rule of Civil Procedure 38.

Dated: June 14, 2023     Respectfully submitted,

         **NIXON PEABODY LLP**

         By: */s/ Daniel J. Hurteau*

         Daniel J. Hurteau
         dhurteau@nixonpeabody.com
         Erin T. Huntington
         ehuntington@nixonpeabody.com
         55 West 46th Street
         New York, NY 10036-4120
         Tel: (212) 940-3000
         Fax: (212) 940-3111

         On Lu (admitted *pro hac vice*)
         onlu@nixonpeabody.com
         Andrew H. Winetroub (admitted *pro hac vice*)
         awinetroub@nixonpeabody.com
         One Embarcadero Center
         San Francisco, California 94111-3600
         Tel: (415) 984-8200
         Fax: (415) 984-8300

         *Attorneys for Plaintiffs Red Rock Sourcing LLC and*
         *Coronado Distributing LLC*