UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------------X
                                                                    :
RED ROCK SOURCING LLC and CORONADO :
DISTRIBUTING LLC,                                                   :
                                                                    :
                          Plaintiffs,              :              21 Civ. 1054 (JPC)
                                                                    :
              -v-                                        :              OPINION AND ORDER
                                                                    :
                                                                    :
JGX LLC, *et al.*,                                        :
                                                                    :
                          Defendants.              :
                                                                    :
----------------------------------------------------------------------X

JOHN P. CRONAN, United States District Judge:

        This case arises out of an alleged counterfeiting scheme related to the manufacture and

distribution of hand sanitizer at the height of the coronavirus pandemic.  In their twice amended,

sixteen-Count, 589-paragraph Complaint, Plaintiffs Red Rock Sourcing ("Red Rock") and

Coronado Distributing LLC ("Coronado") proceed against fifteen defendants, alleging violations

of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961 *et seq.*;

trademark infringement, contributory trademark infringement, unfair competition and false

designation of origin, and false advertising under the Lanham Act, 15 U.S.C. §§ 1051 *et seq.*;

deceptive business practices and civil conspiracy to engage in deceptive business practices under

New York General Business Law ("N.Y. G.B.L.") Section 349; trademark infringement, tortious

interference with prospective economic advantage, unfair competition, unjust enrichment, and

negligence under New York common law; dilution by tarnishment under N.Y. G.B.L. Section 360-

1, fraudulent conveyance under New York Debtor and Creditor Law ("N.Y. D.C.L.") Sections 273

and 274; and alter ego liability.

Before the Court are motions filed by four groups of Defendants seeking dismissal of some or all of the Counts in the Second Amended Complaint (also referred to herein as the "Complaint"). The first group includes JGX, LLC ("JGX"), Isaac Import, Inc. ("Isaac Import"), Jack Grazi ("Grazi"), Dib Jaradeh, and Nouri Jaradeh, collectively referred to as the JGX Defendants.  *See* Dkt. 342 ("JGX Defendants' Motion").  The second group includes Don Ghermezian, as well as a subgroup of Defendants—collectively referred to as the Worldwide Defendants—consisting of Triple Five Worldwide, Isaac Saba, Eliezer Berkowitz ("Berkowitz"), David Ghermezian, and Yonah Ghermezian.  *See* Dkt. 339 ("Worldwide Defendants' Motion").  The third group includes Community Federal Savings Bank ("CFSB") and Syd Ghermezian, together referred to as the Banking Defendants.  *See* Dkt. 346 ("Banking Defendants' Motion").  Plaintiffs assert the first twelve of their sixteen Counts against these three groups of Defendants, as well as against a Defendant that has yet to answer the Complaint, Liberty International Distributors, LLC ("Liberty"), and refers to these fourteen Defendants collectively as the Counterfeiting Defendants. And certain of the Counterfeiting Defendants also are named in the last four Counts of the Complaint.  In a fourth motion to dismiss, Nader Ghermezian separately argues for dismissal of the two Counts brought against him.  *See* Dkt. 333 ("Nader Ghermezian's Motion").

For the reasons provided below, the Court grants in full the motions brought by the Banking Defendants and Nader, and grants in part the motions brought by the JGX Defendants and Don Ghermezian and the Worldwide Defendants.  As a result of these rulings, Count One (RICO) is dismissed as to all the Counterfeiting Defendants aside from Liberty, although Plaintiffs are put on notice of the Court's intent to *sua sponte* dismiss that Count as to Liberty.  In addition, the following Counts are dismissed with prejudice in their entirety: Counts Five (false advertising under the Lanham Act), Six (deceptive business practices), Eight (tortious interference with

economic prospects), Ten (unjust enrichment), Twelve (negligence and gross negligence), Thirteen (fraudulent conveyance), Fourteen (alter ego liability as to Don, Syd, and Nader Ghermezian with respect to Triple Five Worldwide), Fifteen (alter ego liability as to Grazi, Nouri Jaradeh, and Dib Jaradeh with respect to JGX), and Sixteen (alter ego liability as to Dib Jaradeh with respect to Isaac Import). The Court dismisses CFSB, Syd Ghermezian, Nader Ghermezian, and Isaac Import as Defendants in this matter. Conversely, the following Counts—which implicate the liability of JGX, Grazi, Dib Jaradeh, Nouri Jaradeh, Don Ghermezian, the Worldwide Defendants, and Liberty—survive dismissal: Count Two (trademark infringement under the Lanham Act), Count Three (contributory trademark infringement under the Lanham Act), Count Four (false designation of origin under the Lanham Act), Count Seven (trademark infringement under New York common law), Count Nine (unfair competition under New York common law), and Count Eleven (dilution by tarnishment).

## I. Background

### A.    Facts[1]

#### 1.    The Development of URBĀNE Brand Hand Sanitizer

Plaintiffs Coronado and Red Rock are, respectively, Colorado- and Nevada-based limited liability companies engaged in the manufacture, marketing, sale, and distribution of bath and body

---

[1] The following facts, which are drawn primarily from Plaintiffs' Second Amended Complaint, Dkt. 310 ("SAC"), and the attached exhibits, are assumed as true only for the purposes of this Opinion and Order. *See Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 237 (2d Cir. 2007) ("In considering a motion to dismiss for failure to state a claim upon which relief can be granted, the court is to accept as true all facts alleged in the complaint."). The Court additionally refers to a number of extraneous documents (attached to certain of the Defendants' motions to dismiss) that it has determined are either incorporated by reference in the Second Amended Complaint or are the proper subject of judicial notice. *See infra* at III.A.

products—often in collaboration.  SAC ¶¶ 16-17, 33-34.  Coronado is the registered holder of the following trademarks:

1.  The "URBĀNE BATH & BODY" word mark (Registration No. 6,068,164), which was registered in connection with "Fragranced body care preparations, namely, shower gels, bath gel, body scrubs; Bath bombs; Bath salts, not for medical purposes; Bath and shower gels and salts not for medical purposes" on June 2, 2020, with a first use date of August 1, 2019, *id.* ¶ 35, Exh. A;

2.  The "URBANE BATH & BODY" word mark (Registration No. 6,295,360), which was registered in connection with "Hand-sanitizing preparations" on March 16, 2021, with a first use date of at least as early as April 2020, *id.* ¶ 37, Exh. B; and

3.  The related design mark (Registration No. 6,348,225), shown below, which was registered on May 11, 2021, in connection with "Hand-sanitizing preparations," with a first use date of at least as early as April 2020, and in connection with "Fragranced body care preparations, namely, shower gels, bath gel, body scrubs; Bath bombs; Bath salts, not for medical purposes; Bath and shower gels and salts not for medical purposes," with a first use date of August 1, 2019, *id.* ¶ 38, Exh. C.



The URBĀNE Marks, together with the alleged common law rights and goodwill resulting from Coronado's use of these marks, comprise the "URBĀNE Brand."  *Id.* ¶ 42

In early 2020, Plaintiffs started developing hand sanitizer under the URBĀNE Brand, having determined that Red Rock would manage the product's development, sales, and distribution. *Id.* ¶¶ 44-50, 53-55. In Plaintiffs' view, their hand sanitizer was unique because "(1) it utilized a high-quality formula that was equally effective without the associated foul medicinal-smell of typical sanitizer; (2) it was 'Made in America,' which particularly appealed to U.S. consumers and retailers; and (3) a large portion of the product was packaged in a unique credit card-sized sprayer that was prized by consumers and retailers alike." *Id.* ¶ 63. And because the URBĀNE Brand was already established through Coronado's brand-development and marketing efforts, Plaintiffs were able to bring their hand sanitizer product to market quickly at the onset of the COVID-19 pandemic. *Id.* ¶¶ 56-57, 60-61.

In April 2020, Plaintiffs began selling the product to Rigz, an Arizona-based distributor with whom Red Rock had developed a business relationship before the pandemic. *Id.* ¶¶ 72, 74-75, 77. These initial sales were robust. *Id.* ¶ 76. Indeed, in the first three months of sales, Red Rock sold more than $2,000,000 worth of URBĀNE hand sanitizer to Rigz. *Id.* ¶ 77. Rigz, in turn, "successfully placed URBĀNE hand sanitizer in several national businesses, including Pilot Travel Centers ("Pilot") and Love's Travel Stops & Country Stores ("Love's"), which had over 2,000 combined stores located across the country and were among the small number of essential businesses that remained open at the time." *Id.* ¶ 78 (italics and bold removed). After this initial success, Rigz, through its principals Jarrett Portz and Anthony Carelli, began working with other vendors to produce counterfeit URBĀNE hand sanitizer. *Id.* ¶¶ 85-89.

### 2.     JGX and Isaac Import's Involvement in the Counterfeiting Scheme

The JGX Defendants were the first to join Rigz in this scheme. *See id.* ¶¶ 90-91. Defendant JGX, an apparel company in New York, is owned by Defendant Grazi and Jaradeh LLC, whose managing members include Defendants Dib Jaradeh and Nouri Jaradeh. *Id.* ¶¶ 18, 92, 570-574.

In addition, Dib Jaradeh is the sole shareholder and director of Defendant Isaac Import, a New York corporation. *Id.* ¶¶ 21, 95. Plaintiffs aver that JGX operates out of the Isaac Import office, fails to observe required corporate formalities, and "exists solely as a sham vehicle" to shield Grazi, Dib Jaradeh, and Nouri Jaradeh from liability. *Id.* ¶¶ 575-578. Plaintiffs also claim that Isaac Import fails to observe required corporate formalities and "exists solely as a sham vehicle which [Dib Jaradeh] uses in bad faith to shield himself from liability." *Id.* ¶¶ 584-585.

In late April 2020, Carelli informed Grazi of Rigz's hand sanitizer needs, *id.* ¶ 90, and on April 23, 2020, Carelli sent Grazi an email with an image of the URBĀNE label, *id.* ¶ 91, Exh. F (April 23, 2020 email from Carelli to Grazi). As alleged, Carelli intended for JGX to produce hand sanitizer bearing that label. *Id.* ¶ 91; *see also id.* ¶¶ 93, 97. Despite JGX's "experience with and history of registering trademarks," *id.* ¶ 99, JGX never contacted Coronado to confirm whether Rigz had the authority to contract for the manufacture, distribution, and sale of URBĀNE hand sanitizer, *id.* ¶ 98.

On April 27, 2020, Rigz issued an initial purchase order to JGX for over 300,000 bottles of hand sanitizer, which correspondence Grazi immediately forwarded to Dib Jaradeh. *Id.* ¶¶ 94-95; *see also* Dkt. 341, Exh. 2 (April 27, 2020 email exchange between Carelli and Grazi with purchase order attached). Grazi, Dib Jaradeh, and Carelli continued their discussions, including on an April 30, 2020 phone call, to finalize details related to the production and sale of the counterfeit URBĀNE hand sanitizers. *Id.* ¶ 96. Also on April 30, 2020, Dib Jaradeh sent Grazi proofs of two options for URBĀNE labels, as shown below, which Dib Jaradeh had himself created based on the image that Grazi had provided the week before:



*Id.* ¶ 105, Exh. G (April 30, 2020 email from Dib Jaradeh to Grazi).  As shown in the above images, these counterfeit labels represented that the product was "Made in Mexico," although authentic URBĀNE was made only in the United States, *see id.* ¶ 63.

In early May, Grazi began soliciting the manufacture of counterfeit hand sanitizer, circulating the forged URBĀNE label for use to that end.  *Id.* ¶ 110, Exh. H (May 5, 2020 email from Grazi).  Nouri Jaradeh conducted research on Coronado and communicated his findings to Grazi in May 2020.  *Id.* ¶ 103; *see also* Dkt. 341, Exh. 4 (May 26, 2020 email from Nouri Jaradeh to Grazi with "Coronado Distribution Company, Inc." in the subject line and "look them up" in the email body).  Despite knowing at least by then that Coronado was the registered owner of the URBĀNE marks, JGX persisted in furthering the counterfeiting scheme.  SAC ¶ 104.

### 3.   Liberty's Involvement in the Counterfeiting Scheme

Meanwhile, soon after it fulfilled Rigz's first order in late April 2020, JGX partnered with Defendant Liberty as a manufacturer, hoping to leverage Liberty's manufacturing contacts in Mexico.  *Id.* ¶ 117.  Formed in April 2020, Liberty had no significant prior experience in hand

sanitizer production.  *Id.* ¶ 116.  On April 30, 2020, Grazi emailed Liberty's principal, David Amoyelle, the forged URBĀNE label that Dib Jaradeh had created.  *Id.* ¶ 119, Exh. I (April 30, 2020 email from Grazi to Amoyelle).  Liberty reached out to a manufacturer in Mexico, Tropicosméticos S.A. de C.V. ("Trop"), regarding the production and bottling of hand sanitizer with the forged URBĀNE label, and in late April or early May 2020, Liberty and JGX imported the first shipment of the counterfeit product into the United States. *Id.* ¶¶ 122-124.  JGX ultimately sidelined Liberty and instead partnered with members of the Ghermezian family for their manufacturing needs.  *Id.* ¶ 125.

### 4.    The Ghermezian Family's Involvement in the Counterfeiting Scheme

As alleged, multiple generations of the Ghermezian family were involved in the counterfeiting scheme.  *Id.* ¶ 128.  Defendant Nader Ghermezian, who appears to the be the most senior member involved, is an uncle of Defendants Don and Syd Ghermezian, who are brothers. *Id.* ¶ 129.  Defendants Yonah and David Ghermezian are cousins of Don and Syd.  *Id.*  Defendant Isaac Saba is married to Orly Ghermezian Saba, Don's daughter.  *Id.*  Finally, Defendant Berkowitz is a family acquaintance.  *Id.*  ¶ 131.

As investors in retail shopping malls including the Mall of America, American Dream, and the West Edmonton Mall, the Ghermezians, as Plaintiffs aver, faced acute financial pressures at the onset of the pandemic due to the widespread lockdowns imposed during that period.  *Id.* ¶ 134. Don Ghermezian thus contacted GHA Design Studios ("GHA") on May 1, 2020, inquiring about hand sanitizer brands and designs.  *Id.* ¶ 135.  GHA provided Don Ghermezian and Berkowitz with a presentation of proposals for brand names and packaging designs, which included a credit-card style dispenser and a carabiner resembling the packaging used for URBĀNE hand sanitizer.  *Id.* ¶¶ 137-138.  On May 4, 2020, Don Ghermezian held a meeting in his home, at which he presented the GHA presentation to other members of the Ghermezian family, including David Ghermezian,

Yonah Ghermezian, Isaac Saba, and Orly Ghermezian Saba, as well as to Berkowitz.  *Id.* ¶¶ 130-131 139.  Plaintiffs allege that video footage taken by Isaac Saba at that meeting shows bottles of Britz hand sanitizer, which Plaintiffs describe as Trop's "house brand," on Don Ghermezian's table.  *Id.* ¶ 140.

After this meeting, David Ghermezian, Yonah Ghermezian, Isaac Saba, Don Ghermezian, and Berkowitz began researching competitors in the hand sanitizer market, including URBĀNE, and directed others to do the same.  *Id.* ¶¶ 143-144.  That same day, Isaac Saba sent Don Ghermezian a sample design for hand sanitizer packaged in a credit-card style dispenser, and Don Ghermezian responded to Saba and Berkowitz that he wanted to mirror the design.  *Id.* ¶¶ 145-146; *see also* Dkt. 337, Exh. 2 (copy of May 4, 2020 email exchange).  At some time before May 6, 2020, Grazi and Berkowitz ("and/or" David Ghermezian) convened, agreeing to work together to obtain and sell hand sanitizer.  SAC ¶ 148.

This collaboration entailed the members of the Ghermezian family coordinating the manufacture of the counterfeit URBĀNE hand sanitizer for the JGX Defendants, and acting, as portrayed by Plaintiffs, in frenzied urgency.  *Id.* ¶¶ 147-156, 257.  On May 6, 2020, Grazi sent Berkowitz the counterfeit URBĀNE label for use on 2-ounce, 8-ounce, and 16-ounce bottles of hand sanitizer.  *Id.* ¶ 149, Exh. J.  That same day, JGX issued purchase orders, which had been created by Dib Jaradeh and sent by Grazi to Berkowitz, for over 660,000 bottles of hand sanitizer, nearly 600,000 of which were to be shipped to JGX in Arizona.  *Id.* ¶¶ 150-152.  The next day, Berkowitz forwarded Grazi's email to David and Yonah Ghermezian.  *Id.* ¶ 154.  Also on May 7, 2020, Michael Oseen, who is described as the "Senior Vice President and/or Chief Financial Officer of the West Edmonton Mall," and Alan Glazer, In-House Counsel for American Dream, conferred with Berkowitz, Don Ghermezian, David Ghermezian, and Syd Ghermezian, and, as

reflected in an email sent by Oseen after that convening, the group outlined plans to source and sell hand sanitizer globally. *Id.* ¶ 158, Exh. K (May 7, 2020 email from Oseen).

That email refers to the putative creation of a "new Mexican domiciled and incorporated company . . . to operate the key aspects of the [hand sanitizer] business," specifically the sourcing and distribution of the hand sanitizer. *Id.*, Exh. K at 2. As further reflected in the May 7, 2020 email, Defendant Triple Five Worldwide LLC was selected as the entity that the proposed Mexico-based company would use "to facilitate US sales" of the counterfeit URBĀNE hand sanitizer. *Id.* Plaintiffs allege that Triple Five Worldwide was to be made a subsidiary of that Mexico-based company to "further insulate Don Ghermezian, Syd Ghermezian, and Nader Ghermezian from liability," but ultimately that Mexican company was never formed. *Id.* ¶ 554. Instead, Triple Five Worldwide operated as the direct corporate conduit for the counterfeit hand sanitizer scheme. *Id.* ¶ 157. Plaintiffs allege upon information and belief that Triple Five Worldwide fails to observe required corporate formalities, and "exists solely as a sham vehicle," which Don, Syd, and Nader Ghermezian "are using in bad faith to shield themselves from liability." *Id.* ¶¶ 562, 564.

While Triple Five Worldwide was originally founded in June 2000, it had "no activity or assets" as of May 2020. *Id.* ¶¶ 159, 162. Its original managers were Don, Nader, and Syd Ghermezian, but those individuals were replaced as managers with Berkowitz, Isaac Saba, and Orly Ghermezian Saba on or about May 7, 2020. *Id.* ¶¶ 163-165, Exhs. L, M. Glazer effectuated this change in leadership at the direction of the "senior members of the Ghermezian family," *id.* ¶ 171, which includes Don, Syd, and David Ghermezian, along with Berkowitz, *id.* ¶ 158. Despite being formally replaced as managers, Don, Nader, and Syd Ghermezian remained *de facto* in charge of Triple Five Worldwide. *Id.* ¶¶ 177-178. As alleged, Isaac Saba and Orly Ghermezian

Saba were not even aware that they were instated as managers of Triple Five Worldwide.  *Id.* ¶¶ 166-167.

Rather, Don Ghermezian remained "consistently and intimately involved" with Triple Five Worldwide's manufacturing of the counterfeit hand sanitizer, micromanaging all aspects of the business.  *Id.* ¶¶ 180-197, 201-202.  For instance, on at least three occasions, May 8, May 11, and May 18, 2020, Don Ghermezian directed wire payments for the counterfeit hand sanitizer to SoFlo Urban Team, LLC, described by Plaintiffs as a corporate entity through which factories based in Mexico received payment for producing counterfeit URBĀNE hand sanitizer.  *Id.* ¶¶ 183-195, 197, 251, n.2.  And more broadly, Don Ghermezian "directed the movement of [the] counterfeit goods," "communicated directly with potential customers to solicit sales," and "spoke regularly with David Ghermezian and Berkowitz about branding, sourcing, importing, and sales efforts."  *Id.* ¶ 181.

Meanwhile, Berkowitz, Isaac Saba, David Ghermezian, and Yonah Ghermezian were the members regularly in contact with Grazi.  *Id.* ¶ 257.  Indeed, Grazi—desperate to fill Rigz's orders for hundreds of thousands of bottles of URBĀNE hand sanitizer and under "relentless pressure" from Portz and Carelli—directed his production-related inquiries to Berkowitz, Isaac Saba, and David Ghermezian, given their direct relationship with the factories manufacturing the counterfeit product.  *Id.* ¶¶ 265-272.  Yonah Ghermezian created the invoices that Triple Five Worldwide issued to JGX.  *Id.* ¶ 258.

As early as May 8, 2020, counterfeit hand sanitizer bearing the forged URBĀNE label was being mass produced in Mexico.  *Id.* ¶ 260.  While this counterfeit hand sanitizer listed the same ingredients used in non-counterfeit URBĀNE hand sanitizer, the counterfeit product, "upon information belief," did not contain those same ingredients.  *Id.* ¶¶ 262-263.  The product's label

further showed Liberty as the distributor, when, according to Plaintiffs, Triple Five Worldwide was the actual distributor.  *Id.* ¶ 264.

After setting up Triple Five Worldwide as the primary business entity to distribute the counterfeit hand sanitizer, Don Ghermezian, Syd Ghermezian, David Ghermezian, and Berkowitz began using Defendant CFSB as Triple Five Worldwide's banking partner.  *Id.* ¶¶ 211-212.  CFSB was founded in 2001 "as a vehicle to, *inter alia*, support the Ghermezian family businesses."  *Id.* ¶ 216.  It is "wholly owned and controlled by members of the Ghermezian family," *id.* ¶ 219, most notably Syd Ghermezian, who is the bank's Chairman and CEO, *id.* ¶ 215.  "CFSB allowed Triple Five Worldwide to open and/or operate an account without providing necessary corporate documentation," *id.* ¶ 232, granting Syd and Don Ghermezian direct access to the Triple Five Worldwide account, even though they were not at that point listed as either owners or managers of the company, *id.* ¶ 238.  Triple Five Worldwide used using its CFSB account to make transactions in connection with the counterfeit hand sanitizer, including to the JGX Defendants, *id.* ¶¶ 250-251.  Although several of those transactions exceeded $10,000 (and thus purportedly triggered certain reporting requirements), Syd Ghermezian directed CFSB not to report these transactions.  *Id.* ¶¶ 253-255.

Ultimately, JGX delivered at least 200,000 bottles of counterfeit URBĀNE hand sanitizer to Rigz, which sold the products to third party merchants, including Pilot and Love's, for sale to the public.  *Id.* ¶¶ 277-278, 280, 289-290.  Triple Five Worldwide further sold at least 50,000 bottles of hand sanitizer bearing the forged URBĀNE label to a third party, Benzino (Benjamin) Tyberg.  *Id.* ¶¶ 258, 286, Exh. R.  And on or about May 26, 2020, Triple Five Worldwide received a wire transfer from Tyberg for $115,900.  *Id.* ¶ 287.  Moreover, Plaintiffs assert upon information and belief that "the counterfeit URBĀNE hand sanitizer produced in Mexico was still available to

consumers at nationwide chains, including *Pilot*, until as late as or around September 2020." *Id.* ¶ 355.

Monetary transactions "in furtherance of the counterfeit sanitizer scheme" between JGX and Rigz extended to as late as June 2020, *id.* ¶¶ 413-414, and those between JGX and Triple Worldwide extended to as late as August 2020, *id.* ¶ 411.

