UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
                                                :

RED ROCK SOURCING, LLC, *et al.*,         :

                    Plaintiffs,     :

                         :

           -v-               :          21 Civ. 1054 (JPC)

                         :

JGX, LLC *et al.*,                :         <u>OPINION AND ORDER</u>

                         :

                  Defendants.    :

                         :
------------------------------------------------------------------X

JOHN P. CRONAN, United States District Judge:

      In this action, Coronado Distributing LLC ("Coronado"), the owner of trademarks for a brand called "Urbane Bath & Body," and Red Rock Sourcing LLC ("Red Rock"), Coronado's business partner, accuse Defendants of distributing counterfeits of their hand sanitizer product. As they tell it, Red Rock initially sold Urbane Bath & Body brand hand sanitizer ("Urbane Hand Sanitizer") to a company called Rigz, LLC ("Rigz"). But Rigz then recruited other vendors to manufacture hand sanitizer using a slightly modified version of Urbane Bath & Body's logo. A supply chain emerged in which Tropicosmeticos S.A. de C.V. ("Trop") manufactured hand sanitizer in Mexico, labeled each bottle with the modified Urbane Bath & Body logo, and sold the product to Triple Five Worldwide, LLC ("Triple Five"), which, in turn, sold it to JGX, LLC ("JGX"), which, finally, sold it to Rigz for placement in stores. Plaintiffs learned of this supply chain only after the United States Food and Drug Administration ("FDA") intercepted Trop's shipment of another brand of hand sanitizer at the United States-Mexico border, determined that the intercepted hand sanitizer contained methanol, and then added "Urbane Bath and Body Hand Sanitizer" to a list of unsafe products.

This litigation has been beset by years of motion practice and discovery. At the present stage, Plaintiffs' remaining claims assert violations of the Lanham Act, *see* 15 U.S.C. §§ 1051 *et seq.*, New York common law, and New York General Business Law, *see* N.Y. Gen. Bus. Law ("NYGBL") § 360-l, against JGX, Triple Five, several of those two companies' employees, and a third company that has not appeared. In this decision, the Court grants in part and denies in part the JGX Defendants' motion for summary judgment, grants in part and denies in part the Triple Five Defendants' motion for summary judgment, and grants in part and denies in part Plaintiffs' motion for summary judgment. The Court also orders Plaintiffs to show cause by 12:00 p.m. on January 28, 2026, why certain of their claims should not be dismissed.[1]

## I. Background

The factual allegations and procedural history of this case are recited in detail in the Court's prior opinions. *See Red Rock Sourcing LLC v. JGX, LLC ("Red Rock I")*, No. 21 Civ. 1054 (JPC), 2023 WL 1468980 (S.D.N.Y. Feb. 2, 2023); *Red Rock Sourcing LLC v. JGX, LLC ("Red Rock II")*, No. 21 Civ. 1054 (JPC), 2023 WL 3736442 (S.D.N.Y. May 31, 2023); *Red Rock Sourcing LLC v. JGX, LLC ("Red Rock III")*, No. 21 Civ. 1054 (JPC), 2024 WL 1243325 (S.D.N.Y. Mar. 22, 2024); *Red Rock Sourcing, LLC v. JGX, LLC (*"Red Rock IV")*, No. 21 Civ. 1054 (JPC), 2025 WL 524024 (S.D.N.Y. Feb. 18, 2025). The facts are summarized below only as relevant to resolving the parties' summary judgment motions.

---

[1] At the final pretrial conference, the Court will also resolve Defendants' pending motions to preclude Plaintiffs' damages expert, Justin Lewis, from testifying at trial, in addition to several other pretrial motions.

A.    Facts[2]

1.    Urbane Hand Sanitizer

Plaintiffs Coronado and Red Rock are, respectively, Colorado- and Nevada-based limited liability companies.  JGX 56.1(a) Stmt. ¶¶ 5, 7; *accord* Pls. 56.1(b) Counter Stmt. to JGX ¶¶ 5, 7. Coronado is managed by three Members—Randy Toltz, Tom Bruss, and Jeff Daprizio.  JGX 56.1(a) Stmt. ¶ 6; *accord* Pls. 56.1(b) Counter Stmt. to JGX ¶ 6.  Daprizio is also Red Rock's sole Member.  JGX 56.1(a) Stmt. ¶ 8; *accord* Pls. 56.1(b) Counter Stmt. to JGX ¶ 8.

Relevant to this case are three trademarks owned by Coronado.  The first two marks are word marks "consist[ing] of standard characters without claim to any particular font style, size, or color":

URBĀNE BATH & BODY

URBANE BATH & BODY

Hurteau Decl., Exhs. 2, 3.  Coronado's third trademark is the following picture mark (the "Urbane Logo"):

---

[2] The facts throughout this Opinion and Order are drawn mainly from the parties' statements and counterstatements of undisputed material facts submitted pursuant to Local Civil Rule 56.1, Dkt. 466 ("Pls. 56.1(a) Stmt."); Dkt. 467 ("Pls. 56.1(b) Counter Stmt. to JGX"); Dkt. 468 ("Pls. 56.1(b) Counter Stmt. to Triple Five"); Dkt. 453 ("JGX 56.1(a) Stmt."); Dkt. 474 ("JGX 56.1(b) Counter Stmt."); Dkt. 449 ("Triple Five 56.1(a) Stmt."); Dkt. 470 ("Triple Five 56.1(b) Counter Stmt."), as well as the declarations with attached exhibits submitted by the parties, Dkt. 465 ("Hurteau Decl."); Dkt. 455 ("Sutton Decl."); Dkt. 456 ("Grazi Decl."); Dkt. 446-1 ("David Decl."); Dkt. 446-2 ("Don Decl.").  In support of their motions, the parties submitted excerpts from depositions of, among others, Jack Grazi, Nouri Jaradeh, David Ghermezian, Yonah Ghermezian, Eliezer Berkowitz, Isaac Saba, Anthony Carelli, Randy Toltz, Jeff Daprizio, and Tom Bruss.  Those deposition transcripts are referred to herein as follows: (1) Sutton Decl., Exh. 5, and Hurteau Decl., Exh. 79, collectively as "Grazi Dep. Tr."; (2) Sutton Decl., Exh. 6, as "Nouri Dep. Tr."; (3) Hurteau Decl., Exh. 74, as "David Dep. Tr."; (4) Hurteau Decl., Exh. 77, as "Yonah Dep. Tr."; (5) Hurteau Decl., Exh. 76, as "Berkowitz Dep. Tr."; (6) Hurteau Decl., Exh. 80, as "Saba Dep. Tr."; (7) Hurteau Decl., Exh. 78, as "Carelli Dep. Tr."; (8) Sutton Decl., Exh. 7, as "Toltz Dep. Tr."; (9) Sutton Decl., Exh. 9, as "Daprizio Dep. Tr."; and (10) Sutton Decl., Exh. 8, as "Bruss Dep. Tr."



Hurteau Decl., Exh. 4.  These three marks were registered by the United States Patent and Trademark Office ("PTO") on June 2, 2020, March 16, 2021, and May 11, 2021, respectively. Hurteau Decl., Exhs. 2-4.

Red Rock was responsible for the "development, sales, and distribution" of Urbane Hand Sanitizer.  *Red Rock III*, 2024 WL 1243325, at *2.  It developed a hand sanitizer that, in its view, was unique because "it utilized a high-quality formula that was equally effective without the associated foul medicinal-smell of typical sanitizer."  *Id.* (internal quotation marks omitted). According to Coronado, its trademarks reinforced to consumers that Urbane Hand Sanitizer was a quality product.  *See* Toltz Dep. Tr. at 11:14-17 ("[The Urbane name] kind of met the brand we were trying to develop.  We were trying to develop a high-end luxury but yet daily-type brand and it met all the criteria.").

"Much of [Red Rock's] early sales of [Urbane Hand Sanitizer] were to a wholesaler/distributor[ called] Rigz." [3]  JGX 56.1(a) Stmt. ¶ 17; *accord* Pls. 56.1(b) Counter Stmt. to JGX ¶ 17.  Rigz was "an Arizona-based distributor with whom Red Rock had developed a business relationship before the [Coronavirus] pandemic [of 2020]."  *Red Rock III*, 2024 WL 1243325, at *2.  It was managed by two Principals, Anthony Carelli and Jarrett Portz.  *See id.*

Red Rock's "initial sales" to Rigz "were robust."  *Id.*  From April 2020 to May 2020, Rigz purchased approximately $2,000,000 of Urbane Hand Sanitizer.  Hurteau Decl., Exh. 5 (6/25/20

---

[3] Rigz is not a party in this case but separately entered into a settlement with Plaintiffs.  *See* Dkt. 189.

Carelli-Bruss email) at 4;[4] *see also Red Rock III*, 2024 WL 1243325, at *2.  Rigz, in turn, distributed hundreds of thousands of bottles of Urbane Hand Sanitizer to stores such as Pilot Travel Centers and Love's Travel Stops & Country Stores.  Pls. 56.1(a) Stmt. ¶ 60; *accord* JGX 56.1(b) Counter Stmt. ¶ 60; *see also* Bruss Dep. Tr. at 21:16-21 (listing other "customers for Urbane hand sanitizer").

### 2.    The Counterfeiting Scheme

After theses initial purchases, Rigz went behind Red Rock's back and solicited other companies to manufacture hand sanitizer and label the bottles with the Urbane Logo.  Rigz then sold those knock-off hand sanitizer bottles to the same travel stores that it had sold Urbane Hand Sanitizer obtained from Red Rock.  *See* Carelli Dep. Tr. at 49:7-16 ("Q[:]  . . . Love's and Pilot may have received . . . counterfeit Urbane hand sanitizer, correct? . . . A[:]  Yes.").  According to Plaintiffs, each Defendant participated in this scheme in some way.

For purposes of resolving the summary judgment motions, the moving Defendants can be split into two groups.  The first group is the "JGX Defendants," which consists of JGX, Jack Grazi, Nouri Jaradeh, and Dib Jaradeh.  JGX is a New York limited liability company managed by two Members—Grazi and Jaradeh, LLC.  Pls. 56.1(a) Stmt. ¶ 10; JGX 56.1(a) Stmt. ¶ 33.  Jaradeh, LLC, in turn, was jointly managed by Nouri, Dib,[5] and a third person not relevant here.  Nouri Dep. Tr. at 15:12-16:10.  But despite Jaradeh, LLC's part-ownership of JGX, Grazi was most directly in charge of the company's operations.  *See, e.g.*, Grazi Dep. Tr. at 12:13-17 ("Q[:]  . . . [W]hen I say 'your company,' your company's name is JGX.  Correct?  A[:]  Yes.").

---

[4] Unless an exhibit is independently page-numbered, page citations are to the ECF-generated page number of the filing.

[5] The Court refers to parties by their first name—*e.g.*, "Nouri" or "Dib"—when another party shares their last name.

Nouri and Dib worked for JGX.  Pls. 56.1(a) Stmt. ¶ 12.  For instance, on at least one occasion, Grazi referred to Nouri as his "CFO."  Hurteau Decl., Exh. 47 at DG0034 (6/25/20 WhatsApp message from Grazi).

The second group of Defendants is the "Triple Five Defendants," which consists of Triple Five, David Ghermezian, Don Ghermezian, Yonah Ghermezian, Eliezer Berkowitz, and Isaac Saba.  Triple Five is a Nevada limited liability company.  Don Decl. ¶ 2.  Don was a "manager" of Triple Five until May 7, 2020, at which point he was replaced by Saba, Berkowitz, and a third person not relevant here.  *Id.* ¶ 4.  Around that same time, and as discussed further below, "a decision was made to use [Triple Five] as the vehicle to conduct [a hand] sanitizer business, and that the business would be run by Berkowitz and [David]."  David Decl. ¶ 2.

### a.    The JGX Defendants

In Spring of 2020, Carelli asked Grazi if JGX could "source hand sanitizer" for Rigz.  Grazi Decl. ¶ 6.  Carelli then emailed Grazi the following image of a hand sanitizer bottle with the Urbane Logo on April 23, 2020:



Hurteau Decl., Exh. 13 (4/23/20 email from Carelli to Grazi).  On April 27, 2020, Grazi emailed Carelli a signed purchase order for JGX's shipment of 331,250 bottles of hand sanitizer to Rigz.

6

Hurteau Decl., Exh. 16 (4/27/20 Grazi-Carelli email chain) at 2, 4.  Later that same day, Carelli instructed Grazi that each hand sanitizer bottle should "have *our* Urbane logo on it."  *Id.* at 2 (emphasis added).

Although JGX agreed to Rigz's terms, it did "modify the label" slightly.  Grazi Dep. Tr. at 62:4; *see also id.* at 56:16-18 (explaining that "just because they send a label with that artwork doesn't mean it works for the one who is making the goods").  By April 30, 2020, JGX has settled on the following label options for the hand sanitizing bottles (the "JGX Urbane Label Options"), depending on the size of the bottle:



Hurteau Decl., Exh. 18 (4/30/20 email from Dib to Grazi).  The final product looked slightly different still, with an example depicted below:



Hurteau Decl., Exh. 48 (photograph from manufacturing factory).

None of the JGX Defendants "conducted a trademark search . . . before starting their use of [the Urbane Label Options] on hand sanitizer labels." Pls. 56.1(a) Stmt. ¶ 26; *accord* JGX 56.1(b) Counter Stmt. ¶ 26. Grazi explained at his deposition that he had a "long-standing relationship" with Carelli, so he simply "trusted" that the Urbane Logo belonged to Rigz or that Rigz otherwise had authority to use it. Grazi Dep. Tr. at 57:22-58:20.

In early May 2020, JGX shipped Rigz 218,500 bottles of hand sanitizer with the JGX Urbane Label Options. JGX 56.1(a) Stmt. ¶ 50; *accord* Pls. 56.1(b) Counter Stmt. to JGX ¶ 50. Rigz then sold these bottles to the same stores it had sold the Urbane Hand Sanitizer it purchased from Red Rock. *See* Carelli Dep. Tr. at 49:7-16. But due to JGX's shipping delays, Rigz cancelled the remainder of its orders from JGX on May 14, 2020. *See* Grazi Decl. ¶ 18; Grazi Decl., Exh. 22 (May 2020 email chain between Rigz and JGX).

After Rigz's cancellation, Nouri "conducted online research to determine if the cancelled [hand sanitizer] orders could be salvaged," at which point he "came across Coronado." JGX 56.1(a) Stmt. ¶ 52. After this discovery, Nouri sent Grazi an email on May 26, 2020, with the

subject line "Coronado Distribution Company, Inc."  Hurteau Decl., Exh. 34 (5/26/20 email from Nouri to Grazi).  The body of the email advised Grazi to "look them up."  *Id.*  There is, however, no indication that JGX took any steps after Nouri's email to confirm whether Rigz was permitted to use the Urbane Logo.

Throughout this period, Nouri and Dib assisted Grazi in JGX's dealings with Rigz.  For example, on April 30, 2020, Dib emailed Grazi the JGX Urbane Label Options.  Hurteau Decl., Exh. 18 (4/30/20 email from Dib to Grazi).  Also on April 30, 2020, Carelli sent an email to Grazi and Dib confirming the details of Rigz's orders.  Hurteau Decl., Exh. 19 (4/30/20 email from Carelli to Grazi and Dib).  And on May 18, 2020, Grazi forwarded Dib and Nouri an email from Yonah with an invoice for a hand sanitizer shipment.  Hurteau Decl., Exh. 32A (5/18/20 email from Grazi to Nouri and Dib).