### 5.    The FDA Warns Against the Use of URBĀNE Brand Hand Sanitizer

In early July 2020, the United States Food and Drug Administration (the "FDA") intercepted Trop's attempted shipment of counterfeit URBĀNE hand sanitizer from Mexico to the United States. *Id.* ¶¶ 299-300. According to Plaintiffs, the FDA flagged all shipments from Trop because the company "had allegedly used methanol in hand sanitizer formulas for other brands it manufactured." *Id.* ¶ 301. As a result, the FDA issued an order that placed even "Urbane Bath and Body Hand Sanitizer" (identifying Trop as the product's manufacturer and Liberty as the product's distributor) on its list of "hand sanitizers consumers should not use," and further added the product to its "import alert" to block the product's importation into the United States. *Id.* ¶¶ 303-304.[2] In connection with this order, the FDA warned consumers to "be vigilant about which sanitizers they use," and expressed "concern[] about the potential serious risks of alcohol-based hand sanitizers containing methanol," as they pose a "serious threat." *Id.* ¶ 310. Plaintiffs assert that the FDA order warned that "[s]ubstantial methanol exposure can result in nausea, vomiting,

---

[2] The Court takes judicial notice, *see infra* at III.A, of the reference to "Urbane Bath and Body Hand Sanitizer" (manufactured by Trop) on the FDA's public website, which includes under "Product Status" the following information: "Product purported to be made at the same facility that produced methanol contaminated product; FDA recommended the company recall on 7/1/2020; added manufacturer to import alert to help stop their products from entering the U.S. on 7/10/2020; FDA issued a warning letter on 8/10/2021." *See* U.S. Food & Drug Administration, FDA Updates on Hand Sanitizers Consumers Should Not Use, https://www.fda.gov/drugs/drug-safety-and-availability/fda-updates-hand-sanitizers-consumers-should-not-use (last updated January 11, 2024).

headache, blurred vision, permanent blindness, seizures, coma, permanent damage to the nervous system or death," with "young children who accidentally ingest these products and adolescents and adults who drink these products as an alcohol (ethanol) substitute" as the individuals most at risk. *Id.* ¶ 311.

### 6.    Aftermath of the FDA Order

Plaintiffs' authentic URBĀNE hand sanitizer formula has never contained methanol. *Id.* ¶ 302.   Nevertheless, explain Plaintiffs, the URBĀNE Brand "is, and will continue to be, irreparably tarnished by its association" with the warnings issued by the FDA, after which "[s]ales and consumer demand for hand sanitizer under the URBĀNE brand plummeted precipitously." *Id.* ¶¶ 315-316.   Indeed, as a direct result of the FDA order, several businesses called off their purchases of URBĀNE hand sanitizer, including national retailers like Rite Aid and Tractor Supply. *Id.* ¶¶ 317-346.

Communications (which Plaintiffs cast as demonstrative of the Defendants' "[c]ollective [c]allousness," *id.* at 49) between certain Defendants persisted well after the issuance of the FDA order.   For example, in August 2020, some unspecified "harm [was] done to JGX's business relationship with *Ross Stores*" in connection with the FDA order, and Don Ghermezian thus "paid or approved the payment of $100,000 to Grazi as compensation." *Id.* ¶¶ 365-367.   In October 2020, David and Syd Ghermezian exchanged correspondence with respect to a $35,000 payment from SoFlo Urban Team to Triple Five Worldwide, with the wire payment to be received by CFSB, allegedly "concerning issues pertaining to the counterfeit hand sanitizer that Triple Five Worldwide had ordered and sought to manufacture." *Id.* ¶ 420; Dkt. 337, Exh. 7 (October 2020 correspondence with attached communication from SoFlo Urban Team referring to a refund of a $35,000 "for which no product was received").   On or around March 31, 2021, David Ghermezian tried to sell the counterfeit URBĀNE hand sanitizer to Tyberg, stating: "I'm [sic] still have lots

and lots of stock even though the [sic] said it was false accusations about the methanol.  Lmk [Let me know] if you need I'm glad to give to you a cheap price."  SAC ¶¶ 373-374, *see also* Dkt. 337, Exh. 5 (excerpts from March 21, 2021 WhatsApp chat).   And finally, in June 2021, David Ghermezian and Isaac Saba discussed the existence of thousands of units of counterfeit URBĀNE sanitizer "[s]itting in American Dream storage," SAC ¶ 375, and David Ghermezian further relayed to Isaac Saba that he had spoken to Grazi about the instant lawsuit, *id.* ¶¶ 376-378; *see also* Dkt. 337 at Exh. 6 (excerpts from June 9, 2021 WhatsApp exchange).

## B.     Procedural History

On August 3, 2020, Plaintiffs and Rigz entered into a settlement agreement, under which Plaintiffs "release[d] and discharge[d] Rigz *et al*. . . . and their past or present . . . customers . . . from any and all actions, claims, demands . . . and causes of action from the beginning of time to the date of this Settlement Agreement . . . arising under trademark infringement, counterfeiting, or theft of intellectual property."  *See* Dkt. 189.

Plaintiffs commenced this action on February 5, 2021, then proceeding against only JGX and Liberty under RICO, the Lanham Act, and New York common law in their initial eleven-Count Complaint.  Dkt. 1.  JGX answered and asserted crossclaims for equitable indemnity and equitable contribution against Liberty.  Dkt. 22.  Liberty failed to respond, and so, upon Plaintiffs' request, Dkt. 19, the Clerk of Court entered a certificate of default against Liberty on March 5, 2021, Dkt. 20.

On June 11, 2021, Plaintiffs moved for default judgment against Liberty, Dkt. 43, and on July 13, 2021, the Court held a hearing attended by counsel for Plaintiffs and for JGX, Dkt. 51 (July 13, 2021 hearing transcript).  David Amoyelle also appeared at the hearing as Liberty's corporate representative, prompting the Court the adjourn the hearing on Plaintiffs' default

judgment motion by two weeks to allow Liberty additional time to seek counsel. *Id.* at 19:19-20:14. Additionally, the Court directed JGX to provide, in advance of the scheduled hearing, its views as to whether a default judgment should be entered against Liberty as to liability. *Id.* 13:9-15. On July 23, 2021, JGX requested that the Court stay its decision on Plaintiffs' default judgment motion against Liberty pending a determination of the claims as to JGX. Dkt. 53. On July 27, 2021, the Court deferred ruling on the motion, and ordered Plaintiffs to provide a status update on discussions with Liberty, as the parties appeared to be working towards a potential resolution. *See* Dkts. 57, 61, 72. In light of Plaintiffs' representation that they had reached a tentative agreement with Liberty that required several additional months to finalize, *see* Dkt. 72, on November 4, 2021, the Court denied Plaintiffs' default judgment motion without prejudice to renewal. Dkt. 83 (November 4, 2021 hearing transcript) at 4:1-21.

Meanwhile, in April 2021, the Court had entered a Case Management Plan, providing for the close of all discovery by September 20, 2021. Dkt. 28. Discovery ensued, with the parties seeking multiple extensions of the discovery deadlines and raising a number of disputes requiring the Court's intervention along the way. *See, e.g.*, Dkt. 54 (parties' joint request made in July 2021 for sixty-day extension of discovery deadlines); Dkt. 59 (joint extension request made in September 2021); Dkt. 94 (joint extension request made in December 2021); *see also* Dkt. 63 (Plaintiffs' request for pre-motion discovery conference regarding subpoenas to Orly Ghermezian Saba and Isaac Saba); Dkt. 68 (Plaintiffs' motion to compel compliance with various subpoenas, including subpoenas served on Rigz, Tyberg, and David Ghermezian); Dkt. 79 (Plaintiffs' motion to compel David Ghermezian to comply with a document subpoena); Dkt. 105 (Plaintiffs' request for a pre-motion discovery conference again regarding subpoenas to Orly Ghermezian Saba and Isaac Saba).

After conducting this extensive discovery, Plaintiffs moved in December 2021 for leave to amend their Complaint to add seven new Defendants (Triple Five Worldwide, Isaac Import, Grazi, Isaac Saba, Berkowitz, David Ghermezian, and Yonah Ghermezian) and a negligence claim.  *See* Dkt. 102-1 (Plaintiffs' opening memorandum in support of motion for leave to amend) at 3 ("Through the documents and testimony obtained in discovery, Plaintiffs have learned that entities and individuals beyond the Initial Defendants also share responsibility for the destruction of their URBĀNE Brand."); 102-4 (proposed First Amended Complaint).  The Court granted Plaintiffs' motion at a conference held on January 27, 2022.  Dkt. 118 at 21:11-12.  Observing that the opposition had raised "a number of potentially meritorious arguments regarding the allegations in the proposed amended complaint," *id.* at 21:14-16, the Court afforded Plaintiffs the opportunity to file a revised version of their proposed pleading, *id.* at 21:17-20.  Plaintiffs filed their First Amended Complaint on February 10, 2022.  Dkt. 122.

On February 24, 2022, JGX, Grazi, and Isaac Import requested leave to file a motion to dismiss, previewing their intent to argue that Plaintiffs failed to sufficiently plead their RICO, tortious interference, and unjust enrichment claims.  Dkt. 141.  Specifically, they argued that Plaintiffs had failed to state a RICO claim by not alleging two predicates for each Defendant and not alleging continuity; they argued for dismissal of Plaintiffs' tortious interference claim based on the absence of any allegations that Defendants were aware of Red Rock's contracts with various third parties; and they attacked the unjust enrichment claim because of the absence of allegations of a relationship causing reliance or inducement between Plaintiffs and Defendants.  *Id.*  David Ghermezian, Yonah Ghermezian, Berkowitz, and Triple Five Worldwide (*i.e.*, the Worldwide Defendants) also requested such leave on March 2, 2022, explaining that many of the arguments raised by JGX, Grazi, and Isaac Import applied with even greater force to them, and attacking the

17

sufficiency of Plaintiffs' various trademark infringement claims for, among other reasons, Plaintiffs' failure to allege any infringing conduct after the first registration date of the URBĀNE mark. Dkt. 147. Plaintiffs responded to each of these pre-motion letters. Dkts. 146, 149. In the meantime, discovery continued, and so, too, did the parties' contentious discovery disputes, which included multiple requests by Plaintiffs for the imposition of sanctions against certain Defendants. *See, e.g.*, Dkt. 123 (February 11, 2022 joint letter from Plaintiffs and JGX describing a dispute regarding JGX's document production); Dkt. 150 (March 7, 2022 request from Plaintiffs for a pre-motion discovery conference in connection with the alleged spoliation of evidence by David Ghermezian, Berkowitz, and Triple Five Worldwide and a potential request for sanctions); Dkt. 167 (April 15, 2022 joint letter from Plaintiffs, David Ghermezian, Berkowitz, and Triple Five Worldwide describing a dispute regarding Defendants' alleged spoliation of evidence); Dkt. 225 (Plaintiffs' July 26, 2022 renewed request for sanctions against Triple Five Worldwide).

On April 14, 2022, Plaintiffs notified the Court of their intent to seek leave to file a Second Amended Complaint and made an unopposed request for the Court to stay Defendants' requests for a briefing schedule on their anticipated motions to dismiss pending the Court's decision on Plaintiffs' request to amend. Dkts. 166, 169. On April 20, 2022, after the Court granted Plaintiffs' stay request, Dkt. 170, Plaintiffs moved for leave to amend, attaching their proposed Second Amended Complaint. Dkt. 185. Defendants filed opposition briefs on June 3, 2022, Dkts. 198, 201, and Plaintiffs replied on June 10, 2022, Dkt. 203. Then, in November 2022, Plaintiffs requested leave to revise and refile their proposed Second Amended Complaint to make yet another addition—this time, "to incorporate newly adduced evidence stemming from defendants' discovery misconduct" in connection with "Don Ghermezian's management of the hand sanitizer business, the disregard for the corporate form across Triple Five entities, [and] the involvement of

18

CFSB in Triple Five Worldwide's operations." Dkt. 245 at 1. The Court granted the request and provided Defendants with an additional opportunity to oppose amendment based on that revised version. Dkt. 249 at 3. Plaintiffs filed their revised proposed Second Amended Complaint on January 3, 2023, Dkt. 263, and Defendants filed replies addressing that proposed amendment on January 6, 2023, Dkts. 264-1, 266.[3]

Among other amendments, Plaintiffs sought to add as defendants Don Ghermezian, Syd Ghermezian, Nader Ghermezian, CFSB, Dib Jaradeh, and Nouri Jaradeh, and further to add claims for fraudulent conveyance and of alter ego/veil piercing. *See* Dkt. 263. The Court authorized those proposed amendments on May 31, 2023. *See Red Rock Sourcing LLC v. JGX, LLC*, No. 21 Civ. 1054 (JPC), 2023 WL 3736442, at *8-12 (S.D.N.Y. May 31, 2023). Although Plaintiffs had also sought to add Pilot and Love's as defendants, the Court denied that portion of Plaintiffs' motion. *Id.* at *12-13. In its decision, the Court once again instructed Plaintiffs, when preparing the final version of their Second Amended Complaint, to consider and address the futility arguments that Defendants raised in opposing Plaintiffs' amendments. *Id.* at *14. Indeed, in addition to urging the futility of many of the claims, Defendants had more broadly attacked the allegations as conclusory recitations lacking supporting factual bases and lacking specification as to each Defendant's participation in the alleged counterfeiting scheme. *See generally* Dkts. 198,

_____

[3] While briefing was in progress on the motion to amend, Rigz sought leave to move to intervene. Dkt. 187. Pursuant to the Court's briefing schedule, Dkt. 202 at 1, Rigz filed its motion on June 13, 2022, Dkt. 205-207, Plaintiffs filed their opposition to Rigz's motion on June 21, 2022, Dkt. 213, and Rigz replied on June 27, 2022, Dkt. 215. In addition, the JGX Defendants (at the time, consisting only of JGX, Grazi, and Isaac Import) and the Worldwide Defendants each filed briefs in support of Rigz's intervention. Dkts. 212, 214. On February 1, 2023, the Court granted Rigz's motion, allowing permissive intervention under Federal Rule of Civil Procedure 24(b). *See Red Rock Sourcing LLC v. JGX, LLC*, No. 21 Civ. 1054 (JPC), 2023 WL 1468980, at *3-5 (S.D.N.Y. Feb. 2, 2023). Rigz then filed an opposition to Plaintiffs' motion to amend on February 13, 2023, Dkts. 283-284, and Plaintiffs filed a sur-reply responding to Rigz on February 23, 2023, Dkt. 289-1.

201.  The Court further cautioned, "Absent extraordinary circumstances, this will be Plaintiffs'
final opportunity to amend their Complaint." *Red Rock Sourcing*, 2023 WL 3736442, at *14.  Also
on May 31, 2023, the undersigned referred the case to the Honorable James L. Cott, United States
Magistrate Judge, for general pretrial supervision.  Dkt. 309.

On June 14, 2023, Plaintiffs filed their Second Amended Complaint, which, as earlier
mentioned, includes sixteen Counts against various subsets of the fifteen Defendants.  *See
generally* SAC.  Against the Counterfeiting Defendants, Plaintiffs bring in Count One a substantive
civil RICO claim and, in the alternative, a civil RICO conspiracy claim.  *Id.* ¶¶ 392-448.  Against
these same Defendants, Plaintiffs also bring four Counts under the Lanham Act, alleging:
infringement of a registered mark (Count Two), *id.* ¶¶ 449-460; contributory trademark
infringement (Count Three), *id.* ¶¶ 461-467; unfair competition and false designation (Count
Four), *id.* ¶¶ 468-472; and false advertising (Count Five), *id.* ¶¶ 473-480.[4]  Finally, Plaintiffs bring
seven causes of action under New York law once again against the Counterfeiting Defendants,
alleging: deceptive business practices and civil conspiracy to engage in the same (Count Six), *id.*
¶¶ 481-487; common law trademark infringement (Count Seven), *id.* ¶¶ 488-495; tortious
interference with prospective economic advantage (Count Eight), *id.* ¶¶ 496-512; unfair
competition (Count Nine), *id.* ¶¶ 513-518; unjust enrichment (Count Ten), *id.* ¶¶ 519-523; dilution
by tarnishment (Count Eleven), *id.* ¶¶ 524-529; and negligence and gross negligence (Count
Twelve), *id.* ¶¶ 530-539.[5]

Next, in Count Thirteen, Plaintiffs bring a claim for fraudulent conveyance against Triple
Five Worldwide and against Don, Syd, and Nader Ghermezian.  *Id.* ¶¶ 540-559.  And, finally,

---

[4] Counts Two and Three are brought only by Coronado.  SAC at 66, 68.

[5] Count Eight is brought only by Red Rock.  SAC at 74.  Counts Seven, Nine, Ten, and
Eleven are brought only by Coronado.  *Id.* at 73, 76-79.

Plaintiffs' last three Counts allege alter ego/veil piercing theories of liability against Don, Syd, and Nader Ghermezian with respect to Triple Five Worldwide (Count Fourteen), *id.* ¶¶ 560-568, against Grazi, Nouri Jaradeh, and Dib Jaradeh with respect to JGX (Count Fifteen), *id.* ¶¶ 569-581, and against Dib Jaradeh with respect to Isaac Import (Count Sixteen), *id.* ¶¶ 582-589.

In moving to dismiss certain of these Counts, Defendants proceed in four groups. Nader Ghermezian moves to dismiss Plaintiffs' fraudulent conveyance claim (Count Thirteen) and Plaintiffs' alter ego/veil piercing claim (Count Fourteen) against him. *See* Nader Ghermezian's Motion. Don Ghermezian moves to dismiss all Counts against him (Counts One through Fourteen), and in that same motion, the Worldwide Defendants move to dismiss all Counts asserted against them (Counts One through Thirteen), save for Count Four for "unfair competition and false designation of origin." *See* Worldwide Defendants' Motion. JGX, Isaac Import, Grazi, Nouri Jaradeh, and Dib Jaradeh move to dismiss all Counts asserted against them (Counts One through Twelve, as well as Counts Fifteen and Sixteen), except that they concede that Counts Four (unfair competition), Seven (common law trademark infringement) and Count Eleven (dilution by tarnishment) have been sufficiently pleaded against JGX alone. *See* JGX Defendants' Motion; *id.* at 2 n.2. Finally, Syd Ghermezian and CFSB move to dismiss Counts One through Fourteen. *See* Banking Defendants' Motion. To date, Liberty has not responded to the Second Amended Complaint. In fact, Liberty has yet to appear at all in this case.[6]

---

[6] While Amoyelle appeared at the July 13, 2021 conference as Liberty's corporate representative, and it appears that Amoyelle was deposed in this case on August 4, 2021, *see* Dkt. 104-7, a corporate entity must be represented by an attorney. *See Lattanzio v. COMTA*, 481 F.3d 137, 139-40 (2d Cir. 2007).

On September 22, 2023, Plaintiffs filed their omnibus opposition to the four motions.  Dkt. 357 ("Opposition").  Each group of the moving defendants then replied.  Dkts. 363 ("Worldwide Defendants' Reply"), 364-366.

On September 14, 2023, while briefing on the various motions to dismiss was in progress, Plaintiffs requested leave from the Court to move for summary judgment on Counts Four (unfair competition and false designation of origin under the Lanham Act), Seven (trademark infringement under New York common law), and Eleven (dilution by tarnishment under N.Y. G.B.L. Section 360-l) against Triple Five Worldwide, David Ghermezian, and JGX.  Dkt. 349.  The Court denied Plaintiffs' request without prejudice to renewal after the Court's rulings on the instant motions to dismiss.  Dkt. 372.

On November 6, 2023, Plaintiffs renewed their request for a pre-motion conference regarding the imposition of sanctions, including numerous adverse inference instructions, against Triple Five Worldwide, David Ghermezian, Don Ghermezian, Yonah Ghemezian, and Berkowitz, in connection with alleged noncompliance with discovery requests.  Dkt. 367.  Judge Cott denied the request also without prejudice to renewal after this Court's decision on the motions to dismiss. Dkt. 371.

## II.  Legal Standards

To survive a motion to dismiss for failure to state a claim, a complaint must contain more than mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  Rather, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Id.* (quoting *Twombly*, 550 U.S. at 570).  A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable

inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). These "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Indeed, the plausibility standard requires "more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678.

Determining whether a complaint states a plausible claim is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. Although the Court must "accept[] as true the factual allegations in the complaint and draw[] all inferences in the plaintiff's favor," *Biro v. Condé Nast*, 807 F.3d 541, 544 (2d Cir. 2015), it "need not consider conclusory allegations or legal conclusions couched as factual allegations," *Dixon v. von Blanckensee*, 994 F.3d 95, 101 (2d Cir. 2021) (internal quotation marks omitted).

Moreover, on a motion to dismiss, a court's "task is to assess the legal feasibility of the complaint; it is not to assess the weight of the evidence that might be offered on either side." *Lynch v. City of New York*, 952 F.3d 67, 75 (2d Cir. 2020). To that end, a court generally limits its consideration to "only the facts alleged in the pleadings, documents attached as exhibits or incorporated by reference in the pleadings and matters of which judicial notice may be taken." *Samuels v. Air Transp. Local 504*, 992 F.2d 12, 15 (2d Cir. 1993). Yet "[e]ven where a document is not incorporated by reference, the court may nevertheless consider it where the complaint 'relies heavily upon its terms and effect', which renders the document 'integral' to the complaint." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002). To be "integral" to a complaint, the plaintiff (1) must have had "actual notice" of the extraneous information and (2) must have "relied upon the[] documents in framing the complaint." *Id.* (internal quotation marks omitted). And even if a document meets these twin requirements of notice and reliance, a court still may not consider it on a motion to dismiss if there is a dispute "regarding the authenticity or accuracy of

the document" or "the relevance of the document." *Faulkner v. Beer*, 463 F.3d 130, 134 (2d Cir. 2006).

"Where a district court considers material outside of the pleadings that is not attached to the complaint, incorporated by reference, or integral to the complaint, the district court, to decide the issue on the merits, must convert the motion into one for summary judgment." *United States ex rel. Foreman v. AECOM*, 19 F.4th 85, 106 (2d Cir. 2021).  This requirement "deters trial courts from engaging in factfinding when ruling on a motion to dismiss and ensures that when a trial judge considers evidence [outside] the complaint, a plaintiff will have an opportunity to contest [a] defendant's relied-upon evidence by submitting material that controverts it." *Glob. Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 155 (2d Cir. 2006).  A district court thus "errs when it consider[s] affidavits and exhibits submitted by defendants, or relies on factual allegations contained in legal briefs or memoranda" on a motion to dismiss for failure to state a claim.  *Friedl v. City of New York*, 210 F.3d 79, 83-84 (2d Cir. 2000) (internal quotation marks omitted).

### III.  Discussion

**A.      Consideration of Extraneous Documents**

Preliminarily, the Court addresses the various exhibits appended to the motions filed by the JGX Defendants, Don Ghermezian and the Worldwide Defendants, and the Banking Defendants.  *See* Dkts. 337 (declaration of Martin Stein, counsel for Don Ghermezian and the Worldwide Defendants, with seven attached exhibits), 341 (declaration of Yvette Sutton, counsel for the JGX Defendants, with five attached exhibits, the first of which is a copy of the operative Complaint), 345 (declaration of Alexander Widell, counsel for the Banking Defendants, with four attached exhibits, the first three of which are portions of the operative Complaint).  As earlier mentioned, the Court's consideration of Defendants' attached documents is appropriate on a

motion to dismiss only if they are properly subject to judicial notice, incorporated by reference in the Complaint, or deemed integral to the Complaint.  *Chambers*, 282 F.3d at 152-53.