In his role as JGX's unofficial "CFO," Hurteau Decl., Exh. 47 at DG0034 (6/25/20 WhatsApp message from Grazi), Nouri too was involved in JGX's hand sanitizer operations.  He emailed Grazi bills of lading for hand sanitizer shipments, Hurteau Decl., Exh. 27 (5/8/20 email from Nouri to Grazi), checked on the status of shipments, *see generally* Hurteau Decl., Exh. 31 (May 2020 WhatsApp messages about JGX shipments), and, on occasion, arranged for shipments himself, Hurteau Decl., Exh. 30 (5/13/20 email chain about JGX shipments).

### b.    The Triple Five Defendants

JGX had no experience manufacturing hand sanitizer, so to fulfill Rigz's order, it enlisted Triple Five.[6]  On or about May 4, 2020, during the height of the COVID-19 pandemic, members

---

[6] Defendant Liberty International Distributors, LLC ("Liberty") manufactured the first 108,000 bottles of hand sanitizer that JGX shipped to Rigz.  Grazi Dep. Tr. at 43:6-21 (explaining that Liberty was the first company JGX "conducted a sanitizer-based transaction with"); Grazi Decl. ¶ 12 ("I initially contacted . . . Liberty . . .  to supply the sanitizer JGX needed to fulfill

of the Ghermezian family, Berkowitz, and others attended a meeting at Don's house, during which they discussed certain family members entering the hand sanitizer business. Don Decl. ¶ 3; *accord* David Decl. ¶ 2. And at some point between May 4, 2020, and May 6, 2020, Grazi met David and asked him if Triple Five could manufacture hand sanitizer for JGX. David Decl. ¶ 3 ("Grazi told me that he wanted Berkowitz and I to [manufacture and ship] bottles of hand sanitizer using the name Urbane."); Grazi Dep. Tr. at 161:14-21 ("Q[:] And what was the substance of the conversation you had with David Ghermezian? . . . A[:] . . . Well, we have some purchase orders. Can you fill them?"). Then, on May 6, 2020, Grazi emailed Berkowitz the JGX Urbane Label Options for Triple Five to use on each hand sanitizer bottle. Grazi Decl. ¶ 16; *see* Hurteau Decl., Exh. 23 (5/6/20 email from Grazi to Berkowitz with the JGX Urbane Label Options). That same day, Grazi also emailed Berkowitz, Nouri, and Dib purchase orders for hand sanitizer bottles. Hurteau Decl., Exh. 43 (5/6/20 email from Grazi to Berkowitz, Nouri, and Dib).[7] About a week later, Triple Five sent 110,500 bottles of hand sanitizer "to Rigz's specified delivery location" on behalf of JGX. Grazi Decl. ¶ 17; *see also* JGX 56.1(a) Stmt. ¶ 48.[8] But as discussed above, *see*

---

Rigz's order."); *see also* Grazi Dep. Tr. at 51:13-14 ("I got about—from [Liberty], about 108,000 bottles."). But after that initial shipment, "Liberty was unable to meet Rigz's delivery deadlines, so JGX began utilizing Triple Five . . . to fulfill Rigz's order." JGX 56.1(a) Stmt. ¶ 46; *accord* Pls. 56.1(b) Counter Stmt. to JGX ¶ 46.

    [7] The record does not reflect exactly how many hand sanitizer bottles Grazi agreed to purchase from Triple Five. *Compare* Grazi Dep. Tr. at 190:7-12 ("Q[:] How many bottles of sanitizer with the Urbane label on it did you procure or ask to be procured through Triple Five? . . . A[:] I believe it was around 400,000."), *with* Hurteau Decl., Exh. 43 (5/6/20 email from Grazi to Berkowitz, Dib, and Nouri) at 5-9 (purchase orders indicating that JGX was to purchase over 660,000 bottles of hand sanitizer from Triple Five).

    [8] In their submissions to the Court, the Triple Five Defendants do not object to the JGX Defendants' calculation of the total number of hand sanitizer bottles that were shipped. In their depositions, however, at least two of the Triple Five Defendants offered different estimates. *See* David Dep. Tr. at 110:21-111:2 ("Q[:] . . . How many bottles were given? . . . A[:] I would say 60,000, not even."); Berkowitz Dep. Tr. at 78:10-11 (estimating that Triple Five shipped 200,000 hand sanitizer bottles).

*supra* I.A.2.a, Rigz cancelled the remainder of its orders with JGX in mid-May 2020 due to delivery delays, eliminating the need for Triple Five to manufacture more hand sanitizer on JGX's behalf.

Like the JGX Defendants, the Triple Five Defendants did not make "any effort to determine who actually owned the rights to the Urbane [Logo]." David Dep. Tr. at 181:5-6. Instead, the Triple Five Defendants trusted that Grazi owned the rights, just as Grazi had trusted that Rigz owned the rights. *See* Triple Five 56.1(a) Stmt. ¶ 8 ("Based on Grazi's conduct and his conversations with David and Berkowitz, David and Berkowitz believed that Grazi and/or his company had the right to use the name Urbane in connection with hand sanitizer."); David Dep. Tr. at 181:11-14 ("Jack [Grazi] said he owns [the trademark]. If you tell me that's your watch, I'm not going to ask you or ask someone else, 'Is it really yours?'").

As it turned out, Triple Five lacked any experience manufacturing hand sanitizer. So to supply Rigz with hand sanitizer on JGX's behalf, Triple Five hired Trop to manufacture the hand sanitizer in Mexico and ship it to the United States. Berkowitz Dep. Tr. at 76:17-24 ("Q[:] So in other words, orders would come in from, let's say, JGX for a certain amount of bottles, they would pay you, Triple Five Worldwide LLC, and then you would use that money to have the bottles manufactured, they would be shipped and sold. Is that correct? A[:] That is correct."); *see also* JGX 56.1(a) Stmt. ¶ 56 (describing Trop as "the manufacturer of the Accused Product"); David Decl. ¶ 5 ("[W]e decided to use the . . . factory (Tropicosmeticos) . . . in Mexico."); Saba Dep. Tr. at 129:14-18 ("Q[:] Did you have an understanding that this sanitizer was being manufactured in factories in Mexico? A[:] If it says made in Mexico, I think it was."). The complete supply chain was thus as follows: At the direction of Triple Five, Trop manufactured in Mexico hand sanitizer bottles featuring the JGX Urbane Label Options and shipped that product to JGX. JGX, in turn,

sold those hand sanitizer bottles to Rigz. Rigz then sold the bottles to travel stores along with the legitimate bottles of Urbane Hand Sanitizer it obtained from Red Rock. And the travel stores sold the hand sanitizer to individual consumers.

Separate from this complex supply chain, the Triple Five Defendants also sold hand sanitizer directly to a man named Ben Tyberg, whom David's cousin had met through WhatsApp. *See* David Dep. Tr. at 121:10-18 ("Q[:] How did you meet Ben Tyberg? A[:] Funny story. Someone posted a WhatsApp status saying that there's a guy looking to sell [hand sanitizer]. My cousin called him, saying, 'Are you looking to buy?' because he knew I was selling. And he's like, 'Sure. Let me see what you got.' History since then."). In May 2020, Tyberg agreed to purchase 50,700 bottles of "2oz Hand Sanitizer" from Triple Five. Hurteau Decl., Exh. 40 at 4 (Tyberg invoice); *see also* David Decl. ¶ 7 ("[Triple Five] only made two sales of Mexican Urbane. The first sale was for approximately 100,000 2oz. bottles to Grazi's Company JGX, and the second was for approximately 50,000 2oz bottles to Ben Tyberg. These sales occurred in May 2020."). Triple Five packaged Tyberg's hand sanitizer bottles using the JGX Urbane Label Options even though Tyberg never asked it to do so. *See* David Dep. Tr. at 122:15-123:4 ("Q[:] [The invoice says] '2 ounce Hand Sanitizer.' But it doesn't reference—doesn't say Urbane label as in the prior exhibit. . . . This is for a different hand sanitizer? A[:] It was Urbane label but he didn't ask for it. That's why I didn't write it down.").[9]

---

[9] Plaintiffs also argue that in 2021, Triple Five offered to sell Tyberg its excess inventory of hand sanitizer packaged with the JGX Urbane Label Options, *see* Pls. Br. at 32, although no evidence has been presented suggesting that such a sale ever occurred. *See* Hurteau Decl., Exh. 37 (WhatsApp messages between David and Saba) at 41 (discussing "thousands" of unsold hand sanitizer bottles); Hurteau Decl., Exh. 57 (messages between David and Tyberg) at 9 (offering Tyberg "a cheap price" on hand sanitizer); *cf*. Triple Five 56.1(b) Counter Stmt. ¶ 56 (responding that it is "[d]isputed" that "David and Tyberg continued to text each other about hand sanitizer," but not explaining on what basis this fact is disputed).

Each of the Triple Five Defendants played a role in some aspect of the company's hand sanitizer operations. Don provided advice to Triple Five "at a 'high level.'" Don Decl. ¶ 8 (clarifying that when he testified at his deposition that he provided advice "at a 'high level,' all I meant was that my door was always open for David or Berkowitz to consult with me . . . [and] I do not remember a single specific instance where they did so"). Saba corresponded about hand sanitizer with David over WhatsApp and was included on emails about hand sanitizer shipments. *See* Hurteau Decl., Exh. 37 (WhatsApp messages between David and Saba); Hurteau Decl., Exh. 56 (5/13/20 email to Saba, Berkowitz, and David containing purchase orders); Hurteau Decl., Exh. 59 (6/24/20 email with Saba copied about shipping issues). Yonah, meanwhile, "was responsible for [Triple Five's] invoices and correspondence related to payment for sales, production, and/or distribution." Pls. 56.1(a) Stmt. ¶ 25; *see also* Berkowitz Dep. Tr. at 128:8-11 ("Q[:] What was Yonah Ghermezian's role? A[:] Yonah would send the invoices and correspond at that point for the invoice and then for the wires."); Yonah Dep. Tr. at 47:13-15 ("Q[:] . . . What did you text Mr. Grazi about? A[:] Invoices."); Hurteau Decl., Exh. 40 (Triple Five invoices).

As Triple Five's managers, Berkowitz and David were the most extensively involved. David initially met with Grazi and agreed to help JGX fulfill Rigz's order. David Decl. ¶ 3. And after that meeting, Grazi emailed the JGX Urbane Label Options to only Berkowitz and David. Hurteau Decl., Exh. 23 (5/11/20 email with the JGX Urbane Label Options). Among the Triple Five Defendants, David also was the most directly "responsible for making sure that [hand sanitizer] bottles were put on the truck and transported across the border." Berkowitz Dep. Tr. at 90:19-21. And Berkowitz, as David's "second in command," David Dep. Tr. at 104:5-6, was included on important company communications. *See, e.g.*, Hurteau Decl., Exh. 23 (5/11/20 email

with the JGX Urbane Label Options); Hurteau Decl., Exh. 56 (5/13/20 email containing purchase

order); Hurteau Decl., Exh. 56A (5/13/20 email confirming shipping details).

### 3. The Urbane Recall

In July 2020, a shipment of Britz Hand Sanitizer—an unrelated hand sanitizer brand also

manufactured by Trop—was stopped at the border between Mexico and the United States. JGX

56.1(a) Stmt. ¶¶ 56-57; *accord* Pls. 56.1(b) Counter Stmt. ¶¶ 56-57. The FDA tested the Britz

Hand Sanitizer and determined that it contained methanol, Sutton Decl., Exh. 14 ("FDA Import

Alert") at 11, which, when present in hand sanitizer, "can result in nausea, vomiting, headache,

blurred vision, permanent blindness, seizures, coma, permanent damage to the nervous system or

death," *Red Rock III*, 2024 WL 1243325, at *6 (internal quotation marks omitted). Out of concern

that Trop was also using "methanol in hand sanitizer formulas for other brands it manufactured,"

JGX 56.1(a) Stmt. ¶ 58, on July 27, 2020, the FDA placed "Urbane Bath and Body Hand Sanitizer"

on a list of "hand sanitizers consumers should not use," FDA Import Alert at 11.

Upon learning of the FDA's action, Coronado tried to reassure customers that its product

was not the same "Urbane Bath and Body Hand Sanitizer" that was placed on the FDA's list. On

July 28, 2020, the Urbane Bath and Body Facebook account posted: "We are shocked to find out

that not only did someone rip-off ou[r] fully Trademarked brand, but they did it with toxic and

now recalled sanitizer from Mexico. . . . We are 100% made in America with heavily vetted

suppliers. . . . Please KNOW that the recalled products are not ours!" Sutton Decl., Exh. 16

(Urbane Bath and Body Facebook post). On July 29, 2020, Coronado then issued a press release

which further clarified that "a company out of Mexico, Tropicosmeticos SA de CV, made that

specific product [on the FDA list] for a US customer, who was in fact pirating our brand. . . . Rest

assured, in no way did any of this have anything to do with the legitimate Urbane Bath & Body

brand or product." Sutton Decl., Exh. 15 (Coronado press release).

Red Rock did not receive any order cancellations after the FDA Import Alert, *see* JGX 56.1(a) Stmt. ¶ 64, but Coronado nonetheless decided to "rebrand [its] product line to avoid confusion," Hurteau Decl., Exh. 15 (Coronado press release).  As soon as July 30, 2020, Bruss, one of Coronado's Members, notified an employee at Ride Aid that, due to the FDA Import Alert, "we are going to utilize our [o]ther brand, Aspen Bath and Body going forward," explaining that "[w]e are simply just rebranding to avoid any confusion to the consumer."  Hurteau Decl., Exh. 6 (July-August 2020 email chain with Rite Aid) at 4.  At the time, Rite Aid had been considering selling Urbane Hand Sanitizer to its customers, although it had cautioned Coronado that "[t]here is no guarantee" it would do so.  *Id.* at 5.  The very next day, Rite Aid informed Coronado that it would "not be bringing [their] items into the [store]."  *Id.* at 3.

Due in part to the rebranding of Urbane Hand Sanitizer, Red Rock did not sell any hand sanitizer with the Urbane Logo after the FDA Import Alert was issued on July 27, 2020.  *See* Daprizio Dep. Tr. at 139:5-11 ("Q[:]  What efforts have you made to sell Urbane branded hand sanitizer that remains in the possession of Red Rock and Coronado?  A[:]  Again, we cannot sell it because it's already branded.  It has labels that say 'Urbane.'  We can't sell any of that after July 28th.").

## B.    Procedural History

On February 5, 2021, Plaintiffs initiated this action by filing a Complaint against JGX and Liberty.  Dkt. 1.  JGX answered the Complaint on March 24, 2021, and asserted crossclaims against Liberty.  Dkt. 22.[10]  Then, on December 23, 2021, after Plaintiffs and JGX engaged in extensive discovery, *see Red Rock III*, 2024 WL 1243325, at *7 (describing the "multiple

---

[10] Liberty has failed to appear in this action.  The Clerk of Court entered a certificate of default against Liberty on March 5, 2021.  Dkt. 20.

extensions of the discovery deadlines" and the "number of disputes requiring the Court's intervention along the way"), Plaintiffs moved for leave to amend their Complaint to assert a new claim and add as Defendants Triple Five, Grazi, Saba, Berkowitz, David, Yonah, and a company called Isaac Import, Inc. *See* Dkt. 102. The Court granted Plaintiffs' motion at a conference on January 27, 2022, Dkt. 118 (January 27, 2022 conference transcript) at 21:11-12, and Plaintiffs filed their First Amended Complaint on February 10, 2022, Dkt. 122.