Plaintiffs object to the Court's consideration of these extraneous materials at this stage, asserting broadly that "[n]one of the documents submitted by any of the Defendants are integral to the SAC."  Opposition at 2.  But Plaintiffs do not dispute Defendants' contention that Plaintiffs were in possession of the proffered documents before filing the Second Amended Complaint.  *See* Dkt. 337 ¶ 2 (Stein attesting that Plaintiffs possessed the exhibits before they filed the Second Amended Complaint); Dkt. 341 ¶ 8 (Sutton attesting that Plaintiffs possessed the exhibits since February 11, 2022 at the latest).  Moreover, in insisting that "Defendants have made no showing as to the authenticity of" the documents, Opposition at 3, Plaintiffs appear simply to disregard the attestations as to the authenticity of each of the documents, *see* Dkt. 337 ¶¶ 1-9 (Stein attesting that each attached exhibit, based on his personal knowledge of the facts, includes documents expressly referred to in the Second Amended Complaint); Dkt. 341 ¶¶ 3-7 (Sutton attesting that each attached exhibit contains "true and correct" copies of the cited materials); Dkt. 345 ¶ 1 (Widell attesting that the attached exhibit includes "true and correct" copies).  In assessing the propriety of its consideration of these extraneous submissions, the Court thus assumes the absence of any dispute as to Plaintiffs' notice of the documents and as to their authenticity.

The JGX Defendants and Don Ghermezian and the Worldwide Defendants attach a number of exhibits to their dismissal motions, arguing that the documents contained therein—the vast majority of which are communications through email or WhatsApp, an instant messaging application, between certain of the Defendants—are either integral to or have been incorporated by reference in the Second Amended Complaint.  *See* JGX Defendants' Motion 5-7; Worldwide Defendants' Reply at 1-2.

25

The JGX Defendants attach four exhibits, in addition to the Second Amended Complaint: (1) an April 27, 2020 email between Grazi and Carelli; (2) a set of documents "detailing the changes to the URBĀNE label ordered by Defendant Jack Grazi"; (3) a May 26, 2020 email from Nouri Jaradeh to Grazi; and (4) excerpts from 2020 and 2021 WhatsApp exchanges between Grazi, Berkowitz, and David Ghermezian.  *See* Dkt. 341, Exhs. 2-5.  The Court finds that the April 27, 2020 email, *id.*, Exh. 2, and the May 26, 2020 email, *id.*, Exh. 4, are incorporated by reference in the Complaint.  "To be incorporated by reference, the Complaint must make a clear, definite, and substantial reference to the document[]."  *White v. City of New York*, 206 F. Supp. 3d 920, 929 (S.D.N.Y. 2016) (quoting *Helprin v. Harcourt, Inc.*, 277 F. Supp. 2d 327, 330-31 (S.D.N.Y. 2003)).  Plaintiffs have expressly referenced in their Complaint both these communications and their substance, and the contents of the documents attached by the JGX Defendants plainly align with the substance of Plaintiffs' allegations.  *See* SAC ¶¶ 94 ("The discussions between Grazi and Carelli led to Rigz issuing an initial purchase order to JGX, on or about April 27, 2020, for 331,250 bottles of hand sanitizer under trademarks and/or designations identical to or substantially indistinguishable from the URBĀNE Brand."), 103 ("[Nouri] Jaradeh, an employee of Isaac Import and part-owner and principal of JGX, conducted online research about Coronado, the registered owner of the URBĀNE Marks, in May 2020 and communicated his findings to Grazi."). The Court thus considers these documents in deciding the present motion.  *See, e.g.*, *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 112 (2d Cir. 2010) (holding that the district court correctly determined that the complaint incorporated by reference e-mails attached as exhibits to a declaration filed by defense counsel in support of a Rule 12(b)(6) motion to dismiss, where the plaintiff "referred in her complaint to [the] e-mails" but did not attach them as exhibits to her complaint); *Cromwell-Gibbs v. Staybridge Suite Times Square*, No. 16 Civ 5169 (KPF), 2017 WL

2684063, at *1 n.2 (S.D.N.Y. June 20, 2017) (holding that an email chain was incorporated by reference when the complaint made "direct reference to the e-mail chain [and] the contents of the e-mails exchanged"); *Worldwide Servs., Ltd. v. Bombardier Aerospace Corp.*, No. 14 Civ. 7343 (ER), 2015 WL 5671724, at *8 (S.D.N.Y. Sept. 22, 2015) (deeming eight documents, including four e-mails, incorporated by reference in the complaint, because the "documents [were] clearly referenced by the Complaint" and "highly relevant").

On the other hand, the Court declines to consider the group of documents "detailing the changes to the URBĀNE label ordered by Defendant Jack Grazi," Dkt. 341, Exh. 3, or the excerpted 2020 to 2021 WhatsApp exchanges between Grazi, Berkowitz, and David Ghermezian, *id.* Exh. 5. As to the former set of documents, Plaintiffs do not reference these exchanges anywhere in their Complaint, nor do the JGX Defendants urge these documents' integrality. In fact, it appears that the JGX Defendants seek to introduce this new information solely to undermine Plaintiffs' allegation that Dib Jaradeh was the person responsible for creating the forged URBĀNE label. *See* JGX Defendants' Motion at 5-6 (explaining that the exhibit shows Grazi instructing an individual named "Gigi" to repurpose the URBĀNE label, which the JGX Defendants urge was not created by Dib Jaradeh). But the Court declines to engage in such factfinding at this stage of the litigation. *See Glob. Network Commc'ns*, 458 F.3d at 155. As to the latter set of documents, the JGX Defendants urge that the excerpted 2020 to 2021 WhatsApp exchanges are relied upon in paragraphs 430 and 432 of the Complaint. *See* JGX Defendants' Motion at 6. Plaintiffs' reference to those specific communications are far from "clear" and "definite." *White*, 206 F. Supp. 3d at 929; *see* SAC ¶¶ 430, 432 (discussing in vague terms certain defendants' communications in November 2020, April 2021, and May 2021). Nor are the allegations in paragraphs 430 and 432

"integral" to Plaintiffs' claims, which largely revolve around the Defendants' actions in July to August 2020.

Next, Don Ghermezian and the Worldwide Defendants attach seven exhibits to their motion: (1) the list of Trop-manufactured hand sanitizer brands referred to in the July 2020 FDA order, purportedly referred to in paragraphs 9, 107, 303, and 304 of the Complaint; (2) a May 4, 2020 email exchange between Don Ghermezian and Isaac Saba, purportedly referred to and quoted from in paragraphs 145 and 146 of the Complaint; (3) May 8, 2020 emails from Don Ghermezian to David Ghermezian, purportedly referred to in paragraphs 184 and 185 of the Complaint; (4) May 18, 2020 emails to and from Don Ghermezian, invoices for Triple Five Worldwide's first three shipments of hand sanitizer, and American Dream records of payments on May 11, 2020 and May 19, 2020, purportedly referred to in paragraphs 191 through 195 of the Complaint; (5) a March 31, 2021 WhatsApp exchange between David Ghermezian and Tyberg, purportedly quoted from and referred to in paragraphs 373 and 374 of the Complaint; (6) a June 9, 2021 WhatsApp exchange between David Ghermezian and Isaac Saba, purportedly referred to in paragraphs 375 and 425 through 428 of the Complaint; and (7) a copy of the October 2020 correspondence between Syd Ghermezian and David Ghermezian concerning a $35,000 payment from SoFlo Urban Team to Triple Five Worldwide, purportedly referred to in paragraph 420 of the Complaint. *See* Dkt. 337, Exhs. 1-7.

Apart from the list of Trop-manufactured hand sanitizer brands included in the July 2020 FDA order, *id.*, Exh. 1, and the collection of May 18, 2020 emails to and from Don Ghermezian, invoices for Triple Five Worldwide's first three shipments of hand sanitizer, and American Dreams records of payments on May 11, 2020 and May 19, 2020, *id.*, Exh. 4, the Court finds that the proffered documents have been incorporated by reference in the Complaint. Those

communications are expressly referenced with sufficient detail in the paragraphs cited by Don Ghermezian and the Worldwide Defendants, and, in fact, many of them are directly quoted in the Complaint.  *See* SAC ¶¶ 9, 107, 145-146, 184-185, 303-304, 373-375, 425-428.

As to the first exhibit, the list of Trop-manufactured hand sanitizer brands included in the July 2020 FDA order is publicly available on the FDA's website.  *See FDA Updates on Hand Sanitizers Consumers Should Not Use*, U.S. Food & Drug Administration, https://www.fda.gov/drugs/drug-safety-and-availability/fda-updates-hand-sanitizers-consumers-should-not-use (last visited Mar. 22, 2024).  Accordingly, the Court need not determine whether such information has been incorporated by reference by or is integral to the Complaint.  The Court may simply take judicial notice of that publicly available information.  *See Simeone v. T. Marzetti Co.*, No. 21 Civ. 9111 (KMK), 2023 WL 2665444, at *1 (S.D.N.Y. Mar. 28, 2023) ("As such, courts routinely take judicial notice of FDA guidance documents and documents which are publicly available on the FDA's website."); *Apotex Inc. v. Acorda Therapeutics, Inc.*, 823 F.3d 51, 59-60 (2d Cir. 2016) (taking judicial notice of an FDA guidance document); *Simon v. Smith & Nephew, Inc.*, 990 F. Supp. 2d 395, 401 n.2 (S.D.N.Y. 2013) (taking judicial notice of "public records contained on the FDA website").

As to the fourth exhibit, while it appears that the documents included therein may well correspond to Plaintiffs' allegations in paragraphs 191 through 195 of the Complaint, the allegations are not detailed enough for the Court to find that the communications have been incorporated by reference.  Nor is the framing of Plaintiffs' claims so heavily dependent on the terms or effect of these particular communications to meet the integrality requirement.  Accordingly, the Court declines to consider this exhibit.  The Court notes that the documents

included in this exhibit add little in the way of context or substance to Plaintiffs' allegations, and their consideration would not, in any event, alter the Court's analysis of the motions to dismiss.

Finally, Syd Ghermezian and CFSB attach a July 13, 2011 "Notice of Change of Control" document purportedly marking the date on which the Ghermezian family acquired CFSB. *See* Dkt. 345, Exh. 4; Banking Defendants' Motion at 10-11. This document is publicly available on the website of the Office of the Comptroller of the Currency. *See* Office of the Comptroller of the Currency, https://www.occ.gov/static/ots/directors-orders/do-2011-44.pdf (last visited March 22, 2024). The Court thus takes judicial notice of this document. *See Byrd v. City of New York*, No. 04-1396-cv, 2005 WL 1349876, at *1 (2d Cir. June 8, 2005) (summary order) ("[M]aterial that is a matter of public record may be considered in a motion to dismiss.").

Having thus clarified the scope of materials properly before the Court, the Court turns to Defendants' various challenges to the legal sufficiency of Plaintiffs' claims.

## B.    Civil RICO Claims (Count One)

As mentioned, in Count One, Plaintiffs bring a substantive civil RICO claim under 18 U.S.C. § 1962(c)—and, in the alternative, a civil RICO conspiracy claim under 18 U.S.C. § 1962(d)—against the fourteen Counterfeiting Defendants. *See* SAC ¶¶ 392-448. The Court dismisses these claims in their entirety as to the Counterfeiting Defendants who have appeared, and provides Plaintiffs with notice of its intent to dismiss *sua sponte* as to Liberty.

### 1.    Substantive Civil RICO Claim

To state a substantive civil RICO claim, Plaintiffs must sustain two pleading burdens. First, Plaintiffs must show that Defendants violated the substantive RICO statute by "alleg[ing] the existence of seven constituent elements: (1) that the defendant[s] (2) through the commission of two or more acts (3) constituting a 'pattern' (4) of 'racketeering activity' (5) directly or indirectly invest[] in, or maintain[] an interest in, or participate[] in (6) an 'enterprise' (7) the activities of

which affect interstate or foreign commerce." *Moss v. Morgan Stanley Inc.*, 719 F.2d 5, 17 (2d Cir. 1983) (citing 18 U.S.C. § 1962(a)-(c)). Significantly, these requirements "must be established as to each individual defendant." *DeFalco v. Bernas*, 244 F.3d 286, 306 (2d Cir. 2001); *cf. United States v. Persico*, 832 F.2d 705, 714 (2d Cir. 1987) ("The focus of section 1962(c) is on the individual patterns of racketeering engaged in by a defendant, rather than the collective activities of the members of the enterprise, which are proscribed by section 1962(d)."), *cert. denied*, 486 U.S. 1022 (1988). Second, Plaintiffs must allege an injury to their "business or property by reason of a violation of section 1962." 18 U.S.C. § 1964(c); *accord Moss*, 719 F.2d at 17.

### a. Predicate Acts

To plead a pattern of racketeering activity, Plaintiffs must allege at least two "predicate acts" of "racketeering activity" occurring within a ten-year period. 18 U.S.C. § 1961(5); *accord Azrielli v. Cohen L. Offs.*, 21 F.3d 512, 520 (2d Cir. 1994). "Racketeering activity" includes "any act or threat involving" certain enumerated state or federal offenses, including mail fraud in violation of 18 U.S.C. § 1341 and wire fraud in violation of 18 U.S.C. § 1343, *see* 18 U.S.C. § 1961(1) (defining "racketeering activity")—the offenses Plaintiffs allege as predicate acts for their civil RICO claims, *see* SAC ¶¶ 407-417. The elements of mail and wire fraud are "(i) a scheme to defraud (ii) to get money or property, (iii) furthered by the use of interstate mail or wires." *United States v. Autuori*, 212 F.3d 105, 115 (2d Cir. 2000) (citation omitted). As to the first element, a plaintiff must demonstrate "(i) the existence of a scheme to defraud, (ii) the requisite scienter (or fraudulent intent) on the part of the defendant, and (iii) the materiality of the misrepresentations." *Id.* Under these statutes, a plaintiff need not allege "that the defendants have personally used the mails or wires; it is sufficient that a defendant 'causes' the use of the mails or wires." *Sobel v. Fleck*, No. 03 Civ. 1041 (RMB) (GWG), 2003 WL 22839799, at *6 (S.D.N.Y. Dec. 1, 2003) (citing 18 U.S.C. §§ 1341, 1343), *report and recommendation adopted by* 2004 WL

48877 (S.D.N.Y. Jan. 8. 2004); *see also United States v. Bortnovsky*, 879 F.2d 30, 36 (2d Cir. 1989) ("I]t is not significant for purposes of the mail fraud statute that a third-party, rather than the defendant wrote and sent the letter at issue, provid[ed] . . . the defendants could reasonably have foreseen that the third-party would use the mail in the ordinary course of business as a result of [the] defendants' act.").

Civil RICO claims based on fraudulent predicate acts are subject to Federal Rule of Civil Procedure 9(b)'s more stringent pleading standard, which requires a plaintiff to "state with particularity the circumstances constituting fraud." *Paul Hobbs Imports Inc. v. Verity Wines LLC*, No. 21 Civ. 10597 (JPC), 2023 WL 374120, at *4 (S.D.N.Y. Jan. 24, 2023); *accord First Cap. Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 178 (2d Cir. 2004).  Accordingly, where a plaintiff claims that specific mail or wire transmissions "were themselves fraudulent, *i.e.*, themselves contained false or misleading information," the plaintiff "should specify the fraud involved, identify the parties responsible for the fraud, and where and when the fraud occurred." *Evercrete Corp. v. H-Cap Ltd.*, 429 F. Supp. 2d 612, 624 (S.D.N.Y. 2006).  But where a plaintiff claims that the mail or wires were simply used in furtherance of a scheme to defraud, "the actual transmissions that use the mails and wires do not have to be false or contain misrepresentations— only the scheme must be fraudulent." *Id.* at 623 (citation omitted).  In such a case, although the plaintiff "need not allege that each defendant made a misrepresentation," the plaintiff must still "allege sufficient facts showing *each* defendant's knowing or intentional participation in the alleged scheme to defraud." *Williams v. Equitable Acceptance Corp.*, 443 F. Supp. 3d 480, 492 (S.D.N.Y. 2020) (emphasis added); *see also In re Sumitomo Copper Litig.*, 995 F. Supp. 451, 456 (S.D.N.Y. 1998) ("In complex civil RICO actions involving multiple defendants . . . Rule 9(b) requires only that the plaintiff delineate with adequate particularity in the body of the complaint,

the specific circumstances constituting the overall fraudulent scheme."); *Serin v. N. Leasing Sys., Inc.*, No. 06 Civ. 1625, 2009 WL 7823216, at *7 (S.D.N.Y. Dec. 18, 2009) ("In applying Rule 9(b) to predicate acts of mail or wire fraud, Southern District of New York courts have articulated different requirements to apply in either a '*per se*' or 'in furtherance of fraud' context." (citations omitted)).

Plaintiffs appear to proceed under this latter theory—urging that each of the fourteen Counterfeiting Defendants knowingly or intentionally participated in the counterfeit hand sanitizer scheme, furthered by mail or wire communications, even if not every one of those Defendants himself made a misrepresentation. *See* Opposition at 18-22. For instance, in listing the "numerous fraudulent statements and omissions" underlying their civil RICO claim, Plaintiffs refer to their allegations regarding: Grazi's misrepresentations of his ownership of the URBĀNE brand to the "manufacturers" of the hand sanitizer; Grazi's circulation of the URBĀNE label and accompanying representations that he was entitled to use it; Grazi's written and telephonic communications "with Saba, among others, to facilitate the manufacture and distribution" of the counterfeit goods; Nouri Jaradeh's correspondence with Grazi concerning Nouri Jaradeh's research on Coronado in May 2020; transmissions of purchase orders among Nouri Jaradeh, Grazi, and Berkowitz, as well as transmission of purchase orders and invoices from Yonah Ghermezian to Tyberg and SoFlo Urban Team LLC; the "numerous messages and emails" by David Ghermezian, Berkowitz, and Isaac Saba; Don Ghermezian's authorized payments to JGX; and Syd Ghermezian and CFSB's banking services. *See* SAC ¶ 410. Plaintiffs further include a list of monetary transactions, including a May 26, 2020 wire transfer to Triple Five Worldwide from Tyberg, four April 2020 wire transfers from Rigz to JGX, a May 18, 2020 transfer from JGX to Liberty, and two check payments from JGX to Rigz. *Id.* ¶¶ 411-415. And while certain of these

communications are alleged to contain falsehoods or misstatements (*e.g.*, Grazi's representations of his ownership of the URBĀNE brand to the "manufacturers" of the hand sanitizer and Grazi's circulation of the URBĀNE label and accompanying representations that he was entitled to use it), the vast majority of the cited communications appear only to advance the counterfeit hand sanitizer scheme. The Court thus assesses not whether Plaintiffs have alleged that each Defendant made a misrepresentation—seemingly urged by certain of the Defendants in their motions to dismiss, *see* JGX Defendants' Motion at 13; Worldwide Defendants' Motion at 9—but whether Plaintiffs have "allege[d] sufficient facts showing each defendant's knowing or intentional participation" in the manufacture and distribution of counterfeit hand sanitizer.[7] *Williams*, 443 F. Supp. 3d at 492.

Don Ghermezian, the Worldwide Defendants (Triple Five Worldwide, Isaac Saba, Berkowitz, David Ghermezian, and Yonah Ghermezian), and the Banking Defendants (Syd Ghermezian and CFSB) argue that Plaintiffs—in failing to plead facts suggesting that any of them knew or should have known that the URBĀNE mark was, in fact, owned by Coronado—have failed to allege the requisite fraudulent intent as to each of them. *See* Don Ghermezian and Worldwide Defendants' Motion at 9; Banking Defendants' Motion at 17 ("At most, [Plaintiffs] have alleged facts showing that [Syd Ghermezian] was aware that certain members of his family intended to enter the hand-sanitizer business at the outset of the COVID-19 pandemic."). The Court agrees.

"Although Rule 9(b) permits knowledge to be averred generally, plaintiffs must still plead the events which they claim give rise to an inference of knowledge." *Devaney v. Chester*, 813 F.2d 566, 568 (2d Cir. 1987). A sufficient factual basis for fraudulent intent may consist of

---

[7] In so doing, the Court assumes without deciding that Plaintiffs, in describing the counterfeit hand sanitizer operation, have adequately pleaded the existence of a scheme to defraud.

allegations as to who "possessed . . . knowledge" of the fraud, "when and how they obtained [that] knowledge," or even why they "should have known" of the fraud. *Id.* Additionally, "[t]he requisite strong inference of fraud may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *United States v. Strock*, 982 F.3d 51, 66 (2d Cir. 2020) (citation omitted). As earlier emphasized, "[i]n a case involving multiple defendants, plaintiffs must plead circumstances providing a factual basis for scienter for each defendant." *In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 695 (2d Cir. 2009) (citation omitted). "[G]uilt by association is impermissible." *Id.*

Here, the Complaint is devoid of any factual allegations that these Defendants knew or even should have known of Coronado's ownership in the URBĀNE mark. At most, Plaintiffs allege that, "[u]pon information and belief," Syd Ghermezian was aware that the transactions with CFSB "were furthering a counterfeit sanitizer business," SAC ¶ 252, but they provide no factual bases in support of this bare allegation. *See Devaney*, 813 F.2d at 568 (explaining that Rule 9(b) requires plaintiffs to "plead the events which they claim give rise to an inference of knowledge"). And as to Don Ghermezian and the Worldwide Defendants, Plaintiffs do not allege even generally these Defendants' knowledge that the hand sanitizer operation involved counterfeit products.

Plaintiffs urge that their allegations evince each Defendant's motive and opportunity to commit fraud. Specifically, they contend that the "significant amounts of money [that] could be made by selling hand sanitizer" provide the "clear and simple motive to commit fraud," especially in light of the acute financial distress that had befallen the Ghermezian family at that time. Opposition at 19 (citing SAC ¶¶ 132, 134). But under the "motive and opportunity" approach, "allegations that a defendant stands to gain economically from fraud do not satisfy the heightened

35

pleading requirements of Rule 9(b)." *ABF Cap. Mgmt. v. Askin Cap. Mgmt., L.P.*, 957 F. Supp.

1308, 1327, 1331 (S.D.N.Y. 1997); *cf. Colpitts v. Blue Diamond Growers*, 527 F. Supp. 3d 562,

586 (S.D.N.Y. 2021) (explaining that allegations evincing the defendant's "desire to profit from

[a] misrepresentation" were insufficient to allege a specific motive for fraud); *accord Negrete v.

Citibank, N.A.*, 187 F. Supp. 3d 454, 464-65 (S.D.N.Y. 2016) ("[A] generalized profit

motive . . . does not create the requisite 'strong inference' of fraudulent intent." (citing *Chill v.

G.E. Co.*, 101 F.3d 263, 268 (2d Cir. 1996)). In the glaring absence of any indicia of fraudulent

intent on the part of these Defendants, the Court dismisses Plaintiffs' substantive civil RICO claim

against Isaac Saba, Berkowitz, Don Ghermezian, David Ghermezian, Yonah Ghermezian, Syd

Ghermezian, Triple Five Worldwide, and CFSB.