Within the next month, several Defendants requested leave to file motions to dismiss Plaintiffs' Amended Complaint. *See* Dkts. 141 (February 24, 2022 letter from the JGX Defendants), 147 (March 2, 2022 letter from the Triple Five Defendants). Plaintiffs responded to each of these pre-motion letters, *see* Dkts. 146, 149, and then on April 14, 2022, notified the Court of their intent to seek leave to file a Second Amended Complaint. Dkt. 166. Plaintiffs formally moved for leave to further amend on May 20, 2022, attaching their proposed Second Amended Complaint as an exhibit. Dkts. 184, 186-1. But after Defendants filed briefs opposing amendment, Dkts. 198, 201, and Plaintiffs replied, Dkt. 203, Plaintiffs requested leave to revise their proposed Second Amended Complaint to make yet another addition—this time, "to incorporate newly adduced evidence stemming from defendants' discovery misconduct." Dkt. 245 at 1. The Court granted Plaintiffs' request on November 29, 2022, and provided Defendants with an additional opportunity to oppose amendment based on Plaintiffs' revised proposed Second Amended Complaint. Dkt. 249 at 3. Defendants filed additional briefing addressing that revised proposed amendment on January 6, 2023. Dkts. 264-1, 266.

On June 13, 2022, while briefing on Plaintiffs' motion to file a Second Amended Complaint was underway, Rigz filed a motion to intervene. Dkts. 205-207.[11] Plaintiffs opposed Rigz's motion to intervene on June 21, 2022, Dkt. 213, and Rigz replied on June 27, 2022, Dkt. 215. On February 1, 2023, the Court granted Rigz's motion, *see Red Rock I*, 2023 WL 1468980, at *3-5, after which, on February 13, 2023, Rigz filed an opposition to Plaintiffs' motion to file a Second Amended Complaint, Dkts. 283-284. Plaintiffs filed a sur-reply responding to Rigz's opposition on February 23, 2023. Dkt. 289-1.

The Court granted Plaintiffs' motion to amend on May 31, 2023, *see Red Rock II*, 2023 WL 3736442, at *8-12, and on June 14, 2023, Plaintiffs filed their Second Amended Complaint, which asserted two new claims and added Dib and Nouri as Defendants, Dkt. 310 ("SAC"). Then, on August 11, 2023, four groups of Defendants moved to dismiss some or all of the claims in the Second Amended Complaint. *See* Dkts. 333, 335, 340, 343. On March 22, 2024, the Court granted in full some of these motions, granted in part the others, and gave Plaintiffs notice of the Court's intent to *sua sponte* dismiss one of their claims against Liberty, *Red Rock III*, 2024 WL 1243325, at *1, which the Court did, in fact, dismiss on May 8, 2024, Dkt. 397.

Following these decisions, Plaintiffs' remaining claims in the Second Amended Complaint are: (1) Coronado's claim under Section 32(1) of the Lanham Act for infringement of a registered trademark, 15 U.S.C. § 1114(1), against JGX, Grazi, Dib, Nouri, Don, Triple Five, Saba, Berkowitz, David, Yonah, and Liberty (Count Two), SAC ¶¶ 449-460; (2) Coronado's claim under the Lanham Act for contributory trademark infringement against JGX, Grazi, Dib, Nouri, and

---

[11] Plaintiffs presumably did not name Rigz as a Defendant because Plaintiffs and Rigz had entered into a settlement agreement that "release[d] and discharge[d] Rigz . . . and their past or present . . . customers . . . from any and all actions, claims, demands . . . and causes of action." Dkt. 189.

Liberty (Count Three), *id.* ¶¶ 461-467; (3) Plaintiffs' claim under Section 43(a)(1) of the Lanham Act for false designation of origin, 15 U.S.C. § 1125(a)(1), against JGX, Grazi, Dib, Nouri, Don, Triple Five, Saba, Berkowitz, David, Yonah, and Liberty (Count Four), SAC ¶¶ 468-472;[12] (4) Coronado's claim under New York common law for trademark infringement against JGX, Grazi, Dib, Nouri, Don, Triple Five, Saba, Berkowitz, David, Yonah, and Liberty (Count Seven), *id.* ¶¶ 488-495; (5) Coronado's claim under New York common law for unfair competition against JGX, Grazi, Dib, Nouri, and Liberty (Count Nine), *id.* ¶¶ 513-518; and (6) Coronado's claim under New York General Business Law for dilution by tarnishment, NYGBL § 360-l, against JGX, Grazi, Dib, Nouri, Don, Triple Five, Saba, Berkowitz, David, Yonah, and Liberty (Count Eleven), SAC ¶¶ 524-529.  As remedies for these claims, Plaintiffs seek (1) an injunction; (2) an accounting of Defendants' profits; (3) an award of damages, *see* 15 U.S.C. § 1117(a); (4) an award of treble damages; *see id.* § 1117(b); (5) an award of punitive damages; and (6) an award of attorneys' fees and costs.  SAC at 87-89.

After the Court resolved the motions to dismiss the Second Amended Complaint, on April 8, 2024, the JGX Defendants filed an Answer to the Second Amended Complaint, cross-claims against the other Defendants, and a Third-Party Complaint against Rigz and Carelli.  Dkt. 381. Rigz and Carelli moved to dismiss the Third-Party Complaint on July 5, 2024.  Dkts. 410, 410-1. The JGX Defendants filed their opposition on July 29, 2024, Dkt. 413, and Rigz and Carelli replied on August 5, 2024, Dkt. 415.  Construing the JGX Defendants' filings as, in part, a motion under

---

[12]  The title of Count Four references "Unfair Competition" in addition to "False Designation of Origin."  SAC at 69.  As the Court noted in its March 22, 2024 Opinion on the motions to dismiss, "there is no independent federal cause of action for unfair competition (rather, the descriptor refers to a category of causes of action that includes false designation of origin)." *Red Rock III*, 2024 WL 1243325, at *22 n.11 (citations omitted).  The Court therefore refers to Count Four as a claim only for false designation of origin.

Federal Rule of Civil Procedure 16(b) for leave to file a Third-Party Complaint, and Rigz and Carelli's opposition as, in part, a motion to strike the Third-Party Complaint as deficient under Federal Rule of Civil Procedure 14(a)(4), on February 18, 2025, the Court denied leave and struck the Third-Party Complaint in its entirety. *Red Rock IV*, 2025 WL 524024, at *1.

Shortly thereafter, the Court scheduled trial to begin on February 2, 2026, and required the parties to file any motions for summary judgment or to preclude expert witnesses by April 4, 2025. *See* Mar. 7, 2025 Minute Entry.

## C.    Pending Motions

On April 1, 2025, the Triple Five Defendants moved to preclude Justin Lewis, Plaintiffs' proffered damages expert, from testifying at trial. Dkts. 443-445. Later that day, the Triple Five Defendants also moved for summary judgment, arguing (1) that Plaintiffs had failed to establish a genuine dispute of fact as to liability and (2) that Plaintiffs cannot recover damages for injuries arising from the FDA Import Alert. Dkts. 446-449. On April 3, 2025, the JGX Defendants also moved for summary judgment and to preclude Lewis from testifying. Dkts. 450-458. Similar to the Triple Five Defendants' summary judgment motion, the JGX Defendants argued (1) that Plaintiffs had failed to establish a genuine dispute of fact as to liability and (2) that Plaintiffs should be precluded from receiving damages, an accounting of Defendants' profits, or attorneys' fees. Dkt. 457 ("JGX Br.").[13]

---

[13] The JGX Defendants also argue that Plaintiffs should be precluded from recovering "lost profits," a "royalty," "statutory damages," or "prejudgment interest" as remedies. JGX Br. at 26-27. But Plaintiffs' "lost profits" is not a separate form of remedy—it is just one aspect of Plaintiffs' total damages—*i.e.*, the "injuries [they have] suffered as a result of the infringement." 4 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 30:72 (5th ed. 2025); *see also id.* (explaining that "'[d]amages' is a term of legal art" in trademark law). And Plaintiffs have not sought a royalty, statutory damages, or prejudgment interest in this litigation. *See generally* SAC at 87-89.

19

On April 25, 2025, Plaintiffs filed oppositions to Defendants' motions for summary judgment and to preclude Lewis from testifying, as well as a motion for partial summary judgment as to liability against the JGX Defendants and the Triple Five Defendants on Count Four of the Second Amended Complaint. Dkts. 461-468.[14] In May 2025, Defendants filed replies in support of their motions and oppositions to Plaintiffs' motion. Dkts. 469-470, 473-480, 483-485. Plaintiffs filed their reply in support of partial summary judgment on May 30, 2025. Dkt. 486.

On January 5 and January 6, 2026, the JGX Defendants and the Triple Five Defendants filed various motions *in limine*. *See* Dkts. 500, 507, 508, 510, 513, 516. As of this decision, these motions remain pending.

\*    \*    \*

This decision resolves the parties' motions for summary judgment on issues of liability and remedy. It does not, however, resolve the other pending pretrial motions, including Defendants' motions to preclude Lewis's testimony. Although "[o]n a motion for summary judgment, a district court may rely only on material that would be admissible at trial," *Rubens v. Mason*, 387 F.3d 183, 189 (2d Cir. 2004), it need not resolve all evidentiary challenges prior to its decision. Rather, the Court "may, without granting a motion to strike, simply decline to consider evidence" that is potentially inadmissible. *Seife v. FDA*, No. 17 Civ. 3960 (JMF), 2019 WL 1382724, at \*1 (S.D.N.Y. Mar. 27, 2019) (cleaned up); *see also Loc. 553, I.B.T. v. Loc. 803 Pension Fund*, 409 F. Supp. 3d 255, 258 n.1 (S.D.N.Y. 2019) (declining to consider challenged evidence that the court did not "need[] to reach"). Because Lewis's testimony does not bear on any issue relating to the

---

[14] Plaintiffs' motion for summary judgment appears to seek a ruling against Liberty. *See* Dkt. 463 ("Pls. Br.") at 21. But because Liberty has not appeared to defend itself in this action, the Court denies summary judgment without prejudice as to Liberty, and will allow Plaintiffs to move for default judgment against Liberty after liability of the other Defendants is determined.

motions for summary judgment, the Court follows this course and defers resolution of the motion to exclude until the final pretrial conference.

## II. Legal Standard

The Court will grant summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Summary judgment is appropriate '[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party.'" *Mhany Mgmt., Inc. v. Cnty. of Nassau*, 819 F.3d 581, 620 (2d Cir. 2016) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). "A genuine dispute exists where 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party,' while a fact is material if it 'might affect the outcome of the suit under the governing law.'" *Chen v. 2425 Broadway Chao Rest., LLC*, No. 16 Civ. 5735 (GHW), 2019 WL 1244291, at *4 (S.D.N.Y. Mar. 18, 2019) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). In conducting this review, the Court must "resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party." *Mhany Mgmt.*, 819 F.3d at 620.

"The movant bears the initial burden of demonstrating 'the absence of a genuine issue of material fact,' and, if satisfied, the burden then shifts to the non-movant to present 'evidence sufficient to satisfy every element of the claim.'" *Chen*, 2019 WL 1244291, at *4 (quoting *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008)). The non-movant "may not rely on conclusory allegations or unsubstantiated speculation," and "must offer some hard evidence showing that its version of the events is not wholly fanciful." *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005) (cleaned up). The non-movant must present more than a "scintilla of evidence" to survive summary judgment. *Anderson*, 477 U.S. at 252. "Where no rational finder

of fact could find in favor of the nonmoving party because the evidence to support its case is so slight, summary judgment must be granted." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011) (cleaned up).

Generally, a court evaluates each cross-motion for summary judgment independently of the other, considering the facts in the light most favorable to the non-moving party. *Morales v. Quintel Ent., Inc.*, 249 F.3d 115, 121 (2d Cir. 2001). But if, as here, a "motion and cross-motion seek a determination of the same issues, the Court may consider them together." *ExteNet Sys., Inc. v. Vill. of Pelham*, 377 F. Supp. 3d 217, 223 (S.D.N.Y. 2019).

### III. Discussion

The following discussion of the parties' motions for summary judgment is broken up into two sections. First, the Court considers the issues relating to Defendants' liability, *see infra* III.A, and then the Court considers the issues relating to remedies, *see infra* III.B.

### A. Liability

#### 1. Lanham Act

The Court starts with Plaintiffs' federal claims under the Lanham Act. In Count Two, Coronado brings a claim against JGX, Grazi, Dib, Nouri, Don, Triple Five, Saba, Berkowitz, David, and Yonah for infringement of a registered trademark under Section 32(1). SAC ¶¶ 449-460. In Count Three, Coronado brings a claim against JGX, Grazi, Dib, and Nouri for contributory trademark infringement. *Id.* ¶¶ 461-467. And in Count Four, both Plaintiffs bring a claim against JGX, Grazi, Dib, Nouri, Don, Triple Five, Saba, Berkowitz, David, and Yonah for false designation of origin under Section 43(a)(1). *Id.* ¶¶ 468-472.

### a.    Applicable Law

Sections 32(1)[15] and 43(a)(1)[16] of the Lanham Act create causes of action against a defendant who "uses in commerce" a mark that is "likely to cause confusion" about whether the defendant, or the defendant's product, is somehow associated with the plaintiff.  Under both provisions, "the plaintiff must show first, that its mark is protected, and second, that the defendant's use in commerce of the allegedly infringing mark would likely cause confusion as to the origin, sponsorship, or affiliation of the defendant's goods with plaintiff's goods."  *1-800 Contacts, Inc. v. JAND, Inc.*, 119 F.4th 234, 246 (2d Cir. 2024) (cleaned up).

Although neither Section 32(a) nor Section 43(a)(1) expressly indicates that a defendant can be held liable for the acts of another, a plaintiff may prevail on a theory of contributory or vicarious liability.  *See Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 930 (2005) (explaining that "these doctrines of secondary liability emerged from common law principles and are well established in the law").  For contributory liability to attach, a defendant

---

[15] Section 32(1) of the Lanham Act provides:

> Any person who shall . . . use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive . . . shall be liable in a civil action by the registrant.

15 U.S.C. § 1114(1).

[16] Section 43(a)(1) of the Lanham Act provides:

> Any person who . . . uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which . . . is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person . . . shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1).

must either "intentionally induce[] another" to violate Section 32(a) or Section 43(a)(1) or continue

to act in concert with another despite "know[ing] or ha[ving] reason to know" of their

infringement. *Inwood Lab'ys, Inc. v. Ives Lab'ys, Inc.*, 456 U.S. 844, 854 (1982). While the

"appropriate boundaries" of vicarious liability are less certain, courts have looked to the common

law of torts as a guide. *Hard Rock Cafe Licensing Corp. v. Concession Servs., Inc.*, 955 F.2d 1143,

1148 (7th Cir. 1992) (explaining that Lanham Act claims are "a species of tort").

For present purposes, claims under Sections 32(1) and 43(a)(1) differ in two respects.[17]

*Cf. Invicta Plastics (USA) Ltd. v. Mego Corp.*, 523 F. Supp. 619, 622 (S.D.N.Y. 1981) ("Under

both the infringement section of the Lanham Act and the false designation of origin section, the

same test is applied to determine whether a particular activity violates the Act." (internal citations

omitted)). First, Section 32(1) applies when there is a likelihood of confusion with a "*registered*

mark," but Section 43(a)(1) applies regardless of whether the plaintiff's mark is registered. *See*

*Union Mfg. Co. v. Han Baek Trading Co.*, 763 F.2d 42, 47-48 (2d Cir. 1985) ("[A] section 43(a)

false designation of origin claim . . . is now frequently recognized, with regard to unregistered

marks, as the equivalent of a claim for trademark infringement."). Second, Section 32(1) grants a

cause of action to "the registrant" of a trademark, but Section 43(a)(1) more broadly provides a

cause of action to "any person who believes that he or she is or is likely to be damaged." *Compare*

15 U.S.C. § 1114(1), *with* 15 U.S.C. § 1125(a)(1). In this regard, however, Section 43(a)(1)'s

textual sweep is limited by "the zone of interests protected by the law," *Allen v. Wright*, 468 U.S.

737, 751 (1984), and therefore covers only "injuries to business reputation and present and future

---

[17] Although "§ 43(a) prohibits a broader range of practices than does § 32," *Inwood Lab'ys*, 456 U.S. at 858, this difference is immaterial here.

sales" that "are proximately caused by violations of the statute," *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 131-32 (2014).