In contrast, the Complaint contains sufficient factual allegations concerning the fraudulent

intent on the part of the JGX Defendants. For instance, Plaintiffs allege that Grazi, Nouri Jaradeh,

and Dib Jaradeh, as principals of JGX, should have known that Coronado, and not Rigz, was the

proper owner of the URBĀNE mark, given that JGX was an apparel company with a history of

and expertise in obtaining trademarks for their own products. *See, e.g.*, SAC ¶ 111 ("A simple

Google search, let alone a trademark database search—as would be minimally expected of an

experienced reseller like JGX that owns multiple trademark registrations—would have revealed

the unlawfulness of its hand sanitizer business enterprise with Rigz."); *see also id.* ¶ 112 (alleging

that "JGX, Isaac Import, Grazi, [Nouri] Jaradeh, and [Dib Jaradeh] knew that they were

counterfeiting the URBĀNE brand and acted with the specific intent of deceiving everyone outside

the Counterfeiting Defendants, including Plaintiffs and the public at large, about the illicit nature

of their product"). According to Plaintiffs, Dib Jaradeh personally repurposed the URBĀNE label

provided by Carelli, creating a label for unauthorized use on sanitizer bottle and products, and

emailed that counterfeit URBĀNE label to Grazi—conduct, which (if true) certainly gives rise to a plausible inference of fraudulent intent. *Id.* ¶ 105, Exh. G.   And finally, Plaintiffs have pleaded "when and how" Nouri Jaradeh and Grazi, in particular, may have at the latest obtained knowledge of Coronado's rightful ownership of the URBĀNE mark: as alleged, in May 2020, Nouri Jaradeh researched Coronado and communicated his findings to Grazi that "Coronado was the proper owner of the URBĀNE brand, and not Rigz," and JGX, despite knowing this, "knowingly and willingly used the URBĀNE brand on a massive scale in furtherance of the counterfeiting scheme." *Id.* ¶¶ 103-104.   These allegations provide sufficient factual bases for the individual JGX Defendants' fraudulent intent.

Rather than attack the sufficiency of the allegations as to their intent, the JGX Defendants argue that Plaintiffs' allegations regarding the nature and extent of Grazi's, Nouri Jaradeh's, and Dib Jaradeh's involvement in the hand sanitizer scheme are insufficient as a matter of law to show that each of these Defendants committed the requisite predicate acts.   JGX Defendants' Motion at 14.   Specifically, they contend that Nouri Jaradeh's alleged involvement in the scheme involved only "ministerial acts"; that because Dib Jaradeh's only alleged involvement in the scheme was his creation of the URBĀNE label, his conduct cannot satisfy the requirement that each defendant commit *two* predicate acts; and that the "alleged fraudulent misrepresentations of ownership [of the URBĀNE mark] by Grazi never occurred." *Id.*   These arguments, based on an unreasonably narrow reading of the Complaint and an impermissible challenge to the veracity of its substance, are unavailing.

According to Plaintiffs, Grazi coordinated with Rigz to have JGX source the counterfeit hand sanitizer, SAC ¶¶ 90-91; he sent an image of the URBĀNE label to Dib Jaradeh, *id.* ¶ 105; he circulated the label created by Dib Jaradeh to further solicit the manufacture of counterfeit hand

sanitizer both from Liberty and members of the Ghermezian family, *id.* ¶¶ 110, 119, 149; he sent out multiple purchase orders for the counterfeit product, *id.* ¶ 153; and he addressed manufacturers through video messages to encourage the speedy production of the counterfeit product, representing in those videos that he was "producing with Isaac Saba, David Ghermezian, and Eli Berkowitz the URBĀNE label," *id.* ¶ 273.  As further alleged, Dib Jaradeh, a principal of JGX and Isaac Import, created the copycat URBĀNE label used on all the counterfeit goods.  *Id.* ¶ 105.  And he participated in discussions with Grazi and Carelli "to finalize details related to the quantity of counterfeit hand sanitizer bearing the URBĀNE label to be produced, as well as pricing, manufacturing, and shipping of the bottles."  *Id.* ¶ 96.  Finally, according to Plaintiffs, Nouri Jaradeh, an Isaac Import employee and part-owner and principal of JGX, created at least five purchase orders for more than 660,000 bottles of counterfeit hand sanitizer.  *Id.* ¶ 150.  He was kept regularly apprised of invoices that Triple Five Worldwide issued to JGX, *id.* ¶ 259, and regularly corresponded with Grazi and [Dib Jaradeh] throughout the counterfeiting scheme, *id.* ¶ 108.  These allegations, paired with the earlier mentioned allegations regarding each of the JGX Defendants' specific intent to further the scheme, sufficiently demonstrate Grazi's, Nouri Jaradeh's, and Dib Jaradeh's "knowing and intentional participation" in the counterfeiting scheme.  And although Plaintiffs do not allege that each of these Defendants personally used the mail or wires, their allegations sufficiently demonstrate that each of these Defendants "could reasonably have foreseen" that the mail and wires would be used "in the ordinary course of business as a result of their acts."  *See Sobel*, 2003 WL 22839799, at *7 (citing *Bortnovsky*, 879 F.2d at 36).

Of course, this conclusion does not mean that Plaintiffs' substantive civil RICO claim against the JGX Defendants survives.  Plaintiffs still must overcome several more hurdles.

38

### b. Continuity

For instance, in addition to pleading adequately that each JGX Defendant committed at least two predicate acts, Plaintiffs must show that the alleged predicate acts are "related, and that they amount to or pose a threat of continued criminal activity" to establish the requisite pattern of racketeering activity. *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 239 (1989). The continuity requirement reflects Congress's "concern[] in RICO with long-term criminal conduct." *Id.* at 242. To that end, the continuity required to prove a "pattern of racketeering activity" can be closed-ended or open-ended, "referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." *Id.* at 241.

As an initial matter, the Second Circuit has cautioned that "RICO claims premised on mail or wire fraud must be particularly scrutinized because of the relative ease with which a plaintiff may mold a RICO pattern from allegations that, upon closer scrutiny, do not support it." *Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 489 (2d Cir. 2014) (internal quotation marks omitted); *cf. Tabas v. Tabas*, 47 F.3d 1280, 1290 (3d Cir. 1995) (*en banc*) ("The inclusion within the scope of civil RICO of [mail and wire fraud], more prevalent in the commercial world than in the world of racketeers, has caused concern that RICO sweeps too broad a swathe."). That is so because mail and wire communications, which are not themselves inherently unlawful activities, are routinely used in business operations, and "even in connection with an actual fraudulent scheme, there may be substantial innocent or incidental use of the mail or wires that may not relate to the any unlawful activity of the enterprise or that involves no deception of the plaintiff." *Gross v. Waywell*, 628 F. Supp. 2d 475, 493 (S.D.N.Y. 2009) (citation omitted). "[T]o find the necessary criminality in those activities requires substantive inquiry beyond the mere fact of the communication, ordinarily by reference to other relevant considerations such as the extent to which the mailings were part of an intentional scheme to defraud, and in fact deceived, the victim." *Id.*

Accordingly, a mere multiplicity of wire or mail communications does not automatically satisfy the requisite continuity to establish a pattern of racketeering activity. *Id.*; *cf. Crawford*, 758 F.3d at 489 (discussing *Tellis v. United States Fidelity & Guar. Co.*, 826 F.2d 477, 478 (7th Cir. 1986), and agreeing with the Seventh Circuit's reasoning that "multiple acts of mail fraud in furtherance of a single episode of fraud involving one victim and relating to one basic transaction cannot constitute the necessary pattern" for a civil RICO claim).

With these considerations at the forefront, the Court proceeds to assess whether Plaintiffs have adequately pleaded either closed-ended or open-ended continuity as to the JGX Defendants.

### i. Closed-Ended Continuity

Generally, "[t]o satisfy closed-ended continuity, the plaintiff must prove 'a series of related predicates extending over a substantial period of time.'" *Cofacrèdit, S.A. v. Windsor Plumbing Supply Co.*, 187 F.3d 229, 242 (2d Cir. 1999) (quoting *H.J.*, 492 U.S. at 242). Closed-ended continuity "is primarily a temporal concept," with the pertinent period concerning "the time during which RICO predicate activity occurred, not the time during which the underlying scheme operated or the underlying dispute took place." *Spool v. World Child Int'l Adoption Agency*, 520 F.3d 178, 184 (2d Cir. 2008) (citations omitted). Although no bright-line rule defines which periods of time are "substantial," "[p]redicate acts extending over a few weeks or months . . . do not satisfy this requirement." *H.J.*, 492 U.S. at 242. Indeed, the Second Circuit "generally requires that the crimes extend over at least two years," having never found a closed-ended pattern for racketeering activity spanning a shorter period. *Reich v. Lopez*, 858 F.3d 55, 60 (2d Cir. 2017) (citation omitted); *Spool*, 520 F.3d at 184 ("Since the Supreme Court decided *H.J. Inc.*, [the Second Circuit has] *never* held a period of less than two years to constitute a substantial period of time." (emphasis added) (internal quotation marks omitted)).

Still, "while two years may be the *minimum* duration necessary to find closed-ended continuity, the mere fact that predicate acts span two years is insufficient, without more, to support a finding of a closed-ended pattern." *First Cap. Asset Mgmt.*, 385 F.3d at 181. "[O]ther factors such as the number and variety of predicate acts, the number of both participants and victims, and the presence of separate schemes are also relevant in determining whether closed-ended continuity exists." *De Falco*, 244 F.3d at 321.

The Court considers only properly pleaded predicate acts in determining the duration of the alleged racketeering activity. *See GICC Cap. Corp. v. Tech. Fin. Grp., Inc.*, 67 F.3d 463, 467 (2d Cir. 1995) (excluding inadequately pleaded predicate acts in evaluating the duration of the racketeering activity); *Paul Hobbs Imports*, 2023 WL 374120 at *11 (excluding allegations made only upon information and belief in evaluation of closed-ended continuity). Here, the Court thus considers only the allegations concerning the JGX Defendants' participation in the scheme.[8] Accordingly, the Court finds that the JGX Defendants' alleged participation in the counterfeiting scheme at most, lasted from April 2020, SAC ¶ 90 (Carelli first contacts Grazi), to August 2020, *id.* ¶ 411 (describing August 2020 wire transfers between JGX and Triple Five Worldwide).

This five-month period is presumptively too short to establish a closed-ended pattern. *See Spool*, 520 F.3d at 184 (finding sixteen months insufficient for closed-ended continuity*); see also H.J.*, 492 U.S. at 242 (holding "[p]redicate acts extending over a few . . . months" insufficient for closed-ended continuity). Recognizing as much, Plaintiffs nonetheless urge that they have pleaded

---

[8] As explained *infra* at III.B.3, Plaintiffs do not include any allegations regarding Liberty's participation in the counterfeit hand sanitizer scheme in attempting to show a pattern of racketeering activity. Based on the allegations in the Complaint, Liberty's role in the alleged scheme lasted only from April to May 2020. Consideration of Liberty's conduct is thus inconsequential to the Court's analysis on continuity. And, in any event, the Second Circuit has instructed that "[i]n analyzing the issue of continuity," a court should "evaluate the RICO allegations with respect to each defendant individually." *First Cap. Asset Mgmt.*, 385 F.3d at 180.

41

the "rare" case, where short-lived conduct establishes closed-ended continuity due to the sheer complexity and breadth of the alleged criminal conduct.  Opposition at 22-23; *Spool*, 520 F.3d at 184 ("Although we have not viewed two years as a bright-line requirement, it will be rare that conduct persisting for a shorter period of time establishes closed-ended continuity, particularly where . . . the activities alleged involved only a handful of participants and do not involve a complex, multi-faceted conspiracy." (cleaned up)).  The Court disagrees.

With Plaintiffs' claim stripped of the allegations in connection with the Banking Defendants', the Worldwide Defendants', and Don Ghermezian's involvement in the hand sanitizer operation, Plaintiffs' attempt to portray this months-long counterfeiting operation as a "complex, multi-faceted" criminal enterprise requiring "no less than a dozen actors" fails out of the gate.  *See* Opposition at 23.  But even setting aside the limited number of actors involved, Plaintiffs here at most allege a *single* scheme to counterfeit a *single* brand of hand sanitizer.  These circumstances are insufficient to overcome the scheme's unquestionably short-lived duration.  *See DeFalco*, 244 F.3d at 321 (noting that "the presence of separate schemes" is relevant to closed-ended continuity).  Indeed, courts routinely "refuse[] to find a RICO violation in cases like this, where the plaintiffs attempt to transform [a] single scheme of limited duration into a RICO enterprise."  *Lynch v. Amoruso*, 232 F. Supp. 3d 460, 468 (S.D.N.Y. 2017) (internal quotation marks omitted) (collecting cases); *see also MinedMap, Inc. v. Northway Mining, LLC*, No. 21-1480-cv, 2022 WL 570082, at *2 (2d Cir. Feb. 25, 2022) (summary order) ("At most, there is one scheme here: Maranda forming his companies, collecting capital to execute the scheme, and contracting with MinedMap to host the Miners, despite knowing that the defendant companies did not have the capacity to fulfill this contract, and then refusing to return the Miners.  Such a scheme can hardly be considered a large-scale fraud as generally seen in RICO cases.").

The Court thus concludes that Plaintiffs have failed to allege a closed-ended pattern of racketeering activity committed by the JGX Defendants.

### ii.    Open-Ended Continuity

Plaintiffs argue in the alternative that they have pleaded an open-ended scheme. Opposition at 24-26.  "To satisfy open-ended continuity, the plaintiff need not show that the predicates extended over a substantial period of time but must show that there was a threat of continuing criminal activity beyond the period during which the predicate acts were performed." *Cofacrèdit*, 187 F.3d at 242.  Such a threat generally arises from the commission of predicate acts that are themselves inherently unlawful.  *Id.* at 242-43; *see also United States v. Aulicino*, 44 F.3d 1102, 1111 (2d Cir. 1995) ("[W]here the acts of the defendant or the enterprise were inherently unlawful, such as murder or obstruction of justice, and were in pursuit of inherently unlawful goals, such as narcotics trafficking or embezzlement, the courts generally have concluded that the requisite threat of continuity was adequately established . . . .").  Otherwise, "there must be some evidence from which it may be inferred that the predicate acts were the regular way of operating that business, or that the nature of the predicate acts themselves implies a threat of continued criminal activity."  *Cofacrèdit*, 187 F.3d at 243.  As with closed-ended continuity, open-ended continuity must be evaluated based only on adequately pleaded predicate acts.  *Paul Hobbs Imports*, 2023 WL 374120, at *11.

First, as to the nature of the alleged predicate acts of mail and wire fraud, it is well established that offenses of fraud are not considered inherently unlawful acts that by their very nature categorically carry the risk of recurrence.  *See Aulicino*, 44 F.3d at 1111 ("[I]n cases concerning alleged racketeering activity in furtherance of endeavors that are not inherently unlawful, such as frauds in the sale of property, the courts generally have found no threat of continuing criminal activity arising from conduct that extended over even longer periods.").

Turning next to the factual circumstances specific to the pattern of activity alleged, the Court finds no allegations suggesting a specific threat of repeated criminality.  For one, there is no evidence that the JGX Defendants regularly operated their business by selling counterfeit goods. In fact, that inference is belied by Plaintiffs' allegation that JGX is "an apparel company with expertise in and a history of obtaining trademarks relating to athletic apparel."  SAC ¶ 92. Moreover, on Plaintiffs' telling, the JGX Defendants' fraudulent activities alleged here were not initiated internally as part of their regular course of operation; rather, the fraud was instigated by Rigz and its principals, themselves ostensibly driven by the unique opportunities arising out of the "once-in-a-lifetime" pandemic. *Id.* ¶¶ 42, 85-87.  According to Plaintiffs, it was Rigz that "ordered the production of counterfeit URBĀNE hand sanitizer to capitalize on its brand recognition with Rigz's customers," *id.* ¶ 352, and Rigz that "required JGX to use the URBĀNE Brand because Rigz's customer were expecting to purchase and receive hand sanitizer under the URBĀNE brand." *Id.* ¶ 97.  These circumstances are not suggestive of a continued threat of ongoing criminal activity on the part of the JGX Defendants.

Notably, Plaintiffs do not even themselves contend that fraud underlies the regular operation of the JGX Defendants' businesses; rather, they attack the legitimacy only of those businesses associated with Don Ghermezian, the Worldwide Defendants, and the Banking Defendants. *See* Opposition at 25-26.  But the allegations pertaining to these Defendants are, once again, excluded from the Court's continuity analysis.  In a similar vein, Plaintiffs rely largely on allegations concerning the post-scheme conduct of Don Ghermezian, the Worldwide Defendants, and the Banking Defendants in attempting to manufacture a specific threat of repeated criminal conduct.  *See id.* at 24-25.  Of these, the single allegation at all implicating any of the JGX Defendants—that "in November 2020 and again[] in April 2021, Berkowitz corresponded with

Grazi regarding the location of unused bottles of hand sanitizer to obtain compensation from persons in Mexico who had been involved in the production of counterfeit sanitizer," SAC ¶ 430; *see* Opposition at 24—also fails to raise the specter of recurring fraud.

* * *

Because Plaintiffs have failed to plead either closed-ended or open-ended continuity, their substantive civil RICO claim against the JGX Defendants also cannot stand.

### 2.  Civil RICO Conspiracy Claim (Count One)

Plaintiffs have alleged in the alternative that each Counterfeiting Defendant violated section 1962(d) by conspiring to commit the very substantive RICO violation described in Count One of the Complaint—that is, the manufacture, distribution, and sale of the counterfeit URBĀNE hand sanitizer.  SAC ¶¶ 439-440.

"To establish a conspiracy to violate the civil RICO statute pursuant to 18 U.S.C. § 1962(d) . . . [a] plaintiff must prove (1) that there existed a conspiracy to commit acts that, if successful, would constitute a substantive civil RICO violation; (2) that defendant agreed to join in, and knowingly participated in, that conspiracy; and (3) that defendant acted in furtherance of the conspiracy in some manner (although not necessarily by the commission of any RICO predicate acts himself)."  *Martin Hilti Fam. Tr. v. Knoedler Gallery, LLC*, 386 F. Supp. 3d 319, 340 (S.D.N.Y. 2019) (citation and quotation marks omitted).   Plaintiffs' RICO conspiracy claim fails for two independent reasons.

First, because Plaintiffs' conspiracy claim is predicated entirely on an agreement to participate in the very counterfeiting scheme the Court has already concluded fails to constitute a substantive civil RICO violation, Plaintiffs' conspiracy claim necessarily fails as a matter of law. *Salinas v. United States*, 522 U.S. 52, 65 (1997) ("A conspirator must intend to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense.");

45

*Williams*, 889 F.3d at 126 ("The alleged conspiracy involved an agreement to commit the same substantive RICO violations we have deemed insufficiently pled, and the plaintiffs have not alleged any further acts that, if carried out, would have satisfied RICO's requirement of a pattern of racketeering. The plaintiffs therefore failed to plead the necessary agreement to violate RICO's substantive provisions." (citation omitted)).

Second, even had Plaintiffs adequately pleaded a substantive civil RICO violation, the Complaint is still devoid of nonconclusory allegations of "the existence of an agreement to violate RICO's substantive provisions." *Cofacrèdit*, 187 F.3d at 244 (internal quotation marks and citation omitted). Indeed, "[b]ecause the core of a RICO civil conspiracy is an agreement to commit predicate acts, a RICO civil conspiracy complaint, at the very least, must allege specifically such an agreement." *Hecht v. Com. Clearing House, Inc.*, 897 F.2d 21, 25 (2d Cir. 1990). Conclusory, boilerplate allegations as to the existence of the relevant agreement are insufficient. *See, e.g.*, *4 K & D Corp. v. Concierge Auctions, LLC*, 2 F. Supp. 3d 525, 545 (S.D.N.Y. 2014) (dismissing a RICO conspiracy count when "[o]ther than one conclusory allegation that the defendants 'agreed' to commit the violations, the plaintiffs have alleged no facts to show specifically that the defendants had any 'meeting of the minds' in the alleged violations" (citation omitted)); *U.S. Fire Ins. Co. v. United Limousine Serv., Inc.*, 303 F. Supp. 2d 432, 453-454 (S.D.N.Y. 2004) ("Conclusory allegations that 'all of the defendants conspired among themselves to further the scheme to defraud' and 'knowingly and willingly participated in the conspiracy' are insufficient.").

Yet such boilerplate allegations are all that Plaintiffs here provide. *See, e.g.*, SAC ¶¶ 439 ("[E]ach of the Counterfeiting Defendants conspired to violate 18 U.S.C. §§ 1961 (a), (b), and/or (c) by, *inter alia*, agreeing to work with other Counterfeiting Defendants to source, import,

46

distribute, and sell counterfeit URBĀNE hand sanitizer."), 440 ("As alleged herein, each Counterfeiting Defendant knew about and agreed to facilitate the manufacture and sale of counterfeit sanitizer using mail and wire fraud.").  In the absence of any factual allegations supporting the existence of an agreement, Plaintiffs' RICO conspiracy claim against the appearing Counterfeiting Defendants fails.

* * *

Accordingly, the Court dismisses Count One as to the JGX Defendants, Don Ghermezian, the Worldwide Defendants, and the Banking Defendants.

### 3.  RICO Claims against Liberty

Liberty—the final Counterfeiting Defendant—has yet to appear in this case, as mentioned at *supra* I.B, and so has not moved to dismiss any of the claims asserted against it.  To the extent Plaintiffs bring their RICO claims against Liberty—which is not clear from the Complaint[9]—the Court provides Plaintiffs with notice of its intent to dismiss *sua sponte* any RICO claims against Liberty.

It is well established that a court may conclude on its own accord that a plaintiff has failed to state a claim against a non-appearing defendant, so long as the plaintiff was given "an opportunity to be heard" on the pertinent issue.  *Antidote Int'l Films, Inc. v. Bloomsbury Pub., PLC*, 467 F. Supp. 2d 394, 399 (S.D.N.Y. 2006); *see also Hecht v. Commerce Clearing House,*

---

[9]  Although Count One is brought against all the Counterfeiting Defendants, which unambiguously includes Liberty, *see* SAC at 2, Plaintiffs do not refer to Liberty in their allegations under Count One.  For instance, they list each of the Counterfeiting Defendants *except for Liberty* as a culpable "person" for purposes of RICO, *id.* ¶ 393, and consistently exclude any mention of Liberty's role in the hand sanitizer operation in attempting to allege the existence of a RICO enterprise, *id.* ¶¶ 394-406, or a pattern of racketeering activity, *id.* ¶¶ 407-438.  In an abundance of caution, the Court nonetheless assumes that Plaintiffs bring their RICO claims, as well as the eleven other claims asserted against the entire group of Counterfeiting Defendants, including Liberty.

*Inc.*, 897 F.2d 21, 26 n.6 (2d Cir. 1990) (finding proper the district court's dismissal of the complaint with respect to all defendants, including a non-appearing defendant, "because the issues concerning [that defendant were] substantially the same as those concerning the other defendants" and the plaintiff "had notice and a full opportunity to make out his claim against" the non-appearing defendant). Indeed, for several Counts that are discussed *infra*, the Court dismisses them as to Liberty based on the same grounds that apply to other Defendants and because Plaintiffs had an opportunity to be heard on those arguments.