### i.    Protected Marks

Whether or not a plaintiff's mark is registered, a claim under Section 32(1) or Section 43(a)(1) requires that the mark is *protected*.  In order to be protected, the plaintiff's mark must be entitled to protection and the plaintiff must have used the mark in a manner sufficient to claim such protection.

Starting with the first requirement, to be "entitled to protection[,] . . . a mark must be capable of distinguishing the [plaintiff's] goods from those of others." *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992).  Courts assess whether a mark meets this requirement of "distinctiveness" by "following the classic formulation set out by Judge Friendly, [wherein a mark] may be (1) generic; (2) descriptive; (3) suggestive; (4) arbitrary; or (5) fanciful." *Id.* (citing *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9 (2d Cir. 1976)); *see also Operation Able of Greater Bos., Inc. v. Nat'l Able Network, Inc.*, 646 F. Supp. 2d 166, 171 (D. Mass. 2009) (explaining that "[d]istinctiveness is a term of art in trademark law").

Under this test, distinctiveness is conceived as an ascending spectrum.  On the lowest end of that spectrum, a "generic mark is a common name, such as automobile or aspirin, that identifies a kind of product." *RiseandShine Corp. v. PepsiCo, Inc.*, 41 F.4th 112, 120 (2d Cir. 2022).  Such a mark "receives no protection from the law of trademark, even if the mark has acquired public recognition as identifying the source of the product." *Id.*  Slightly more distinctive is a descriptive mark, which "tells something about a product, its qualities, ingredients or characteristics." *Gruner + Jahr USA Pub., a Div. of Gruner + Jahr Printing & Pub. Co. v. Meredith Corp. (*"Gruner"*),* 991 F.2d 1072, 1076 (2d Cir. 1993).  "A descriptive mark is entitled to protection upon proof that

it has obtained a secondary meaning, that is to say, an identity that consumers associate with a single source." *Id.*  Next along the spectrum are suggestive marks, which, as the name implies, "suggest (rather than directly describe) the product on which they are employed, or its attributes, sometimes requiring imagination to grasp the linkage." *RiseandShine*, 41 F.4th at 121.  Crucially, and unlike a descriptive mark, a suggestive mark is protectable without proof of secondary meaning.  *Gruner*, 991 F.2d at 1076.  Finally, at the highest end of the distinctiveness spectrum, arbitrary and fanciful marks also are protectable without proof of secondary meaning. *RiseandShine*, 41 F.4th at 121.  An arbitrary or fanciful mark is one that "that make[s] no logical reference to the product or service on which they are used, such as Google for a search engine, Kodak for cameras, or Quilted Giraffe for a restaurant." *Id.*

This distinctiveness spectrum applies to picture marks as well as more traditional word marks.  *See Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 454 F.3d 108, 116 (2d Cir. 2006) ("The breadth of trademarks . . . is not limited to word marks such as 'Nike.'  A person may also claim a trademark in a symbol, such as the Nike 'swoosh,' a device, or any combination thereof." (internal citations omitted)).  Common shapes or the use of a particular color—much like the use of common names in a word mark—are unlikely to be considered distinctive.  *See Qualitex Co. v. Jacobson Prods. Co.*, 514 U.S. 159, 163 (1995) (analogizing the use of a color to a descriptive word mark).  But "stylized shapes or letters may qualify, provided the design is not commonplace but rather unique or unusual in the relevant market."  *Star Indus., Inc. v. Bacardi & Co. Ltd.*, 412 F.3d 373, 382 (2d Cir. 2005).  As with word marks, the "guiding principle in distinguishing protectable from unprotectable marks is that no one enterprise may be allowed to attain a monopoly on designs that its competitors must be able to use in order to effectively communicate information regarding their products to consumers."  *Id.*

26

For both picture and word marks, categorizing a mark's distinctiveness is, for the most part, a factual determination. *See Bristol-Myers Squibb Co. v. McNeil-P.P.C., Inc.*, 973 F.2d 1033, 1039-40 (2d Cir. 1992) ("[T]he initial classification of a mark to determine its eligibility for protection is a question of fact."). There is, however, "a considerable component of law" in the inquiry. *Patsy's Brand, Inc. v. I.O.B. Realty, Inc.*, 317 F.3d 209, 216 (2d Cir. 2003). For example, "[i]f a marketer chose 'Toothpaste' as a mark for a toothpaste and sought to prevent other toothpaste makers from use of the word 'toothpaste,' the factfinder would not have discretion to find that the plaintiff's mark was anything other than generic and unprotected." *RiseandShine*, 41 F.4th at 122 n.1.

In cases where a plaintiff receives a certificate of registration for their mark from the PTO, there is a rebuttable presumption that the mark is protected. *See* 15 U.S.C. § 1057(b). If the PTO registered the mark without proof of secondary meaning, the presumption is that the mark is either suggestive, fanciful, or arbitrary, and that it was so since the mark's date of first use. *Lane Cap. Mgmt., Inc. v. Lane Cap. Mgmt., Inc.*, 192 F.3d 337, 345 (2d Cir. 1999). But if the PTO registered the mark after requiring proof of secondary meaning, there is no presumption that the mark is suggestive, fanciful, or arbitrary, and the presumption of protectability extends only going back to the date of the PTO registration. *See Converse, Inc. v. Int'l Trade Comm'n Skechers U.S.A., Inc.*, 909 F.3d 1110, 1117 (Fed. Cir. 2018) ("This rule is a straightforward application of the Lanham Act, pursuant to which the PTO examines whether secondary meaning has been acquired at the time of registration.").

Regardless of the scope of the presumption created by a PTO registration, that presumption may always be rebutted. "In order to rebut the presumption of validity, the allegedly infringing party must show, by a preponderance of the evidence, that the mark is ineligible for protection."

*Christian Louboutin S.A. v. Yves Saint Laurent Am. Holdings, Inc.*, 696 F.3d 206, 216 n.10 (2d Cir. 2012) (internal citations omitted).  Although the alleged infringer has the burden of persuasion on this point, once he "comes forward with evidence from which [a] fact-finder could conclude that [the] registered mark is generic, . . . the certificate of registration is [not] itself evidence of how the public actually views the mark." *Lane Cap. Mgmt.*, 192 F.3d at 345.

In addition to being protectable, a mark protected by the Lanham Act must also be used in a manner sufficient to claim that protection.  *See Gordon Elecs., Inc. v. Katone Corp.*, No. 89 Civ. 2339 (KMW), 1991 WL 8485, at *2 (S.D.N.Y. Jan. 17, 1991) ("It is well settled that trademark rights do not flow from registration, but from the acquisition of common law rights through prior appropriation and use in the market."); *see also B & B Hardware, Inc. v. Hargis Indus., Inc.*, 575 U.S. 138, 142 (2015) ("[F]ederal law does not create trademarks.").  For suggestive, arbitrary, or fanciful marks, which are protectable without proof of secondary meaning, a plaintiff need have used the mark only once in connection with the sale of its goods or services.  *See Blisscraft of Hollywood v. United Plastics Co.*, 294 F.2d 694, 700 (2d Cir. 1961) ("A technical trademark, consisting of a coined or fanciful expression, comes into being as soon as it is affixed to the goods and the goods are sold.").  But for descriptive marks, which require proof of secondary meaning, the plaintiff must show that "[s]econdary meaning [was] acquired by the time the allegedly infringing product came on the market." *RVC Floor Decor, Ltd. v. Floor & Decor Outlets of Am., Inc.*, 527 F. Supp. 3d 305, 317 (E.D.N.Y. 2021) (internal quotation marks omitted); *see also Saratoga Vichy Spring Co. v. Lehman*, 625 F.2d 1037, 1043 (2d Cir. 1980) ("Even if Saratoga Vichy has rights in the name 'Saratoga' because its use of the name has acquired a secondary meaning, it could not prevent the use of that term by one whose use had begun before the secondary meaning was acquired.").

#### ii.        Use in Commerce

Under both Sections 32(1) and 42(a)(1), a defendant, or a third party whose acts the defendant is contributorily or vicariously liable for, must "use in commerce" a mark.  15 U.S.C. § 1114(1); *accord id.* § 1125(a)(1).  Perhaps inaccurately, the Second Circuit has construed this requirement by looking to the definition of "use in commerce" found in 15 U.S.C. § 1127.  *See 1-800 Contacts, Inc. v. WhenU.Com, Inc.*, 414 F.3d 400, 407-08 (2d Cir. 2005) (applying the "use in commerce" definition in 15 U.S.C. § 1127); *see also Rescuecom Corp. v. Google Inc.*, 562 F.3d 123, 131-140 (2d Cir. 2009) (recognizing that *1-800 Contacts* is the law "for this Circuit" but explaining why "Congress did not intend that this definition apply to the sections of the Lanham Act which define infringing conduct"); *Can't Live Without It, LLC v. ETS Express, Inc.*, 287 F. Supp. 3d 400, 415 (S.D.N.Y. 2018) (adhering to *1-800 Contacts* even though it is "plainly apparent from context that Section 1127 does not apply to infringement claims" (internal quotation marks omitted)).  That definition instructs that a mark is used in commerce when (1) "it is placed in any manner on the goods or their containers or the displays associated therewith or on the tags or labels affixed thereto" and (2) "the goods are sold or transported in commerce."  15 U.S.C. § 1127.  So "in determining whether [a] plaintiff[] ha[s] satisfied the 'use in commerce' requirement, we ask whether the trademark has been displayed to consumers in connection with a commercial transaction."  *Kelly-Brown v. Winfrey*, 717 F.3d 295, 306 (2d Cir. 2013).

When a theory of direct liability under Section 32(1) or Section 42(a)(1) is alleged against an individual defendant who acted on behalf of a company, that corporate officer need not have personally displayed the mark to consumers or consummated a sale, but the officer must have at least "play[ed] a significant role in accomplishing" the alleged infringing conduct.  *Steak & Brew, Inc. v. Makris*, No. 15332, 1973 WL 19835, at *2 (D. Conn. Feb. 14, 1973).  "[I]t is well-

established in this Circuit" that this requires the defendant be "a moving, active[,] conscious force" behind the relevant acts. *Chloe v. DesignersImports.com USA, Inc.*, No. 07 Civ. 1791 (CS), 2009 WL 1227927, at *11 (S.D.N.Y. Apr. 30, 2009); *see also Babbit Elecs., Inc. v. Dynascan Corp.*, 38 F.3d 1161, 1184 (11th Cir. 1994) ("[A] corporate officer who directs, controls, ratifies, participates in, or is the moving force behind the infringing activity, is personally liable for such infringement without regard to piercing of the corporate veil.").

Although widely used, the phrase "moving, active, conscious force" is somewhat misleading. For one, not every officer who actively participates in a company's affairs may be liable—rather, "a plaintiff must show that the officer authorized and approved the acts of unfair competition which are the basis of the corporation[']s liability." *Carell v. Shubert Org., Inc.*, 104 F. Supp. 2d 236, 271 (S.D.N.Y. 2000) (internal quotation marks omitted); *see also Steven Madden, Ltd. v. Jasmin Larian, LLC*, No. 18 Civ. 2043 (RWS), 2019 WL 294767, at *4 (S.D.N.Y. Jan. 22, 2019) ("[A] defendant is not considered a 'moving, active, conscious force' if the only allegation made by the plaintiff is that the defendant holds a particular title, without alleging that the defendant authorized or approved any allegedly infringing action."). Additionally, an officer need not actually be aware that he is authorizing acts which violate the Lanham Act in order to be a "conscious" force behind that conduct. *See Bambu Sales, Inc. v. Sultana Crackers, Inc.*, 683 F. Supp. 899, 913-14 (E.D.N.Y. 1988) ("[I]n determining whether the officer's acts render him individually liable, it is immaterial whether he knows that his acts will result in an infringement." (cleaned up)); 87 C.J.S. *Trademarks, Trade Names, and Unfair Competition* § 296 (Dec. 2025 update) ("Actual intent to infringe is not necessary for liability under the Lanham Act, and, therefore, individual liability may be imposed on a corporate officer who had no knowledge of the infringement.").

30

### iii.    Likelihood of Confusion

To prevail on a claim under Section 32(1) or Section 43(a)(1), a plaintiff must show that, as a result of the defendant's conduct, "there is a likelihood of confusion or, in other words, that numerous ordinary prudent purchasers are likely to be misled or confused as to the source of the product in question because of the entrance in the marketplace of defendant's mark." *Gruner*, 991 F.2d at 1077.  Under this test, showing that consumers are likely to be misled demands more than "the mere possibility of confusion." *Tiffany & Co. v. Costco Wholesale Corp.*, 971 F.3d 74, 84 (2d Cir. 2020).  But on the other hand, there may be a likelihood of consumer confusion in cases where such confusion never actually occurs. *See The Sports Auth., Inc. v. Prime Hosp. Corp.*, 89 F.3d 955, 960 (2d Cir. 1996) ("In order to succeed a plaintiff does not have to show necessarily that consumers would believe that the defendant's goods or services are from the same source as those of the plaintiff.").

To assess whether confusion is likely, courts in this Circuit have often looked to the "*Polaroid* factors" identified by Judge Friendly—"the strength of [the plaintiff's] mark, the degree of similarity between the two marks, the [competitive] proximity of the products, the likelihood that the prior owner will bridge the gap [and start selling similar products as the defendant], actual confusion, and the reciprocal of defendant's good faith in adopting its own mark, the quality of defendant's product, and the sophistication of the buyers*." Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492, 495 (2d Cir. 1961).  But no single factor is dispositive, and "additional factors may be considered or initial factors abandoned." *Gruner*, 991 F.2d at 1077.

Although "[a]pplication of a test that relies upon an ordinary consumer's understanding of the impression that a mark conveys" to ordinary consumers would seem to "fall[] comfortably within the ken of a jury," *Hana Fin., Inc. v. Hana Bank*, 574 U.S. 418, 422 (2015), the Second

Circuit is "one of three circuits, along with the Sixth and Federal Circuits, that consider likelihood of confusion to be a question of law," *Car-Freshner Corp. v. Am. Covers, LLC*, 980 F.3d 314, 326 n.4 (2d Cir. 2020); *see also Souza v. Exotic Island Enters., Inc.*, 68 F.4th 99, 109 (2d Cir. 2023) (synthesizing Second Circuit precedent on this issue).  That is because "the determination of whether one of the *Polaroid* factors favors one party or another [often] involves a legal judgment" as to whether proof of certain facts is sufficient.  *Tiffany & Co.*, 971 F.3d at 86.  So "[t]hough likelihood of confusion is frequently a fairly disputed issue of fact on which reasonable minds may differ, the issue is amenable to summary judgment."  *Warner Bros. Inc. v. Am. Broad. Cos., Inc.*, 720 F.2d 231, 246 (2d Cir. 1983) (internal citation omitted).

On the likelihood of confusion issue, the most "open and shut" cases are those in which "a defendant uses an identical mark on competitive goods."  McCarthy, *supra*, at § 23:20 (explaining that such cases "hardly ever find their way into the appellate reports"); *see Stone Creek, Inc. v. Omnia Italian Design, Inc.*, 875 F.3d 426, 429 (9th Cir. 2017) ("Placing an identical mark on identical goods creates a strong likelihood of confusion.").  Courts in this District have explained that "[w]here the [parties'] marks are identical, and the goods are also identical and directly competitive, [a] decision [on likelihood of confusion] can be made directly without a more formal and complete discussion of all of the *Polaroid* factors."  *Topps Co. Inc. v. Gerrit J. Verburg Co.*, No. 96 Civ. 7302 (RWS), 1996 WL 719381, at *6 (S.D.N.Y. Dec. 13, 1996); *cf. Gucci Am., Inc. v. Duty Free Apparel, Ltd.*, 286 F. Supp. 2d 284, 287 (S.D.N.Y. 2003) ("[T]he Court need not undertake a factor-by-factor analysis under *Polaroid* because counterfeits, by their very nature, cause confusion.").