With respect to Count One, the Court's analysis with respect to Plaintiffs' failure to allege the requisite continuity (as well as its analysis on the consequent failure of Plaintiffs' conspiracy claim) would appear to apply with equal, if not greater, force to Liberty, whose alleged participation in the hand sanitizer scheme was far more limited than that of the other Counterfeiting Defendants. Moreover, there is no question that Plaintiffs had the full opportunity to address the relevant arguments regarding the infirmities of their RICO claims—including those regarding the counterfeiting scheme's temporal scope, its complexity, and any threat of repetition evinced by the specific circumstances of the scheme—in opposing the other Counterfeiting Defendants' motions to dismiss. But since the elements of a RICO claim must be assessed as to each individual defendant, *see DeFalco*, 244 F.3d at 306, the Court will provide Plaintiffs with the opportunity to present any arguments unique to Liberty that preclude dismissal. Plaintiffs must make a submission identifying such reasons within fourteen days of this Opinion and Order. In doing so, Plaintiffs of course should be mindful of the Court's preceding analysis as to why their RICO claims fail as to the other Counterfeiting Defendants.

### C.   Lanham Act Claims (Counts Two through Five)

Against these same fourteen Defendants and based on substantially the same allegations, Plaintiffs bring four causes of action under Sections 32(1) and 43(a) of the Lanham Act, 15 U.S.C. §§ 1114(1), 1125(a).

Section 32(1) of the Lanham Act protects registered trademarks from infringement, extending liability to:

> Any person who shall, without the consent of the registrant . . . use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive.

15 U.S.C. § 1114(1)(a).   Section 43(a) covers both registered and unregistered trademarks, and "provides for two distinct causes of action: [1] false designation of origin or source, known as 'product infringement,' and [2] false description or representation, known as 'false advertising,'" *Res. Devs., Inc. v. Statue of Liberty-Ellis Island Found., Inc.*, 926 F.2d 134, 139 (2d Cir. 1991) (quoting *Johnson & Johnson v. Carter-Wallace, Inc.*, 631 F.2d 186, 188 (2d Cir. 1980)).[10] Specifically, it extends liability to:

> Any person who . . . uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which –
>
> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

---

[10] In fact, "false designation of origin" claims under 15 U.S.C. 1125(a)(1)(A) may bear a multitude of labels, including "false association," "passing-off," and "reverse passing off"—all of which simply describe different methods of trademark infringement. *See George & Co. LLC v. Target Corp.*, No. 21 Civ. 4254 (DG) (SJB), 2022 WL 1407236, at *14 (E.D.N.Y. Jan. 27, 2022) (report and recommendation) (citations omitted).

> (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities.

15 U.S.C. § 1125(a)(1). These subsections of Section 43(a) provide "two distinct bases of liability," *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1384 (2014), and are assessed under distinct analytical frameworks: whereas false designation of origin claims under Section 1125(a)(1)(A) act as a "vehicle for assertion of a claim of infringement of an unregistered mark," false advertising claims under Section 1125(a)(1)(B) concern "whether an advertisement about a product has a tendency to deceive prospective purchasers about the nature or characteristics of the product." *Parks, LLC v. Tyson Foods, Inc.*, 186 F. Supp. 3d 405, 414 (E.D. Pa. 2016), *aff'd*, 863 F.3d 220 (3d Cir. 2017) (citations omitted).

In Count Two, Coronado brings a claim for infringement of a registered trademark under Section 32(1), 15 U.S.C. § 1114(1), and in Count Four, both Plaintiffs bring a claim for false designation of origin (or "product infringement") under Section 43(a), 15 U.S.C. § 1125(a)(1)(A).[11] In addition to and in connection with these two claims for direct infringement, Coronado brings in Count Three a claim for contributory trademark infringement, a judicially created doctrine extending liability to those who either intentionally induce others to infringe a trademark or knowingly continue to supply an infringing product. *Tiffany (NJ) Inc. v. eBay Inc.*, 600 F.3d 93, 103-04 (2d Cir. 2010); *accord Inwood Lab'ys, Inc. v. Ives Lab'ys, Inc.*, 456 U.S. 844,

---

[11] Count Four is presented as a claim for "Unfair Competition and False Designation of Origin." SAC at 69. Because there is no independent federal cause of action for unfair competition (rather, the descriptor refers to a category of causes of action that includes false designation of origin), the Court refers to Count Four as a claim only for false designation of origin. *Cf. Tactica Int'l, Inc. v. Atl. Horizon Int'l, Inc.*, 154 F. Supp. 2d 586, 597 n.14 (S.D.N.Y. 2001) ("Because [the plaintiff]'s claims of unfair competition and trademark infringement (for unregistered marks) under Section 43(a) of the Lanham Act are one in the same, they need not be addressed as separate causes of action." (citing *EMI Catalogue P'ship v. Hill, Holliday, Connors, Cosmopulos, Inc*., 228 F.3d 56, 61-63 (2d Cir. 2000)).

853-54 (1982).  Finally, in Count Five, both Plaintiffs bring a false advertising claim under Section 43(a), 15 U.S.C. § 1125(a)(1)(B).

The Court dismisses Counts Two and Four, the direct infringement claims, as to Isaac Import and the Banking Defendants; dismisses Count Three for contributory infringement against Isaac Import, the Banking Defendants, Don Ghermezian, and the Worldwide Defendants; and dismisses Count Five in its entirety.

### 1.  Direct Infringement (Counts Two and Four)

"Under both the infringement section of the Lanham Act, 15 U.S.C § 1114, and the false designation of origin section, 15 U.S.C. § 1125, the same test is applied to determine whether a particular activity violates the Act." *Invicta Plastics (USA) Ltd. v. Mego Corp.*, 523 F. Supp. 619, 622 (S.D.N.Y. 1981).  To state a direct infringement claim under either provision, a plaintiff must allege "that (1) it has a valid mark that is entitled to protection under the Lanham Act; and that (2) the defendant used the mark, (3) in commerce, (4) in connection with the sale[, offering for sale, distribution,] or advertising of goods or services . . . without the plaintiff's consent." *1-800 Contacts, Inc. v. WhenU.Com, Inc.*, 414 F.3d 400, 406-07 (2d Cir. 2005) (internal quotation marks omitted).  The plaintiff must further demonstrate "that the defendant's use of that mark is likely to cause confusion as to the affiliation, connection, or association of defendant with plaintiff, or as to the origin, sponsorship, or approval of the defendant's goods, services, or commercial activities by plaintiff." *Id.* at 407 (cleaned up).  "Because the Lanham Act is a strict liability statute, a registrant need not prove knowledge or intent in order to establish liability." *Spin Master Ltd. v. Alan Yuan's Store*, 325 F. Supp. 3d 413, 421 (S.D.N.Y. 2018); *see also Sunward Elec., Inc. v. McDonald*, 362 F.3d 17, 25 (2d Cir. 2004); *El Greco Leather Prods. Co. v. Shoe World, Inc.*, 806 F.2d 392, 396 (2d Cir. 1986) (explaining that the defendants' "claimed lack of knowledge of its supplier's infringement, even if true, provides no defense" to Section 1114 liability).  Here, the

Defendants do not dispute that Coronado's mark is entitled to protection or that the use of the mark on the counterfeit hand sanitizer caused consumer confusion. *See* JGX Defendants' Motion at 16-17; Worldwide Defendants' Motion at 14-16; Banking Defendants' Motion at 21-22.

### a. False Designation of Origin (Count Four)

The Court begins with Plaintiffs' false designation of origin (or "product infringement") claim under Section 43(a) of the Lanham Act. In moving to dismiss this claim, the Banking Defendants argue that Plaintiffs have failed to allege that these Defendants have "used" the URBĀNE mark, Banking Defendants' Motion at 21-22, and Don Ghermezian contends that Plaintiffs have failed to allege that he was a "moving, active, conscious force" behind Triple Five Worldwide's alleged infringement, Worldwide Defendants' Motion at 17. The Worldwide Defendants do not move to dismiss this claim. *See* Worldwide Defendants' Motion at 17 (arguing that Count Four must be dismissed only as to Don Ghermezian). Although the JGX Defendants do not expressly move to dismiss Plaintiffs' Section 43(a) claim, certain of their arguments for dismissal of Coronado's Section 32(1) claim against them—namely, that Plaintiffs have failed to allege adequately that Isaac Import, Dib Jaradeh, and Nouri Jaradeh "used" the URBĀNE mark in commerce—apply equally to the false designation of origin claim. JGX Defendants' Motion at 17. The Court will thus consider these arguments in evaluating whether Plaintiffs have adequately alleged a claim for false designation of origin under Section 43(a) against these JGX Defendants.[12]

The Second Circuit has explained that "'use,' 'in commerce,' and 'likelihood of confusion' [are] three distinct elements of a trademark infringement claim," and that "'use' must be decided

---

[12] In urging the absence of any allegations showing those Defendants' "use" of the URBĀNE mark under the section of their motion addressing Count Two (false designation of origin), the JGX Defendants explain that "[t]he same analysis is applicable to the remainder of Plaintiffs' Lanham Act and common law trademark infringement claims." *See* JGX Defendants' Motion at 16-17.

as a threshold matter because . . . no such activity is actionable under the Lanham Act absent the 'use' of a trademark." *1-800 Contacts, Inc. v. WhenU.Com, Inc.*, 414 F.3d 400, 412 (2d Cir. 2005). In assessing this threshold "use" requirement for infringement claims, courts in this Circuit apply the definition of "use in commerce" found in 15 U.S.C. § 1127, which provides, in relevant part, that a mark is "in use in commerce" on goods when (1) " it is placed in any manner on the goods or their containers or the displays associated therewith or on the tags or labels affixed thereto" and (2) "the goods are sold or transported in commerce."  15 U.S.C. § 1127; *see 1-800 Contacts*, 414 F.3d at 407-08 (applying the "use in commerce" definition in 15 U.S.C. § 1127 to infringement claim); *see also Rescuecom Corp. v. Google Inc.*, 562 F.3d 123, 139 (2d Cir. 2009) (undertaking a non-binding examination of the Lanham Act's legislative history and observing that "Congress did not intend that this definition [in 15 U.S.C. § 1127] apply to the sections of the Lanham Act which define infringing conduct" but rather only to those sections concerning trademark registration); *Can't Live Without It, LLC v. ETS Express, Inc.*, 287 F. Supp. 3d 400, 415 (S.D.N.Y. 2018) (concluding that courts in this Circuit are required to apply at least the second sentence of the definition in Section 1127, even though it is "'plainly apparent from context' that [it] does not apply to infringement claims").  A defendant need not have manufactured or itself affixed the subject trademark to the goods to be liable for the results of such infringement.  *El Greco Leather Prods. Co., Inc. v. Shoe World, Inc.*, 806 F.2d 392, 396 (2d Cir. 1986).  Mere sale of the infringing goods is sufficient to meet the "use" requirement.  *Id.*  Indeed, any member of the distribution chain may be held liable for trademark infringement.  *See WM Int'l Inc. v. 99 Ranch Mkt. #601*, 329 F.R.D. 491, 497 (E.D.N.Y. 2019) (citing *Make Up For Ever, SA v. SOHO Forever, LLC*, 198 F.R.D. 56, 60 (S.D.N.Y. 2000)); *cf. Bassett v. Mashantucket Pequot Tribe*, 204 F.3d 343, 358 (2d

Cir. 2000) (explaining that "in . . . copyright infringement cases, any member of the distribution chain can be sued as an alleged joint tortfeasor" (alteration in original) (citations omitted)).

Here, there is no indication in the Second Amended Complaint that Syd Ghermezian or CFSB "used" the URBĀNE mark.  Plaintiffs do not allege that either Defendant manufactured, distributed, or sold the counterfeit products.  Rather, as the aptly designated Banking Defendants point out, Syd Ghermezian's and CFSB's alleged involvement in the counterfeit hand sanitizer scheme is limited to their rendering of banking services to Triple Five Worldwide and its principals.  SAC ¶¶ 211-255, 410; *see* Banking Defendants' Motion at 21-22.  These allegations are insufficient to demonstrate either Defendant's "use" of the URBĀNE mark.  *See Gucci Am., Inc. v. Frontline Processing Corp.*, 721 F. Supp. 2d 228, 247 (S.D.N.Y. 2010) (finding that the defendants who were alleged to have established credit card processing services used to complete the online sales of fake Gucci items could not be held directly liable for trademark infringement because they had not "used the mark in commerce").[13]  The Court thus dismisses Plaintiffs' claim for false designation of origin under Section 43(a) as against Syd Ghermezian and CFSB.  Because the Court's foregoing analysis also applies to Coronado's Section 32(1) claim, the Court dismisses that claim as to the Banking Defendants as well.

On the other hand, the Court finds that Plaintiffs have adequately alleged Don Ghermezian's liability for the infringing activity allegedly undertaken by Triple Five Worldwide, which has not moved to dismiss the claim for false designation of origin.  *See* Worldwide

---

[13]  In opposing the Banking Defendants' motion, Plaintiffs counter that that they have alleged that "Syd was involved in Triple Five Worldwide's hand sanitizer business, and that without Syd and CFSB's involvement, the Worldwide Defendants would have been unable to produce and sell their infringing products" without any explanation as to how these allegations satisfy the "use" requirement for direct infringement.  Opposition at 6.  Curiously, Plaintiffs then cite *Gucci America*, 721 F. Supp. 2d at 251-53, for the Court's holding on *contributory* trademark infringement.  *See* Opposition at 6.  These arguments are entirely beside the point.

Defendants' Motion at 17.  A corporate officer may be held directly liable for trademark infringement and unfair competition if the officer is a "moving, active, conscious force behind the defendant corporation's infringement." *Innovation Ventures, LLC v. Ultimate One Distrib. Corp.*, 176 F. Supp. 3d 137, 155 (E.D.N.Y. 2016) (alterations omitted) (quoting *KatiRoll Co. v. Kati Junction, Inc.*, 33 F. Supp. 3d 359, 367 (S.D.N.Y. 2014)).  "A corporate officer is considered a moving, active, conscious force behind a company's infringement when the officer was either the sole shareholder and employee, and therefore must have approved of the infringing act, or a direct participant in the infringing activity." *Mayes v. Summit Ent. Corp.*, 287 F. Supp. 3d 200, 212 (E.D.N.Y. 2018) (quoting *Innovation Ventures*, 176 F. Supp. 3d at 155).

Plaintiffs here have pleaded a plausible basis for Don Ghermezian's direct participation in the infringing activity.  For instance, Plaintiffs have alleged that "[u]pon information and belief, all sanitizer-related business conducted by Triple Five Worldwide, Berkowitz, David Ghermezian, Yonah Ghermezian, and Saba was overseen, approved, and/or performed at the behest, guidance, and/or direction of Don Ghermezian."  SAC ¶ 202.  That assertion is bolstered by specific allegations that Don Ghermezian both hosted and led the May 4, 2020 meeting in which he and other members of the Ghermezian family first discussed plans to enter the hand sanitizer business, *id.* ¶¶ 130, 139; participated in a meeting on May 7, 2020, outlining a business plan to sell hand sanitizer manufactured in Mexico, which plan designated Triple Five Worldwide as the corporate entity to facilitate sales in the United States, *id.* ¶¶ 158-159; "spoke regularly with David Ghermezian and Berkowitz about branding, sourcing, importing, and sales efforts," *id.* ¶ 181; and directed wire payments for hand sanitizer purchases, circulating at least on one occasion a purchase order from Triple Five Worldwide for 150,000 units for 2-ounce hand sanitizer under the URBĀNE Brand, *id.* ¶ 187.

Don Ghermezian urges that these allegations fail to connect him to the sale of counterfeit URBĀNE products specifically, inviting the Court to look beyond the face of the pleadings—and to rely on evidence attached to his motion that the Court has found is neither incorporated by reference nor integral to the Complaint, *see supra* III.A—to determine whether the payments he is alleged to have directed actually concerned counterfeit URBĀNE (as opposed to another brand of hand sanitizer) or whether any URBĀNE referenced in a purchase order was in fact shipped.  *See* Worldwide Defendants' Motion at 6 (insisting that certain payments referred to in the Complaint concerned the purchase of Britz hand sanitizer, and that to the extent URBĀNE sanitizer was referenced in a purchase order, the products were "never shipped to or by anyone"), 14-16.  But, once again, the Court's task on a motion to dismiss "is to assess the legal feasibility of the complaint"— "not to assess the weight of the evidence that might be offered on either side." *Lynch*, 952 F.3d at 75.  And taking Plaintiffs' allegations as true and drawing all reasonable inferences in their favor, as it must, the Court finds that Plaintiffs have adequately pleaded Don Ghermezian's individual liability for Triple Five Worldwide's alleged infringing activity.  *Cf. Pado, Inc. v. SG Trademark Holding Co. LLC*, 537 F. Supp. 3d 414, 428 (E.D.N.Y. 2021) (finding the allegations that the individual defendants had "personally directed and authorized the creation, distribution, and use of the infringing materials" sufficient at the pleading stage to establish that they were "direct participant[s] in the infringing activity").

Finally, although JGX and Grazi concede that Plaintiffs have stated a false designation of origin claim against them, Isaac Import, Nouri Jaradeh, and Isaac Jaradeh argue a failure to plead their "use" of the mark (albeit in connection with their arguments to dismiss Coronado's claim under 15 U.S.C. § 1114(1)).  *See* JGX Defendants' Motion at 17.

The Court agrees that Plaintiffs have failed to adequately plead Isaac Import's role in the alleged counterfeiting operation. Plaintiffs do not allege any purchase or sale of the counterfeit goods or any wire transfer involving Isaac Import. Rather, they simply group Isaac Import in with the remaining JGX Defendants, seemingly treating that corporation as interchangeable either with JGX or with Dib Jaradeh himself. *See, e.g.*, SAC ¶¶ 108 ("Throughout the counterfeiting scheme, Grazi corresponded regularly with [Nouri] Jaradeh, [Dib Jaradeh], and Isaac Import), 261 (alleging that the counterfeit labels were created by "JGX, Isaac Import, Grazi, [Nouri] Jaradeh, and [Dib Jaradeh]").[14] Because the Court is unable to discern from the pleadings Isaac Import's specific role, if any, in the manufacture or distribution of the counterfeit URBĀNE, the Court dismisses Plaintiffs' false designation of origin claim against it. *See Adamou v. Cty. of Spotsylvania, Va.*, No. 12 Civ. 7789 (ALC), 2016 WL 1064608, at *11 (S.D.N.Y. Mar. 14, 2016) ("Pleadings that fail to differentiate as to which defendant was involved in the alleged unlawful conduct are insufficient to state a claim."); *cf. Atuahene v. City of Hartford*, 10 F. App'x 33, 34 (2d Cir. 2001) (observing that Rule 8's pleading standard "requires, at a minimum, that a complaint give each defendant fair notice of what the plaintiff's claim is and the ground upon which it rests," and that a complaint fails to meet that minimum where it "lump[s] all the defendants together in each claim and provide[s] no factual basis to distinguish their conduct"). The Court's conclusion as to the deficiency of allegations specifying the role of Isaac Import also applies to Plaintiffs' other Lanham Act claims.

---

[14] Plaintiffs elsewhere allege that Dib Jaradeh alone created the forged label. *See* SAC ¶¶ 105 ("[Dib Jaradeh] took the URBĀNE label provided by Carelli and created a counterfeit version of the URBĀNE label for use on various unauthorized sanitizer bottles and products."), 410(c) ("[Dib Jaradeh] knowingly created the fake URBĀNE label . . . ."), 305 (alleging that the hand sanitizer bore the "URBĀNE label artwork that Deb [sic] Jaradeh of Isaac Import created and first distributed").

As for Nouri Jaradeh and Dib Jaradeh, however, the Court finds that Plaintiffs have alleged sufficient facts for their liability for infringement at this stage of the litigation—at least as "moving, active, conscious" forces behind JGX's infringement.  *See Innovation Ventures*, 176 F. Supp. 3d at 155.  As to their role at JGX, Dib Jaradeh and Nouri Jaradeh are alleged to be managing members of Jaradeh, LLC, which is in turn alleged to hold a two-third ownership interest in JGX; according to the Complaint, they each "exercise complete dominion and control over JGX," alongside Grazi himself.  SAC ¶¶ 570, 572-573, 577.  And as to their "direct participation" in the infringement, as earlier described *supra* III.B.1.a, Plaintiffs allege that Dib Jaradeh personally created the very label ultimately placed on all the counterfeit products, *id.* ¶ 105, and that he was involved in discussions with both Grazi and Carelli concerning "the quantity of counterfeit hand sanitizer bearing the URBĀNE label to be produced, as well as pricing, manufacturing, and shipping of the bottles," *id.* ¶ 96.  As further set out in the Complaint, Nouri Jaradeh allegedly created at least five purchase orders for more than 660,000 bottles of counterfeit hand sanitizer on behalf of JGX, was kept regularly apprised of invoices that Triple Five Worldwide issued to JGX, and regularly corresponded with both Dib Jaradeh and Grazi—even advising Grazi to "look [Coronado] up" sometime in May 2020.  *Id.* ¶¶ 103, 108, 150-151, 259; *see* Dkt. 341, Exh. 4 (May 26, 2020 email from Nouri Jaradeh to Jack Grazi with subject line "Coronado Distribution Company, Inc." and text body "look them up").  At this stage, the Court finds these allegations plausibly plead Dib Jaradeh's and Nouri Jaradeh's liability for direct infringement.

The Court thus dismisses Coronado's false designation of origin claim as to Syd Ghermezian, CFSB, and Isaac Import.  On the other hand, the Court rejects the arguments for dismissal raised by Don Ghermezian, Dib Jaradeh, and Nouri Jaradeh.  Accordingly, Count Four

against those three Defendants, as well as against the Worldwide Defendants, JGX, Grazi, and Liberty—who did not move for dismissal—survives.

### b.  Infringement of a Registered Mark (Count Two)

As discussed, although the analysis for infringement claims under Section 32(1) and Section 43(a) are the same, the former protects only registered trademarks.  In urging specifically dismissal of Coronado's Section 32(1) claim, Don Ghermezian, the Worldwide Defendants, and the JGX Defendants contend that Plaintiffs have failed to allege any infringing activity after June 2, 2020—the earliest registration date for the URBĀNE mark.  Worldwide Defendants' Motion at 14; JGX Defendants' Motion at 16.  The Court disagrees.

Plaintiffs have alleged that "Berkowitz, Saba, David Ghermezian, and Yonah Ghermezian also corresponded regularly with Grazi during this period, with particular frequency during May and June 2020 so that Triple Five Worldwide and its principals could proceed as fast as they could to produce counterfeit product bearing the URBĀNE label" and that as late as June 24, 2020, David Ghermezian and Saba were still coordinating the importation of URBĀNE hand sanitizer into the United States.  SAC ¶¶ 257, 292.  Plaintiffs also allege upon information and belief that the counterfeit hand sanitizer was still available in large retailers as late as September 2020.  *Id.* ¶ 355. Finally, Plaintiffs allege that "Triple Five Worldwide and JGX exchanged wire transfers in connection with their counterfeit sanitizer scheme" on June 25, 2020, August 12, 2020, and August 14, 2020, and that "JGX mailed Rigz check payments" on June 24, 2020.  SAC ¶¶ 411, 414.