### iv.    Zone of Interests

As discussed above, *see supra* III.A.1.a, an implied requirement for a cause of action under Section 43(a)(1) is that the plaintiff suffered "injuries to business reputation [or] present and future sales" that were "proximately caused by violations of the statute," *Lexmark Int'l*, 572 U.S. at 131-32.  Under the first prong of that test, "the plaintiff must show that it has a valid commercial interest in the mark that may be harmed by the alleged infringement." *JC Hosp. v. Hochberg*, 703 F. Supp. 3d 448, 466 (S.D.N.Y. 2023) (internal quotation marks omitted); *see also Ripple Analytics Inc. v. People Ctr., Inc.*, 153 F.4th 263, 271 (2d Cir. 2025) (finding it insufficient for a plaintiff to show only that it "has been the continuous user of the mark").  And under the second prong, the plaintiff's injury must "flow[] directly" from the defendant's conduct.  *Lexmark Int'l*, 572 U.S. at 133; *see also id.* at 134 ("[W]hile a competitor who is forced out of business by a defendant's false advertising generally will be able to sue for its losses, the same is not true of the competitor's landlord, its electric company, and other commercial parties who suffer merely as a result of the competitor's inability to meet its financial obligations." (cleaned up)).

Although a plaintiff suing under Section 43(a)(1) must show that they are suffering a type of harm within "the zone of interests protected by the law," *Allen*, 468 U.S. at 751, "it is not necessary for [the] plaintiff to plead or prove actual damage or injury in order to state a *prima facie* case of infringement." McCarthy, *supra*, at § 23:1.  That is because liability under Section 43(a)(1) requires only "a *likelihood* of confusion among consumers." *Res. Devs., Inc. v. Statue of Liberty-Ellis Island Found., Inc.*, 926 F.2d 134, 139 (2d Cir. 1991) (emphasis added); *see also Web Printing Controls Co. v. Oxy-Dry Corp.*, 906 F.2d 1202, 1204 (7th Cir. 1990) ("[T]he elements necessary to establish a *violation* of section 43(a) of the Lanham Act do not include any involving actual injury or actual confusion.").

To be sure, "a plaintiff who establishes false advertising in violation of § 43(a) of the Lanham Act will be entitled only to such damages as were caused by the violation." *Burndy Corp. v. Teledyne Indus., Inc.*, 748 F.2d 767, 771 (2d Cir. 1984). But requiring proof of injury caused by the defendant's conduct "confuse[s] the elements necessary to prove a breach of the law with elements necessary to justify a certain remedy for that breach." *Web Printing Controls Co.*, 906 F.2d at 1204. Indeed, there are many Section 43(a)(1) cases where "sales of [the plaintiff's product] have been minimal . . . and there has been little chance for actual confusion." *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 875 (2d Cir. 1986). In such cases, "[i]t would be unfair to penalize [a party] for acting to protect its trademark rights before serious damage has occurred." *Id.*

### b. Analysis

#### i. Section 43(a)(1) (Count Four)

The Court begins its analysis with Count Four of the Second Amended Complaint, in which both Plaintiffs allege false designation of origin in violation of Section 43(a)(1) of the Lanham Act. SAC ¶¶ 468-472. For reasons explained below, the Court concludes that there is no dispute of material fact that (1) Red Rock and Coronado are both within the zone of interests protected by Section 43(a)(1); (2) each of Coronado's trademarks are protected by the Lanham Act; and (3) Defendants' use of the JGX Urbane Label Options created a likelihood of confusion. But as presented, the undisputed facts do not establish that all Defendants "used in commerce" the JGX Urbane Label Options.

Beginning with the zone of interests, Coronado unquestionably may bring suit as the owner of the relevant trademarks. *See* McCarthy, *supra*, at § 32:11 ("[A] plaintiff who alleges that it owns an unregistered trademark and sues for infringement under Lanham Act § 43(a)(1)(A) has

properly alleged its standing under the *Lexmark* test."). Red Rock, too, falls comfortably within the zone of interests. Under the first prong of *Lexmark*, Red Rock's injury flows from the same "valid commercial interest," *JC Hosp.*, 703 F. Supp. 3d at 466, as Coronado's claim—the interest in selling Urbane Hand Sanitizer to stores. *Cf. Bus. Trends Analysts v. Freedonia Grp., Inc.*, 650 F. Supp. 1452, 1458 (S.D.N.Y. 1987) ("[T]he absence of the trademark's 'owner' . . . does not prevent a plaintiff with a concrete interest in protecting the mark from bringing suit."). And under *Lexmark*'s second prong, the injury to Red Rock's future sales was proximately caused by Defendants. Red Rock was solely responsible for the development, distribution, and sale of Urbane Hand Sanitizer, so there is no "'discontinuity' between the injury to the direct victim [(Coronado)] and the injury to the indirect victim [(Red Rock)]." *Lexmark*, 572 U.S. at 140.

Citing to *Lexmark*, Defendants argue that they did not proximately cause any damages resulting from the FDA Import Alert, which was "an extraordinary, unforeseen, and superseding event." JGX Br. at 24; *accord* Dkt. 448 ("Triple Five Br.") at 15. But this argument "confuse[s] the elements necessary to prove a breach of the law with elements necessary to justify a certain remedy for that breach." *Web Printing Controls Co.*, 906 F.2d at 1204. Even if Defendants are correct that they did not cause any injury relating to the FDA Import Alert, that only might limit the extent of the damages that Plaintiffs may recover. It does not show that Plaintiffs are outside "the zone of interests protected by the law," *Allen*, 468 U.S. at 751, or that Plaintiffs are not entitled to other remedies, such as an injunction or an accounting of Defendants' profits.

Additionally, Coronado's word marks for "URBĀNE BATH & BODY" and "URBANE BATH & BODY," and the associated picture mark displayed on bottles of Urbane Hand Sanitizer,

are protected by the Lanham Act.[18]   The word marks are, as a matter of law, suggestive marks because no reasonable juror could dispute that they "suggest (rather than directly describe) the product on which they are employed." *RiseandShine*, 41 F.4th at 121.

"Although the line between descriptive and suggestive may be difficult to discern," *Bristol-Myers Squibb Co.*, 973 F.2d at 1040, the "difference between them lies in the immediacy of association—how quickly and easily consumers grasp the nature of the product from the information conveyed," *Cross Com. Media, Inc. v. Collective, Inc.*, 841 F.3d 155, 162 (2d Cir. 2016).   "A descriptive mark communicates an immediate idea of the ingredients, qualities or characteristics of the goods," so "if the mental leap between the [mark] and the product's attributes is not almost instantaneous, this strongly indicates suggestiveness, not direct descriptiveness." *Id.* (cleaned up).   This distinction explains why, on the one hand, "BLACKCARD" is a descriptive mark for a black-colored credit card, *Am. Exp. Mktg. & Dev. Corp. v. Black Card LLC*, No. 10 Civ. 1605 (DLC), 2011 WL 5825146, at *7 (S.D.N.Y. Nov. 17, 2011), and "Sportscreme" is a descriptive mark for a topical cream made for use in connection with sports, *Thompson Med. Co. v. Pfizer Inc.*, 753 F.2d 208, 217 (2d Cir. 1985), whereas, on the other hand, "Wet Ones" is a suggestive mark for a brand of moist towelettes, *Playtex Prods., Inc. v. Ga.-Pac. Corp.*, 390 F.3d 158, 164 (2d Cir. 2004), and "Orange Crush" is a suggestive mark for an orange-flavored beverage, *Gruner*, 991 F.2d at 1076.   Moist towelettes are, in fact, wet, and orange soda is, in fact, orange, but the implications of those marks are not *immediately* obvious.   "[I]t requires imagination,

---

[18] Although Plaintiffs submit copies of Coronado's trademark registrations as exhibits in support of their summary judgment motion, *see* Hurteau Decl., Exhs. 2-4, it is not clear from those exhibits or any other submission whether the PTO registered Coronado's marks without requiring proof of secondary meaning.   As such, the Court presumes only that Coronado's marks were protectable on the date that each registration was issued. *See Converse*, 909 F.3d at 1117.   In any event, the Court concludes that Coronado's marks are protectable irrespective of the existence, strength, or scope of this presumption of validity.

thought and perception to reach a conclusion as to the nature of goods." *Abercrombie & Fitch Co.*, 537 F.2d at 11 (quoting *Stix Prods., Inc. v. United Merchs. & Mfrs. Inc.*, 295 F. Supp. 479, 488 (S.D.N.Y. 1968)).

Here, too, the "mental leap" between Coronado's word marks (and its associated picture mark) and hand sanitizer is not "almost instantaneous." Defendants maintain, however, that "Urbane" is a self-laudatory mark because "[t]he word 'urbane' means polished, refined, [or] elegant." JGX Br. at 9; *accord* Triple Five Br. at 8. Since "[m]arks that are laudatory . . . are descriptive marks," *Murphy v. Provident Mut. Life Ins. Co. of Phila.*, 923 F.2d 923, 927 (2d Cir. 1990), Defendants reason that Plaintiffs cannot show that Coronado's marks are protected without proof of secondary meaning. *See* JGX Br. at 9-10; Trip Five Br. at 8.[19]

Defendants' argument misunderstands the concept of a "laudatory" mark. The reason that "[m]erely laudatory words, such as 'best', 'outstanding', or 'supreme,'" *Supreme Wine Co. v. Am. Distilling Co.*, 310 F.2d 888, 889 (2d Cir. 1962), are typically considered descriptive marks is because they are often "regarded as a condensed form of describing the character or quality of the goods," *In re Bos. Beer Co. Ltd. P'ship*, 198 F.3d 1370, 1373 (Fed. Cir. 1999) (internal quotation marks omitted). But positive epithets are not descriptive marks if they do not actually convey the "merits of a product." *PaperCutter, Inc. v. Fay's Drug Co.*, 900 F.2d 558, 563 (2d Cir. 1990); *see also Murphy*, 923 F.2d at 927 ("Marks that are laudatory *and that describe the alleged qualities or*

---

[19] Although Coronado's picture mark and its word mark for "URBĀNE BATH & BODY" both place a line above the "A" in Urbane, this distinction does not make a difference. *See Flexitized, Inc. v. Nat'l Flexitized Corp.*, 335 F.2d 774, 780 (2d Cir. 1964) ("That the terms used to comprise a trademark are misspelled . . . or are otherwise so formed or malformed that the mark does not appear in any standard dictionary, will not preclude a finding of invalidity based on descriptiveness."); *Classic Liquor Importers, Ltd. v. Spirits Int'l B.V.*, 201 F. Supp. 3d 428, 443 (S.D.N.Y. 2016) ("ELIT (as a bastardization of ELITE) falls into a category of marks aptly described in the case law as 'self-laudatory' terms.").

*characteristics* of a product or service are descriptive marks." (emphasis added)).  For example, "MAJESTIC" was found to be a suggestive mark for pearls, because although the word "majestic" has a generally positive connotation, it still "leave[s] the consumer to consult his or her imagination to determine what the pearls are like."  *Perfect Pearl Co. v. Majestic Pearl & Stone, Inc.*, 887 F. Supp. 2d 519, 533 (S.D.N.Y. 2012); *see also Alpha Recycling, Inc. v. Crosby*, No. 14 Civ. 5015 (JPO), 2016 WL 1178774, at *4 (S.D.N.Y. Mar. 23, 2016) (concluding, "even if alpha can be used in a laudatory sense," that the word "when used in relation to catalytic converter recycling, is arbitrary and therefore inherently distinctive, and that there is no genuine issue of material fact as to this issue").  Like referring to pearls as "majestic," referring to hand sanitizer as "urbane" "does not convey the qualities of the subject [product] with the immediacy normally associated with a purely descriptive mark."  *Perfect Pearl Co.*, 887 F. Supp. 2d at 533.  After all, it certainly "requires imagination" to grasp what qualities might make hand sanitizer elegant, polished, or refined.  *Abercrombie & Fitch Co.*, 537 F.2d at 11; *cf. Alpha Recycling*, 2016 WL 1178774, at *5 ("[E]ven if alpha can be used in a laudatory sense, it is not used in a laudatory sense when the subject is scrap metal recycling.").

Moreover, the stylization of the words "Urbane Bath & Body" in the Urbane Logo mark are independently protectable.  *See Star Indus.*, 412 F.3d at 382 ("[S]tylized shapes or letters may [be protected without proof of secondary meaning], provided the design is not commonplace but rather unique or unusual in the relevant market.").  That is because "trademark rights in the stylized appearance of a word are distinct from trademark rights in the word itself."  *Time, Inc. v. Petersen Publ'g Co. L.L.C.*, 173 F.3d 113, 119 (2d Cir. 1999).  And here, the Urbane Logo's "typeface, color, and other design elements," *Courtenay Commc'ns Corp. v. Hall*, 334 F.3d 210, 216 (2d Cir. 2003)—namely, its arrangement of text within a box with a white backdrop and an image of a

plant—go beyond the sort of "common basic shapes" that do not qualify for protection, *Star Indus.*, 412 F.3d at 382 (internal quotation marks omitted).  *See also* T.R. Lee, *et al.*, *An Empirical and Consumer Psychology Analysis of Trademark Distinctiveness*, 41 ARIZ. ST. L.J. 1033, 1099 (2009) ("If a descriptive word mark is presented in a spatial placement, size, and style that matches the consumer's schematic mental model of what a product package and brand look like, the word may be perceived as a source indicator even if its semantic meaning is 'merely descriptive.'").

Red Rock also used Coronado's marks in a manner sufficient for those protectable marks to be protected.  Indeed, because Coronado's marks are suggestive, protection occurred at the moment Red Rock first used the marks in connection with its initial hand sanitizer sales to Rigz. *See Blisscraft of Hollywood*, 294 F.2d at 700 ("A technical trademark, consisting of a coined or fanciful expression, comes into being as soon as it is affixed to the goods and the goods are sold.").