To be sure, these allegations are not overwhelmingly indicative of post-registration infringement activity by the JGX Defendants, the Worldwide Defendants, or Don Ghermezian. Taking these allegations as true (particularly in conjunction with the litany of pre-registration allegations specifying these Defendants' roles in the alleged counterfeiting scheme) and drawing all reasonable inferences in Coronado's favor, as it must, the Court finds that Coronado has

plausibly alleged that infringing conduct by JGX, Grazi, Nouri Jaradeh, Dib Jaradeh, Don Ghermezian, and the Worldwide Defendants continued into late August 2020.

Accordingly, the Court denies the JGX Defendants' and Don Ghermezian and the Worldwide Defendants' motions to dismiss Coronado's Section 32(1) claim.  On the other hand, the Court incorporates its analysis on Coronado's false designation of origin claim, *see supra* III.C.1.a, and dismisses Coronado's Section 32(1) claim against the Banking Defendants and Isaac Import.

\* \* \*

In sum, the direct infringement claims (Counts Two and Four) against JGX, Grazi, Dib Jaradeh, Nouri Jaradeh, Don Ghermezian, the Worldwide Defendants, and Liberty survive dismissal.

### 2.  Contributory Infringement (Count Three)

Next, in Count Three, Coronado also seeks to hold each of the Counterfeiting Defendants *contributorily* liable for trademark infringement.  Contributory infringement is a theory of secondary liability that arises when "a manufacturer or distributor intentionally induces another to infringe a trademark, or . . . continues to supply its product to one whom it knows or has reason to know is engaging in trademark infringement."  *Inwood Lab'ys*, 456 U.S. at 853-54.  Although "*Inwood's* test for contributory trademark infringement applies on its face to manufacturers and distributors of goods," other courts, including the Seventh and Ninth Circuits, have "extended the test to providers of services."  *Tiffany (NJ)*, 600 F.3d at 104 (citing *Hard Rock Café Licensing Corp. v. Concession Servs., Inc.*, 955 F.2d 1143, 1148-49 (7th Cir. 1992) and *Lockheed Martin Corp. v. Network Sols., Inc.*, 194 F.3d 980, 984 (9th Cir. 1999)).  In particular, the Ninth Circuit has determined that "contributory trademark infringement applies to a service provider if he or she exercises sufficient control over the infringing conduct."  *Id* at 104-05 (citing *Lockheed Martin*

*Corp.*, 194 F.3d at 984).  The Second Circuit has yet to determine that *Inwood* applies outside the context of manufacturers and distributors, but in *Tiffany (NJ)*, the Second Circuit—in assuming without deciding that *Inwood* applied to an online marketplace (eBay)—explained:

> A service provider must have more than a general knowledge or reason to know that its service is being used to sell counterfeit goods.  Some contemporary knowledge of which particular listings are infringing or will infringe in the future is necessary.

*Id.* at 107.

It is not entirely clear from the Complaint on what grounds Coronado bases its claim for contributory infringement.  Nor is it clear whether these grounds include conduct distinct from Coronado's allegations describing the same Defendants' direct infringement.  A consistent feature of the Complaint, the allegations merely touch upon the requirements of an asserted claim in conclusory fashion and, further obscuring any underlying factual bases, treat the fourteen Counterfeiting Defendants as an undifferentiated group.  For instance, Coronado simply asserts in Count Three that "[b]y, *inter alia,* importing, distributing, offering for sale, and selling, despite knowing, or having reason to know, that they did not have the rights to the trademarks, the Counterfeiting Defendants induced third-parties to infringe Coronado's rights in and to the URBĀNE Marks."  SAC ¶ 463.  Coronado fails to specify any Defendant's role in this purported inducement; it fails to identify the third parties whose infringement any Defendant allegedly induced; and it fails to describe these third parties' direct infringement, a prerequisite for contributory liability to lie.  *See Solid 21, Inc. v. Richemont N. Am., Inc.*, No. 19 Civ. 1262 (LGS), 2020 WL 3050970, at *7 (S.D.N.Y. June 8, 2020) ("Contributory trademark infringement is predicated on the existence of direct infringement."); *cf. Tiffany (NJ)*, 600 F.3d at 103 (describing "contributory trademark infringement" as "culpably facilitating the infringing conduct").

Raising these deficiencies, among others, the Banking Defendants, Don Ghermezian, the Worldwide Defendants, and the JGX Defendants, all move to dismiss Count Three.  *See* Banking Defendants' Motion at 23-25; Worldwide Defendants' Motion at 16; JGX Defendants' Motion at 17-19.

The Banking Defendants, implicated in this action as service providers, emphasize the utter dearth of allegations in the Complaint that they intentionally induced any entity of infringing the URBĀNE mark, noting in particular that Coronado's own allegations show that the JGX Defendants were already infringing the mark before any member of the Ghermezian family became involved in the alleged counterfeiting scheme.  Banking Defendants' Motion at 23.  They further argue that Coronado has failed to "plead any *facts* to even remotely suggest that either CFSB or Syd had *any knowledge* or reason to know that its service was being used to infringe the URBĀNE Marks."  *Id.* at 24.

Coronado does not oppose the former contention.  And as to the latter, Coronado responds only that "the Banking Defendants knew or had reason to know that Triple Five Worldwide and its principals were engaged in trademark infringement," but citing allegations in the Complaint that do not actually provide factual support for that assertion.  *See* Opposition at 9 (citing SAC ¶¶ 183-185, 230-231, 251-252).  Rather, these allegations describe the exchanges of invoices and wire payments for hand sanitizer, SAC ¶¶ 183-185, 251, assert that Syd Ghermezian's control of CFSB furthered the alleged scheme, *id.* ¶ 230, and recite without any factual content that Syd "knew or had reason to know" that the banking services were furthering the counterfeit hand sanitizer scheme, *id.* ¶¶ 231, 252.  Indeed, even were the Court to accept the latter, wholly conclusory allegations regarding Syd Ghermezian's awareness that CFSB transactions "were furthering a counterfeit sanitizer business," *id.* ¶ 252, those allegations demonstrate only a "general

knowledge . . . [that Syd Ghermezian's] service [was] being used to sell counterfeit goods," *see Tiffany (NJ)*, 600 F.3d at 107.  Such generalized knowledge is insufficient for contributory liability to attach.  *Id.*  Accordingly, the Court grants the Banking Defendants' motion as to Count Three.

The Court also grants as to Count Three the motion of Don Ghermezian and the Worldwide Defendants, which similarly raises arguments citing the absence of allegations of knowledge of the infringement of Coronado's mark.  Worldwide Defendants' Motion at 16.  In addressing their arguments, Plaintiffs respond that "in determining whether [an] officer's acts render him individually liable, [it] is immaterial whether . . . [he] knows that his acts will result in an infringement"—quoting a proposition that refers to the scope of a corporate officer's liability for direct trademark infringement.  Opposition at 9 (alteration in original) (quoting *Bambu Sales, Inc. v. Sultana Crackers, Inc.*, 683 F. Supp. 899, 914 (E.D.N.Y. 1988)).  This assertion is, of course, irrelevant to Defendants' arguments on *contributory* infringement.

Coronado then insists that Don Ghermezian's and the Worldwide Defendants' argument "requires simply ignoring voluminous well plead [sic] allegations of intentionally inducing others to infringe," once again listing a string of citations to allegations in the Complaint that do not, in fact, support that assertion.  *Id.* (citing SAC ¶¶ 156, 180, 187, 258, 260, 266-267, 273).  Indeed, those cited allegations simply describe the participation of Don Ghermezian and the Worldwide Defendants in the hand sanitizer operation, without reference to any facts suggesting that these Defendants in fact knew that the hand sanitizer they were manufacturing and distributing bore counterfeit labels.  *See* SAC ¶¶ 156 (explaining that the Worldwide Defendants began soliciting and taking orders for counterfeit URBĀNE hand sanitizer), 180 (explaining that Don Ghermezian was "involved in all aspects of the counterfeit sanitizer operation"), 187 (describing wire payments directed by Don Ghermezian), 258 (describing invoices for the counterfeit URBĀNE hand

sanitizer), 260 (describing a May 8, 2020 shipment of counterfeit URBĀNE hand sanitizer), 266-267 (specifying the Worldwide Defendants responsible for interfacing with Grazi and JGX), 273 (alleging that Grazi leveraged his relationship with the Ghermezian family to expedite the manufacture and importation of the counterfeit hand sanitizer).   In any event, the Court has already found that the Complaint lacks any allegations providing a factual basis for Don Ghermezian's and the Worldwide Defendants' knowledge that the hand sanitizer operations involved infringement of Coronado's mark.  *See supra* III.B.1.a.  The Court thus grants Don Ghermezian and the Worldwide Defendants' motion as to Count Three.

Finally, the Court turns to the JGX Defendants' various arguments for dismissal.  As a preliminary matter, the Court notes that its discussion on the absence of any specific allegations as to conduct undertaken by Isaac Imports applies equally to Coronado's claim for contributory infringement, and thus dismisses Count Three against that Defendant.  *See supra* III.C.1.a.  The Court proceeds to assess the JGX Defendants' arguments only as to JGX, Grazi, Nouri Jaradeh, and Dib Jaradeh.

First, the JGX Defendants argue that contributory infringement must be predicated on direct infringement of a *registered* trademark, and, presumably relying on their contention that Coronado has failed to allege infringing conduct by the JGX Defendants after June 2, 2020, they thus contend that Coronado's contributory infringement claim fails as a matter of law as against all of them.  JGX Defendants' Motion at 17-18.  The Court has already identified allegations in the Complaint describing certain of the JGX Defendants' continued participation in infringing activities after June 2, 2020, and thus rejects this argument.   *See supra* III.C.1.b.  The Court nonetheless addresses the JGX Defendants' proposition that "no contributory liability lies based upon acts which occurred prior to registration," for which assertion they rely on *Sly Magazine,*

*LLC v. Weider Publications L.L.C.*, 241 F.R.D. 527 (S.D.N.Y. 2007).  JGX Defendants' Motion at 17-18.

*Sly Magazine* involved a plaintiff's motion for leave to add a claim specifically under Section 32(1) of the Lanham Act (governing registered marks) based on infringing acts undertaken by the defendant *before* registration of the mark.  *Sly Mag.*, 241 F.R.D. at 530.  The plaintiff there sought to circumvent the well-established principle that registration of a trademark cannot retroactively give rise to Section 32(1) liability for pre-registration infringement by advancing a theory of contributory liability.  *Id.*  The plaintiff thus sought to hold the defendant liable for post-registration activity conduct by third parties, which the plaintiff claimed had been induced by the defendant's pre-registration actions.  *Id.*  The court rejected that theory, explaining that to "permit direct liability under § 32(1) based upon retroactive registration or, for that matter, contributory liability based upon acts which occurred in their entirety prior to registration, would obviate the[] elemental distinctions" between Section 32(1) and Section 43(a) infringement claims.  *Id.* at 531.

*Sly Magazine* thus instructs that a theory of contributory liability for infringement of a *registered* trademark under Section 32(1) may arise only from actions undertaken by a defendant after registration of the trademark.  It does not preclude contributory liability for infringement of an unregistered trademark for claims brought under Section 43(a) of the Lanham Act.  Indeed, the Second Circuit has implicitly recognized the availability of a contributory liability infringement claims predicated on direct infringement of an unregistered trademark.  *See Societe Des Hotels Meridien v. LaSalle Hotel Operating P'ship, L.P.,* 380 F.3d 126, 132-33 (2d Cir. 2004) (reinstating claims for "[c]ontributory [u]nfair [c]ompetition/[r]everse [p]alming [o]ff and [c]ontributory [f]alse [a]dvertising" after holding that the district court erred in dismissing the two direct Section 43(a) claims); *cf. Duty Free Ams., Inc. v. Estée Lauder Cos.*, 797 F.3d 1248, 1276-77 (11th Cir.

2015) (explaining "that the principles underlying the Lanham Act contemplate liability that extends beyond direct violators of the trademark provision of § 43(a)" and thus holding that "a plaintiff may bring a claim for contributory false advertising").

Second, the JGX Defendants urge that Nouri Jaradeh's May 26, 2020 email to Grazi establishes that JGX was not aware of Coronado until that date, that any alleged infringement by JGX occurred *before* May 26, 2020, and that the JGX Defendants thus could not have intentionally induced any infringement. JGX Defendants' Motion at 18-19. Coronado responds that even beyond the reference to the May 26, 2020 email (the JGX Defendants' interpretation of which Coronado impugns as "implausible"), the Complaint includes allegations that the JGX Defendants should have known that Rigz was not the rightful owner of the URBĀNE mark (presumably given its experience in the apparel industry), and that the JGX Defendants "made unapproved modifications" to the label provided by Rigz "so that the [counterfeit product] could be misleadingly manufactured in Mexico." Opposition at 8. The Court agrees with Coronado. Moreover, it has already found Coronado's allegations sufficient to demonstrate (1) knowledge of the infringement on the part of Grazi, Nouri Jaradeh, and Dib Jaradeh, *see supra* III.B.1.a, and (2) conduct in furtherance of the alleged counterfeiting scheme extending into as late as August 2020, *see supra* III.C.1.b. The Court thus rejects the JGX Defendants' arguments on this score.

Finally, the JGX Defendants argue that the actions alleged as to Nouri Jaradeh and Dib Jaradeh do not constitute intentional inducement of infringement. JGX Defendants' Motion at 19. Fair enough. But contributory infringement includes more than just intentional inducement: it also attaches where the defendant "continues to supply its product to one whom it knows or has reason to know is engaging in trademark infringement." *Inwood Lab'ys*, 456 U.S. at 853-54. And at this stage of the litigation, the Court finds that the Coronado has plausibly alleged a claim for

66

contributory infringement as to Nouri Jaradeh and Dib Jaradeh, given the Court's findings as to their knowledge of the infringement, their alleged dominion over the affairs of JGX, and Coronado's allegations regarding the shipments of the counterfeit product between JGX and Rigz and between JGX and Triple Five Worldwide.  *See supra* III.C.1.a.

Accordingly, the Court dismisses Count Three as to all Defendants, save for JGX, Grazi, Dib Jaradeh, Nouri Jaradeh, and Liberty.

### 3.  False Advertising (Count Five)

In Count Five, Plaintiffs bring a claim for false advertising, once again through a perfunctory recitation of the claim's requirements aimed at the entire group of Counterfeiting Defendants without differentiation.  SAC ¶¶ 473-480.  All appearing Counterfeiting Defendants move to dismiss the claim, focusing their arguments on Plaintiffs' failure to specify any false or misleading statements made for the purpose of advertising the counterfeit product.  *See* JGX Defendants' Motion at 19-20; Worldwide Defendants' Motion at 17-18; Banking Defendants' Motion at 25.  In response, Plaintiffs clarify (for the first time) that its false advertising claim is predicated largely on the representations included on URBĀNE label.  Opposition at 10-11. Specifically, Plaintiffs argue that the Counterfeiting Defendants misrepresented to consumers that authentic URBĀNE hand sanitizer is manufactured in Mexico (by including a "Made in Mexico" description on the counterfeit product); that the product was distributed by Liberty (rather than by JGX or Triple Five Worldwide); and that ingredients were identical to that of authentic URBĀNE. *Id.* at 11.  Plaintiffs then add that the JGX Defendants and the Worldwide Defendants also "made [these] false representations with respect to the production process for the Counterfeit Products to their own consumers, including Rigz and Tyberg."  *Id.*  These allegations fail to make out a false advertising claim as a matter of law, and so the Court dismisses the claim as to all fourteen Defendants.

To state a claim for false advertising under the Lanham Act, a plaintiff must allege "(1) a false or misleading statement; (2) in connection with commercial advertising or promotion that (3) was material; (4) was made in interstate commerce; and (5) damaged or will likely damage the plaintiff." *Unlimited Cellular, Inc. v. Red Points Sols. SL*, No. 21 Civ. 10638 (NSR), 2023 WL 4029824, at *6 (S.D.N.Y. June 14, 2023) (citation omitted).  Such a claim may be based on the theory "that the challenged advertisement is literally false, *i.e.*, false on its face," or "that the advertisement, while not literally false, is nevertheless likely to mislead or confuse consumers." *Tiffany (NJ)*, 600 F.3d at 112 (citation omitted).  "Under either theory, the plaintiff must also demonstrate that the false or misleading representation involved an inherent or material quality of the product." *Time Warner Cable, Inc. v. DIRECTV, Inc.*, 497 F.3d 144, 153 n.3 (2d Cir. 2007); *accord* 15 U.S.C. § 1125(a)(1) (proscribing misrepresentations as to "the nature, characteristics, qualities, or geographic origin of his or her or another person's goods").  Moreover, such representation must be made for the purpose of influencing consumers to buy the defendant's goods or services, most commonly as "part of an organized campaign to penetrate the relevant market." *Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*, 314 F. 3d 48, 57 (2d Cir. 2002). "[A]lthough representations less formal than those made as part of a classic advertising campaign may suffice, they must be disseminated sufficiently to the relevant purchasing public." *Gmurzynska v. Hutton*, 355 F.3d 206, 210 (2d Cir. 2004) (citation omitted).

Here, the "statements" on the counterfeit URBĀNE label, to the extent they are even false or misleading, do not involve an "inherent or material quality of the product" and so cannot give rise to a false advertising claim.

Take first the list of ingredients.  Plaintiffs allege that the counterfeit product listed the same ingredients used in authentic URBĀNE, but that "upon information and belief" the

counterfeit product "did not contain identical ingredients as the genuine URBĀNE hand sanitizer." SAC ¶ 263.  This allegation is pure speculation and thus does not suffice to make out a plausible basis for the falsity of the ingredient list.  Even setting aside that deficiency, Plaintiffs have pleaded no facts demonstrating the materiality of such a misrepresentation.  Accepting the sufficiency of Plaintiffs' false advertisement claim as pleaded would require the Court to adopt the dubious premise that consumers base their hand sanitizer purchase decisions on the product's strict adherence to an ingredient list of "70% Alcohol, Purified Water, Glycerine, Acrylates C10-3-Alkyl Acrylate Crosspolymer, [and] Fragrance."  *Cf. Telebrans Corp. v. Wilton Indus.*, 983 F. Supp. 471, 475 (S.D.N.Y. 1997) (explaining that a "material misrepresentation" under the Lanham Act is "one that would have an impact on a consumer's decision whether to purchase the product" (citation omitted)).  This Court will not do.  *Cf. Vogel v. Boris*, No. 20 Civ. 9301 (VM), 2021 WL 1668072, at *5 (S.D.N.Y. Apr. 28, 2021) (explaining that courts "are not required to accept every strained interpretation proposed by the plaintiff" in the context of a motion to dismiss (citation omitted)).

Next, Plaintiffs complain that the counterfeit URBĀNE label falsely names Liberty as the product's distributor—not JGX or Triple Five Worldwide.  Because a product's distributor does not involve "an inherent or material quality of the product," *Time Warner Cable*, 497 F.3d at 153 n.3, this misstatement falls short as a matter of law.

Finally, Plaintiffs maintain that the "Made in Mexico" designation on the counterfeit label misleads consumers into believing that authentic URBĀNE is manufactured in Mexico.  Of course, that statement is not on its face false, given that the product *was* manufactured in Mexico, according to Plaintiffs.  Any confusion arising out of the "Made in Mexico" designation on the counterfeit products stems from the presence of the URBĀNE mark on the same label, and the

crux of Plaintiffs' claim is that the use of the URBĀNE mark on the counterfeit product "is likely to cause, or to cause mistake, or to deceive as to the affiliation, connection, . . . association . . . [or] origin" of the product, 15 U.S.C. § 1125(a)(1)(A).  In other words, Plaintiffs have merely recast their false designation of origin claim as a false advertising claim.  But, as discussed at *supra* III.C, a false designation of origin claim is analytically distinct from a false advertising claim, and "to properly analyze a claim under [Section 43(a)] of the Lanham Act, the claim must [first] be correctly classified." *Parks*, 186 F. Supp. 3d at 414; *see also C.M.B. Prods., Inc. v. SRB Brooklyn, LLC*, No. 19 Civ. 2009 (ENV), 2022 WL 2704506, at *9-10 (E.D.N.Y. July 12, 2022) (recharacterizing the plaintiff's false advertising claim as a false association claim).  Because this theory of liability is more appropriately assessed under the framework for false designation of origin, the Court dismisses Plaintiffs' false advertising claim against the appearing Counterfeiting Defendants. *Parks LLC v. Tyson Foods, Inc.*, 863 F.3d 220, 226 (3d Cir. 2017) ("[The plaintiff]'s false advertising claim fails because it is essentially [an infringement] claim in disguise."); *cf. Twentieth Century Fox Film Corp. v. Marvel Enters., Inc.*, 277 F.3d 253, 260 (2d Cir. 2002) (holding that the district court properly dismissed the plaintiff's false designation of origin claim and noting that the plaintiff had "endeavor[ed] to blend its claim of false advertising with a claim of false designation of origin").  The above analysis also plainly warrants dismissal of Plaintiffs' Lanham Act false advertisement claim against Liberty, and Plaintiffs had the opportunity to be heard on this issue in opposing the appearing Counterfeiting Defendants' motions. *See Antidote Int'l Films*, 467 F Supp. 2d at 399.  Accordingly, the Court dismisses *sua sponte* Count Five as to Liberty.

**D.      State Law Claims (Counts Six through Sixteen)**

Plaintiffs also bring eight claims under state law, and in the final three Counts of their Complaint, urge the Court to pierce of the corporate veils of JGX (to hold Grazi, Dib Jaradeh, and Nouri Jaradeh individually liable), Triple Five Worldwide (to hold Don, Nader, and Syd Ghermezian individually liable), and Isaac Import (to hold Dib Jaradeh individually liable). Except for Coronado's claims for common law trademark infringement (Count Seven), common law unfair competition (Count Nine), and dilution by tarnishment under N.Y. G.B.L. Section 360-l (Count Eleven), the Court dismisses the remainder of these claims against the appearing Defendants.

**1.  Common Law Trademark Infringement and Unfair Competition (Counts Seven and Nine)**

In Counts Seven and Nine, Coronado brings trademark infringement and unfair competition claims under New York common law against the Counterfeiting Defendants, all of whom, save for JGX (and Liberty), move to dismiss the claims.