Additionally, the Court concludes, as a matter of law, that Defendants' use of the JGX Urbane Label Options created a likelihood of confusion.  *Cf. Souz*a, 68 F.4th at 109 (explaining that "the determination of whether one of the *Polaroid* factors favors one party or another" and the "balancing of those factors" both "involve[] a legal judgment" (internal quotation marks omitted)). On the facts presented here, this issue is "open and shut" because Defendants "use[d] an identical mark on competitive goods."  McCarthy, *supra*, at § 23:20; *see also Topps Co.*, 1996 WL 719381, at *6 ("Where the [parties'] marks are identical, and the goods are also identical and directly competitive, [a] decision [on likelihood of confusion] can be made directly without a more formal and complete discussion of all of the *Polaroid* factors."); *Gucci Am.*, 286 F. Supp. 2d at 287 ("[T]he

Court need not undertake a factor-by-factor analysis under *Polaroid* because counterfeits, by their very nature, cause confusion.").[20]

With regard to the similarity of the marks, Coronado's trademarks protect the exact same words—"Urbane Bath & Body"—which Defendants used on their labels. Defendants respond that their mark was sufficiently distinct because it used a different font and slightly different coloring, *see* JGX Br. at 15, but point to no authority supporting the proposition that a company may appropriate another company's distinctive word mark by simply varying the font or coloring of the letters. To be sure, if a trademark protects only a stylized *picture* of a word—*i.e.*, a logo—and not the word itself, then another company may be able to use a different stylization of that same word without creating a likelihood of confusion. *See, e.g.*, *Star Indus.*, 412 F.3d at 386 ("Bacardi's label displays the Bacardi 'O' design alone against a clear background, whereas Georgi's label displays the Star 'O' alongside a number of other elements and against a white background."); *Gruner*, 991 F.2d at 1078 (explaining that because "the actual trademark registration in this case protects not the name or the word 'parents,' but rather the stylized logo of that name including the unusual form and shape of the letters comprising the word," there was no likelihood of confusion caused by the defendant's logo that had "dissimilar elements" but also used the word "Parent's"). But while a company may use a unique design for an unprotected letter or word, copying multiple

---

[20] To be sure, when Triple Five sold JGX hand sanitizer with Coronado's trademarks, JGX was not "confused" about whether or not the hand sanitizer was somehow affiliated with Coronado. Likewise, Rigz was not "confused" about the fact that it was purchasing illicitly branded hand sanitizer from JGX. But under the Lanham Act, "likelihood of confusion" includes post-sale confusion among those third-parties who believe the knowingly purchased knock-off is genuine. *See Hermes Int'l v. Lederer de Paris Fifth Ave., Inc.*, 219 F.3d 104, 109 (2d Cir. 2000) (explaining that a likelihood of confusion exists "when a sophisticated buyer purchases a knockoff and passes it off to the public as the genuine article, thereby confusing the viewing public and achieving the status of owning the genuine article at a knockoff price"); *Mastercrafters Clock & Radio Co. v. Vacheron & Constantin-LeCoultre Watches, Inc.*, 221 F.2d 464, 466 (2d Cir. 1955) (first recognizing the concept of post-sale confusion).

words of a protected word mark is another matter entirely. *See Car-Freshner*, 980 F.3d at 331 ("[W]e have found no decision where differences in packaging dispelled the similarity of a mark that used two identical words, neither of which is descriptive of the products on which they appear, and the defendant put them, in sequence, in a mark placed on competitive products."); *see also id.* (finding an "extremely unusual" similarity between the plaintiff's mark for "Black Ice" and the defendant's use of "Midnight Black Ice Storm"); *The Sports Auth.*, 89 F.3d at 962 (noting similarity between the plaintiff's mark for "The Sports Authority" and the defendant's use of "Sports Authority Food, Spirits & Sports").

Even assuming it were theoretically possible to use the words "Urbane Bath & Body" without creating a likelihood of confusion, Defendants' slight changes to Coronado's picture mark did not rise to that level. The coloring of the hand sanitizer labels is only marginally different, and the addition of the words "Made in Mexico" on each bottle does not alter the "overall impression" of the products. *Gruner*, 991 F.2d at 1078. In a case such as this, "[t]o find trademark infringement only by exact identity and not where the junior user makes some slight modification would be in effect to reward the cunning infringer and punish only the bumbling one." *Kemp v. Bumble Bee Seafoods, Inc.*, 398 F.3d 1049, 1057 (8th Cir. 2005) (internal quotation marks omitted); *see also Baker v. Master Printers Union of N.J.*, 34 F. Supp. 808, 811 (D.N.J. 1940) ("[F]ew would be stupid enough to make exact copies of another's mark or symbol. It has been well said that the most successful form of copying is to employ enough points of similarity to confuse the public with enough points of difference to confuse the courts.").

The likelihood of confusion here is only reinforced by the fact that Plaintiffs and Defendants used the marks on "directly competitive" products. *Topps Co.*, 1996 WL 719381, at *6. Not only did Red Rock and Defendants each sell hand sanitizer, but they sold hand sanitizer

to the same exact customer—Rigz.  In fact, Rigz directed Defendants to use Coronado's mark precisely so that they could stop purchasing Urbane Hand Sanitizer from Red Rock.  *See* Hurteau Decl., Exh. 16 (4/27/20 Grazi-Carelli email chain) at 2 (Carelli instructing Grazi that the hand sanitizer bottles sold to Rigz should have the "Urbane logo on it").

The more difficult question regarding Plaintiffs' Section 43(a)(1) claim is whether each Defendant actually "used in commerce" the infringing mark.  *See* 15 U.S.C. § 1125(a)(1).  The answer to that question varies by Defendant.

Starting with the easiest, JGX and Triple Five undoubtedly used the JGX Urbane Label Options in commerce.  Even though neither company placed the infringing marks on the hand sanitizer bottles in the first place, Triple Five sold bottles bearing the marks to JGX, which, in turn, sold them to Rigz.  "A defendant's sale of infringing goods suffices to establish direct liability." *Abbott Lab'ys v. Adelphia Supply USA*, No. 15 Civ. 5826 (CBA), 2019 WL 5696148, at *6 (E.D.N.Y. Sept. 30, 2019); *see also El Greco Leather Prods. Co. v. Shoe World, Inc.*, 806 F.2d 392, 396 (2d Cir. 1986) ("Even though Shoe World was involved neither in the manufacture nor the affixing of the CANDIE'S trademark to the shoes, its sale of the shoes was sufficient 'use' for it to be liable for the results of such infringement and its claimed lack of knowledge of its supplier's infringement, even if true, provides no defense.").

The Court also concludes, as a matter of law, that Grazi and David used the infringing marks in commerce.  Based on the undisputed evidence, no reasonable factfinder could doubt that those Defendants personally "authorized and approved the acts of unfair competition which are the basis of the[ir] corporations['] liability."  *Carelli*, 104 F. Supp. 2d at 271 (internal quotation marks omitted).

As Grazi acknowledged, JGX was his company. *See* Grazi Dep. Tr. at 12:13-17 ("Q[:] . . . [W]hen I say 'your company,' your company's name is JGX. Correct? A[:] Yes."). And the undisputed evidence shows that he spearheaded the hand sanitizer operation on JGX's end. Grazi was the person whom Rigz asked if JGX could "source hand sanitizer, Grazi Decl. ¶ 6, and he received Rigz's initial email containing an image of an Urbane Hand Sanitizer bottle, *see* Hurteau Decl., Exh. 13 (4/23/20 email from Carelli to Grazi). Grazi then emailed Rigz a signed purchase order. *See* Hurteau Decl., Exh. 16 (4/27/20 Grazi-Carelli email chain) at 4. And Grazi, on behalf of JGX, "trusted" that Rigz owned the rights to use the Urbane Logo because he had a "long-standing relationship" with Carelli, one of Rigz's Principals. Grazi Dep. Tr. at 58:17-20. Unsurprisingly given these facts, the JGX Defendants' brief in opposition to Plaintiffs' motion for summary judgment does not contest that Grazi used the infringing marks in commerce.

David also indisputably authorized and approved Triple Five's infringement. From the very outset, Triple Five's hand sanitizer business was run by David, with the help of Berkowitz, his "second in command." David Dep. Tr. at 104:5-6; *see also* David Decl. ¶ 2 ("[A] decision was made to use [Triple Five] as the vehicle to conduct [a hand] sanitizer business, and that the business would be run by Berkowitz and I."). David was also the person at Triple Five who first came into contact with Grazi. David Decl. ¶ 3. And by David's own admission, he and Berkowitz jointly decided to sell hand sanitizer to Grazi using the JGX Urbane Label Options. *See id.* ¶¶ 4-5 ("Based on [Grazi's] conversations with Berkowitz and me, the fact that Grazi gave us Urbane labels, and that he had been buying and selling sanitizer with the name Urbane, we believed that he had the right to use the name Urbane on the hand sanitizer . . . Grazi told us that he was using a factory in Mexico, and we decided to use the same factory (Tropicosmeticos). It turned out that we did not need the labels that Grazi gave us, because the factory already had the labels with the name Urbane

on them.").  Thus, even if David did not direct Triple Five's infringement on his own, there is no dispute that he "play[ed] a significant role in accomplishing" it.  *Steak & Brew*, 1973 WL 19835, at *2; *see also Luxottica Grp., S.p.A. v. Airport Mini Mall, LLC*, 932 F.3d 1303, 1317 n.8 (11th Cir. 2019) (concluding that multiple individual defendants "were the moving, active, conscious force[s]" behind the infringement (cleaned up)).

On the other end of the spectrum, based on the evidence presented by the parties, no reasonable juror could hold Dib, Don, Yonah, or Saba individually liable.[21]  Under the Lanham Act, individual liability is based on the principle that a person "cannot shield himself behind a corporation when he is an actual participant in the tort."  *Donsco, Inc. v. Casper Corp.*, 587 F.2d 602, 606 (3d Cir. 1978); *see also Mead Johnson & Co. v. Baby's Formula Service, Inc.*, 402 F.2d 19, 23 (5th Cir. 1968) ("There can be no doubt but that a trademark . . . can be infringed by an individual.").  A corporate officer therefore is liable if he "uses the corporation as an instrument to carry out his own willful and deliberate infringements."  *4SEMO.com Inc. v. S. Illinois Storm Shelters, Inc.*, 939 F.3d 905, 912-13 (7th Cir. 2019) (internal quotation marks omitted). Liability does not reach all employees who somehow had a role in the infringing conduct, however.  "It is not sufficient to show that the individual participated or engaged in some infringing act; the individual must have actively participated as a moving force in the decision to engage in the

---

[21] Plaintiffs do not argue that Defendants are liable as joint tortfeasors.  *See Bauer Lamp Co. v. Shaffer*, 941 F.2d 1165, 1171 (11th Cir. 1991) ("[Because] infringement is a tort, [parties] may be held responsible as joint tort-feasors.").  In any event, "[t]his theory of liability requires a finding that the defendant and the [direct] infringer have an apparent or actual partnership, have authority to bind one another in transactions with third parties or exercise joint ownership or control over the infringing product."  *Hard Rock Cafe Licensing*, 955 F.2d at 1150.  With the possible exception of Berkowitz, no individual Defendant had this kind of relationship with a direct infringer.

infringing acts, or otherwise caused the infringement as a whole to occur." *Edmondson v. Velvet Lifestyles, LLC*, 43 F.4th 1153, 1164 (11th Cir. 2022) (internal quotation marks omitted).

Unlike Grazi and David, Plaintiffs present no evidence allowing a jury to reasonably conclude that Dib, Don, Yonah, or Saba was a "moving force" behind JGX's or Triple Five's infringement. Nor have Plaintiffs presented evidence that any of these four Defendants was even in a position where he conceivably could have used JGX or Triple Five as his "instrument" in accomplishing such infringement.

Plaintiffs argue that "Dib worked alongside Grazi and JGX to initiate the infringing use of the URBANE Brand, including but not limited to working directly on the creation of the Counterfeit Mark." Pls. Br. at 20; *see id.* (referring to a "file that Dib created with the Counterfeit Mark and sent to Grazi"). Yet the record presented to the Court is bereft of any evidence that Dib created a file with the JGX Urbane Label Options.[22] Rather, Dib merely emailed the JGX Urbane Label Options to Grazi, *see* Hurteau Decl., Exh. 18 (4/30/20 email from Dib to Grazi), and also was occasionally included in emails regarding JGX's hand sanitizer business, *see* Hurteau Decl., Exh. 18 (4/30/20 email from Carelli to Grazi and Dib); Hurteau Decl., Exh. 32A (5/18/20 email from Grazi to Nouri and Dib). This evidence shows, at most, that Dib "participated" in JGX's operations as much as any diligent employee would—not that he "authorized and approved the acts . . . which are the basis of [Triple Five's] liability." *Donsco*, 587 F.2d at 606.

Don, meanwhile, provided only "high level" advice to Triple Five. Don Decl. ¶ 8 (explaining that this meant "my door was always open for David or Berkowitz to consult with

---

[22] In fact, Grazi testified that the JGX Urbane Label Options were created by a Chinese designer named "Gigi" who had done "sone some small work for JGX" from time to time. Grazi Dep. Tr. at 55:8-25; *see also id.* at 61:22-62:3 ("Q[:] [I]s it fair to say that you had your designer, that is Gigi, modify the labels so that it could fit onto a bottle? . . . A[:] We had her modify the label.").

me").  No evidence suggests that Don actually directed or authorized any of Triple Five's infringing activities.  Plaintiffs argue that Don managed Triple Five before Berkowitz and David took over, and that the decision to put Berkowitz and David in charge occurred at the May 4, 2020 meeting at Don's house.  Pls. Br. at 9.  But Don's management of Triple Five and the meeting at his house occurred before the Triple Five Defendants became involved in infringing activities.  *See* David Decl. ¶ 3 ("At the time of the meeting in Don'[s] house none of us had ever heard of Urbane hand sanitizer.").  Nor is a dispute of material fact created by evidence that, on one occasion, Don directed that certain wire transfers be made.  *See* Pls. Br. at 9-10.  Even if these wire transfers were made by Triple Five, and even if they were used to pay for the shipment of hand sanitizer to JGX, that would show only that Don had the power to tell others to make wire transfers, not that he authorized—or even knew about—the business activities that those wire transfers supported. [23]

Saba, too, had an indisputably minimal role in Triple Five's hand sanitizer business based on the evidence presented.  To be sure, Saba corresponded about hand sanitizer with David over WhatsApp and was included on emails about hand sanitizer shipments.  *See* Hurteau Decl., Exh. 37 (WhatsApp messages between David and Saba); Hurteau Decl., Exh. 56 (5/13/20 email containing purchase orders); Hurteau Decl., Exh. 59 (6/24/20 email about shipping issues).  And Plaintiffs argue that, at his deposition, Saba did not dispute Grazi's contention on a video that Saba was producing hand sanitizer with Grazi, David, and Berkowitz.  Pls. Br. at 11.  But Plaintiffs present no evidence that would allow a reasonable jury to find that Saba "use[d] the corporation

---

[23] Plaintiffs' only evidence linking Don to wire transfers is the fact that, two days after Don emailed someone saying "please send a wire out for this right away," Hurteau Decl., Exh. 52 (5/18/20 email from Don to Adi Adair), a Triple Five purchase order referenced "hand sanitizer, brand: Urbane," Hurteau Decl., Exh. 53 (5/10/20 purchase order).  A reasonable juror could not conclude from this evidence that Don was responsible for the purchase order in question.  *See also* Don Decl. ¶¶ 8-10 (attesting that the wire transfer was for a separate business to purchase a different brand of hand sanitizer).

as an instrument to carry out his own willful and deliberate infringements," *4SEMO.com*, 939 F.3d at 912-13, or otherwise "authorized and approved" Triple Five's acts, *Donsco*, 587 F.2d at 606.

Plaintiffs' case is weaker still when it comes to Yonah. By Plaintiffs' account, Yonah was responsible "for Triple Five Worldwide's invoices and correspondence related to payment for sales, production, and/or distribution of hand sanitizer." Pls. Br. at 16. At most, this shows that Yonah assisted the other, more senior Triple Five Defendants. No reasonable juror could conclude from these duties that Yonah was calling the shots in a manner that would trigger his liability under Section 43(a)(1).

Of Don, Dib, Saba, and Yonah, however, only Don argues for summary judgment on the basis that Plaintiffs fail to come forward with evidence of his use of the trademarks in commerce. Triple Five Br. at 12-14. Accordingly, the Court grants summary judgment to Don on Plaintiffs' Section 43(a)(1) claim and dismisses Count Four as to him. Because Plaintiffs were not presented with these grounds for granting summary judgment in favor of Dib, Saba, and Yonah on Count Four, the Court will afford Plaintiffs the opportunity to come forward with evidence why their Section 43(a)(1) claim against those Defendants should not be dismissed as well. Thus, Plaintiffs must show cause why Count Four should not be dismissed as to Dib, Saba, and Yonah based on the factual record.

With respect to the remaining two Defendants—Nouri and Berkowitz—factual disputes preclude summary judgment for either side. Plaintiffs argue that Nouri was JGX's "CFO" and was in charge of the logistics of JGX's infringing activities. Pls. Br. at 19-20. That is certainly one interpretation of Nouri's acts of emailing Grazi bills of lading for hand sanitizer shipments, Hurteau Decl., Exh. 27 (5/8/20 email from Nouri to Grazi), checking on the status of shipments, *see generally* Hurteau Decl., Exh. 31 (May 2020 WhatsApp messages about JGX shipments), and

47

arranging for shipments himself, Hurteau Decl., Exh. 30 (Emails about JGX shipments). But reasonable jurors could disagree as to whether Nouri's involvement actually evinces the decision-making capacity needed to give rise to liability under Section 43(a)(1).