New York common law on trademark infringement "developed as the remedy designed to protect technical trade-marks," and it was later "supplemented by the formulation of a broader remedy of an action for unfair competition," which "was intended to protect nontechnical, common law trade-mark—marks used although not registered." *Allied Maintenance Corp. v. Allied Mechanical Trades, Inc.*, 42 N.Y.2d 538, 542 (1977). The legal standards for these two claims are "virtually identical" to their Lanham Act counterparts. *Now-Casting Econ., Ltd. v. Econ. Alchemy LLC*, 628 F. Supp. 3d 501, 516 (S.D.N.Y. 2022). Common law unfair competition claims, however, require an additional showing of bad faith. *See Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.*, 58 F.3d 27, 35 (2d Cir. 1995); *Girl Scouts v. Bantam Doubleday Dell Publ'g Grp., Inc.*, 808 F. Supp. 1112, 1131 (S.D.N.Y. 1992) ("Under New York law, common law unfair competition

claims closely resemble Lanham Act claims except insofar as the state law claim may require an additional element of bad faith or intent." (internal quotation marks omitted)), *aff'd*, 996 F.2d 1477 (2d Cir. 1993).  "In analyzing whether a defendant has acted in bad faith, the question is whether the defendant attempted 'to exploit the good will and reputation of a senior user by adopting the mark with the intent to sow confusion between the two companies' products.'" *Shandong Shinho Food Indus. Co., Ltd. v. May Flower Int'l, Inc.*, 521 F. Supp. 3d 222, 251 (E.D.N.Y. 2021) (quoting *Tiffany & Co. v. Costco Wholesale Corp.*, 971 F.3d 74, 88 (2d Cir. 2020)).  Bad faith is presumed where a defendant has willfully copied a plaintiff's mark.  *Nike, Inc. v. Top Brand Co. Ltd.*, No. 00 Civ. 8179 (KMW), 2005 WL 1654859, at *8 (S.D.N.Y. July 13, 2005); *cf. Warner Bros. Inc. v. Am. Broad. Cos., Inc.*, 720 F.2d 231, 246-47 (2d Cir. 1983) ("We have recognized that evidence of intentional copying raises a presumption that a second comer intended to create a confusing similarity of appearance and succeeded.").

Because the Court has found that Coronado has stated claims for direct infringement claims under the Lanham Act against Grazi, Dib Jaradeh, and Nouri Jaradeh, and moreover that Coronado has alleged their fraudulent intent in using the counterfeit URBĀNE label, the Court denies the JGX Defendants' motion to dismiss Coronado's common law trademark infringement and unfair competitions claims against these Defendants.  *See supra* III.C.  Conversely, as the Court has already determined that Coronado's Lanham Act claims against the Banking Defendants and Isaac Import fail, the Court dismisses Coronado's common law trademark infringement and unfair competition claims against them.  *See id*.  Finally, because Coronado has failed to plausibly allege even knowledge of the infringement on the part of Don Ghermezian and the Worldwide Defendants, *see supra* III.B.1.a, III.C.2, it has necessarily failed to make the requisite showing of bad faith, and so the Court dismisses Coronado's unfair competition claim against them as well.

The more difficult question raised here is whether the absence of allegations evincing bad faith on the part of Don Ghermezian and the Worldwide Defendants also requires dismissal of Coronado's common law trademark infringement claim against them. Don Ghermezian and the Worldwide Defendants, as well as the Banking Defendants, argue that common law trademark infringement claims, like common law unfair competition claims, require a showing of bad faith. Worldwide Defendants' Motion at 18; Banking Defendants' Motion at 27-28. Plaintiffs contend otherwise, pointing out that the cases relied upon by these Defendants speak only to the bad faith requirement for unfair competition claims. Opposition at 12 n.9.

Unfortunately, this area of the law is fraught with ambiguity. Although the Second Circuit has made it clear that bad faith is a requirement for common law unfair competition claims, *see Jeffrey Milstein*, 58 F.3d at 35, this Court is aware of no precedential authority expressly pronouncing that same requirement for common law trademark infringement claims. Moreover, while some judges in this District have required a showing of bad faith for common law trademark infringement claims, others have not. *Compare CFC Newburgh Inc. v. STM Bags, LLC*, No. 22 Civ. 1597 (NSR), 2023 WL 6066136, at *14 (S.D.N.Y. Sept. 18, 2023) (dismissing the counterclaim plaintiff's common law claim for trademark infringement for failure to show that the counterclaim defendant acted in bad faith); *Lopez v. Nike, Inc.*, No. 20 Civ. 905 (PGG) (JLC), 2021 WL 128574, at *14 (S.D.N.Y. Jan. 14, 2021) ("Therefore, to succeed on his common law trademark claim, Lopez must demonstrate a likelihood of confusion between the marks and additionally show that [the defendant] acted in bad faith."), *report and recommendation adopted by* 2021 WL 2207451 (S.D.N.Y. Feb. 16, 2021); *and SLY Mag., LLC v. Weider Publ'ns L.L.C.*, 529 F. Supp. 2d 425, 442-43 (S.D.N.Y. 2007) (explaining that the plaintiff's "claims for violations of trademark infringement, trade dress infringement, misappropriation, and unfair competition

under New York's common law" all fail because the plaintiff had failed to state claims under Lanham Act and because "the evidence raises no genuine issue of fact as to bad faith"), *aff'd*, 346 F. App'x 721 (2d Cir. 2009), *with Pearson Educ., Inc. v. Kumar*, 721 F. Supp. 2d 166, 191 (S.D.N.Y. 2010) ("Traditionally, there must be some element of bad faith in an unfair competition claim.  However, with regard to trademark infringement under unfair competition, a showing of bad faith or fraudulent intent is not always a prerequisite." (internal quotation marks omitted)); *Pfizer Inc. v. Sachs*, 652 F. Supp. 2d 512, 526 (S.D.N.Y. 2009) (explaining that to prevail on a common law claim of trademark infringement, a plaintiff "need only present evidence sufficient to establish a violation of section 32(1) of the Lanham Act," and must present additional evidence of "bad faith or intent" only for unfair competition claims); *and Philip Morris USA Inc. v. Felizardo*, No. 03 Civ. 5891 (HB), 2004 WL 1375277, at *6 (S.D.N.Y. June 18, 2004) (same).

This split seems a natural consequence of pervasive inconsistency around the use of the term "unfair competition."  *See* 1 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 4:6 (5th ed.) ("Perhaps no term of art in this field of law has over the years provoked such a confusion of definitions as 'unfair competition.'").   "[In the] pre-Lanham Act era, 'trademark law' concerned only registered marks, while 'unfair competition' law governed claims of infringement of unregistered marks under common law." *Id.* § 4:4.  And in the early twentieth century, some courts required an intent to deceive for unfair competition, but *not* for trademark infringement.  *Id.*  Over time, however, the distinction between the two areas "was constantly being blurred because many courts, including the Supreme Court, stated that trademark law was merely a species of unfair competition law." *Id.* (citing, among other cases, *American Steel Foundries v. Robertson*, 269 U.S. 372, 380 (1926)).  By the 1920s, "courts were holding that intent to deceive or confuse was not a required element of either trademark infringement or unfair competition," *id.*,

including the Second Circuit itself, *see Coty, Inc., v. Parfums De Grande Luxe*, 298 F. 865, 870 (2d Cir. 1924) ("We think that the reasons for not requiring proof of a fraudulent intent in cases of infringement of trade-marks apply with equal force in cases of unfair competition, the basis of the remedy being substantially the same.").  Indeed, it appears that under modern prevailing notions of trademark infringement law, a showing bad faith is not required for liability: "Although early cases of trademark infringement were brought as actions at law for deceit, the element of fraud was later presumed, and eventually eliminated."  Restatement (Third) of Unfair Competition § 20 cmt. c (Am. L. Inst. 1994).

But it is difficult to reconcile the absence of a bad faith requirement for common law trademark infringement with the express recognition of a bad faith requirement for unfair competition claims, *see Jeffrey Milstein*, 58 F.3d at 35, given "the well-established rule . . . that the law of trademarks is a part of the larger field of unfair competition," *Safeway Stores, Inc. v. Safeway Props., Inc.*, 307 F.2d 495, 497 n.1 (2d Cir. 1962) (citing *Dell Pub. Co. v. Stanley Publ'ns, Inc.*, 9 N.Y.2d 126, 211 (1961)).  From that principle, it necessarily follows that "there cannot be any trademark infringement without acts which amount to unfair competition."  104 N.Y. Jur. 2d Trade Regulation § 138.  And insofar as a showing of bad faith is a prerequisite for a common law unfair competition claim, presumably it would also have to be prerequisite for a common law trademark infringement claim.

The Court leaves the resolution of this thorny issue for another day.  Because the Court has already dismissed Coronado's Lanham Act claims against the Banking Defendants and has found that Coronado has plausibly alleged fraudulent intent as to the JGX Defendants, the issue remains relevant only as to Don Ghermezian and the Worldwide Defendants.  Given the complexity of the legal issue and the parties' only cursory treatment of it in their briefing, the Court declines at this

juncture to dismiss Coronado's common law trademark infringement claim against Don Ghermezian and the Worldwide Defendants on this ground.

The Court thus dismisses Coronado's common law unfair competition claim as to the Banking Defendants, Don Ghermezian, the Worldwide Defendants, and Isaac Import, as well as Coronado's common law trademark infringement claim as to the Banking Defendants and Isaac Import. Count Nine thus proceeds against JGX, Grazi, Dib Jaradeh, Nouri Jaradeh, and Liberty, and Count Seven proceeds against JGX, Grazi, Dib Jaradeh, Nouri Jaradeh, Don, the Worldwide Defendants, and Liberty.

### 2. Dilution by Tarnishment Under New York Law (Count Eleven)

Next, the Court addresses Coronado's dilution by tarnishment claim under N.Y. G.B.L. Section 360-l, against the Counterfeiting Defendants. The Banking Defendants, Don Ghermezian, and the Worldwide Defendants move to dismiss this claim. Banking Defendants' Motion at 31; Worldwide Defendants' Motion at 18. The JGX Defendants do not.[15]

Section 360-l provides for injunctive relief[16] in the event of "[l]ikelihood of injury to business reputation or of dilution of the distinctive quality of a mark or trade name . . . in cases of infringement of a mark registered or not registered or in cases of unfair competition, notwithstanding the absence of competition between the parties or the absence of confusion as to

---

[15] The JGX Defendants assert that Count Eleven is sufficiently pleaded "as to JGX only," Opposition at 2 n.2, yet they do not provide any grounds for dismissal of Count Eleven for the remainder of the JGX Defendants. But because the lack of specificity as to Isaac Import's role in the scheme is also fatal to this claim, *see supra* III.C.1.a, the Court dismisses *sua sponte* Count Eleven as to Isaac Import. *Cf. Leonhard v. United States*, 633 F.2d 599, 609 n.11 (2d Cir. 1980) ("The district court has the power to dismiss a complaint *sua sponte* for failure to state a claim.").

[16] Coronado seeks money damages in Count Eleven, SAC ¶ 529, but the only remedy available under N.Y. G.B.L. Section 360-l is injunctive relief. *See Scholastic, Inc. v. Stouffer*, 124 F. Supp. 2d 836, 848 (S.D.N.Y. 2000) ("Moreover, the sole relief possible on a dilution claim under either federal or state law is injunctive relief, rather than monetary damages." (citing N.Y. G.B.L. § 360-l )). The Court thus assumes Coronado seeks injunctive relief in this Count.

the source of goods or services." N.Y. G.B.L. § 360-l.  Under New York law, "a plaintiff may obtain injunctive relief if it can show a '[l]ikelihood of injury to business reputation or of dilution of the distinctive quality of a mark or trade name.'" *E.A. Sween Co. v. A & M Deli Express Inc.*, 787 F. App'x 780, 786 (2d Cir. 2019) (first alteration in original) (quoting *Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 588 F.3d 97, 113-14 (2d Cir. 2009)); *accord* N.Y. G.B.L. § 360-l. To prevail on such a claim, a plaintiff must first show that it possesses a strong mark, which either "has a distinctive quality or has acquired a secondary meaning such that the trade name has become so associated in the public's mind with the [plaintiff] that it identifies goods sold by that entity as distinguished from goods sold by others." *Biosafe-One, Inc. v. Hawks*, 639 F. Supp. 2d 358, 367 (S.D.N.Y. 2009) (citation omitted; first alteration in original).  "Unlike federal trademark dilution law, . . . New York's trademark dilution law does not require a mark to be 'famous' for protection against dilution to apply." *Starbucks Corp.*, 588 F.3d at 114.  "[B]ut it must be an extremely strong mark either because of its inherently distinctive qualities or the fact that it has acquired secondary meaning." *Mobileye, Inc. v. Picitup Corp.*, 928 F. Supp. 2d 759, 782 (S.D.N.Y. 2013) (citation omitted).

Second, a plaintiff must show a likelihood of dilution by either blurring or tarnishment. Plaintiffs here advance a dilution by tarnishment theory.  "Dilution through tarnishment occurs where the defendant uses the plaintiffs' mark in association with unwholesome or shoddy goods or services." *Trs. of Columbia Univ. v. Columbia/HCA Healthcare Corp.*, 964 F. Supp. 733, 750 (S.D.N.Y. 1997).  Indeed, "[t]he *sine qua non* of tarnishment is a finding that the plaintiff's mark will suffer negative associations through the defendant's use." *Hormel Foods Corp. v. Jim Henson Prods., Inc.*, 73 F.3d 497, 507 (2d Cir. 1996).

The Banking Defendants contend that Coronado's dilution by tarnishment claim against them cannot stand because Coronado has not alleged their "use" of its mark.  Banking Defendants' Motion at 31.   In response, Coronado relies on the same arguments regarding the Banking Defendants' "use" of the mark as relied on with respect to its infringement claims.   Opposition at 32.  The Court has already rejected those counterarguments, *see supra* III.C.1.a, and thus dismisses Coronado's dilution by tarnishment claim against the Banking Defendants.  *See Tiffany (NJ)*, 600 F.3d at 112 (affirming the district court's dismissal of the plaintiff's dilution by tarnishment claims under both the Lanham Act and N.Y. G.B.L. Section 360-l because the defendant "did not itself sell the [counterfeit] goods at issue" and thus "did not itself engage in dilution").

Don Ghermezian and the Worldwide Defendants appear to challenge the sufficiency of Coronado's allegations as to the strength of its mark, but it is unclear on what grounds.  They merely assert that Coronado has failed to allege any facts suggesting that its mark was distinctive in the marketplace before May 2020, when Defendants are alleged to have first used the mark. Worldwide Defendants' Reply at 9.  And they point to the first use date of April 2020 recorded in Coronado's registration application for its mark specifically in connection with hand sanitizer products, as well as the June 2, 2020 registration date of the URBĀNE mark, without elaborating on how these facts bear on whether the mark has inherently distinctive qualities or has acquired secondary meaning in the marketplace.  *Id.* at 9 (citing SAC, Exh. B).

Defendants appear to be arguing that Coronado cannot establish secondary meaning as a matter of law, given the short period between April 2020, when Coronado first used the mark in connection with hand sanitizer products, and May 2020, when Defendants are alleged to have used the mark on the counterfeit products.

Initially, the Court notes that Coronado has alleged that it used its mark in commerce since August 1, 2019—albeit in connection with bath and body products and not hand sanitizer. *See* SAC ¶ 36.  Defendants offer no explanation for why that earlier first use date should be disregarded here.  To be sure, taking even that earlier first use date, the Court recognizes that commercial use during the brief period between August 2019 to May 2020 "may well weigh heavily against finding secondary meaning on summary judgment or at trial absent extraordinary circumstances." *Kaplan, Inc. v. Yun*, 16 F. Supp. 3d 341, 349 (S.D.N.Y. 2014).  But dismissal solely for the brevity of commercial use is inappropriate at this stage—especially given that Coronado has alleged that it developed and marketed the URBĀNE brand before the onset pandemic in March 2020 such that the mark was identifiable and considered trustworthy by consumers by the time Plaintiffs went to market with URBĀNE hand sanitizer, SAC ¶¶ 56-57, and that, as a result, in the first three months of hand sanitizer sales starting in April 2020, Plaintiffs had sold more than $2,000,000 of URBĀNE hand sanitizer, *id.* ¶ 77.  *See Kaplan*, 16 F. Supp. 3d at 348-49 (declining to hold as a matter of law that a seven-month period of commercial use of a mark was insufficient to show "secondary meaning").

In any event, a failure to establish secondary meaning is not dispositive here: Coronado may demonstrate the strength of its mark *either* through the mark's acquisition of secondary meaning *or* the mark's inherently distinctive qualities, and Don Ghermezian and the Worldwide Defendants do not appear to challenge that the URBĀNE mark is inherently distinctive.  Don Ghermezian and the Worldwide Defendants have thus failed to raise adequate grounds for dismissal of Coronado's dilution claim against them, and so the Court denies their motion to dismiss Count Eleven.

### 3.   Deceptive Business Practices (Count Six)

The Court next considers Plaintiffs' claim for deceptive business practices under N.Y. G.B.L. Section 349 against the Counterfeiting Defendants.

Section 349 makes unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service.'" N.Y. G.B.L. § 349.  "To make out a prima facie case under Section 349, a plaintiff must demonstrate that (1) the defendant's deceptive acts were directed at consumers, (2) the acts are misleading in a material way, and (3) the plaintiff has been injured as a result." *Maurizio v. Goldsmith*, 230 F.3d 518, 521 (2d Cir. 2000).  "Although the statute is, at its core, a consumer protection device, corporate competitors now have standing to bring a claim under this [statute] . . . so long as some harm to the public at large is at issue." *Securitron Magnalock Corp. v. Schnabolk*, 65 F.3d 256, 264 (2d Cir. 1995) (internal quotation marks omitted; alterations in original).  Indeed, whether the action is brought by a consumer or a competitor, "the gravamen of the complaint must be consumer injury or harm to the public interest." *Id.* (citation and internal quotation marks omitted).

Here, Plaintiffs submit that the Counterfeiting Defendants' infringing acts constitute deceptive business practices under Section 349.  But "[i]t is well-established that trademark infringement actions alleging only general consumer confusion do not threaten the direct harm to consumers for purposes of stating a claim under section 349." *Perkins Sch. for the Blind v. Maxi-Aids, Inc.*, 274 F. Supp. 2d 319, 327 (E.D.N.Y. 2003) (internal quotation marks omitted).  Rather, to state a cognizable Section 349 claim predicated on trademark infringement, a plaintiff must allege "specific and substantial injury to the public interest over and above the ordinary trademark infringement." *Perfect Pearl Co., Inc. v. Majestic Pearl & Stone, Inc.*, 887 F. Supp. 2d 519, 543 (S.D.N.Y. 2012).

Plaintiffs have not done so. They claim that they have adequately alleged harms "concerning public health and safety" arising from the Counterfeiting Defendants' scheme, pointing to allegations in the Complaint attacking the Counterfeiting Defendants' "callous indifference to the public safety and health of the American people," SAC ¶ 1; emphasizing certain Defendants' "intent of deceiving . . . the public at large[] about the illicit nature of their product," *id.* ¶ 112; and describing the FDA's "targeting of hand sanitizer products containing or allegedly containing methanol more generally," *id.* ¶¶ 308-311. But these allegations do not show any connection between the Counterfeiting Defendants' deceptive business practices and public health and safety concerns. Significantly, nowhere in the Complaint do Plaintiffs allege that counterfeit URBĀNE hand sanitizer contained methanol or that any consumers were otherwise harmed through their purchase of the counterfeit product. As earlier mentioned, Plaintiffs' only allegation as to any qualitative difference between authentic URBĀNE hand sanitizer and the counterfeit version is the bare assertion made upon information and belief that the latter "did not contain identical ingredients" as the former. *Id.* ¶ 263. And, in fact, on Plaintiffs' telling, the FDA intercepted the shipment of counterfeit URBĀNE hand sanitizer because it had "flagged all products arriving from Trop because Trop had allegedly used methanol in hand sanitizer formulas for *other* brands it manufactured," *id.* ¶ 301 (emphasis added)—and presumably *not* for the counterfeit URBĀNE brand it allegedly manufactured.

On that score, Plaintiffs' case is readily distinguishable from *Fischer v. Forrest*, Nos. 14 Civ. 1304 (PAE), 14 Civ. 1307 (PAE), 2015 WL 195822 (S.D.N.Y. Jan. 13, 2015), on which they attempt to rely for support. *See* Opposition at 12-13. In *Fischer*, as here, the gravamen of the plaintiff's Section 349 claim was harm resulting from trademark infringement. 2015 WL 195822, at *13. But, in stark contrast from the instant case, the plaintiff there, an inventor and producer of

a "honey harvesting aid for beekeepers," had "provide[d] sufficient allegations of a potential public impact," by pleading that a bee keeper "duped into purchasing" the infringing product could face "drastic consequences," including: "(a) health problems resulting from use of a product made with an 'unknown mix of chemicals having unknown vaporization/evaporation/volatility properties,' (b) 'inedible and unsalable' honey harvests caused by use of a product that is not food safe or FDA approved, and (c) loss of organic certification from using a product that is not organic." *Id.* at *1, 13. The Complaint here is bereft of any allegations that consumers of counterfeit URBĀNE faced any health or safety risks.

In the absence of any allegations evincing "specific and substantial injury to the public interest over and above the ordinary trademark infringement," *Perfect Pearl Co.*, 887 F. Supp. 2d at 543, Plaintiffs' Section 349 claim cannot stand and is thus dismissed as to all the Counterfeiting Defendants, including Liberty, given that the Court's foregoing analysis requires dismissal of the claim, irrespective of the Defendant against whom the claim is brought.

### 4. Tortious Interference with Prospective Economic Advantage (Count Eight)

Proceeding through Plaintiffs' catalogue of claims, the Court next turns to their claim for tortious interference with prospective economic advantage under New York common law, asserted by Red Rock against the Counterfeiting Defendants.

In New York, to state a claim for tortious interference with prospective economic advantage, a plaintiff must adequately plead that "(1) it had a business relationship with a third party; (2) the defendant knew of that relationship and intentionally interfered with it; (3) the defendant acted solely out of malice, or used dishonest, unfair, or improper means; and (4) the defendant's interference caused injury to the relationship." *Carvel Corp. v. Noonan*, 350 F.3d 6, 17 (2d Cir. 2003). The second element requires "direct interference with [the] third party." *Black Radio Network, Inc. v. NYNEX Corp.*, No. 96 Civ. 4138 (DC), 2000 WL 64874, at *4 (S.D.N.Y.

Jan. 25, 2000).  In other words, the defendant must have "direct[ed] some activities towards the third party and convince[d] the third party not to enter into a business relationship with the plaintiff."  *Id.* (citation omitted).

Red Rock's tortious interference claim is premised on the Counterfeiting Defendants' alleged interference with its prospective business relationships with Rite Aid, Pilot, Love's, Tractor Supply Company, and Business Development Center.  SAC ¶ 509; *see also id.* ¶¶ 81, 332. The Banking Defendants, the JGX Defendants, Don Ghermezian, and the Worldwide Defendants contend that Red Rock has failed to plead any factual allegations that any of them had actual knowledge of Red Rock's business relations with these third parties, or that they had the specific intent to interfere with these relations.  Banking Defendants' Motion at 28-29; JGX Defendants' Motion at 22-23; Worldwide Defendants' Motion at 19.

In response, Red Rock largely rests on the single allegation that "[t]he Counterfeiting Defendants knew of Red Rock's business with Pilot and Love's, either directly or indirectly," SAC ¶ 506 (italics removed).  *See* Opposition at 28.[17]  This conclusory allegation is insufficient to make out Defendants' actual knowledge of the subject business relations.  *See DeJesus v. Sears, Roebuck & Co., Inc.*, 87 F.3d 65, 70 (2d Cir. 1996) ("A complaint which consists of conclusory allegations unsupported by factual assertions fails even the liberal standard of Rule 12(b)(6)." (citation omitted)); *Lindberg v. Dow Jones & Co.*, No. 20 Civ. 8231 (LAK), 2021 WL 3605621, at *13

---

[17] In their opposition, Plaintiffs assert that "Defendants dispute the SAC's allegation that they had knowledge of the business relationships they tarnished," and then cites paragraph 509 of the Complaint.  Opposition at 28.  That paragraph explains: "Therefore, the Counterfeiting Defendants interfered with Red Rock's relationship with, at a minimum, Rite Aid, Pilot, Love's, Tractor Supply, and BDC by manufacturing, distributing, and attempting to import the unlicensed and unauthorized Counterfeit Products."  SAC ¶ 509 (italics removed).  The Court presumes that Plaintiffs meant to refer to paragraph 506, which concerns Defendants' supposed knowledge of the business relationships.