The proof is similarly equivocal as to Berkowitz. There is evidence suggesting that Berkowitz was David's "second in command," David Dep. Tr. at 104:5-6, and David has described the decision to sell hand sanitizer with the infringing marks to JGX as one made jointly with Berkowitz, *see* David Decl. ¶¶ 4-5. Depending on whether one credits these accounts, Berkowitz may or may not face liability under Section 43(a)(1).

*    *    *

In sum, the Court grants Plaintiffs' motion for summary judgment and denies Defendants' motions for summary judgment on Count Four as against JGX, Triple Five, Grazi, and David, and finds those Defendants liable for false designation of origin in violation of 15 U.S.C. § 1114(1). The Court further grants the Triple Five Defendants' motion for summary judgment and denies Plaintiffs' motion for summary judgment on Count Four as against Don, and thus dismisses that Count as to him. Finally, the Court denies Defendants' and denies Plaintiffs' motions for summary judgment on Count Four as to Dib, Saba, Yonah, Nouri, and Berkowitz. Plaintiffs are ordered to show cause why their claims against Dib, Saba, and Yonah in Count Four should not be dismissed for the absence of evidence showing their "use in commerce" of the infringed marks.

### ii.    Section 32(1) and Contributory Infringement (Counts Two and Three)

In Count Two, Coronado alleges infringement of a registered trademark against JGX, Grazi, Dib, Nouri, Triple Five, Don, Saba, Berkowitz, David, and Yonah under Section 32(1) of the Lanham Act , SAC 449-460, and, in Count Three, Coronado alleges contributory trademark infringement against JGX, Grazi, Dib, and Nouri, *id.* ¶¶ 461-467. The Court's disposition of these

48

Lanham Act claims differs depending on how the Court resolved the Section 43(a)(1) claims against that Defendant. In one group are JGX, Triple Five, Grazi, and David—the parties that the Court has found liable under Section 43(a)(1). In another group are parties for whom the Court granted Defendants' motions for summary judgment or ordered Plaintiffs to show cause why Count Four should not be dismissed—Don, Dib, Saba, and Yonah. And in the final group are Nouri and Berkowitz, for whom the Court denied Defendants' motions for summary judgment and Plaintiffs' motion for summary judgment.

Starting with the second group—Don, Dib, Saba, and Yonah—the Court grants Don's motion for summary judgment on Count Two and otherwise orders Coronado to show cause why its claims should not be dismissed. After all, if Coronado's claims against these Defendants fail under Section 32(1), they also fail under Section 43(a)(1). *See Invicta Plastics (USA)*, 523 F. Supp. at 622 ("Under both the infringement section of the Lanham Act and the false designation of origin section, the same test is applied to determine whether a particular activity violates the Act." (internal citations omitted)).

Additionally, no reasonable juror could conclude from the evidence presented that Dib is contributorily liable under Count Three. Contributory liability exists when a party either (1) "intentionally induces another" to violate Section 32(a) or Section 43(a)(1); or (2) continues to act in concert with another although he "knows or has reason to know" that they are engaging in infringement. *Inwood Lab'ys*, 456 U.S. at 854. Coronado, however, does not adduce any evidence showing that JGX's infringement was "brought to [the] attention" of Dib. *Tiffany (NJ) Inc. v. eBay Inc.*, 600 F.3d 93, 109 (2d Cir. 2010).

Citing to two decisions discussing *copyright* law, Coronado contends that contributory infringement requires only that a defendant should have known that infringement was occurring.

Pls. Br. at 34-35 (citing *Capitol Recs., LLC v. ReDigi Inc.*, 934 F. Supp. 2d 640 (S.D.N.Y. 2013);

*Arista Recs. LLC v. Usenet.com, Inc.*, 633 F. Supp. 2d 124 (S.D.N.Y. 2009)).  But these cases are

inapposite because "secondary liability for trademark infringement should . . . be more narrowly

drawn than secondary liability for copyright infringement." *Hard Rock Cafe Licensing*, 955 F.2d

at 1150 (citing *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 439 n.19 (1984));

*see Sony Corp. of Am.*, 464 U.S. at 439 n.19 (noting "fundamental differences" between copyright

and trademark law).  To be sure, the Second Circuit has held that contributory liability may apply

if a defendant is "willfully blind," but such a theory of liability requires a defendant to "ha[ve]

reason to suspect that [a third party is] infringing a protected mark." *Tiffany (NJ)*, 600 F.3d at 109.

In such a situation, a defendant "may not shield itself from learning of the particular infringing

transactions by looking the other way."  *Id.*  But this concept has no pertinence here, where

Coronado has produced no evidence suggesting that Dib had reason to suspect that any

infringement was occurring.

Moving next to the first group of Defendants—JGX, Triple Five, Grazi, and David—the

Court orders Coronado to show cause why Counts Two and Three should not be dismissed as

duplicative.  It is a cardinal rule that a "plaintiff seeking compensation for the same injury under

different legal theories is of course only entitled to one recovery," *Indu Craft, Inc. v. Bank of

Baroda*, 47 F.3d 490, 497 (2d Cir. 1995), and Coronado's claims under Sections 32(1) and 43(a)(1)

both seek compensation for the legal injury caused by infringement.  Similarly, contributory and

direct infringement are just two different ways in which a defendant may cause the legal injury of

violating Sections 32(1) and 43(a)(1).  *See Suntree Techs., Inc. v. Ecosense Int'l, Inc.*, 693 F.3d

1338, 1346 (11th Cir. 2012) ("[C]ontributory infringement is a device by which liability for

trademark infringement extends beyond those who actually infringe on the mark of another."

(cleaned up)).  So Coronado must show why there is a sufficient distinction between Count Four, for which the Court has found these four Defendants liable, on the one hand, and Counts Two and Three, on the other.

Turning to the third and final group of Defendants—Nouri and Berkowitz—the Court grants Nouri's motion for summary judgment on Count Three and orders Coronado to show cause why the claims in Count Two should not be dismissed as duplicative.  With regard to Count Three, a reasonable juror might conclude that Nouri authorized JGX's infringement, but no reasonable juror could find that Nouri knew JGX was not authorized to use the JGX Urbane Label Options.  Coronado notes that on May 26, 2020, Nouri sent Grazi an email with the subject line "Coronado Distribution Company, Inc.," advising him to "look them up."  Hurteau Decl., Exh. 34 (5/26/20 email from Nouri to Grazi); *see* Pls. Br. at 35.  But Rigz cancelled the remainder of its orders from JGX before May 14, 2020, *see* Grazi Decl. ¶ 18; Grazi Decl., Exh. 22 (May 2020 email chain between Rigz and JGX), so JGX was not still engaging in infringement when Nouri sent the May 26, 2020 email.  There is thus nothing to suggest that, at the time Nouri used the marks, he was willfully blind to the fact that such use was not authorized.

With regard to Count Two, Coronado's claims against Nouri and Berkowitz appear to be duplicative for similar reasons that its claims in Count Two against JGX, Triple Five, Grazi, and David appear to be.  That is, if Nouri and Berkowitz are found liable under Count Four, Coronado cannot seek a double recovery under Count Two.  "[A] jury should not be confused by being presented with two separate claims, one for § 43(a), the other for registered trademark infringement."  McCarthy, *supra*, at § 27:14; *see also Union Mfg.*, 763 F.2d at 48 ("[W]e doubt that a plaintiff should be entitled to have a jury consider separate claims of trademark infringement and false designation of origin unless he can satisfy the district court that in the circumstances of

51

his particular case a sufficient distinction between the claims exists to warrant submission of both claims.").  Therefore, the Court orders Coronado to show cause why Count Two should not be dismissed as against Nouri and Berkowitz.

### 2.    New York Law

The Court next turns to Plaintiffs' claims pursuant to New York law.  "[U]nder New York state law, a mark owner may maintain a statutory or common law action against a party who engages in unauthorized use of the mark."  *ITC Ltd. v. Punchgini, Inc.*, 482 F.3d 135, 146 (2d Cir. 2007).  Here, in Count Seven, Coronado brings a claim for trademark infringement under New York common law against JGX, Grazi, Dib, Nouri, Triple Five, Don, Saba, Berkowitz, David, and Yonah.  SAC ¶¶ 488-495.  In Count Nine, Coronado brings a claim for unfair competition under New York common law against JGX, Grazi, Dib, and Nouri.  *Id.* ¶¶ 513-518.  And in Count Eleven, Coronado brings a claim for dilution by tarnishment under New York statutory law, NYGBL § 360-l, against JGX, Grazi, Dib, Nouri, Triple Five, Don, Saba, Berkowitz, David, and Yonah.  SAC ¶¶ 524-529.  The Court considers each source of law, before turning to Coronado's specific claims.

### a.    Common Law (Counts Seven and Nine)

### i.    Applicable Law

New York common law recognizes distinct causes of action for trademark infringement and unfair competition.  Historically, in the "'pre-Lanham Act era, 'trademark law' concerned only registered marks," and "only fanciful and arbitrary 'technical trademarks'" could be registered. McCarthy, *supra*, at § 4:4.  But as "the law evolved, the protection provided by an action for trade-mark infringement was supplemented by the formulation of a broader remedy" under New York law—"an action for unfair competition."  *Allied Maint. Corp. v. Allied Mech. Trades, Inc.*, 369

N.E.2d 1162, 1164 (N.Y. 1977). This tort "was intended to protect nontechnical, common-law trade-mark marks [that were] used although not registered as well as trade names." *Id.*

"'Palming off'—that is, the sale of the goods of one manufacturer as those of another— was the first theory of unfair competition endorsed by New York courts." *ITC Ltd. v. Punchgini, Inc.*, 880 N.E.2d 852, 858 (N.Y. 2007) (footnotes omitted). Then, over time, New York courts also recognized the misappropriation theory of unfair competition, which prevents profiting from another company's good will—*i.e.*, "misappropriat[ing] the results of the skill, expenditures and labors of a competitor." *Electrolux Corp. v. Val-Worth, Inc.*, 161 N.E.2d 197, 203 (N.Y. 1959). As the theories of unfair competition expanded, the guiding principle became that, for a plaintiff to state a claim for unfair competition, there must be some "form of commercial immorality." *Metro. Opera Ass'n v. Wagner-Nichols Recorder Corp.*, 101 N.Y.S.2d 483, 492 (Sup. Ct. 1950). Today, this is described as an element of "bad faith." *See Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.*, 58 F.3d 27, 34-35 (2d Cir. 1995) (explaining that under New York common law for unfair competition, "there must be some showing of bad faith").

Eventually, trademark law under New York common law and the Lanham Act liberalized such that plaintiffs can now sue for infringement of unregistered and non-fanciful marks. *See Allied Maint.*, 369 N.E.2d at 1164 n.2. Due to this development, today the "common law doctrine of unfair competition is distinguishable from [the common law of] trademark infringement in that the former does not involve the exclusive right to use a particular[] name symbol or device . . . [but does] require the element of bad faith or intent to deceive on the part of the defendant." *Ivy League Sch., Inc. v. Danick Indus., Inc.*, 999 N.Y.S.2d 797, 797 (Sup. Ct. 2014) (collecting cases).

Despite this relatively clear demarcation, the shifting boundaries of trademark law and unfair competition have ensured that "this area of the law is fraught with ambiguity." *Red Rock*

*III*, 2024 WL 1243325, at *33. Defendants, for their part, argue that bad faith is an element of common law infringement in New York, even though New York state caselaw suggests that bad faith is a requirement only for an unfair competition claim. *See* JGX Br. at 20-21 (citing *Mintable Pte. Ltd. v. Mintology Inc.*, No. 23 Civ. 8215 (LJL), 2024 WL 3454825 (S.D.N.Y. July 18, 2024)); Triple Five Br. at 10-11 (same). Indeed, this approach has been taken by a number of courts. *See, e.g.*, *Lopez v. Nike, Inc.*, No. 20 Civ. 905 (PGG) (JLC), 2021 WL 128574, at *14 (S.D.N.Y. Jan. 14, 2021) ("[T]o succeed on his common law trademark claim, Lopez must demonstrate a likelihood of confusion between the marks and additionally show that [the defendant] acted in bad faith."), *report and recommendation adopted by* 2021 WL 2207451 (S.D.N.Y. Feb. 16, 2021); *SLY Mag., LLC v. Weider Publ'ns L.L.C.*, 529 F. Supp. 2d 425, 442-43 (S.D.N.Y. 2007) (explaining that the plaintiff's claim "for violations of trademark infringement . . . under New York's common law" fails because "the evidence raises no genuine issue of fact as to bad faith"). But it is notable that New York state courts have taken care to distinguish common law trademark and unfair competition claims. *See Ivy League Sch.*, 999 N.Y.S.2d at 797 (describing the differences between the two causes of action); *cf. Capitol Recs., Inc. v. Naxos of Am., Inc.*, 830 N.E.2d 250, 266 (N.Y. 2005) ("[C]auses of action for copyright infringement and unfair competition are not synonymous under New York law.").[24]

---

[24] To be sure, New York courts have said that "the substantive law of trade-marks is merely a portion of the broader law of unfair competition," *Dell Publ'g Co. v. Stanley Publ'ns, Inc.*, 172 N.E.2d 656, 660 (N.Y. 1961), but that does not mean those bodies of law are the same. The reason that courts have said "the common law of trademarks is but a part of the broader law of unfair competition," *Hanover Star Milling Co. v. Metcalf*, 240 U.S. 403, 413 (1916), is because both doctrines originated as a type of action for fraud under early Anglo-American law, *see Singleton v. Bolton*, 99 Eng. Rep. 661 (K.B. 1783) ("[I]f the defendant had sold a medicine of his own under the plaintiff's name or mark, that would be a fraud for which an action would lie."). Between the two, unfair competition was the broader category because it applied regardless of whether the plaintiff's mark was a "technical trademark." *See* Christine Farley, *The Lost Unfair Competition*

Adding further uncertainty, some federal courts have also treated trademark infringement under the Lanham Act the same as trademark infringement under New York common law. *See Tiffany & Co*, 971 F.3d at 91 n.13 ("[L]iability for trademark infringement under New York law mirrors liability under the Lanham Act.").  For the most part, this is a fair characterization, *cf. Allied Maint.*, 369 N.E.2d at 1165 (citing Lanham Act and New York state common law cases interchangeably), but it is not necessarily clear that each requirement created by the Lanham Act is also a requirement under New York law.  *Cf. Inwood Lab'ys*, 456 U.S. at 861 n.2 (White, J., concurring) (explaining that "the purpose of the Lanham Act was to codify" but also to "unify" the common law of trademark infringement).  For instance, the Lanham Act's definition of "use in commerce," 15 U.S.C. § 1127, differed from the prevailing common law rule, which required that a mark be "affixed" to goods, *see Rescuecom*, 562 F.3d at 135 (describing this shift).  It is not clear the extent to which this distinction—or any others—makes a difference under New York law.

### ii.    Analysis

Throughout this case, all parties have proceeded under the assumption that New York common law claims for trademark infringement and unfair competition are synonymous, *see* Pls. Br. at 36-37 (analyzing Counts Seven and Nine together), and that these claims also mirror a claim for trademark infringement under the Lanham Act, *see* JGX Br. at 20 ("Because Plaintiffs' Lanham Act claims are not viable, Plaintiffs' common law claim (Count VII) necessarily fails as well."),

---

*Law*, 110 TRADEMARK RPTR. 739, 746, 752 (2020) ("[T]echnical trademark cases involved a property right protected by trademark law, whereas in unfair competition cases the complainant had no property interest in what was imitated. . . . Unfair competition law offered courts a vehicle for their desire to offer a remedy not in relation to a violation of a right, but in response to 'odious' conduct.").

with the one exception being Defendants' aforementioned argument that claims under New York common law require "bad faith," *see* Triple Five Br. at 10-11; JGX Br. at 20-21.