(S.D.N.Y. Aug. 11, 2021) ("With regard to tortious interference, allegations of actual knowledge may not consist of conclusory assertions of knowledge or pleadings based solely on information and belief." (internal quotation marks omitted)).  Plaintiffs further point to their allegation that the JGX Defendants "managed the relationship and sales to Pilot and Love's through Rigz," *see* SAC ¶ 399 (italics removed), seemingly contending that this allegation provides the factual predicate for all the Counterfeiting Defendants' knowledge of Red Rock's business relations with those entities.  At most, that allegation is suggestive of the JGX Defendants' knowledge of *Rigz's* business relations with Pilot and Love's, not *Red Rock's* business relations with them.

Moreover, Plaintiffs do not even attempt to respond to the Defendants' arguments regarding the absence of allegations that any of them *intended* to interfere with Red Rock's relationships with the third parties.  Nor could they.  Even their boilerplate, conclusory allegations for their tortious interference claim fail to recite that Defendants "intentionally interfered" with Red Rock's business relations or directed any of their activities at the third parties.  *See, e.g.*, SAC ¶ 510 (alleging only that the "Counterfeiting Defendants' actions in manufacturing, distributing, and attempting to import the Counterfeit Products were intentional").

The foregoing analysis applies equally to the tortious interference claim as asserted against Liberty.  Accordingly, the Court dismisses Count Eight in its entirety.

### 5.  Unjust Enrichment (Count Ten)

Next, in Count Ten, Coronado brings a claim for unjust enrichment against the Counterfeiting Defendants, alleging that those Defendants were "wrongfully enriched" by "usurping Plaintiffs' business relationships and inserting the counterfeit hand sanitizer . . . into the supply of authentic URBĀNE sanitizer."  SAC ¶ 521.

Under New York common law, "[t]he theory of unjust enrichment lies as a quasi-contract claim and contemplates an obligation imposed by equity to prevent injustice, in the absence of an

actual agreement between the parties." *Georgia Malone & Co. v. Rieder*, 973 N.E.2d 743, 746 (N.Y. 2012) (internal quotation marks omitted).  A claim of unjust enrichment thus requires "a relationship between the parties that could have caused reliance or inducement." *Mandarin Trading Ltd. v. Wildenstein*, 944 N.E.2d 1104, 1111 (N.Y. 2011).  In addition, the plaintiff must allege "that they themselves conferred a direct benefit on the defendants."  *Kaplan*, 16 F. Supp. 3d at 353.  To state a claim of unjust enrichment, "[a] plaintiff must show that (1) the other party was enriched, (2) at that party's expense, and (3) that it is against equity and good conscience to permit [the other party] to retain what is sought to be recovered." *Mandarin Trading*, 944 N.E.2d at 1110 (internal quotation marks omitted; second alteration in original).

Coronado here attempts to recast its infringement claim as a claim for unjust enrichment simply by alleging that the Counterfeiting Defendants profited from using its mark.  *See* SAC ¶¶ 520-522.    But Coronado has not alleged that it performed any services for any of the Counterfeiting Defendants.  Coronado has not alleged any relationship between these Defendants and itself, let alone one that would induce reliance.  And Coronado has not alleged that it conferred a direct benefit on the Counterfeiting Defendants—only that these Defendants benefitted from copying its mark.

Accordingly, Coronado's unjust enrichment claim fails as a matter of law and is dismissed in its entirety, given that the Court's foregoing analysis applies with equal force to their claim as to Liberty.  *See GeigTech E. Bay LLC v. Lutron Elecs. Co., Inc.*, 352 F. Supp. 3d 265, 286-87 (S.D.N.Y. 2018) (dismissing unjust enrichment claim that was predicated on the defendant's infringing use of the plaintiff's trade dress); *Kaplan*, 16 F. Supp. 3d at 353 (dismissing unjust enrichment claim in a trademark infringement case, given the plaintiff's failure to allege conferral of a direct benefit).

6. **Negligence (Count Twelve)**

In Count Twelve, Plaintiffs bring a negligence (including gross negligence) claim against the Counterfeiting Defendants.  To state a negligence claim under New York law, "a plaintiff must allege (1) that the defendant owed him or her a cognizable duty of care; (2) that the defendant breached that duty; and (3) that the plaintiff suffered damage as a proximate result of that breach." *DeAngelis v. Corzine*, 17 F. Supp. 3d 270, 280 (S.D.N.Y. 2014) (internal quotation marks omitted).

In attempting to plead these familiar elements, Plaintiffs allege that the Counterfeiting Defendants' duty of care to Plaintiffs arose out of Defendants' unlawful use of the URBĀNE Brand, and that these Defendants breached their duty by failing "to ensure the integrity of the manufacturing process" and "to attend to FDA requirements for hand sanitizer products."  SAC ¶¶ 532, 533.  The JGX Defendants, Don Ghermezian, and the Worldwide Defendants challenge the allegations broadly as conclusory, formulaic recitations of the requisite elements without any differentiation as to each Defendant's conduct.  JGX Defendants' Motion at 25; Worldwide Defendants' Motion at 20.  The Banking Defendants direct their arguments for dismissal at the duty element, reiterating first that Plaintiffs have failed to plausibly allege their use of the brand and arguing second that their provision of banking services to Triple Five Worldwide does not give rise to a duty to Plaintiffs.  Banking Defendants' Motion at 32.  They also maintain that Plaintiffs have failed to allege that their conduct proximately caused the purported harm.  *Id.*

The Court considers at the threshold whether Plaintiffs have pleaded a cognizable duty, the existence of which is appropriately determined as a matter of law.  *Almeciga v. Ctr. for Investigative Reporting, Inc.*, 121 F. Supp. 3d 379, 383 (S.D.N.Y. 2015).  Plaintiffs urge that "counterfeiting has been found to create a duty of care in this Circuit," citing *Fagan v. AmerisourceBergen Corp.*, 356 F. Supp. 2d 198 (E.D.N.Y. 2004), for support.  Opposition at 32.  But they radically misstate the duty of care recognized in *Fagan*.

There, the plaintiff had received from his pharmacy a counterfeit version of the drug he was prescribed to aid his recovery from his liver transplant. *Fagan*, 356 F. Supp. 2d at 204. The counterfeit drug contained only one-twentieth the dosage set forth on its label. *Id.* The plaintiff was treated with the counterfeit drug with weekly injections for two months—all the while suffering from continued anemia and excruciating side effects, with his recovery delayed. *Id.* As a result, he brought a negligence action against, among others, the distributor of the prescription drug, who the plaintiff alleged had also facilitated the existence of the "gray market" that traded in diverted or counterfeit drugs. *Id.* at 209. In considering whether the distributor of the prescription drug owed a duty of care to the plaintiff, the court focused on the distributor's affirmative actions in participating in the "gray market," and additionally considered, *inter alia*, societal expectations that the heavy regulation of prescription drugs exists for the protection of its consumers, analogizing the circumstances to cases involving the manufacture, marketing, and distribution of illegally obtained handguns. *Id.* at 208-09.

That case provides no support for recognition of a duty in the instant circumstances. Hand sanitizer, unlike prescription drugs or guns, does not carry with it comparable dangers or the concomitant societal expectations around its regulation. Moreover, Plaintiffs do not bring suit as consumers of the hand sanitizer; rather they bring suit as commercial competitors in the hand sanitizer industry, of whose existence many of the Counterfeiting Defendants are not even alleged to have known. Plaintiffs ask this Court to recognize a duty of care wherever counterfeiting occurs, *see* Opposition at 32, without providing any apposite authority in support of such an expansive request. The Court is "unwilling to create a duty of care, where no sound basis for doing so has been provided," however. *Mechigian v. Art Cap. Corp.*, 612 F. Supp. 1421, 1431 (S.D.N.Y. 1985).

Accordingly, the Court dismisses Plaintiffs' negligence claim in its entirety, as, once again, the Court's analysis applies equally to the negligence claim as asserted against Liberty.

### 7.  Fraudulent Conveyance (Count Thirteen)

Next, the Court turns to Plaintiffs' fraudulent conveyance claim against Triple Five Worldwide and against Don, Syd, and Nader Ghermezian.  SAC ¶¶ 540-559.  Plaintiffs base this claim on the change in Triple Five Worldwide's managers from Don, Syd, and Nader Ghermezian to David Ghermezian, Orly Ghermezian Saba, and Isaac Saba on May 7, 2020, alleging that this change was effectuated "with actual intent to hinder, delay or defraud future creditors of Triple Five Worldwide."  *Id.* ¶¶ 542, 558.  Although the parties dispute whether New York, Nevada, or New Jersey law applies here, they agree that "there does not appear to be any significant applicable conflict" in the law in all three jurisdictions.  *See, e.g.*, Opposition at 33 n.24.  The Court thus analyzes Plaintiffs' claims under New York law.[18]

To state a claim for actual fraudulent conveyance under New York law, Plaintiffs must plead that a defendant has transferred property with actual intent to hinder, delay, or defraud its creditors.  N.Y. D.C.L. § 273(a)(1).  Such a claim is thus subject to Rule 9(b)'s heightened pleading standards.  *See Sharp Int'l Corp. v. State St. Bank & Trust Co.*, 403 F.3d 43, 56 (2d Cir. 2005) ("As actual intent to hinder, delay, or defraud constitutes fraud, it must be pled with specificity, as required by Fed. R. Civ. P. 9(b).") (internal quotation marks omitted)).  On the other hand, a transaction is voidable as constructively fraudulent "if the debtor did not receive reasonably equivalent value and the debtor either (i) was left with unreasonably small assets for a business or

---

[18] Plaintiffs bring their claims under provisions of the New York Debtor and Creditor Law (that is, under Sections 273, 275, and 276) that had been repealed and replaced by the time the alleged fraudulent conveyance occurred.  Because the alleged fraudulent transaction occurred on May 7, 2020, after the amendment's April 4, 2020 effective date, the Court construes Plaintiffs' claims as arising under Sections 273 and 274 as amended.

transaction in which it was engaged or about to engage or (ii) intended to incur or believed or reasonably should have believed that it would incur debts beyond its ability to repay as they came due." N.Y. D.C.L. § 273(a)(2); *see also id.* § 274(a) (describing constructively fraudulent transfers specifically as to present creditors).

Plaintiffs' fraudulent conveyance claim is deficient in several respects.

First, Plaintiffs have not alleged a transfer of any assets—a basic prerequisite of a fraudulent conveyance claim. *See* N.Y. D.C.L. §§ 270, 275. Indeed, their entire claim is predicated on the change of Triple Five Worldwide's managers, with no allegations that anything of value was transferred from the three previous managers to their three successors. Plaintiffs do not respond to this criticism; rather, they attempt to shrug off the attack as "inapposite" given that "these defendants are alleged to have transferred their ownership of Triple Five Worldwide." Opposition at 34 n.25. But in so doing, they misrepresent their own allegations that (1) "it is unclear whether this change in managers and/or members also effected a change in ownership," SAC ¶ 543, and (2) "[t]o the extent this change in managers and/or members also constituted a change in ownership, it should be set aside," *id.* ¶ 544. These speculative musings are insufficient to provide a factual basis for a transfer of assets necessary to state fraudulent conveyance claim.

Second, Don, Syd, and Nader Ghermezian—who are the alleged *transferors* of some unspecified assets—are not the appropriate defendants for such an action, in any event. "The New York Court of Appeals has made it clear that the pertinent provisions of the New York Debtor and Creditor Law provide a creditor's remedy for money damages against parties who participate in the fraudulent transfer of a debtor's property and are *transferees* of the assets and *beneficiaries* of the conveyance." *Stochastic Decisions, Inc. v. DiDomenico*, 995 F.2d 1158, 1172 (2d Cir. 1993) (emphasis added) (citing *FDIC v. Porco*, 552 N.E.2d 158, 159-60 (N.Y. 1990) (per curiam)).

"Thus, the transferor of the property—that is, the debtor—is not the proper defendant in a fraudulent conveyance claim.  Nor may a claim be brought against parties who merely participated in the transfer but did not benefit from it."  *Amusement Indus., Inc. v. Midland Ave. Assocs., LLC*, 820 F. Supp. 2d 510, 527 (S.D.N.Y. 2011).  Thus, even if they had alleged a viable fraudulent conveyance claim, Plaintiffs have failed to name the proper defendants for such a claim.

Third, Plaintiffs' allegation that "[u]pon information and belief" the change in managers was effectuated "with actual intent to hinder, delay or defraud future creditors of Triple Five Worldwide," SAC ¶ 558, is wholly conclusory, unsupported by any factual allegations in the Complaint, and fails to meet Rule 9(b)'s heightened pleading standard.  And as for their constructive fraudulent conveyance claim, Plaintiffs have not alleged anywhere in their Complaint that the transferors failed to receive "reasonably equivalent value in exchange for the transfer." N.Y. D.C.L. § 273(a)(2).

The Court thus dismisses Count Thirteen in its entirety.

### 8.  Alter Ego/Piercing the Corporate Veil (Counts Fourteen through Sixteen)

Finally, in Counts Fourteen through Sixteen, Plaintiffs raise alter ego/veil piercing theories of liability for Don Ghermezian, Syd Ghermezian, and Nader Ghermezian with respect to Triple Five Worldwide, SAC ¶¶ 560-568, for Grazi, Nouri Jaradeh, and Dib Jaradeh with respect to JGX, *id.* ¶¶ 569-581, and for Dib Jaradeh with respect to Isaac Import, *id.* ¶¶ 582-589.  The parties once again dispute the law that applies, with Plaintiffs urging the application of New York law and Defendants urging the application of Nevada law.  Because Plaintiffs' claims must be dismissed even accepting their position that New York law applies, the Court will assume without deciding that New York law applies here.

As an initial matter, under New York law, there is no independent cause of action for alter ego liability.  *See Morris v. N.Y. State Dep't of Tax'n & Fin.*, 623 N.E.2d 1157, 1160 (N.Y. 1993).

Rather, "it is an assertion of facts and circumstances which will persuade the court to impose the corporate obligation on its owners." *Id.* Dismissal of Counts Fourteen through Sixteen is warranted on that ground alone. *See Ocampo v. 455 Hosp. LLC*, No. 14 Civ. 9614 (KMK), 2021 WL 4267388, at *10 (S.D.N.Y. Sept. 20, 2021) ("Courts in the Second Circuit routinely dismiss independent causes of action separately alleging alter ego or veil piercing liability." (collecting cases)); *Network Enters., Inc. v. Reality Racing, Inc.*, No. 09 Civ. 4664 (RJS), 2010 WL 3529237, at *4 (S.D.N.Y. Aug. 24, 2010) ("Accordingly, to the extent Plaintiff attempts to allege alter ego liability as an *independent* cause of action, the claim fails without any need for further analysis.").

Moreover, Plaintiffs have failed to allege sufficient facts to justify piercing the corporate veil with respect to Triple Worldwide or JGX.[19] Under New York law, the corporate veil may be pierced, and the principal or a signatory held bound to the corporation's obligations, when the individual has used the corporate form "to achieve fraud, or when the corporation has been so dominated by an individual . . . and its separate identity so disregarded, that it primarily transacted the dominator's business rather than its own and can be called the other's alter ego." *William Wrigley Jr. Co. v. Waters*, 890 F.2d 594, 600 (2d Cir. 1989) (quoting *Gartner v. Snyder*, 607 F.2d 582, 586 (2d Cir. 1979)); *see also William Passalacqua Build. v. Resnick Dev.*, 933 F.2d 131, 138 (2d Cir. 1991) ("The critical question is whether the corporation is a 'shell' being used by the individual shareowners to advance their own 'purely personal rather than corporate ends.'" (citations omitted)). In determining whether to disregard the corporate form and to hold the individual liable to the corporation's obligations, courts consider "(1) the intermingling of corporate and personal funds, (2) undercapitalization of the corporation, and (3) failure to maintain

---

[19] Because all claims against Isaac Import are dismissed, the Court need not address Plaintiffs' allegations to pierce Isaac Import's corporate veil.

separate books and records or other formal legal requirements of the corporation."  *Wrigley*, 890
F.2d at 600 (internal citations omitted).  The standard for veil-piercing is "very demanding such
that piercing the corporate veil is warranted only in extraordinary circumstances, and conclusory
allegations of dominance and control will not suffice to defeat a motion to dismiss."  *Reynolds v.
Lifewatch, Inc.*, 136 F. Supp. 3d 503, 525 (S.D.N.Y. 2015) (internal quotation marks omitted).

    Here, Plaintiffs' Complaint contains only conclusory assertions in support of their alter
ego/veil piercing theories.  *See, e.g.*, SAC ¶¶ 562 ("Upon information and belief, Triple Five
Worldwide has failed to observe the required corporate formalities including, *inter alia*, failing to
properly issue stock, hold meetings, and/or keep corporate records."), 563 ("Upon information and
belief, Triple Five Worldwide lacks any accounting, financial review or audit policies, or other
mechanisms for ensuring the accuracy and/or legitimacy of its financial records."), 564 ("Upon
information and belief, Don Ghermezian, Syd Ghermezian, and Nader Ghermezian exercise
complete dominion and control over Triple Five Worldwide and it exists solely as a sham vehicle
which Don Ghermezian, Syd Ghermezian, and Nader Ghermezian are using in bad faith to shield
themselves from liability."), 575 ("JGX has failed to observe the required corporate formalities
including, *inter alia*, failing to properly issue stock, hold meetings, and/or keep corporate
records."), 577 ("Grazi, [Dib Jaradeh], and [Nouri] Jaradeh exercise complete dominion and
control over JGX and it exists solely as a sham vehicle which Grazi, [Dib Jaradeh], and [Nouri]
Jaradeh are using in bad faith to shield themselves from liability.").  And the factual allegations
Plaintiffs cite in defense of their pleading—primarily concerning the various individual
Defendants' use of their personal messaging accounts, personal telephone numbers, and email
accounts not affiliated with the corporation—are insufficient to meet the "very demanding"

standard for invoking the extraordinary standard for piercing the corporate veil. *Reynolds*, 136 F. Supp. 3d at 525.

### E.     Leave to Amend

The Court's dismissals are all with prejudice and without leave to amend. While leave to amend should be freely granted where justice so requires, *see* Fed R. Civ. P. 15(a), even this liberal standard has its bounds. Indeed, "[a] district court has discretion to deny leave for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007).

Here, Plaintiffs have amended their Complaint twice already, *see* Dkts. 122, 310, and before each amended version was filed, the Court afforded Plaintiffs an additional opportunity to revise each of their proposed amended complaints to address to any arguments raised by Defendants as to the infirmity of their claims. *See Red Rock Sourcing*, 2023 WL 3736442, at *14; Dkt. 118 (transcript January 27, 2022 conference at which the Court granted Plaintiffs' motion for leave to file their first amended complaint) at 21:14-20. Plaintiffs have thus had, in effect, four opportunities to amend their Complaint to offer more than conclusory recitations of their claims' legal elements and to specify conduct as to each Defendant's conduct for any given cause of action—all the while supported in their efforts by the extensive discovery taken over the course of years. Moreover, in granting leave to amend for a second time, the Court expressly cautioned that Plaintiffs would not be given another opportunity to amend their Complaint "[a]bsent extraordinary circumstances." *Red Rock Sourcing*, 2023 WL 3736442, at *14.

Despite all this, Plaintiffs failed to plead adequately many of the claims asserted in their Second Amended Complaint. Considering these circumstances and given the nature of substantive deficiencies identified in the instant writing, the Court finds that granting Plaintiffs yet another

bite at the apple would be futile. *Binn v. Bernstein*, No. 19 Civ. 6122 (GHW) (SLC), 2020 WL 4550312, at *34 (S.D.N.Y. July 13, 2020) ("To grant Plaintiffs leave to amend would be allowing them a third bite at the apple, which courts in this district routinely deny." (internal quotation marks omitted)), *report and recommendation adopted by* 2020 WL 4547167 (S.D.N.Y. Aug. 6, 2020).

## IV.  Conclusion

For the foregoing reasons, the Courts grants the motions to dismiss filed by Syd Ghermezian and Community Federal Savings Bank and by Nader Ghermezian.  The Court grants in part the motions to dismiss filed by the JGX Defendants and by Don Ghermezian and the Worldwide Defendants.

Pursuant to these rulings, Count One is dismissed as to the thirteen Counterfeiting Defendants who have appeared, and Plaintiffs shall submit any arguments as to why it should not be dismissed as to Liberty within fourteen days of this Opinion and Order.  Counts Five, Six, Eight, Ten, Twelve, Thirteen, Fourteen, Fifteen, and Sixteen are dismissed in their entirety.  Counts Two, Four, Seven, and Eleven are dismissed as to Isaac Import, Syd Ghermezian, and Community Federal Savings Bank.  Counts Three and Nine are dismissed as to Isaac Import, Don Ghermezian, Triple Five Worldwide, Eliezer Berkowitz, Isaac Saba, Yonah Ghermezian, David Ghermezian, Syd Ghermezian, and Community Federal Savings Bank.

For convenience, the Court therefore summarizes in the below chart the claims that have survived dismissal:

| Count | Cause of Action | Defendants |
|-------|-----------------|------------|
| One | RICO (substantive and conspiracy) | Liberty[20] |
| Two | Infringement of a Registered Mark (Lanham Act) | JGX, Grazi, Dib Jabareh, Nouri Jaradeh, Don Ghermezian, the Worldwide Defendants, and Liberty |
| Three | Contributory Infringement (Lanham Act) | JGX, Grazi, Dib Jaradeh, Nouri Jaradeh, and Liberty |
| Four | False Designation of Original (Lanham Act) | JGX, Grazi, Dib Jabareh, Nouri Jaradeh, Don Ghermezian, the Worldwide Defendants, and Liberty |
| Seven | Trademark Infringement (New York Common Law) | JGX, Grazi, Dib Jaradeh, Nouri Jaradeh, Don Ghermezian, the Worldwide Defendants, and Liberty |
| Nine | Unfair Competition (New York Common Law) | JGX, Grazi, Dib Jaradeh, Nouri Jaradeh, and Liberty |
| Eleven | Dilution by Tarnishment (New York Common Law) | JGX, Isaac Import, Grazi, Dib Jaradeh, Nouri Jaradeh, Don Ghermezian, the Worldwide Defendants, and Liberty |

---

[20] Although, as discussed, the Court provides Plaintiffs notice of its intent to *sua sponte* dismiss Count One as to Liberty.

The Clerk of Court is respectfully directed to close Docket Numbers 333, 335, 340, and 343, and to terminate Nader Ghermezian, Syd Ghermezian, Community Federal Savings Bank, and Isaac Import, Inc. as Defendants in this case.

SO ORDERED.

Dated: March 22, 2024
New York, New York

_____
JOHN P. CRONAN
United States District Judge