For reasons just explained, the parties' assumptions about New York common law appear to be misguided. The Court intimated as much when, in resolving Defendants' motions to dismiss Plaintiffs' Second Amended Complaint, the undersigned noted "the complexity of the legal issue" and criticized "the parties' only cursory treatment of [New York common law] in their briefing." *Red Rock III*, 2024 WL 1243325, at *34. Now, almost a year-and-a-half later, the parties fare no better.

As things stand, the Court orders Coronado to show cause why their New York common law claims should not be dismissed as duplicative. In Coronado's own view, the elements of a claim for trademark infringement under the Lanham Act, trademark infringement under New York common law, and unfair competition under New York common law are the same. *See* Pls. Br. at 36-37 (making this argument). But as discussed above, a "plaintiff seeking compensation for the same injury under different legal theories is of course only entitled to one recovery." *Indu Craft*, 47 F.3d at 497. Coronado therefore must "satisfy" this Court "that in the circumstances of [its] particular case a sufficient distinction between the claims exists to warrant submission of both claims [to the jury]." *Union Mfg.*, 763 F.2d at 48.

### b.    Anti-Dilution Statute (Count Eleven)

#### i.    Applicable Law

New York's anti-dilution statute provides:

> Likelihood of injury to business reputation or of dilution of the distinctive quality of a mark or trade name shall be a ground for injunctive relief in cases of infringement of a mark registered or not registered or in cases of unfair competition, notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services.

NYGBL § 360-l.  The law "is grounded on the idea that a trademark can lose its ability to clearly and unmistakably distinguish one source through unauthorized use." *Hormel Foods Corp. v. Jim Henson Prods., Inc.*, 73 F.3d 497, 506 (2d Cir. 1996) (cleaned up).  To that end, it supplements trademark and unfair competition protections by providing "that an injunction may be obtained notwithstanding the absence of competition or confusion." *Allied Maint.*, 369 N.E.2d at 1165.  For example, if a company opened an unauthorized "Tiffany & Co. Movie Theater," under New York's anti-dilution provision "it would be of no significance . . . that Tiffany's Movie Theatre is not a competitor of, nor likely to be confused with Tiffany's Jewelry." *Id.* at 1165-66.

"In order to establish a dilution claim, two elements must be shown: (1) ownership of a distinctive mark, and (2) a likelihood of dilution." *Hormel Foods*, 73 F.3d at 506.  "Distinctiveness for dilution purposes often has been equated with the strength of a mark for infringement purposes," *Mead Data Cent., Inc. v. Toyota Motor Sales, U.S.A., Inc.*, 875 F.2d 1026, 1030 (2d Cir. 1989), but there is a higher degree of distinctiveness required under New York's anti-dilution provision.  "The mark need not be famous or celebrated, but it must be an extremely strong mark." *Kraft Gen. Foods, Inc. v. Allied Old Eng., Inc.*, 831 F. Supp. 123, 134 (S.D.N.Y. 1993) (internal quotation marks omitted).  It is possible that "not even all those [marks] that qualify as arbitrary or fanciful" are protected. *Sally Gee, Inc. v. Myra Hogan, Inc.*, 699 F.2d 621, 625 (2d Cir. 1983); *see, e.g.*, *Allied Maint.*, 369 N.E.2d at 1166 (holding that the mark for "Allied Maintenance" was not "truly distinctive" and thus unprotected by New York's anti-dilution statute); *Mead Data Cent.*, 875 F.2d at 1031 (holding that the mark for "LEXUS" was not "widely enough known" to be protected by New York's anti-dilution statute).[25]

---

[25] In addition to "those trade names which are truly of distinctive quality," New York's anti-dilution statute also protects trademarks "which have acquired a secondary meaning in the

If a mark is sufficiently distinctive, it is often said that a plaintiff may show that there is a likelihood of either of two forms of dilution—"the blurring of a mark's product identification or the tarnishment of the affirmative associations a mark has come to convey." *Mead Data Cent.*, 875 F.2d at 1031. "But the blurring/tarnishment dichotomy does not necessarily represent the full range of uses that can dilute a mark under New York law." *Deere & Co. v. MTD Prods., Inc.*, 41 F.3d 39, 44 (2d Cir. 1994). Properly understood, New York's anti-dilution provision more broadly protects against any "whittling away of an established trade-mark's selling power and value through its unauthorized use by others upon dissimilar products." *Allied Maint.*, 369 N.E.2d at 1164 (internal quotation marks omitted); *see also Shadow Box, Inc. v. Drecq*, 336 N.Y.S.2d 801, 802 (Sup. Ct. 1972) (explaining that New York's anti-dilution law "protects . . . against any use of the symbol that may drain off any of the potency of the mark").

### ii.    Analysis

The Court grants Defendants' motions for summary judgment on Coronado's claims for dilution by tarnishment in Count Eleven because there is no evidence suggesting that Coronado's marks are sufficiently distinctive to be protected by New York's anti-dilution law.[26] To be sure, the Court has concluded that Coronado's marks are suggestive, and thus "inherently distinctive" for purposes of the Lanham Act. *See Two Pesos*, 505 U.S. at 768 ("[Suggestive marks] are deemed

---

mind of the public." *Allied Maint.*, 369 N.E.2d at 1166. Coronado does not contend, however, that its trademarks have acquired secondary meaning.

[26] Defendants also argue that the Court lacks standing to consider Coronado's claim in Count Eleven because their unauthorized use of the marks has ceased. *See* Triple Five Br. at 11; JGX Br. at 22. But it is not "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *United States v. Concentrated Phosphate Exp. Ass'n*, 393 U.S. 199, 203 (1968). Defendants therefore have not discharged "the heavy burden of persuading" the Court that Coronado's claim is moot. *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000) (cleaned up).

inherently distinctive and are entitled to protection."). But the test of distinctiveness under New York's anti-dilution law is more exacting. *See Allied Maint.*, 369 N.E.2d at 1166 (explaining that New York's anti-dilution statute protects "those trade names which are *truly* of distinctive quality" (emphasis added)); *Kraft Gen. Foods*, 831 F. Supp. at 134 (explaining that New York's anti-dilution statute protects only "an *extremely* strong mark" (emphasis added)); *see also W.W.W. Pharm. Co. v. Gillette Co.*, 984 F.2d 567, 572 (2d Cir. 1993) ("[A] finding of suggestiveness does not guarantee a determination that the mark is a strong one."). Without proof of secondary meaning, New York courts have even found arbitrary and fanciful marks to be insufficiently distinctive for purposes of the state's anti-dilution statute. *E.g.*, *Mead Data Cent.*, 875 F.2d at 1031 (holding that the mark for "LEXUS" was not protected by New York's anti-dilution statute); *Bel Paese Sales Co. v. Macri*, 472 N.Y.S.2d 387, 389 (1st Dep't 1984) (reversing lower-court finding that the mark for "Bel Paese" was protected by the anti-dilution statute); *Qedi's Corp. v. 3 Bros. Pizza Cafe, Inc.*, 110 N.Y.S.3d 423, 424 (2d Dep't 2019) (holding that the mark for "Three Brothers" was not protected by the anti-dilution statute); *see also RiseandShine*, 41 F.4th at 121 (explaining that arbitrary and fanciful marks are more distinctive than suggestive marks).

This demanding test for distinctiveness makes sense in light of the limited marginal purpose of an anti-dilution law. Consider the fact that ordinary trademark and unfair competition doctrine already protects a company in those instances when its trade identity is misappropriated by a competitor or in a manner likely to cause confusion—*e.g.*, if Cartier started designing bracelets using Tiffany & Co.'s logo. The unique purpose of anti-dilution law, then, is to protect a company's trade identity even when it is misappropriated by a *non*-competitor in a manner that is *not* likely to cause confusion—*e.g.*, if AMC Theatres started using Tiffany & Co.'s logo to add prestige to the latest box-office flick. *See Allied Maint.*, 369 N.E.2d at 1165. In practice, however,

this second form of misappropriation will only affect a company if its trade identity is *so* distinctive that its use in one industry will "whittl[e] away" its value in another. *Id.* at 1166. That concern is realistic for the strongest marks like Tiffany & Co.—not much weaker marks like "Urbane Bath & Body." Accordingly, the Court grants Defendants' motions for summary judgment on Count Eleven and dismisses that Count.

## B. Remedies

In addition to making arguments relating to liability, the JGX Defendants' and the Triple Five Defendants' summary judgment motions argue that Plaintiffs should be precluded from recovering certain remedies. JGX Br. at 23-27; Triple Five Br. at 14-17. The Court construes these arguments as seeking partial summary judgment on the issue of whether, if Plaintiffs succeed in proving liability, an award of damages would be appropriate,[27] and exercises its discretion to reach this issue in order to "streamline the litigation process by narrowing the triable issues." *D'Iorio v. Winebow, Inc.*, 68 F. Supp. 3d 334, 356 (E.D.N.Y. 2014) (internal quotation marks omitted); *see also* Fed. R. Civ. P. 56(g) ("If the court does not grant all the relief requested by the motion, it may enter an order stating any material fact—including an item of damages or other relief—that is not genuinely in dispute and treating the fact as established in the case.").

---

[27] The Court declines to consider the JGX Defendants' argument that Plaintiffs should not recover attorneys' fees. *See* JGX Br. at 27. Under the Lanham Act, whether a party is entitled to attorneys' fees depends in part on the "manner in which the case was litigated." *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 554 (2014). This litigation is ongoing, so any decision at this stage regarding attorneys' fees would be premature.

Similarly, the Court also declines to consider the JGX Defendants' argument that Plaintiffs should not receive an accounting of Defendants' profits. *See* JGX Br. at 26. "[A]n accounting of profits [is] an equitable remedy" which is decided by the Court. *Gucci Am.*, 768 F.3d at 132 (emphasis omitted). Because "the legal claims involved in [an] action must be determined prior to any final court determination of [any] equitable claims," *Dairy Queen, Inc. v. Wood*, 369 U.S. 469, 479 (1962), ruling on this issue would be premature.

### 1.    Applicable Law

Under the Lanham Act, an award of damages provides a plaintiff "compensation for all injury to [their] business arising from wrongful acts committed" by an infringer, which may include "injury to business standing or good will, loss of business, additional expenses incurred because of the tort and all other elements of injury to the business." *Aladdin Mfg. Co. v. Mantle Lamp Co. of Am.*, 116 F.2d 708, 716 (7th Cir. 1941). Proof of such damages "is governed by the law of damages of tort actions," including the familiar concepts of proximate and direct causation. *Broan Mfg. Co., Inc. v. Associated Distribs., Inc.*, 923 F.2d 1232, 1235 (6th Cir. 1991).

In assessing a plaintiff's right to damages, courts draw "a sharp distinction between proof of the *fact* of damage and proof of the *amount* of damage." *Id.* Whereas "some degree of speculation" is permitted "in computing the *amount* of . . . damages," *Burndy*, 748 F.2d at 771 (emphasis added), the proof that some injury was actually caused by the infringement may not be too "remote and speculative in nature," *Agric. Servs. Ass'n v. Ferry-Morse Seed Co.,* 551 F.2d 1057, 1072 (6th Cir. 1977); *see also Skydive Ariz., Inc. v. Quattrocchi*, 673 F.3d 1105, 1112 (9th Cir. 2012) ("The trier of fact must distinguish between proof of the *fact* of damages and the *amount* of damages because a mark holder is held to a lower standard in proving the exact amount of actual damages.").

To show that infringement actually caused injury, there must be "proof of real and precise actual consumer confusion"—*i.e.*, that consumers were, in fact, misled by the "likelihood of confusion" that a defendant's infringement engendered. *W.W.W. Pharm.*, 984 F.2d at 576 n.6. Such "[a]ctual consumer confusion often is demonstrated through the use of direct evidence, *e.g.*, testimony from members of the buying public, as well as through circumstantial evidence, *e.g.*, consumer surveys or consumer reaction tests." *PPX Enters., Inc. v. Audiofidelity Enters., Inc.*, 818 F.2d 266, 271 (2d Cir. 1987). But this evidence is not invariably necessary. In certain cases,

"common sense" may support the conclusion that consumers were "certainly deceived" without need for "surveys or anecdotal evidence." *Getty Petrol. Corp. v. Island Transp. Corp.*, 878 F.2d 650, 656 (2d Cir. 1989) ("Consumer witnesses or surveys are not a *sine qua non* of proof of actual confusion").

A factfinder also may presume that actual confusion exists if "it is shown that a defendant deliberately engaged in a deceptive commercial practice." *Res. Devs.*, 926 F.2d at 140. In other words, if a plaintiff "demonstrate[s] that [the defendant] set out to intentionally deceive . . . purchasers [of a product]," then "the burden shifts to the defendant to demonstrate the absence of consumer confusion." *Id.*; *see also George Basch Co. v. Blue Coral, Inc.*, 968 F.2d 1532, 1537 (2d Cir. 1992) ("[I]t is well settled that in order for a Lanham Act plaintiff to receive an award of damages the plaintiff must prove either actual consumer confusion or deception resulting from the violation, or that the defendant's actions were intentionally deceptive, thus giving rise to a rebuttable presumption of consumer confusion." (cleaned up)).

## 2.    Analysis

The Court concludes that Plaintiffs have created a genuine dispute of fact as to whether they may recover damages. Coronado's trademarks and the JGX Urbane Label Options are so similar in their appearance that, even absent anecdotal or survey evidence, a jury could reasonably conclude that Defendants' use of the JGX Urbane Label Options created post-sale confusion among consumers. Indeed, the Second Circuit has held that "common sense" may support a finding of actual confusion in a case such as this, where an infringer uses nearly identical marks to sell nearly identical products. *See Getty Petrol.*, 878 F.2d at 656 ("[Because] the non-Getty product was sold to consumers under the Getty trademark without any notice or suggestion to them that it was not Getty gasoline[,] [t]he jury was entitled to use its common sense to reason that purchasers at those stations, who would have no way of knowing the truth, were certainly deceived

by and unaware of the substitution."); *see also PPX Enters.*, 818 F.2d at 272 (noting "several cases involving counterfeit Louis Vuitton products, in which plaintiffs appear to have established entitlement to damages absent an evidentiary showing of actual consumer confusion or deception").

In urging the Court to preclude an award of damages, Defendants argue that Plaintiffs should not be able to recover based on injuries due to the "entirely unforeseen" FDA Import Alert. JGX Br. at 26; *accord* Triple Five Br. at 14-17. But this argument only goes to the *extent* of the damages that Plaintiffs may recover—after all, the "common sense" conclusion that some consumers were confused by identically-labeled hand sanitizer has nothing to do with the FDA Import Alert. At this stage, the Court will not venture to decide particularized disputes about the extent of recovery available.

## IV. Conclusion

For the foregoing reasons, the Court grants Plaintiffs' motion for summary judgment as to liability on Count Four against JGX, Triple Five, David, and Grazi. The Court also grants the Triple Five Defendants' motion for summary judgment on all Counts as to Don. The Court further denies all motions for summary judgment on Count Four as to Nouri and Berkowitz. And the Court orders Plaintiffs to show cause by 12:00 p.m. on January 28, 2026, why their other claims against the JGX Defendants and Triple Five Defendants should not be dismissed.

All other aspects of the parties' motions for summary judgment are denied, including Defendants' request for a ruling that Plaintiffs are not entitled to recover damages.  The Clerk of Court is respectfully directed to close Docket Numbers 446, 452, 463, and 464.

SO ORDERED.

Dated: January 21, 2026
       New York, New York

_____
                JOHN P. CRONAN
            United States District Judge